

Search for Cases by: Select Search Method...

Judicial Links  |  eFiling  |  Help  |  Contact Us  |  Print                                    Logon

20SL-CC05024 - BUSEY BANK V BENJA INCORPORATED ET AL (E-CASE)

| Case Header | Parties & Attorneys | Docket Entries | Charges, Judgments & Sentences | Service Information | Filings Due | Scheduled Hearings & Trials | Civil Judgments | Garnishments/ Execution |

This information is provided as a service and is not considered an official court record.

Sort Date Entries:  ● Descending  ○ Ascending        Display Options:  All Entries

| | |
|---|---|
| 10/09/2020 | **Summ Issd- Circ Pers Serv O/S**<br>Document ID: 20-SMOS-1022, for BENJA INCORPORATED.Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service.<br><br>**Summ Issd- Circ Pers Serv O/S**<br>Document ID: 20-SMOS-1021, for CHAPIN, ANDREW J.Summons Attached in PDF Form for Attorney to Retrieve from Secure Case.Net and Process for Service. |
| 10/06/2020 | **Filing Info Sheet eFiling**<br>      **Filed By:** MICHAEL ALLEN CAMPBELL<br><br>**Motion Special Process Server**<br>Request for Appointment of Process Server.<br>      **Filed By:** MICHAEL ALLEN CAMPBELL<br>      **On Behalf Of:** BUSEY BANK<br><br>**Proposed Order Filed**<br>Order Appointing General Receiver.<br>      **Filed By:** MICHAEL ALLEN CAMPBELL<br><br>**Motion Filed**<br>Verified Expedited Motion for Appointment of General Receiver.<br>      **Filed By:** MICHAEL ALLEN CAMPBELL<br><br>**Affidavit Filed**<br>Affidavit of Howard B Samuels.<br>      **Filed By:** MICHAEL ALLEN CAMPBELL<br><br>**Affidavit Filed**<br>Affidavit of Joe Alouf.<br>      **Filed By:** MICHAEL ALLEN CAMPBELL<br><br>**Pet Filed in Circuit Ct**<br>Verified Petition; Exhibit 1 - Note; Exhibit 2 - Business Loan Agreement Part 1; Exhibit 2 - Business Loan Agreement part 2; Exhibit 3 - Security Agreement; Exhibit 4 - UCC Filing; Exhibit 5 - Chapin Guaranty; Exhibit 6 - Goode Guaranty; Exhibit 7 - Default Letter; Exhibit 8 - Loan Payoff Statement and Transaction History.<br><br>**Judge Assigned** |

Case.net Version 5.14.0.18                    [Return to Top of Page](#)                    Released 09/01/2020

EXHIBIT A

**20SL-CC05024**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

| | | |
|---|---|---|
| **BUSEY BANK, an Illinois banking** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:** |
| | ) | |
| **BENJA INCORPORATED,** | ) | **Division:** |
| **a Delaware corporation,** | ) | |
| <u>Serve</u>:  **Andrew Chapin** | ) | |
| **26 Cragmont Avenue** | ) | |
| **San Francisco, CA 94116** | ) | |
| **and** | ) | |
| | ) | |
| **ANDREW J. CHAPIN,** | ) | |
| <u>Serve at</u>: **26 Cragmont Avenue** | ) | |
| **San Francisco, CA 94116** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>VERIFIED PETITION</u>

COMES NOW Plaintiff, Busey Bank, by and through its undersigned counsel, and for its

causes of action against Defendants Benja Incorporated and Andrew J. Chapin, states as follows:

1.      Filed contemporaneously herewith and in support of Plaintiff's Petition is the

Verification of Michael McElhone, who is a Vice President and Special Assets Officer at the

Bank.  Such Verification from Mr. McElhone verifies the facts and matters set forth herein, and

further authenticates each of the Exhibits identified herein and attached to this Petition.

2.      Also filed contemporaneously herewith and in support of Plaintiff's Petition is the

Affidavit of Joe Alouf, who was the Interim President and Chief Financial Officer of Benja until

his purported termination on October 2, 2020.  The Alouf Affidavit verifies certain additional

Electronically Filed - St. Louis County - October 06, 2020 - 05:19 PM

facts and matters as set forth herein in support of this Petition relating to extensive fraudulent actions committed by Benja by and through Chapin (as defined below).

## Parties

3.     Plaintiff Busey Bank (the "Bank" or "Plaintiff") is an Illinois banking corporation, organized and existing under and by virtue of the laws of the State of Illinois and doing business in St. Louis County, Missouri.

4.     Defendant Benja Incorporated, is a Delaware corporation ("Benja").

5.     Defendant Andrew J. Chapin is an individual residing in San Francisco, California ("Chapin").

## Jurisdiction and Venue

6.     This Court has jurisdiction over the subject matter of this cause of action and the Defendants herein because the Defendants contractually submitted to this Court's jurisdiction and agreed that this Court would be the proper forum for the dispute that is the subject of this action pursuant to a valid and enforceable forum selection clause.

7.     Venue is proper in this Court pursuant to RSMo. §508.010 because none of the Defendants is a resident of Missouri, the Court otherwise has personal jurisdiction over each of the Defendants, and the Defendants contractually agreed to St. Louis County, Missouri as the appropriate venue for the dispute that is the subject of this action.

## General Allegations

8.     On July 16, 2019, Benja executed a Promissory Note in favor of the Bank dated as of July 16, 2019, in the principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by Benja in favor of the Bank in the

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

original principal amount of $3,000,000.00, as further replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by Benja in favor of the Bank in the original principal amount of $5,000,000.00 (collectively, the "Note") evidencing a loan (the "Loan") in the same amounts. A true and accurate copy of Note is attached hereto and incorporated herein by reference as **Exhibit 1**.

9.      The Loan is also evidenced by a Business Loan Agreement (Asset Based) dated July 16, 2019, executed by Benja and the Bank, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by Benja in favor of Bank in the original principal amount of $3,000,000.00, as replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by Benja in favor of Bank in the original principal amount of $5,000,000.00 (collectively, the "BLA").  A true and accurate copy of the BLA is attached hereto and incorporated herein by reference as **Exhibit 2**.

10.     The Note is secured by a Commercial Security Agreement dated July 16, 2019 (the "Security Agreement") executed by Benja in favor of the Bank. Under the Security Agreement, and as security for the Loan, Benja granted to the Bank a security interest in the Collateral (as defined and as more particularly described therein), including, but not limited to, all of Benja's inventory, equipment, accounts, chattel paper, instruments, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles, and all proceeds, additions, substitutions, and replacements thereof. A true and accurate copy of the Security Agreement is attached hereto and incorporated herein by reference as **Exhibit 3**.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

11.    To perfect the security interest arising under the Security Agreement, the Bank caused a UCC Financing Statement to be filed on July 19, 2019, with the Delaware Department of State as File Number 20195005348 (the "UCC Filing" and, together with the Security Agreement, the "Security Documents"), with respect to all assets and property of Benja as described therein. A true and accurate copy of the UCC Filing is attached hereto and incorporated herein by reference as **Exhibit 4**.

12.    Benja maintains a deposit account number XXXXX4766 at the Bank that is and has been used by Benja in connection its business. (The foregoing account, and any other accounts of Benja at the Bank, are collectively referred to herein as the "Deposit Account"). The Bank funded the Loan by depositing monies directly into the Deposit Account.  The Deposit Account and the funds on deposit therein are part of the Collateral securing the Loan.

13.    The Note is also secured by a Commercial Guaranty executed by Chapin on or about July 16, 2019 (the "Chapin Guaranty").  A true and accurate copy of the Chapin Guaranty is attached hereto and incorporated herein by reference as **Exhibit 5**.

14.    The Note is also secured by a Commercial Guaranty executed by Thomas L. Goode III ("Goode") on or about July 16, 2019 (the "Goode Guaranty" and, together with the Chapin Guaranty, the "Guarantees").  A true and accurate copy of the Goode Guaranty is attached hereto and incorporated herein by reference as **Exhibit 6**.

15.    The Note, BLA, Guarantees, Security Agreement, the UCC Filing, and all other agreements, instruments, and documents evidencing, securing, or otherwise relating to the Loan are collectively referred to herein as the "Loan Documents."  Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

16.     Pursuant to a letter dated September 29, 2020 (the "Default Letter"), the Bank notified Benja and the Guarantors of various Events of Default under the Loan Documents and reserved all rights and remedies on account thereof under the Loan Documents, at law or in equity.  As reflected in the Default Letter, the outstanding Events of Default include, without limitation, that Benja violated the BLA and Security Agreement in the following respects:

a.     Benja borrowed money from First Corporate Solutions and E-Revshare Core, LLC, and in connection therewith granted security interests to those lenders in assets of Benja.

b.     Benja allowed certain state tax liens in favor of the California Employment Development Department to be recorded against Benja and its assets on or about January 14, 2020, and March 9, 2020.

c.     Benja allowed a judgment in favor of Peter A. Manderino to be recorded against Benja and its assets on or about October 30, 2018.

d.     Additionally, as reflected in the Default Letter, Goode contends that he did not execute and/or is not bound by the Goode Guaranty.  Although the Bank disputes this contention, if it is ultimately determined that Goode did not execute and/or is not bound by the Goode Guaranty, Benja violated the BLA, which required the execution of the Goode Guaranty as a condition to the Bank making the Loan.[1]

---

[1] The Bank is currently investigating the issues raised by Goode with respect to the execution and enforceability of the Goode Guaranty, and therefore has elected not to name Goode as a defendant herein or seek to enforce the Goode Guaranty against him at this time.  By not naming Goode as a defendant herein, the Bank has not waived, and hereby preserves, all of its rights, claims and causes of action against Goode pursuant to the Goode Guaranty and otherwise.

74952835.6

5

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

       e.      Finally, as reflected in the Default Letter, Benja violated the BLA by maintaining an operating account at JPMorgan Chase Bank, and not with the Bank, as the BLA requires that Benja maintain the Bank as its primary depository and cash management services institution.

A true and accurate copy of the Default Letter is attached hereto and incorporated herein by reference as **Exhibit 7**.

17.      As of October 1, 2020, the total balance due under the Note, exclusive of applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by the Bank, is as follows:

| | |
|---|---|
| Principal: | $4,999,999.50 |
| Regular Interest: | $   26,656.53 |
| **Total:** | **$5,026,656.03** |

18.      Additionally, interest continues to accrue under the Note from and after October 1, 2020.

19.      True and accurate copies of a Loan Payoff Statement showing the balance due under the Note and a transactional history of the Loan are attached hereto and incorporated herein by reference as **Exhibit 8**.

### Count I
### BREACH OF CONTRACT
### PROMISSORY NOTE
### BENJA INCORPORATED

COMES NOW Plaintiff, Busey Bank, by and through its undersigned counsel, and for its cause of action in Count I against Defendant Benja Incorporated, states as follows:

20.      Plaintiff realleges each and every allegation contained in the foregoing paragraphs above, as though fully set forth herein.

74952835.6

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

21.     Defendant Benja is in default under the terms and conditions of the Note and the other Loan Documents.

22.     The Loan Documents provide that, upon default, the Bank may, among other things, accelerate and declare the entire unpaid principal balance and all unpaid interest immediately due and payable, without notice.

23.     The Note and the other Loan Documents also provide that Benja shall pay all costs of collection in the event of default, including the costs, expenses and attorneys' fees incurred by the Bank.

24.     The Bank hereby exercises its option to declare all unpaid indebtedness under the Note immediately due and payable.

25.     As of October 1, 2020, the total balance due under the Note (exclusive of costs, expenses and attorneys' fees incurred by the Bank) is as follows:

| | |
|---|---|
| Principal: | $4,999,999.50 |
| Regular Interest: | $    26,656.53 |
| **Total:** | **$5,026,656.03** |

26.     Additionally, interest continues to accrue under the Note from and after October 1, 2020 at the rate of $577.26 per day.

27.     Further, there are due and owing under the Note all costs, expenses and attorneys' incurred by the Bank in seeking to recover on the Note.

28.     The Bank has performed all conditions precedent to enforcement of the Note and the other Loan Documents.

29.     As a direct and proximate result of Defendant Benja's failure and refusal to pay the balance due under the Note, the Bank has been damaged in the total sum of $5,026,656.03 as

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

of October 1, 2020, together with all interest accruing after that date, all applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by the Bank in seeking to recover on the Note.

WHEREFORE, Plaintiff prays this honorable Court for a judgment against Defendant Benja on the Note in the total sum of $5,026,656.03 as of October 1, 2020, consisting of the principal balance of $4,999,999.50 and regular interest due through October 1, 2020 in the amount of $26,656.53, together with all applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by the Bank in seeking to recover on the Note at the time of entry of judgment herein, and for such other and further relief as the Court deems just and proper.

<div align="center">

**Count II**
BREACH OF COMMERCIAL GUARANTY – ANDREW J. CHAPIN

</div>

COMES NOW Busey Bank, by and through its undersigned counsel, and for its cause of action in Count II against Defendant Andrew J. Chapin, states as follows:

30.    Plaintiff re-alleges and incorporates all of the foregoing paragraphs above, as though fully set forth herein.

31.    Chapin executed and delivered the Chapin Guaranty to the Bank, under which he absolutely and unconditionally guaranteed the full and prompt payment to the Bank of the amounts due under the Note.

32.    In reliance on the Chapin Guaranty, the Bank agreed to loan money and otherwise extended credit to Benja, as evidenced by the Note.

33.    The Note is in default, and Chapin is liable to pay the Bank the full balance due under the Note, and his failure to do so is and shall be a breach of the Chapin Guaranty.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

34.     The Chapin Guaranty also provides that Chapin agreed to pay upon demand all of the Bank's costs and expenses, including the Bank's attorneys' fees and legal expenses, incurred in connection with the enforcement of the Chapin Guaranty.

35.     The entire balance of all principal, regular and default interest, late charges, attorneys' fees and legal expenses, and other sums owing under the Note is due and payable at this time.

36.     The failure of Chapin to pay the entire indebtedness has damaged the Bank.

37.     The Bank has performed all conditions precedent to enforcement of the Chapin Guaranty.

38.     As of October 1, 2020, the total balance due under the Note (exclusive of costs, expenses and attorneys' fees incurred by the Bank) and due under the Chapin Guaranty is as follows:

| | |
|---|---|
| Principal: | $4,999,999.50 |
| Regular Interest: | $    26,656.53 |
| **Total:** | **$5,026,656.03** |

39.     Further, there are due and owing under the Chapin Guaranty all costs, expenses and attorneys' fees incurred by the Bank in seeking to recover on the Chapin Guaranty.

40.     As a direct and proximate result of Defendant Chapin's failure and refusal to pay the balance due under the Note pursuant to the Chapin Guaranty, the Bank has been damaged in the total sum of $5,026,656.03 as of October 1, 2020, together with all interest accruing after that date, all applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by the Bank in seeking to recover on the Note.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

WHEREFORE, Plaintiff prays this honorable Court for a judgment against Defendant Chapin on the Chapin Guaranty in the total sum of $5,026,656.03 as of October 1, 2020, consisting of the principal balance of $4,999,999.50 and interest due through October 1, 2020 in the amount of $26,656.53, together with all applicable late charges, default interest, and costs, expenses and attorneys' fees incurred in seeking to recover on the Chapin Guaranty at the time of entry of judgment herein, and for such other and further relief as the Court deems just and proper.

<u>**Count III**</u>
<u>APPOINTMENT OF RECEIVER</u>

COMES NOW Plaintiff, Busey Bank, by and through its undersigned counsel, and for its cause of action in Count III for appointment of a Receiver, states as follows:

41.     Plaintiff realleges each and every allegation contained in all of the foregoing paragraphs above, as though fully set forth herein.

42.     As set forth above, the Note and Loan are secured by the Security Documents under which Benja granted the Bank security interests in the Collateral.

43.     Based on the outstanding Events of Default, the Bank has exercised its option to declare all unpaid indebtedness under the Note immediately due and payable.

44.     The Bank also exercised its option to make an application to the Court for an appointment of a Receiver over Benja for the benefit of the Bank, and to take possession of the Collateral, with the power to manage, receive, collect, and apply all income and revenues with respect to Benja and the Collateral.

45.     This Court is empowered to appoint a receiver pursuant to RSMo. §515.500 et seq., known as the Missouri Commercial Receivership Act (the "<u>Receivership Act</u>") and

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Missouri Supreme Court Rule 68.02.

46.    Section 515.510.1 of the Receivership Act provides in relevant part that:

(T)he court, or any judge thereof on vacation, shall have the power to appoint a receiver, whenever such appointment shall be deemed necessary, whose duty it shall be to keep and preserve any moneys or other thing deposited in court, or that may be subject of a tender, and to keep and preserve all property and protect any business or business interest entrusted to the receiver pending any legal or equitable action concerning the same, subject to the order of the court, including in the following instances:

· · ·

(2)  In an action in which the person seeking appointment of a receiver has a lien on or interest in property or its revenue-producing potential, and either:

(a)  The appointment of a receiver with respect to the property or its revenue-producing potential is necessary to keep and preserve the property or its revenue-producing potential or to protect any business or business interest concerning the property or its revenue-producing potential; or

(b)  The appointment of a receiver with respect to the property or its revenue-producing potential is provided for by a valid and enforceable contract or contract provision;

· · ·

(9)  In an action against any entity if that person is insolvent or is not generally paying the entity's debts as those debts become due unless they are the subject of bona fide dispute;

· · ·

(12)  Pursuant to the terms of a valid and enforceable contract or contract provision providing for the appointment of a receiver, other than pursuant to a contract or contract provision providing for the appointment of a receiver with respect to the primary residence of a debtor who is a natural person;

· · ·

(14)  To prevent irreparable injury to the person or persons requesting the appointment of a receiver with respect to the debtor's property.

47.    Additionally, Missouri Supreme Court Rule 68.02 states that:

74952835.6                                    11

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Whenever in a pending legal or equitable proceeding it appears to the court that a receiver is necessary to keep, preserve and protect any business, business interest or property, including money or other thing deposited in court or the subject of a tender, the court, or any judge thereof in vacation, may appoint a receiver whose duty it shall be to keep, preserve and protect, to the extent and in the manner that the court may direct, that which the receiver is ordered to take into the receiver's charge.

48.     The Security Agreement provides the Bank with the right to appoint a receiver in the event of a default.  In relevant part, the Security Agreement provides:

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

49.     The Security Agreement provides that the receiver may serve without bond if permitted by law.

50.     A receiver is just and necessary to keep and preserve the Bank's business interest in Benja and security interests in the Collateral, and to prevent irreparably injury to the Bank, for the following reasons:

a.     Benja and the Guarantors are in extensive default under the Loan Documents, and such defaults remain outstanding despite notice;

b.     Benja contractually agreed to the appointment of a receiver in the event of default pursuant to the Security Agreement;

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

c.      Chapin has engaged, and has caused Benja to engage, in an extensive pattern of malfeasance and fraud as set forth in the Affidavit of Joe Alouf, the extent of which requires an investigation by the receiver;

d.      After such investigation, it may be necessary for the receiver to assert and maintain claims and causes of action on behalf of Benja that arose as a result of Chapin's actions;

e.      It is necessary that a receiver take control of the revenues and income generated by Benja, preserve such income and revenues, pay ongoing expenses associated with the business, and pay the Bank the sums owed under the Note;

f.      Federal and state income, payroll, sales, personal property, and similar tax returns may need to be executed and filed with respect to Benja, and the appointment of a receiver will help to assure that such tax returns are filed and every effort is made to pay such taxes;

g.      The only source of repayment of the Note is from the recovery of the Collateral, including the recovery upon potential claims and causes of action, and a receiver is necessary to pursue and recover the Collateral in order to satisfy the balance due under the Note;

h.      The Bank lacks other good and sufficient security from Benja or the Guarantors to further secure the Note; and

i.      The Bank has a vested interest in making sure that Benja and the Collateral is not subject to waste, diversion, or diminution, whereby it may incur irreparable injury.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

51.     The Bank has no adequate remedy at law (other than under RSMo. §§ 515.500 et seq. and Missouri Supreme Court Rule 68.02) and is in need of this Court's Order Appointing a Receiver to protect its interests in Benja and the Collateral and to keep, preserve, and maintain Benja and the Collateral.

52.     Without the appointment of a receiver to take control of, collect, manage, and liquidate Benja and the Collateral, and to enforce all rights of the Bank in Benja and the Collateral, the Bank and others will suffer irreparable injury and loss.

53.     The appointment of a receiver pursuant to the Receivership Act and Missouri Supreme Court Rule 68.02 is appropriate for the foregoing purposes, with the power to take all actions of a receiver as defined in the Receivership Act and as permitted by the Security Agreement, and with the enumerated powers set forth below.

54.     The Bank reserves the right, pursuant to the Security Documents to pursue any and all other remedies with respect to the Note described above, which may be available to the Bank pursuant to the Loan Documents or applicable law.

55.     The Bank seeks the appointment of Howard B. Samuels of Rally Capital Services, LLC as a general receiver (the "Receiver") pursuant to §515.515 of the Receivership Act. Section 515.515 provides in relevant part as follows:

> A receiver shall be a general receiver if the receiver is appointed to take possession and control of all or substantially all of a debtor's property and provided the power to liquidate such property.

56.     The proposed Receiver is suitable and capable, with extensive knowledge and expertise in the management of a business and collateral of this nature, as well as the pursuit of litigation claims that will likely be at issue.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

57.     The Affidavit of Howard B. Samuels in support of the appointment of the Receiver has been filed contemporaneously herewith and is incorporated herein by reference. Attached to such Affidavit are the qualifications of the Receiver and the proposed hourly rates to be charged by the Receiver in this case.

WHEREFORE, Plaintiff prays this honorable Court enter an order and judgment:

A.      Appointing Howard B. Samuels of Rally Capital Services, LLC as general Receiver for the following interests, including all income, revenues and proceeds of the same:

      1.      Benja and all of its business, operations and assets;

      2.      The Deposit Account;

      3.      All other accounts of Benja; and

      4.      All other Collateral identified in the Security Documents for the purpose of assembling and administering the Collateral and the proceeds thereof identified therein;

B.      Granting to such Receiver all rights, powers and authority as more fully set forth in the proposed Order Appointing General Receiver filed contemporaneously herewith; and

C.      Granting such other and further relief as the Court deems just and proper.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

POLSINELLI PC


By: /s/ Michael A. Campbell
    MICHAEL A. CAMPBELL (#35392)
    mcampbell@polsinelli.com
    NICHOLAS A. GRIEBEL (#69104)
    ngriebel@polsinelli.com
    100 South Fourth Street, Suite 1000
    St. Louis, Missouri 63102
    (314) 889-8000

    JERRY L. SWITZER, JR. (*pro hac pending*)
    jswitzer@polsinelli.com
    150 North Riverside Plaza, Suite 3000
    Chicago, Illinois 60606
    (312) 873-3626


*ATTORNEYS FOR PLAINTIFF*
*BUSEY BANK*

74952835.6

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**VERIFICATION**

STATE OF MISSOURI     )
                              )
COUNTY OF ST. LOUIS    )

I certify under PENALTY OF PERJURY under the laws of the State of Missouri that the foregoing paragraph is true and correct.

_____
Michael McElhone
Vice President and Special Assets Officer
Busey Bank

Before me, the undersigned authority, on this day personally appeared Michael McElhone, who, being by me duly sworn, upon his oath, deposed and stated that he is a Vice President and Special Assets Officer of Busey Bank, and certifies that the statements set forth in this Petition are true and correct, except as to matters therein stated to be on information and belief, and to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

WITNESS my hand and official seal.

_____
Notary Public

My Commission Expires: 04/29/2023

KAJAL TAYLOR
Notary Public - Notary Seal
State of Missouri
Commissioned for St. Louis County
My Commission Expires: April 29, 2023
Commission Number: 19402167

74952835.5

1

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 1

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**ORIGINAL**

*0006706741601086S#########095507162019*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 67067416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

**Borrower:**  Benja Incorporated
845 Market Street 450A
San Francisco, CA  94103

**Lender:**  BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO  63141

---

**Principal Amount:  $1,000,000.00**                                              **Date of Note:  July 16, 2019**

**PROMISE TO PAY.**  Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of One Million & 00/100 Dollars ($1,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance.  Interest shall be calculated from the date of each advance until repayment of each advance.

**PAYMENT.**  Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on July 15, 2020.  In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 16, 2019, with all subsequent interest payments to be due on the same day of each month after that.  Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs.  Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**VARIABLE INTEREST RATE.**  The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the one month London Interbank Offered rate as published in the Money Rates section of the Wall Street Journal (or such other rate that is widely recognized as the successor to the London interbank offered rate, as published by the Wall Street Journal or another comparable service determined by Lender in its sole discretion, for the purpose of displaying the rates at which U.S. Dollars deposits are offered by leading banks in the London interbank deposit market or, if no such widely recognized successor rate exists at such time, such other rate as published by the Wall Street Journal or another comparable service that reflects an alternative index rate designated by Lender in its sole discretion); provided that in no event shall such rate be less than 0.00% (the "Index").  The Index is not necessarily the lowest rate charged by Lender on its loans.  If the Index becomes unavailable during the term of this loan, Lender may designate a substitute index after notifying Borrower. Lender will tell Borrower the current Index rate upon Borrower's request.  The interest rate change will not occur more often than each month on anniversary date of note.  Borrower understands that Lender may make loans based on other rates as well.  **The Index currently is 2.379% per annum.**  Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 3.000 percentage points over the Index, resulting in an initial rate of 5.379%.  NOTICE:  Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD.**  Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding.  All interest payable under this Note is computed using this method.  This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT.**  Borrower agrees that all loan fees and other prepaid finance charges are earned fully as of the date of the loan and will not be subject to refund upon early payment (whether voluntary or as a result of default), except as otherwise required by law.  Except for the foregoing, Borrower may pay without penalty all or a portion of the amount owed earlier than it is due.  Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest.  Rather, early payments will reduce the principal balance due.  Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language.  If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender.  **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to:  Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL  61820.**

**LATE CHARGE.**  If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.**  Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin").  The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default.  However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.**  Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.**  Borrower fails to make any payment when due under this Note.

**Other Defaults.**  Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.**  Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.**  Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false

**PROMISSORY NOTE**
**(Continued)**

Loan No: 10865                                                                                                                    Page 2

or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President & CEO of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56 (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**PROMISSORY NOTE**
**(Continued)**

Loan No: 10865                                                                 Page 3

endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT.  TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

JURY WAIVER.  Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:


BENJA INCORPORATED

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - MO  C:\CFI\KINCF7\LPL\D20.FC  TR-92597  PR-526

ORIGINAL

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

*6706744910865%########%0955%02282020*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,000,000.00 | 02-28-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

**Principal Amount: $3,000,000.00** **Date of Note: February 28, 2020**

**PROMISE TO PAY. Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million & 00/100 Dollars ($3,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on February 27, 2021. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning March 28, 2020, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the one month London interbank offered rate as published in the Money Rates section of the Wall Street Journal (or such other rate that is widely recognized as the successor to the London interbank offered rate, as published by the Wall Street Journal or another comparable service determined by Lender in its sole discretion, for the purpose of displaying the rates at which U.S. Dollars deposits are offered by leading banks in the London interbank deposit market or, if no such widely recognized successor rate exists at such time, such other rate as published by the Wall Street Journal or another comparable service that reflects an alternative index rate designated by Lender in its sole discretion); provided that in no event shall such rate be less than 0.00% (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on anniversary date of note. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 1.647% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 4.000 percentage points over the Index (the "Margin"), resulting in an initial rate of 5.647%. If Lender determines, in its sole discretion, that the Index has become unavailable or unreliable, either temporarily, indefinitely, or permanently, during the term of this Note, Lender may amend this Note by designating a substantially similar substitute index. Lender may also amend and adjust the Margin to accompany the substitute index. The change to the Margin may be a positive or negative value, or zero. In making these amendments, Lender may take into consideration any then-prevailing market convention for selecting a substitute index and margin for the specific Index that is unavailable or unreliable. Such an amendment to the terms of this Note will become effective and bind Borrower 10 business days after Lender gives written notice to Borrower without any action or consent of the Borrower. NOTICE: Under no circumstances will the interest rate on this Note be more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL 61820.**

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**PROMISSORY NOTE**

Loan No: 6706744910865                    **(Continued)**                    Page 2

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change In Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: **Andrew J. Chapin, President/Secretary of Benja Incorporated, and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.** Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56) (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**PRIOR NOTE.** This Note represents a renewal, extension and modification of that Promissory Note dated July 16, 2019 of Borrower payable to Lender in the maximum principal amount of $1,000,000.00 (the "Prior Note"). This Note does not constitute a novation, payment and reborrowing, or termination of any of Borrower's obligations under the Prior Note and Borrower's obligations under the Prior Note are in all respects continuing (as renewed, extended and modified by this Note).

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**PROMISSORY NOTE**
**(Continued)**

Loan No: 6706744910865                                                                                         Page 3

**SUCCESSOR INTERESTS.**  The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.**  If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor.  Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT.  TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**JURY WAIVER.**  Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

**PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS.  BORROWER AGREES TO THE TERMS OF THE NOTE.**

**BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.**

**BORROWER:**

BENJA INCORPORATED

By: _____
    Andrew  J.  Chapin,  President/Secretary  of  Benja
    Incorporated

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

*6706744910865%#########%0955%08202020*

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $5,000,000.00 | 08-20-2020 | 02-27-2021 | 6706744910865 | 130 | | *** | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CLAYTON
175 CARONDELET PLAZA
CLAYTON, MO 63105

**Principal Amount: $5,000,000.00** **Date of Note: August 20, 2020**

**PROMISE TO PAY. Benja Incorporated ("Borrower") promises to pay to BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender"), or order, in lawful money of the United States of America, the principal amount of Five Million & 00/100 Dollars ($5,000,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance. Interest shall be calculated from the date of each advance until repayment of each advance.**

**PAYMENT. Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on February 27, 2021. In addition, Borrower will pay regular monthly payments of all accrued unpaid interest due as of each payment date, beginning August 28, 2020, with all subsequent interest payments to be due on the same day of each month after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; then to any late charges; and then to any unpaid collection costs. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.**

**VARIABLE INTEREST RATE.** The interest rate on this Note is subject to change from time to time based on changes in an independent index which is the rate of interest specified as the London interbank offered rate for a one-month period in the "Money Rates" section of The Wall Street Journal or its successors or another comparable service determined by Lender in its sole discretion (the "Index"). The Index is not necessarily the lowest rate charged by Lender on its loans. Lender will tell Borrower the current Index rate upon Borrower's request. The interest rate change will not occur more often than each month on the same day as the date of this note. Borrower understands that Lender may make loans based on other rates as well. **The Index currently is 0.152% per annum.** Interest on the unpaid principal balance of this Note will be calculated as described in the "INTEREST CALCULATION METHOD" paragraph using a rate of 4.000 percentage points over the Index (the "Margin"), adjusted if necessary for any minimum and maximum rate limitations described below, resulting in an initial rate of 4.152%. Notwithstanding anything herein to the contrary, in the event that Lender, in its sole judgment, determines that (a) the Index is permanently or indefinitely unavailable or unascertainable, or the Index administrator or its successor has ceased or will cease publishing the Index, permanently or indefinitely, (b) the Index is determined to be no longer representative by the regulatory supervisor of the Index administrator or its successor, (c) the Index can no longer be lawfully relied upon in contracts of this nature by one or both of the parties, (d) the Index does not accurately or fairly reflect the cost of making or maintaining the type of loans under this Note, or (e) U.S. dollar-denominated credit facilities are being executed or amended, as applicable, to incorporate or adopt a new benchmark interest rate to replace the Index, then, at the election of Lender, all references to the Index herein will instead be to a replacement index determined by Lender in its sole judgment, including any adjustment to the replacement index to reflect a different credit spread, term or other mathematical adjustment deemed necessary by Lender in its sole judgment. Lender will provide reasonable notice to Borrower of such replacement rate and the date on which it will become effective. In no event shall the Index or any replacement index be less than 0.00%. Lender's determination of the Index or any replacement rate shall be conclusive, absent manifest error.
NOTICE: Under no circumstances will the interest rate on this Note be less than 3.500% per annum or more than the maximum rate allowed by applicable law.

**INTEREST CALCULATION METHOD. Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.**

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. **All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Chief Credit Officer, Busey Bank, 100 W. University Ave. Champaign, IL 61820.**

**LATE CHARGE.** If a payment is more than 10 days late, Borrower will be charged **5.000% of the unpaid portion of the regularly scheduled payment or $10.00, whichever is greater.**

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay upon final maturity, the interest rate on this Note shall be increased by adding an additional 5.000 percentage point margin ("Default Rate Margin"). The Default Rate Margin shall also apply to each succeeding interest rate change that would have applied had there been no default. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

Case: 4:20-cv-01473-HEA   Doc. #: 1-1   Filed: 10/13/20   Page: 27 of 252   PageID #: 30

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses whether or not there is a lawsuit, including attorneys' fees and expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. If not prohibited by applicable law, Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Missouri.**

**CHOICE OF VENUE.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**DISHONORED ITEM FEE.** Borrower will pay a fee to Lender of $30.00 if Borrower makes a payment on Borrower's loan and the check or preauthorized charge with which Borrower pays is later dishonored.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**COLLATERAL.** Borrower acknowledges this Note is secured by or may be secured by prior or subsequent security documents notwithstanding that such security is not indicated herein.

**LINE OF CREDIT.** This Note evidences a revolving line of credit. Advances under this Note may be requested either orally or in writing by Borrower or as provided in this paragraph. Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above. The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority: Andrew J. Chapin, President/Secretary of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guarantor seeks, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure.

**SECURITY INTEREST IN DEPOSIT ACCOUNTS.** Borrower grants to Lender a contractual security interest in, and hereby assigns, conveys, delivers, pledges, and transfers to Lender all Borrower's right, title and interest in and to, Borrower's deposit accounts with Lender (whether checking, savings, or some other account), including without limitation all deposit accounts held jointly with someone else and all deposit accounts Borrower may open in the future, excluding however all IRA and Keogh accounts, and all trust accounts for which the grant of a security interest would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on this Note against any and all such deposit accounts.

**USA PATRIOT ACT NOTICE.** Lender hereby notifies Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L 107 56 (signed into law October 26, 2001) (the Patriot Act)), it is required to obtain, verify and record information that identifies Borrower, which information includes the name and address of Borrower and other information that will allow Lender to identify Borrower in accordance with the Patriot Act.

**PRIOR NOTE.** This Note represents a renewal, extension and modification of that Promissory Note dated February 28, 2020 of Borrower

**PROMISSORY NOTE**
**(Continued)**

**Loan No: 6706744910865**

**Page 3**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

payable to Lender in the maximum principal amount of $3,000,000.00 (the "Prior Note"). This Note does not constitute a novation, payment and reborrowing, or termination of any of Borrower's obligations under the Prior Note and Borrower's obligations under the Prior Note are in all respects continuing (as renewed, extended and modified by this Note).

**SUCCESSOR INTERESTS.** The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.** If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

**JURY WAIVER.** Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE, INCLUDING THE VARIABLE INTEREST RATE PROVISIONS. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

**BORROWER:**

**BENJA INCORPORATED**

By: _____
Andrew J. Chapin, President/Secretary of Benja Incorporated

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 2

ORIGINAL

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

*00006706741601086S########007007162019*

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 67067416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

**Borrower:**  Benja Incorporated
845 Market Street 450A
San Francisco, CA  94103

**Lender:**  BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO  63141

THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated July 16, 2019, is made and executed between Benja Incorporated ("Borrower") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION   ("Lender") on the following terms and conditions.  Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement.  Borrower understands and agrees that:  (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement;  (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and  (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of July 16, 2019, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.**  The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority:  **Andrew J. Chapin, President & CEO of Benja Incorporated** and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.

**LINE OF CREDIT.**  Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base.  Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.**  Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1) Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2) Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3) The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4) All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5) Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6) Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7) There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.**  Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons.  Lender may, but need not, require that all oral requests be confirmed in writing.  Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1)  when credited to any deposit account of Borrower maintained with Lender or (2)  when advanced in accordance with the instructions of an authorized person.  Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.**  If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base.  On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.**  Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility.  Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.**  To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require.  Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

Loan No: 10865                              **(Continued)**                              Page 2

limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.** Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.** Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings. Records related to Accounts (Receivables) are or will be located at Borrower's address as identified in this Agreement. The records are an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.** Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Accounts, schedules shall be delivered 15 days after each month end.

**Representations and Warranties Concerning Accounts.** With respect to the Accounts, Borrower represents and warrants to Lender: (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account; (2) All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and (3) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 845 Market Street 450A, San Francisco, CA 94103. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: **None.**

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under (1) any provision of (a) Borrower's articles of incorporation or organization, or bylaws, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws; (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

Loan No: 10865                              **(Continued)**                              Page 3

ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Compliance with Laws.** Borrower has complied in all material respects with all laws, orders, regulations, fees, decrees and ordinances affecting to any extent or in any manner it or any aspect of its business. There are no existing or, to Borrower's knowledge, proposed laws, orders, regulations, rules, decrees or ordinances of such a nature as could be expected to materially adversely affect the continued conduct of its business in the manner presently being carried on and conducted.

**Permits.** Borrower possesses all material permits, licenses, registrations, consents, certificates, authorizations, orders and approvals required under applicable law in connection with the ownership and operation of its business. All such permits have been legally and validly obtained and are in full force and effect, no suspension or cancellation of such permit is pending or has been threatened, and there is no fact, event or condition which would cause any such permit not to be renewed upon expiration, except where failure to maintain any such permit could not reasonably be expected to have a material adverse effect on Borrower's financial condition.

**Business Loan.** The Advances, including interest rate, fees and charges as contemplated hereby, (a) are business loans within the purview of 815 ILCS 205/4(1)(c), as amended from time to time, (b) are an exempted transaction under the Truth in Lending Act, 15 U.S.C. 1601 et seq., as amended from time to time, and (c) do not, and when disbursed will not, violate the provisions of the Illinois usury laws, any consumer credit laws or the usury laws of any state which may have jurisdiction over this transaction, Borrower or any Collateral.

**Accuracy of Information.** No information provided to Lender by or on behalf of Borrower or any Guarantor contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading. There is no material fact known to Borrower or any Guarantor which has not been disclosed in writing to Lender, which has or, insofar as a Borrower or any Guarantor can reasonably foresee, is likely to have a material adverse effect on the financial condition of Borrower or any Guarantor. No representation or warranty made by Borrower or any Guarantor set forth herein or in any Related Document, or in any schedule hereto or thereto, or in any supplement to any schedule contains or will contain any untrue statement of a material fact, or omits to state any material fact, necessary in order to make the statement therein, in light of the circumstances in which it was made, not misleading.

**Anti-Corruption Laws and Sanctions.** Borrower, its subsidiaries and their respective officers and employees and, to the knowledge of Borrower, its directors and agents, are in compliance in all material respects with (1) all laws, rules, and regulations of any jurisdiction applicable to Borrower or its affiliates from time to time concerning or relating to bribery or corruption (collectively, "Anti-Corruption Laws") and (2) applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom (collectively, "Sanctions"). None of (1) Borrower, any subsidiary of Borrower or to the knowledge of Borrower or such subsidiary any of their respective directors, officers or employees, or (2) to the knowledge of Borrower, any agent of Borrower or any subsidiary of Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is (a) any person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a country or territory which is itself the subject or target of any Sanctions or (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b). No Advance or use of proceeds of the Loan will violate any Anti-Corruption Law or applicable Sanctions.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than one hundred and twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended to be provided in form satisfactory to Lender.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: 10865                                                                                                 Page 4

As soon as available, but in no event later than one hundred twenty (120) days after the end of each calendar year, Borrower(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each month end, Borrower(s)' accounts receivable aging and borrowing base certificate to be provided in form satisfactory to Lender when there is a principal balance.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.**  Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.**  Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender.  Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.**  Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (1)  the name of the insurer;  (2)  the risks insured;  (3)  the amount of the policy;  (4)  the properties insured;  (5)  the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and  (6)  the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.  The cost of such appraisal shall be paid by Borrower.

**Guaranties.**  Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

**Other Agreements.**  Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.**  Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.**  Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.  Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as  (1)  the legality of the same shall be contested in good faith by appropriate proceedings, and  (2)  Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.**  Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender.  Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.**  Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.**  Unless waived in writing by Lender, provide Lender within one hundred twenty (120) days after the end of each fiscal year, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.**  Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
(Continued)

Loan No: 10865                                                                 Page 5

owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect any Security Interests.

**Primary Depository.** Maintain Lender as its primary depository and cash management services financial institution for Borrower.

**Expenses.** Pay: (1) all reasonable out-of-pocket expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel), in connection with the documentation or administration of the credit facilities provided for herein, and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (2) all out-of-pocket expenses incurred by Lender (including the fees, charges and disbursements of any counsel for Lender) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Related Documents. The provisions of this section of the Agreement shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Indemnification.** Indemnify and defend Lender  and each director, officer, employee, agent and advisor of Lender (Lender and each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all claims, losses, liabilities, damages, penalties and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify, defend and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrower or any Guarantor arising out of, in connection with, or as a result of: (1) the execution or delivery of this Agreement, any other Related Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (2) any Advance or the use or proposed use of the proceeds therefrom; or (3) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any Guarantor, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such claims, losses, liabilities damages, penalties and expenses have been determined by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A)  increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B)  reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C)  reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower. All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.**  (1)  Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases,  (2)  sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or  (3)  sell with recourse any of Borrower's accounts, except to Lender.

**Loans, Acquisitions and Guaranties.**  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2)  purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.**  Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.**  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: 10865 Page 6

revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Change in Ownership.** Any change of twenty-five percent (25%) or more in the legal or beneficial ownership of Borrower without Lender's prior written consent.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**REST PERIOD.** Borrower must maintain a principal balance of $0.00 for thirty (30) consecutive days during the term of the Note.

**MINIMUM FIXED CHARGE COVERAGE RATIO.** Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 1.50 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash, plus (C) the aggregate dividends, distributions, redemptions or repurchases on or with respect to Borrower's equity in each case paid in cash, plus (D) the aggregate increase in any loans and/or advances made by Borrower to any of Borrower's equity holders or affiliates divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

**CONTINUITY OF OPERATIONS.** Borrower agrees that it shall not (A) engage in any business activities substantially different than those in which Borrower is presently engaged or (B) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

**Loan No: 10865**                    **(Continued)**                    **Page 7**

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law. This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.** If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.** The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: 10865                                                                                                       Page 8

terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) **$1,000,000.00**   or (2) **80.000%** of the aggregate amount of Eligible Accounts.

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Missouri.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise.   The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender.   The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature.   Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

    (1)  Accounts with respect to which the Account Debtor is employee or agent of Borrower.

    (2)  Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with  Borrower or its shareholders, officers, or directors.

    (3)  Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

    (4)  Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

    (5)  Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

    (6)  Accounts which are subject to dispute, counterclaim, or setoff.

    (7)  Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

    (8)  Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

    (9)  Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

    (10)  Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

    (11)  Accounts which have not been paid in full within **90 days** from the invoice date.

    (12)  That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

    (13)  All Accounts of an Account Debtor for which more than 25% of its total Accounts have not been paid in full within 90 days from the invoice date.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled.   The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: 10865                                                                                      Page 9

interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.**  The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Loan.**  The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.**  The word "Note" means the Note dated July 16, 2019 and executed by Benja Incorporated in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.**  The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender;  (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;   (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent;  (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and  (6)  those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.**  The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.**  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.**  The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.**  The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT.  TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.

WAIVE JURY.  All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS.  THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED JULY 16, 2019.

BORROWER:

BENJA INCORPORATED

By: _____
Andrew J. Chapin, President/Secretary of Benja Incorporated

LENDER:

BUSEY BANK, AN ILLINOIS BANKING CORPORATION

By: _____
Authorized Signer

LaserPro, Ver. 18.2.0.042  Copr. Finastra USA Corporation 1997, 2019.  All Rights Reserved.  - MO  C:\CFWIN\CFILPL\C40.FC  TR-N2547  PR-525

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 2

# MODIFICATION OF BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal<br>$3,000,000.00 | Loan Date<br>02-28-2020 | Maturity<br>02-27-2021 | Loan No<br>6706744910865 | Call / Coll<br>130 | Account | Officer<br>*** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

ORIGINAL.

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

Principal Amount: 3,000,000.00                                          Date of Agreement: February 28, 2020

**DESCRIPTION OF EXISTING BUSINESS LOAN AGREEMENT (ASSET BASED).** Business Loan Agreement (Asset Based) dated July 16, 2019 between Borrower and Lender (the "Loan Agreement").

**DESCRIPTION OF CHANGE IN TERMS.**

**1. The Minimum Fixed Charge Coverage Ratio (Before Distributions).** covenant is hereby amended as follows:

**Minimum Fixed Charge Coverage Ratio (Before Distributions).** Beginning December 31, 2020, Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 2.00 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

**2. The Minimum EBITDA.** covenant is hereby added as follows:

**Minimum EBITDA.** Beginning December 31, 2020, Borrower shall not permit consolidated EBITDA for the 12-month period ending on such day to be less than $2 million. "Consolidated EBITDA" means, for any 12-month period, the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization.

**CONTINUING VALIDITY.** Except as expressly changed by this Modification, the terms of the Loan Agreement remain unchanged and in full force and effect and all terms, conditions and provisions thereof are hereby affirmed except as specifically modified herein. Consent by Lender to this Modification does not waive Lender's right to strict performance of the Loan Agreement as changed above, nor obligate Lender to make any future modifications. Nothing in this Modification will constitute a satisfaction of the obligations arising under the Loan Agreement or the Related Documents (as defined in the Loan Agreement). It is the intention of Lender to retain as liable parties all makers and endorsers of the original obligations under the Loan Agreement and the Related Documents, including accommodation parties, unless a party is expressly released by Lender in writing. Any maker or endorser, including accommodation makers, will not be released by virtue of this Modification. If any person who signed the original obligation does not sign this Modification below, then all persons signing below acknowledge that this Modification is given conditionally, based on the representation to Lender that the non-signing party consents to the changes and provisions of this Modification or otherwise will not be released by it. This waiver applies not only to any initial extension, modification or release, but also to all such subsequent actions.

**PRIOR TO SIGNING THIS AGREEMENT, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGREEMENT. BORROWER AGREES TO THE TERMS OF THE AGREEMENT.**

**BORROWER:**

**BENJA INCORPORATED**

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated

**LENDER:**

**BUSEY BANK, AN ILLINOIS BANKING CORPORATION**

X _____
    Authorized Signer

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

ORIGINAL

Electronically Filed - St. Louis County - October 06, 2020 - 05:19 PM

*6706744910865%#########%0070%08202020*

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal $5,000,000.00 | Loan Date 08-20-2020 | Maturity 02-27-2021 | Loan No 6706744910865 | Call / Coll 130 | Account | Officer *** | Initials |
|---|---|---|---|---|---|---|---|

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:** Benja Incorporated
845 Market Street 450A
San Francisco, CA  94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CLAYTON
175 CARONDELET PLAZA
CLAYTON, MO  63105

**THIS BUSINESS LOAN AGREEMENT (ASSET BASED)** dated August 20, 2020, is made and executed between Benja Incorporated ("Borrower") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION  ("Lender") on the following terms and conditions.  Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement.  Borrower understands and agrees that:  (A)  in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement;  (B)  the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and  (C)  all such Loans shall be and remain subject to the terms and conditions of this Agreement.

**TERM.**  This Agreement shall be effective as of August 20, 2020, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

**ADVANCE AUTHORITY.**  The following person or persons are authorized to request advances and authorize payments under the line of credit until Lender receives from Borrower, at Lender's address shown above, written notice of revocation of such authority:  **Andrew J. Chapin, President/Secretary of Benja Incorporated and such other persons as may be designated in writing by any previously authorized person or persons in accordance with Borrower's resolutions.**

**LINE OF CREDIT.**  Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base.  Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

**Conditions Precedent to Each Advance.**  Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1)  Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2)  Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3)  The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4)  All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5)  Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Accounts, books, records, and operations, and Lender shall be satisfied as to their condition.

(6)  Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7)  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

**Making Loan Advances.**  Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons.  Lender may, but need not, require that all oral requests be confirmed in writing.  Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1)  when credited to any deposit account of Borrower maintained with Lender or (2)  when advanced in accordance with the instructions of an authorized person.  Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

**Mandatory Loan Repayments.**  If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base.  On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

**Loan Account.**  Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility.  Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

**COLLATERAL.**  To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require.  Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

limitation the proceeds of any insurance.  With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

**Perfection of Security Interests.**  Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral.  Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender.  Contemporaneous with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations.  Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest.  Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement.  Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral.  Borrower promptly will notify Lender before any change in Borrower's name including any change to the assumed business names of Borrower.  Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number.  Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

**Collateral Records.**  Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time.  With respect to the Accounts, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Accounts and Account balances and agings.  Records related to Accounts (Receivables) are or will be located at Borrower's address as identified in this Agreement.  The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

**Collateral Schedules.**  Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender schedules of Accounts and schedules of Eligible Accounts in form and substance satisfactory to the Lender.  Thereafter supplemental schedules shall be delivered according to the following schedule:  With respect to Eligible Accounts, schedules shall be delivered 30 days after each month end.

**Representations and Warranties Concerning Accounts.**  With respect to the Accounts, Borrower represents and warrants to Lender:  (1) Each Account represented by Borrower to be an Eligible Account for purposes of this Agreement conforms to the requirements of the definition of an Eligible Account;  (2)  All Account information listed on schedules delivered to Lender will be true and correct, subject to immaterial variance; and  (3)  Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect, examine, and audit Borrower's records and to confirm with Account Debtors the accuracy of such Accounts.

**REPRESENTATIONS AND WARRANTIES.**  Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.**  Borrower is a corporation for profit which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the laws of the State of Delaware.  Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business.  Specifically, Borrower is, and at all times shall be, duly qualified as a foreign corporation in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition.  Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage.  Borrower maintains an office at 845 Market Street 450A, San Francisco, CA  94103.  Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral.  Borrower will notify Lender prior to any change in the location of Borrower's state of organization or any change in Borrower's name.  Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.**  Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower.  Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business:  **None.**

**Authorization.**  Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under  (1)  any provision of  (a)  Borrower's articles of incorporation or organization, or bylaws, or  (b)  any agreement or other instrument binding upon Borrower or  (2)  any law, governmental regulation, court decree, or order applicable to Borrower or to Borrower's properties.

**Financial Information.**  Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender.  Borrower has no material contingent obligations except as disclosed in such financial statements.

**Legal Effect.**  This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.**  Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and as accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties.  All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for at least the last five (5) years.

**Hazardous Substances.**  Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that:  (1)  During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral.  (2)  Borrower has no knowledge of, or reason to believe that there has been  (a)  any breach or violation of any Environmental Laws;  (b)  any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral; or  (c)  any actual or threatened litigation or claims of any kind by any person relating to such matters.  (3)  Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

Loan No: 6706744910865        **(Continued)**        **Page 3**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

ordinances, including without limitation all Environmental Laws.  Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement.  Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person.  The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances.  Borrower hereby  (1)  releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and  (2)  agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral.  The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.**  No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.**  To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.**  Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.**  This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**Compliance with Laws.** Borrower has complied in all material respects with all laws, orders, regulations, fees, decrees and ordinances affecting to any extent or in any manner it or any aspect of its business. There are no existing or, to Borrower's knowledge, proposed laws, orders, regulations, rules, decrees or ordinances of such a nature as could be expected to materially adversely affect the continued conduct of its business in the manner presently being carried on and conducted.

**Permits.**  Borrower possesses all material permits, licenses, registrations, consents, certificates, authorizations, orders and approvals required under applicable law in connection with the ownership and operation of its business. All such permits have been legally and validly obtained and are in full force and effect, no suspension or cancellation of such permit is pending or has been threatened, and there is no fact, event or condition which would cause any such permit not to be renewed upon expiration, except where failure to maintain any such permit could not reasonably  be expected to have a material adverse effect on Borrower's financial condition.

**Accuracy of Information.**  No information provided to Lender by or on behalf of Borrower or any Guarantor contains any untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary in order to make the statements contained therein, in light of the circumstances under which they were made, not misleading. There is no material fact known to Borrower or any Guarantor which has not been disclosed in writing to Lender, which has or, insofar as a Borrower or any Guarantor can reasonably foresee, is likely to have a material adverse effect on the financial condition of Borrower or any Guarantor.  No representation or warranty made by Borrower or any Guarantor set forth herein or in any Related Document, or in any schedule hereto or thereto, or in any supplement to any schedule contains or will contain any untrue statement of a material fact, or omits to state any material fact, necessary in order to make the statement therein, in light of the circumstances in which it was made, not misleading.

**Anti-Corruption Laws and Sanctions.** Borrower, its subsidiaries and their respective officers and employees and, to the knowledge of Borrower, its directors and agents, are in compliance in all material respects with (1) all laws, rules, and regulations of any jurisdiction applicable to Borrower or its affiliates from time to time concerning or relating to bribery or corruption (collectively, "Anti-Corruption Laws") and (2) applicable economic or financial sanctions or trade embargoes imposed, administered or enforced from time to time by (a) the U.S. government, including those administered by the Office of Foreign Assets Control of the U.S. Department of the Treasury ("OFAC") or the U.S. Department of State or (b) the United Nations Security Council, the European Union, any European Union member state or Her Majesty's Treasury of the United Kingdom (collectively, "Sanctions").  None of (1) Borrower, any subsidiary of Borrower or to the knowledge of Borrower or such subsidiary any of their respective directors, officers or employees, or (2) to the knowledge of Borrower, any agent of Borrower or any subsidiary of Borrower that will act in any capacity in connection with or benefit from the credit facility established hereby, is (a) any person listed in any Sanctions-related list of designated persons maintained by OFAC, the U.S. Department of State, the United Nations Security Council, the European Union or any EU member state, (b) any person operating, organized or resident in a country or territory which is itself the subject or target of any Sanctions or (c) any person owned or controlled by any such person or persons described in the foregoing clauses (a) or (b).  No Advance or use of proceeds of the Loan will violate any Anti-Corruption Law or applicable Sanctions.

**AFFIRMATIVE COVENANTS.**  Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.**  Promptly inform Lender in writing of  (1)  all material adverse changes in Borrower's financial condition, and  (2)  all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of Borrower or the financial condition of any Guarantor.

**Financial Records.**  Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.**  Furnish Lender with the following:

**Annual Statements.**  As soon as available, but in no event later than one-hundred-twenty (120) days after the end of each fiscal year, Borrower's balance sheet and income statement for the year ended, reviewed by a certified public accountant satisfactory to Lender.

**Interim Statements.**  As soon as available, but in no event later than thirty (30) days after the end of each fiscal quarter, Borrower's balance sheet and profit and loss statement for the period ended, prepared by Borrower in form satisfactory to Lender.

**Additional Requirements.**  As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Borrower(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

Loan No: 6706744910865                (Continued)                                    **Page 4**

As soon as available, but in no event later than thirty (30) days after the end of each month end, Borrower(s)' accounts receivable aging and borrowing base certificate to be provided in form satisfactory to Lender when line is in use.

As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**Additional Information.**  Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.**  Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, coverages and with insurance companies acceptable to Lender.  Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days prior written notice to Lender.  Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person.  In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.**  Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request, including without limitation the following:  (1)  the name of the insurer;  (2)  the risks insured;  (3)  the amount of the policy;  (4)  the properties insured;  (5)  the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and  (6)  the expiration date of the policy.  In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral.  The cost of such appraisal shall be paid by Borrower.

**Guaranties.**  Prior to disbursement of any Loan proceeds, furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
|---|---|
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

**Other Agreements.**  Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.**  Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.**  Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits.  Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as  (1)  the legality of the same shall be contested in good faith by appropriate proceedings, and  (2)  Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.**  Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender.  Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.**  Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.**  Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.**  Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act.  Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized.  Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.**  Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records.  If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Compliance Certificates.**  Unless waived in writing by Lender, provide Lender within one hundred twenty (120) days after the end of each fiscal year, with a certificate executed by Borrower's chief financial officer, or other officer or person acceptable to Lender, certifying that the representations and warranties set forth in this Agreement are true and correct as of the date of the certificate and further certifying that, as of the date of the certificate, no Event of Default exists under this Agreement.

**Environmental Compliance and Reports.**  Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
| Loan No: 6706744910865 | **(Continued)** | Page 5 |

authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.**  Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**Primary Depository.** Maintain Lender as its primary depository and cash management services financial institution for Borrower.

**Expenses.** Pay: (1) all reasonable out-of-pocket expenses incurred by Lender (including the reasonable fees, charges and disbursements of counsel), in connection with the documentation or administration of the credit facilities provided for herein, and any amendments, modifications or waivers of the provisions hereof or thereof (whether or not the transactions contemplated hereby or thereby shall be consummated); and (2) all out-of-pocket expenses incurred by Lender (including the fees, charges and disbursements of any counsel for Lender) in connection with the enforcement or protection of its rights in connection with this Agreement and the other Related Documents. The provisions of this section of the Agreement shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Indemnification.**  Indemnify and defend Lender  and each director, officer, employee, agent and advisor of Lender (Lender and each such person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all claims, losses, liabilities, damages, penalties and expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and shall indemnify, defend and hold harmless each Indemnitee from all fees and time charges and disbursements for attorneys, incurred by any Indemnitee or asserted against any Indemnitee by any third party or by Borrower or any Guarantor arising out of, in connection with, or as a result of: (1) the execution or delivery of this Agreement, any other Related Document or any document contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby; (2) any Advance or the use or proposed use of the proceeds therefrom; or (3) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by Borrower or any Guarantor, and regardless of whether any Indemnitee is a party thereto, in all cases, whether or not caused by or arising, in whole or in part, out of the comparative, contributory or sole negligence of the Indemnitee; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such claims, losses, liabilities damages, penalties and expenses have been determined by a court of competent jurisdiction to result from the gross negligence or willful misconduct of such Indemnitee.  The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would  (A)  increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates,  (B)  reduce the amounts payable to Lender under this Agreement or  the Related Documents, or  (C)  reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.**  If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral.  All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Borrower.  All such expenses will become a part of the Indebtedness and, at Lender's option, will  (A)  be payable on demand;  (B)  be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either  (1)  the term of any applicable insurance policy; or  (2)  the remaining term of the Note; or  (C)  be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.**  Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.**  (1)  Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases,  (2)  sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or  (3)  sell with recourse any of Borrower's accounts, except to Lender.

**Loans, Acquisitions and Guaranties.**  (1)  Loan, invest in or advance money or assets to any other person, enterprise or entity,  (2)  purchase, create or acquire any interest in any other enterprise or entity, or  (3)  incur any obligation as surety or guarantor other than in the ordinary course of business.

**Agreements.**  Enter into any agreement containing any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.**  If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if:  (A)  Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender;  (B)  Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt;  (C)  there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or  (D)  any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or  (E)  Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.**  To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**

checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the debt against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's or any Grantor's property or Borrower's or any Grantor's ability to repay the Loans or perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Insolvency.** The dissolution or termination of Borrower's existence as a going business, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Change in Ownership.** Any change in ownership of twenty-five percent (25%) or more of the common stock of Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Change in Ownership.** Any change of twenty-five percent (25%) or more in the legal or beneficial ownership of Borrower without Lender's prior written consent.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**REST PERIOD.** Borrower must maintain a principal balance of $0.00 for thirty (30) consecutive days during the term of the Note.

**MINIMUM FIXED CHARGE COVERAGE RATIO.** Borrower shall not permit the Fixed Charge Coverage Ratio for any 12-month period ending on the last day of a fiscal year to be less than 2.00 to 1. "Fixed Charge Coverage Ratio" means, for any 12-month period, the ratio of (a) the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization, minus (iii) the sum of Borrower's consolidated amounts of the following items for such period (and without duplication): (A) the aggregate capital expenditures (other than capital expenditures financed with the proceeds of purchase money debt or capital leases), plus (B) the aggregate income taxes paid or payable in cash, plus (C) the aggregate dividends, distributions, redemptions or repurchases on or with respect to Borrower's equity in each case paid in cash, plus (D) the aggregate increase in any loans and/or advances made by Borrower to any of Borrower's equity holders or affiliates divided by (b) the aggregate scheduled or required principal and interest payments during such period on Borrower's consolidated capital leases, subordinated debt and other debt.

**CONTINUITY OF OPERATIONS.** Borrower agrees that it shall not (A) engage in any business activities substantially different than those in which Borrower is presently engaged or (B) cease operations, liquidate, merge, transfer, acquire or consolidate with any other entity, change its name, dissolve or transfer or sell Collateral out of the ordinary course of business.

**MINIMUM EBITDA.** Borrower shall not permit Consolidated EBITDA for any 12-month period ending on the last day of a fiscal year to be less than $2,000,000.00. "Consolidated EBITDA" means, for any 12-month period, the sum of the following for such period (and without duplication): (i) Borrower's consolidated net income (or loss) for such period (excluding (A) gains (or losses) from the sale or disposition of assets outside the ordinary course of business, (B) gains (or losses) from discontinued operations, and (C) extraordinary gains (or losses)), plus (ii) to the extent deducted in determining such net income: (A) interest expense, (B) net income tax expense and (C) depreciation and amortization.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

**Amendments.**  This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement.  No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement.  Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.  Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**  Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.**  Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender.  Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower hereby waives any rights to privacy Borrower may have with respect to such matters.  Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests.  Borrower also agrees that the purchasers of any such participation interests will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests.  Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan.  Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

**Governing Law.**  **This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions.  This Agreement has been accepted by Lender in the State of Missouri.**

**Choice of Venue.**  If there is a lawsuit, Borrower agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement.  No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.**  Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement.  Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address.  Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Severability.**  If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance.  If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable.  If the offending provision cannot be so modified, it shall be considered deleted from this Agreement.  Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.**  To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates.  Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.**  All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns.  Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.**  Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents.  Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made, and shall remain in full force and effect until such time as Borrower's Indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.**  Time is of the essence in the performance of this Agreement.

**DEFINITIONS.**  The following capitalized words and terms shall have the following meanings when used in this Agreement.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code.  Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement:

**Account.**  The word "Account" means a trade account, account receivable, other receivable, or other right to payment for goods sold or

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# BUSINESS LOAN AGREEMENT (ASSET BASED)
## (Continued)

services rendered owing to Borrower (or to a third party grantor acceptable to Lender).

**Account Debtor.** The words "Account Debtor" mean the person or entity obligated upon an Account.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) **$5,000,000.00** or (2) **80.000%** of the aggregate amount of Eligible Accounts.

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Missouri.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Accounts.** The words "Eligible Accounts" mean at any time, all of Borrower's Accounts which contain selling terms and conditions acceptable to Lender. The net amount of any Eligible Account against which Borrower may borrow shall exclude all returns, discounts, credits, and offsets of any nature. Unless otherwise agreed to by Lender in writing, Eligible Accounts do not include:

    (1) Accounts with respect to which the Account Debtor is employee or agent of Borrower.

    (2) Accounts with respect to which the Account Debtor is a subsidiary of, or affiliated with Borrower or its shareholders, officers, or directors.

    (3) Accounts with respect to which goods are placed on consignment, guaranteed sale, or other terms by reason of which the payment by the Account Debtor may be conditional.

    (4) Accounts with respect to which the Account Debtor is not a resident of the United States, except to the extent such Accounts are supported by insurance, bonds or other assurances satisfactory to Lender.

    (5) Accounts with respect to which Borrower is or may become liable to the Account Debtor for goods sold or services rendered by the Account Debtor to Borrower.

    (6) Accounts which are subject to dispute, counterclaim, or setoff.

    (7) Accounts with respect to which the goods have not been shipped or delivered, or the services have not been rendered, to the Account Debtor.

    (8) Accounts with respect to which Lender, in its sole discretion, deems the creditworthiness or financial condition of the Account Debtor to be unsatisfactory.

    (9) Accounts of any Account Debtor who has filed or has had filed against it a petition in bankruptcy or an application for relief under any provision of any state or federal bankruptcy, insolvency, or debtor-in-relief acts; or who has had appointed a trustee, custodian, or receiver for the assets of such Account Debtor; or who has made an assignment for the benefit of creditors or has become insolvent or fails generally to pay its debts (including its payrolls) as such debts become due.

    (10) Accounts with respect to which the Account Debtor is the United States government or any department or agency of the United States.

    (11) Accounts which have not been paid in full within **90 days** from the invoice date.

    (12) That portion of the Accounts of any single Account Debtor which exceeds **25.000%** of all of Borrower's Accounts.

    (13) All Accounts of an Account Debtor for which more than 25% of its total Accounts have not been paid in full within 90 days from the invoice date.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

| Loan No: 6706744910865 | | Page 9 |
|---|---|---|

===================================================================================

waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated August 20, 2020 and executed by Benja Incorporated in the principal amount of $5,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean  (1)  liens and security interests securing Indebtedness owed by Borrower to Lender;  (2)  liens for taxes, assessments, or similar charges either not yet due or being contested in good faith;  (3)  liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4)  purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens";  (5)  liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and  (6)  those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

**ORAL OR UNEXECUTED AGREEMENTS OR COMMITMENTS TO LOAN MONEY, EXTEND CREDIT OR TO FORBEAR FROM ENFORCING REPAYMENT OF A DEBT INCLUDING PROMISES TO EXTEND OR RENEW SUCH DEBT ARE NOT ENFORCEABLE, REGARDLESS OF THE LEGAL THEORY UPON WHICH IT IS BASED THAT IS IN ANY WAY RELATED TO THE CREDIT AGREEMENT. TO PROTECT YOU (BORROWER(S)) AND US (CREDITOR) FROM MISUNDERSTANDING OR DISAPPOINTMENT, ANY AGREEMENTS WE REACH COVERING SUCH MATTERS ARE CONTAINED IN THIS WRITING, WHICH IS THE COMPLETE AND EXCLUSIVE STATEMENT OF THE AGREEMENT BETWEEN US, EXCEPT AS WE MAY LATER AGREE IN WRITING TO MODIFY IT.**

**WAIVE JURY.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED AUGUST 20, 2020.**

**BORROWER:**

**BENJA INCORPORATED**

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated

**LENDER:**

**BUSEY BANK, AN ILLINOIS BANKING CORPORATION**

By: _____
    Authorized Signer

LaserPro, Ver 20 2 20 003  Copr  Finastra USA Corporation 1997, 2020   All Rights Reserved   - MO  C:\CFI\WIN\CFI\LPL\C40 FC  TR-97331  PR-771

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 3

ORIGINAL

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

*00006706741601086 5#########023507162019*

# COMMERCIAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $1,000,000.00 | 07-16-2019 | 07-15-2020 | 10865 | 1301 | 67067416 | 646 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item. Any item above containing "****" has been omitted due to text length limitations.

**Grantor:** Benja Incorporated
845 Market Street 450A
San Francisco, CA 94103

**Lender:** BUSEY BANK, AN ILLINOIS BANKING CORPORATION
CREVE COEUR
12300 OLIVE BLVD.
CREVE COEUR, MO 63141

## THE LIEN GRANTED PURSUANT TO THIS AGREEMENT MAY ALSO SECURE FUTURE ADVANCES

**THIS COMMERCIAL SECURITY AGREEMENT dated July 16, 2019, is made and executed between Benja Incorporated ("Grantor") and BUSEY BANK, AN ILLINOIS BANKING CORPORATION ("Lender").**

**GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.**

**COLLATERAL DESCRIPTION.** The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

**All inventory, equipment, accounts (including but not limited to all health-care-insurance receivables), chattel paper, instruments (including but not limited to all promissory notes), letter of credit rights, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles (including but not limited to all software and all payment intangibles); all attachments, accessions, accessories, fittings, increases, tools, parts, repairs, supplies, and commingled goods relating to the foregoing property, and all additions, replacements of and substitutions for all or any part of the foregoing property; all insurance refunds relating to the foregoing property; (all goodwill relating to the foregoing property; all records and data and embedded software relating to the foregoing property,) and all equipment, inventory and software to utilize, create, maintain and process any such records and data on electronic media; and all supporting obligations relating to the foregoing property; all whether now existing or hereafter arising, whether now owned or hereafter acquired or whether now or hereafter subject to any rights in the foregoing property; and all products and proceeds (including but not limited to all insurance payments) of or relating to the foregoing property; whether any of the foregoing is owned now or acquired later; all accessions, additions, replacements, and substitutions relating to any of the foregoing; all records of any kind relating to any of the foregoing; all proceeds relating to any of the foregoing (including insurance, general intangibles, and account proceeds).**

In addition, the word "Collateral" also includes all the following, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located:

(A) All accessions, attachments, accessories, tools, parts, supplies, replacements of and additions to any of the collateral described herein, whether added now or later.

(B) All products and produce of any of the property described in this Collateral section.

(C) All accounts, general intangibles, instruments, rents, monies, payments, and all other rights, arising out of a sale, lease, consignment or other disposition of any of the property described in this Collateral section.

(D) All proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the property described in this Collateral section, and sums due from a third party who has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(E) All records and data relating to any of the property described in this Collateral section, whether in the form of a writing, photograph, microfilm, microfiche, or electronic media, together with all of Grantor's right, title, and interest in and to all computer software required to utilize, create, maintain, and process any such records or data on electronic media.

**CROSS-COLLATERALIZATION.** In addition to the Note, this Agreement secures all obligations, debts and liabilities, plus interest thereon, of Grantor to Lender, or any one or more of them, as well as all claims by Lender against Grantor or any one or more of them, whether now existing or hereafter arising, whether related or unrelated to the purpose of the Note, whether voluntary or otherwise, whether due or not due, direct or indirect, determined or undetermined, absolute or contingent, liquidated or unliquidated, whether Grantor may be liable individually or jointly with others, whether obligated as guarantor, surety, accommodation party or otherwise, and whether recovery upon such amounts may be or hereafter may become barred by any statute of limitations, and whether the obligation to repay such amounts may be or hereafter may become otherwise unenforceable.

**FUTURE ADVANCES.** In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL.** With respect to the Collateral, Grantor represents

**COMMERCIAL SECURITY AGREEMENT**
**(Continued)**

Loan No: 10865                                                                                          Page 2

and promises to Lender that:

**Perfection of Security Interest.** Grantor agrees to take whatever actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. **This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.**

**Notices to Lender.** Grantor will promptly notify Lender in writing at Lender's address shown above (or such other addresses as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the management of the Corporation Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name or state of organization will take effect until after Lender has received notice.

**No Violation.** The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its certificate or articles of incorporation and bylaws do not prohibit any term or condition of this Agreement.

**Enforceability of Collateral.** To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. At the time any account becomes subject to a security interest in favor of Lender, the account shall be a good and valid account representing an undisputed, bona fide indebtedness incurred by the account debtor, for merchandise held subject to delivery instructions or previously shipped or delivered pursuant to a contract of sale, or for services previously performed by Grantor with or for the account debtor. So long as this Agreement remains in effect, Grantor shall not, without Lender's prior written consent, compromise, settle, adjust, or extend payment under or with regard to any such Accounts. There shall be no setoffs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning the Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral (or to the extent the Collateral consists of intangible property such as accounts or general intangibles, the records concerning the Collateral) at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Missouri, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. If the Collateral is subjected to a lien which is not discharged within fifteen (15) days, Grantor shall deposit with Lender cash, a sufficient corporate surety bond or other security satisfactory to Lender in an amount adequate to provide for the discharge of the lien plus any interest, costs, attorneys' fees or other charges that could accrue as a result of foreclosure or sale of the Collateral. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**COMMERCIAL SECURITY AGREEMENT**
Loan No: 10865                          (Continued)                          Page 3

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender and issued by a company or companies reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least thirty (30) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement.

**GRANTOR'S RIGHT TO POSSESSION AND TO COLLECT ACCOUNTS.** Until default and except as otherwise provided below with respect to accounts, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. Until otherwise notified by Lender, Grantor may collect any of the Collateral consisting of accounts. At any time and even though no Event of Default exists, Lender may exercise its rights to collect the accounts and to notify account debtors to make payments directly to Lender for application to the Indebtedness. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the rate charged under the Note from the date incurred or paid by Lender to the date of repayment by Grantor. All such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon Default.

**REINSTATEMENT OF SECURITY INTEREST.** If payment is made by Grantor, whether voluntarily or otherwise, or by guarantor or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment (A) to Grantor's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, (B) by reason of any judgment, decree or order of any court or administrative body having jurisdiction over Lender or any of Lender's property, or (C) by reason of any settlement or compromise of

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**COMMERCIAL SECURITY AGREEMENT**

Loan No: 10865                          **(Continued)**                                  Page 4

any claim made by Lender with any claimant (including without limitation Grantor), the Indebtedness shall be considered unpaid for the purpose of enforcement of this Agreement and this Agreement shall continue to be effective or shall be reinstated, as the case may be, notwithstanding any cancellation of this Agreement or of any note or other instrument or agreement evidencing the Indebtedness and the Collateral will continue to secure the amount repaid or recovered to the same extent as if that amount never had been originally received by Lender, and Grantor shall be bound by any judgment, decree, order, settlement or compromise relating to the Indebtedness or to this Agreement.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**Default in Favor of Third Parties.** Any guarantor or Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of any guarantor's or Grantor's property or ability to perform their respective obligations under this Agreement or any of the Related Documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or Guarantor dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Missouri Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness, including any prepayment penalty which Grantor would be required to pay, immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return them to Grantor after repossession.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this

**COMMERCIAL SECURITY AGREEMENT**
(Continued)

Loan No: 10865                                                                                     Page 5

Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Missouri.

**Choice of Venue.** If there is a lawsuit, Grantor agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Commercial Security Agreement, as this Commercial Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Commercial Security Agreement from time to time.

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## COMMERCIAL SECURITY AGREEMENT
**Loan No: 10865** (Continued) Page 6

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Default.** The word "Default" means the Default set forth in the section titled "Default".

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means Benja Incorporated.

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Indebtedness.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision, together with all interest thereon and all amounts that may be indirectly secured by the Cross-Collateralization provision of this Agreement.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Note.** The word "Note" means the Note dated July 16, 2019 and executed by Benja Incorporated in the principal amount of $1,000,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

WAIVE JURY. All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS COMMERCIAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JULY 16, 2019.

GRANTOR:

BENJA INCORPORATED

By: _____
    Andrew J. Chapin, President/Secretary of Benja
    Incorporated

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 4

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# iLien Cover Page

Date Printed:  07/19/2019

Debtor:
BENJA INCORPORATED
845 Market Street 450A
San Francisco, CA  94103

Cost Center:  33500
Relationship Manger:  Dan Saettele
Region:  Gateway
Special Assets:
Ref5:
Ref6:
Ref7:
Law Firm Bill Code:

iLien File #:  72257856
Order Confirmation #:  70865712

UserID:  292595
UserName:  AMY STAHL
Number of Collateral Pages Attached:  0

Transaction Type:  Original
Jurisdiction:  DE, Secretary of State

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# State of Delaware - Division of Corporations

**FAX**

## UNIFORM COMMERCIAL CODE FILING SHEET

Priority 1
(Two HR. Service)

Priority 2
(Same Day)

Priority 3
(24 Hour)

Priority 6
(Reg. Work)

DATE SUBMITTED:        07/19/2019

REQUESTOR NAME:     **Lien Solutions**                                         FILE DATE _____

ADDRESS:                       **P.O. Box 29071**                                      FILE TIME _____

**Glendale, CA  91209-9071**

ATTN:

PHONE:                          **(800) 331-3282 Fax: (818) 662-4141**

ACCOUNT NUMBER:    **9224820**

NAME OF COMPANY/ENTITY:   BENJA INCORPORATED

TRUST FORMED ON                         _____

TRUST NAME/NUMBER IDENTIFIER       _____

TYPE OF DOCUMENT:        **UCC1**

| FOR UCC FILING ONLY | | METHOD of RETURN |
|---|---|---|
| BASE FEE | $ _____ | ____ MESSENGER/PICKUP<br>____ FED. EXPRESS Acct# _____<br>____ REGULAR MAIL |
| SPECIAL SERVICE FEE | $ _____ | ____ OTHER _____ |
| CHECK # | $ _____ | |
| | | COMMENTS/FILING INSTRUCTIONS |
| TOTAL | $ _____ | |

| CREDIT CARD CHARGES |
|---|
| You have my authorization to charge my credit card for this service:<br><br>_____-_____-_____-_____     Exp. Date _____<br><br>Signature _____     Printed Name _____ |

**X**

**X**

| AGENT USE ONLY | INSTRUCTIONS |
|---|---|
| | 1. Full shade in the required Priority square using a dark pencil or marker, staying within the square.<br>2. Each Request must be submitted as a separate item, with its own Filing sheet as the FIRST PAGE. |

Order No: 70865712

**SODUCC4 03-02-98**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**Lien Solutions**
Representation of filing

**This filing is Completed**
File Number : 20195005348
File Date   : 19-Jul-2019

| | |
|---|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>Phone: (800) 331-3282 Fax: (818) 662-4141 | |
| B. E-MAIL CONTACT AT FILER (optional)<br>CLS-CTLS_Glendale_Customer_Service@wolterskluwer.com | |
| C. SEND ACKNOWLEDGMENT TO: (Name and Address)<br>Lien Solutions<br>P.O. Box 29071<br>Glendale, CA  91209-9071 | 49152 - Busey Bank<br>70865712<br>DEDE |
| File with: Secretary of State, DE | |

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| BENJA INCORPORATED | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 845 Market Street 450A | San Francisco | CA | 94103 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| | | | |

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | |
|---|---|---|---|
| Busey Bank | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 12300 Olive Blvd | Creve Coeur | MO | 63141 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
All assets of debtor

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction  ☐ Manufactured-Home Transaction  ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien  ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable):  ☐ Lessee/Lessor  ☐ Consignee/Consignor  ☐ Seller/Buyer  ☐ Bailee/Bailor  ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
70865712            33500                                          Dan Saettele

**FILING OFFICE COPY** — UCC FINANCING STATEMENT (Form UCC1) (Rev. 04/20/11)

Prepared by Lien Solutions, P.O. Box 29071,
Glendale, CA 91209-9071 Tel (800) 331-3282

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 5

Electronically Filed - St. Louis County - October 06, 2020 - 05:19 PM

*000067067416010865#########022007162019*

## COMMERCIAL GUARANTY

| | | | |
|---|---|---|---|
| **Borrower:** | Benja Incorporated<br>845 Market Street 450A<br>San Francisco, CA  94103 | **Lender:** | BUSEY BANK, AN ILLINOIS BANKING CORPORATION<br>CREVE COEUR<br>12300 OLIVE BLVD.<br>CREVE COEUR, MO  63141 |
| **Guarantor:** | Andrew J. Chapin<br>10 Lyon Street # 210<br>San Fransisco, CA  94117 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.**  For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness.  Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.  Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.**  The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative.  This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties.  Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.**  THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS.  ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.**  This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full.  If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing.  Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing.  Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation.  For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due.  For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness.  This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death.  Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect.  Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty.  A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.  **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty.  This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.**  Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability** under this Guaranty, from time to time: (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B)  to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest, principal amount, fees or other charges on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C)  to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D)  to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E)  to determine how, when

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 10865

Page 2

and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Guaranty:

**Amendments.** This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.** This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions.

**Choice of Venue.** If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**Integration.** Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.** In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. All of the obligations of Guarantor under this Guaranty (if more than one Guarantor) shall be joint and several. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.** Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** This Guaranty shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Indebtedness or any interest therein, and this Guaranty shall be transferable to the same extent and with the same force and effect as any such Indebtedness may be transferable.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation Andrew J. Chapin, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 10865 | | Page 4

---

of and substitutions for promissory notes or credit agreements.

**Related Documents.**  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**WAIVE JURY.**  Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS.  IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY".  NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.  THIS GUARANTY IS DATED JULY 16, 2019.

GUARANTOR:

X _____
  Andrew J. Chapin

LaserPro, Ver. 19.2.0.042  Copr. Finastra USA Corporation 1997, 2019.   All Rights Reserved.   - MO   C:\CFI\WIN\CFI\LPL\E20.FC  TR-92597  PR-526

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 6

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

*00006706741601086S#########022007162019*

## COMMERCIAL GUARANTY

| | | | |
|---|---|---|---|
| **Borrower:** | Benja Incorporated<br>845 Market Street 450A<br>San Francisco, CA  94103 | **Lender:** | BUSEY BANK, AN ILLINOIS BANKING CORPORATION<br>CREVE COEUR<br>12300 OLIVE BLVD.<br>CREVE COEUR, MO  63141 |
| **Guarantor:** | Thomas L. Goode III<br>2901 Barton Skyway<br>Austin, TX  78746 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.**  For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents.  This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness.  Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents.  Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.**  The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, attorneys' fees, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative.  This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties.  Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.**  THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS.  ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.**  This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full.  If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing.  Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing.  Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation.  For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due.  For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness.  This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death.  Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect.  Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty.  A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty.  **It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty.  This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).**

**GUARANTOR'S AUTHORIZATION TO LENDER.**  Guarantor authorizes Lender, either before or after any revocation hereof, **without notice or demand and without lessening Guarantor's liability under this Guaranty, from time to time:** (A)  prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower;  (B)  to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest, principal amount, fees or other charges on the Indebtedness; extensions may be repeated and may be for longer than the original loan term;  (C)  to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral;  (D)  to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose;  (E)  to determine how, when

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## COMMERCIAL GUARANTY
### (Continued)

| Loan No: 10865 | | Page 2 |
|---|---|---|

and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

**Additional Requirements.** As soon as available, but in no event later than one hundred and twenty (120) days after the end of each calendar year, Guarantor(s)' Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

As soon as available, but in no event later than thirty (30) days after the end of each calendar year, Guarantor(s)' personal financial statement to be provided in form satisfactory to Lender.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

**GUARANTOR'S WAIVERS.** Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

**GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS.** Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

**SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR.** Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**COMMERCIAL GUARANTY**
**(Continued)**

| Loan No: 10865 | | Page 3 |
|---|---|---|

agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

**MISCELLANEOUS PROVISIONS.**  The following miscellaneous provisions are a part of this Guaranty:

**Amendments.**  This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty.  No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.**  Guarantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty.  Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement.  Costs and expenses include Lender's attorneys' fees and legal expenses whether or not there is a lawsuit, including attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals.  Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.**  Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

**Governing Law.**  This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Missouri without regard to its conflicts of law provisions.

**Choice of Venue.**  If there is a lawsuit, Guarantor agrees upon Lender's request to submit to the jurisdiction of the courts of ST. LOUIS County, State of Missouri.

**Integration.**  Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty.  Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

**Interpretation.**  In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them.  The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them.  All of the obligations of Guarantor under this Guaranty (if more than one Guarantor) shall be joint and several.  If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced.  Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable.  If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

**Notices.**  Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty.  All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address.  For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.  Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty.  No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.**  This Guaranty shall be understood to be for the benefit of Lender and for such other person or persons as may from time to time become or be the holder or owner of any of the Indebtedness or any interest therein, and this Guaranty shall be transferable to the same extent and with the same force and effect as any such Indebtedness may be transferable.

**DEFINITIONS.**  The following capitalized words and terms shall have the following meanings when used in this Guaranty.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.**  The word "Borrower" means Benja Incorporated and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.**  The word "GAAP" means generally accepted accounting principles.

**Guarantor.**  The word "Guarantor" means everyone signing this Guaranty, including without limitation Thomas L. Goode III, and in each case, any signer's successors and assigns.

**Guaranty.**  The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.**  The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.**  The word "Lender" means BUSEY BANK, AN ILLINOIS BANKING CORPORATION, its successors and assigns.

**Note.**  The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**COMMERCIAL GUARANTY**
**(Continued)**

Loan No: 10865

Page 4

of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**WAIVE JURY.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JULY 16, 2019.

GUARANTOR:

X _____

Thomas L. Goode III

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 7

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



150 N. Riverside Plaza, Suite 3000, Chicago, IL 60606  •  (312) 819-1900

September 29, 2020

Jerry L. Switzer Jr.
(312) 873-3626
(312) 893-2005  Direct Fax
jswitzer@polsinelli.com

**<u>Via Certified Mail/Return Receipt Requested</u>**

Benja Incorporated
845 Market Street, 450A
San Francisco, CA 94103
Attn:  Joe Alouf

Andrew J. Chapin, Jr.
26 Cragmont Avenue
San Francisco, CA 94116

Thomas L. Goode, III
2901 Barton Skyway, #3002
Austin, TX 78746

> **Re:     Outstanding Loan Owed to Busey Bank**
> **<u>Borrower</u>:  Benja Incorporated**
> **<u>Guarantors</u>:  Andrew J. Chapin, Jr., and Thomas L. Goode, III**

Gentlemen:

We represent Busey Bank ("<u>Lender</u>") in connection with the revolving loan referenced below (the "<u>Loan</u>") made by Lender to Benja Incorporated ("<u>Borrower</u>") and guaranteed by Andrew J. Chapin, Jr. ("<u>Chapin</u>") and Thomas L. Goode, III ("<u>Goode</u>" and, together with Chapin, "<u>Guarantors</u>") (Borrower and Guarantors shall be collectively referred to herein as "<u>Borrower Parties</u>").

Reference is made to the following notes, loan agreements, guarantees, security agreements, pledge agreements, mortgages, assignments of rents, and other agreements, instruments and documents by and between Lender and Borrower Parties, among others, evidencing, securing or otherwise relating to the Loan (collectively, the "<u>Loan Documents</u>"):

- a Business Loan Agreement (Asset Based) dated as of July 16, 2019, executed by Borrower in favor of Lender in the original principal amount of $1,000,000.00, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by Borrower in favor of Lender in the original principal amount of $3,000,000.00, as



Benja Incorporated
September 29, 2020
Page 2

replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by Borrower in favor of Lender in the original principal amount of $5,000,000.00 (collectively, the "<u>BLA</u>");

- a Promissory Note dated as of July 16, 2019, executed by Borrower in favor of Lender in the original principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by Borrower in favor of Lender in the original principal amount of $3,000,000.00, as replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by Borrower in favor of Lender in the original principal amount of $5,000,000.00 (collectively, the "<u>Note</u>");

- a Commercial Security Agreement dated as of July 16, 2019, executed by Borrower in favor of Lender (the "<u>Security Agreement</u>"), pursuant to which Borrower granted a first lien and security interest in favor of Lender against all of Borrower's assets and property to secure the Loan;

- a Commercial Guaranty dated July 16, 2019, executed by Chapin in favor of Lender which secures the Loan; and

- a Commercial Guaranty dated July 16, 2019, executed by Goode in favor of Lender which secures the Loan.

The BLA provides in relevant part that:

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

>**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

(*See* BLA, at p. 5.)  The Security Agreement includes similar provisions in the "Grantor's Representations and Warranties With Respect to the Collateral" section under the headings "Transactions Involving Collateral" and "Title". (*See* Security Agreement, at pp. 1-2.)  Please be advised that Borrower has violated the foregoing provisions of the BLA and Security Agreement.  In particular, Borrower has incurred borrowed money debt from First Corporate Solutions and E-Revshare Core, LLC, and in connection therewith granted security interests in favor of these lenders in assets of Borrower.  Lender understands that these unauthorized secured loans remain outstanding.  Additionally, Borrower obtained other unauthorized secured loans from C&S Associates, Inc., Gibraltar Business Capital, LLC, and UMB Bank, N.A., which

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



Benja Incorporated
September 29, 2020
Page 3

Lender understands have since been repaid and the related UCC financing statements terminated.  Finally, the U.S. Small Business Administration filed a financing statement against Borrower on or about May 29, 2020, which remains pending.

Additionally, the BLA provides in relevant part that:

**Taxes, Charges and Liens.**  [Borrower shall] pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or it properties, income, or profits, prior to the date on which penalties would attach…

(*See* BLA, at p. 4.)  The Security Agreement includes a similar provision in the "Grantor's Representations and Warranties With Respect to the Collateral" section under the heading "Taxes, Assessments and Liens". (*See* Security Agreement, at p. 2.)  Please be advised that Borrower has violated the foregoing provisions of the BLA and Security Agreement.  In particular, Borrower has allowed certain state tax liens in favor of the California Employment Development Department to be recorded against Borrower and its assets on or about January 14, 2020, and March 9, 2020, and a judgment in favor of a Peter A. Manderino to be recorded against Borrower and its assets on or about October 30, 2018, which remain outstanding.

Further, the BLA provides in relevant part that:

**Guaranties.**  Prior to disbursement of any Loan proceeds, [Borrower shall] furnish executed guaranties of the Loans in favor of Lender, executed by the guarantors named below, on Lender's forms, and in the amounts and under the conditions set forth in those guaranties.

| Names of Guarantors | Amounts |
| --- | --- |
| Andrew J. Chapin | Unlimited |
| Thomas L. Goode III | Unlimited |

(*See* BLA, at p. 4.)  Please be advised that Goode contends that he did not execute and/or is not bound by his Commercial Guaranty referenced above.  Although Lender disputes Goode's contention, if it is ultimately determined that Goode did not execute and/or is not bound by his Commercial Guaranty, Borrower has violated the aforementioned provision of the BLA.

Finally, the BLA further provides in relevant part that:

**Primary Depository.**  [Borrower shall] [m]aintain Lender as its primary depository and cash management services institution for Borrower.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



Benja Incorporated
September 29, 2020
Page 4

(*See* BLA, at p. 5.)  Please be advised that Borrower has violated the foregoing provision of the BLA because it is currently maintaining its operating and other accounts at JPMorgan Chase Bank, not with Lender.

Please be advised that Borrower's violations of the aforementioned provisions of the BLA, Security Agreement and other Loan Documents constitute Events of Default under the BLA, Security Agreement, Note and other Loan Documents.  Lender reserves the right to exercise any and all rights and remedies available to it under the BLA, Security Agreement, Note and other Loan Documents or at law or in equity, without further notice or demand.  Nothing herein shall constitute a waiver or a commitment to waive by Lender of its rights and remedies due to such Events of Default or any other existing or future Defaults or Events of Default or an agreement by Lender to forbear from exercising any of its rights or remedies arising out of the Events of Default or any other existing or future Defaults or Events of Default.

Any past or future negotiations between Borrower Parties or their representatives or agents on the one hand, and Lender and its representatives or agents on the other, do not and shall not constitute a waiver of Lender's right to exercise its rights and remedies under the Loan Documents or at law or in equity.  Any alleged waiver of any of Lender's rights shall not be effective unless in writing duly executed by an authorized representative of Lender.  Borrower Parties and any other obligor for the indebtedness owed under the Loan Documents are not entitled to rely upon any oral statements made or purported to be made by or on behalf of Lender or its agents in connection with any alleged agreement by or on behalf of Lender to refrain from exercising any of Lender's rights under the Loan Documents or otherwise at law or in equity.

Nothing set forth in this letter, no delay on the part of Lender in enforcing its rights with respect to any default, and no discussions between Lender and Borrower Parties regarding the matters addressed in this letter, the Loan Documents, or any other subject matter, are intended (and none shall be deemed) to modify, limit, release, reduce, or waive any of Lender's rights, remedies, or privileges under the Loan Documents, or at law or in equity, all of which are hereby specifically reserved.  Furthermore, the enumeration of any specific default herein is not intended and shall not be deemed to waive other defaults that may currently exist under the Loan Documents.

Sincerely,

/s/ Jerry L. Switzer, Jr.
Jerry L. Switzer Jr.

cc:    Steve Henderson (via email)
       Larry Johnson (via email)
       Michael McElhone (via email)
       Mike Peluso (via email)

74927984.1



Benja Incorporated
September 29, 2020
Page 5

       John Powers (via email)
       Scott H. Olson, Esq. (via email)
       Johnny K. Merritt, Esq. (via email)

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 8

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**Busey Banking Service Support**

PO Box 17370
Urbana, IL 61803-9802
WWW.BUSEY.COM
Phone      800.203.4983
Fax          314.317.7983

**To:    Taylor Walter**
**Attn:**
**Email:**                                                                                    **Prepared By: Ashtin Keating**

**Customer Name: BENJA INCORPORATED**                        **Date Prepared: 10/1/2020**

**Loan Number: 6706744910865**                                   **Original Date: 07/16/2019**

**Collateral Address:         ,        ,                ,**                **Original Amount: $1,000,000.00**

---

Principal Balance:                                                                  $4,999,999.50

Interest Balance:                                                                   $26,656.53

Late Fee Balance:                                                                  $0.00

Unapplied Funds:                                                                   $(0.00)

Prepayment Fee:                                                                    $0.00
**PAYOFF AMOUNT:**                                                           $5,026,656.03

PMI                                                                                        $0.00

Release Fee:                                                                            $

**AMOUNT TO BE REMITTED:**                                              **$5,026,656.03**

**Daily Accrual:**                                                                    $577.26

**Search (Payoff) Date:**                                                        **10/01/2020**

*\*\*After this date a new payoff quote will need to be requested.\*\**

**Escrow Balance:  $**
*Any escrow balance or overpayment will be mailed to the borrowers within 15 business days after the receipt and processing of the funds required to pay the loan in full.   Once the loan is paid in full it immediately becomes the responsibility of the homeowner to obtain and pay property tax bills, homeowner's and flood insurance premiums.*

*Verified by: ASF*

*Caution: Any loan payoff quote is accurate according to our records AS OF THE DATE SEARCHED and only as to the loan number stated above. Actual payoff at a future date may be affected by (1)payments made, (2)interest, late fees and other expenses incurred, (3)further advances, (4)payment of insurance and/or taxes. Issuance of this statement does not suspend the requirement to make the regularly scheduled payment when due.  Our release of lien is subject to actual payment in full of all related indebtedness and our receipt, FROM THE BORROWER, of a written cancellation of any applicable revolving credit agreement.*

Mailing Address: PO Box 17370 Urbana, IL 61803-9802
Overnight Address: 115 N. Neil St, Suite 300, Champaign, IL 61820

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



### *Please return this portion along with your payoff check.*

*If you have an escrow account and your address has or will be changed, please complete the information below and send with your payoff.  This will ensure that your escrow funds will be mailed to your correct address.*

LOAN NUMBER: 6706744910865

CUSTOMER NAME: BENJA INCORPORATED

❑   FORWARDING ADDRESS:
_____

_____

_____

CUSTOMER SIGNATURE NEEDED FOR ADDRESS CHANGE:

_____         _____
SIGNATURE                                                              DATE

❑   SEND RELEASE OF LIEN TO:
_____

_____

_____

FEE FOR RECORDING WAS:

❑   COLLECTED AND HELD BY   _____

❑   INCLUDED WITH BUSEY BANK PAYOFF





# Instructions for Incoming Wires to Commercial Banking Service Support

ABA:                             071102568
Bank Name:                       Busey Bank
                                 100 W. University Ave.
                                 Champaign, IL   61820

Attn:                            Commercial Banking Service Support
Account Number:                  500719364

Further Credit To
   Beneficiary Name:          *BENJA INCORPORATED*
   Beneficiary Loan Number:   *6706744910865*
   Beneficiary Address:       *845 MARKET ST 450A*
                                 *SAN FRANCISCO CA 94117*

*Please note that any wire received after 4:00pm will be processed the next business day.  Please add additional daily accrual if necessary.*

**THANK YOU!**

Mailing Address: PO Box 17370 Urbana, IL 61803-9802
Overnight Address: 115 N. Neil St, Suite 300, Champaign, IL 61820

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BUSEY BANK**
100 W UNIVERSITY AVE
CHAMPAIGN IL 61820
800-672-8739
**Corporation Activity Statement**

**BENJA INCORPORATED**
845 MARKET ST 450A
SAN FRANCISCO CA 94117

## General Information

| | | | |
|---|---|---|---|
| Account Number: | 670674491XXXX | Customer Number: | BAB7762 |
| Home Phone: | (203)695-4167 | Work Phone: | (203)695-4167 |
| Loan Term: | 6 | Loan Type: | Coml & Industrial |
| Interest Rate: | 4.156250 % | Origination Date: | 07/16/2019 |
| | | Date Range: | 1/1/0001-12/31/9999 |

| | |
|---|---|
| Loan Officer: | Walter Taylor |
| Collateral: | All Business Assets |
| Call Report: | Commercial and Industrial Loans to US Addresses |
| Loan Purpose: | Working Capital |

## Balance & Payment Information

| | | | |
|---|---|---|---|
| Original Amount: | $1,000,000.00 | Payment Due Date: | 09/28/2020 |
| Current Balance: | $4,999,999.50 | Payment Amount: | $16,846.70 |
| Accrued Interest: | $26,656.53 | Principal/Interest: | $0.00 |
| Daily Per Diem: | $577.25688 | Payment Type: | Payment is accrued interest only |

## Loan History

| Posting Date | Transaction Description | Debit | Credit | Principal Balance |
|---|---|---|---|---|
| 07/19/2019 | Loan Advance | $668,000.00 | | $668,000.00 |

October 1, 2020
Page: 1

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

| 08/01/2019 | Loan Advance | | $232,000.00 | | $900,000.00 |
| 08/05/2019 | Loan Advance | | $50,000.00 | | $950,000.00 |
| 08/15/2019 | Regular Payment | | | $2,297.53 | $950,000.00 |
| 08/15/2019 | Interest Payment Split Out | | | $1,297.53 | $950,000.00 |
| 08/15/2019 | Principal Payment Split Out | | | $1,000.00 | $949,000.00 |
| 08/16/2019 | Interest Rate Change | 5.18200000 % | | $0.00 | $949,000.00 |
| 09/16/2019 | Interest Rate Change | 5.02475000 % | | $0.00 | $949,000.00 |
| 09/23/2019 | Loan Advance | | $40,000.00 | | $989,000.00 |
| 10/08/2019 | Regular Payment | | | $4,500.00 | $989,000.00 |

| Payment Break Down | | | | |
|---|---|---|---|---|
| Transaction Description | Affects | Debit | Credit | Balance |
| Interest Payment Split Out | Interest Payment | | | $989,000.00 |
| Interest Payment Split Out | Interest Payment | | | $989,000.00 |

| 10/16/2019 | Interest Rate Change | 4.88913000 % | | $0.00 | $989,000.00 |
| 10/28/2019 | Late Charge Assessed | | $193.27 | | $989,000.00 |
| 10/30/2019 | Loan Advance | | $11,000.00 | | $1,000,000.00 |
| 11/12/2019 | Regular Payment | | | $725.00 | $1,000,000.00 |

| Payment Break Down | | | | |
|---|---|---|---|---|
| Transaction Description | Affects | Debit | Credit | Balance |
| Interest Payment Split Out | Interest Payment | | | $1,000,000.00 |

| 11/18/2019 | Interest Rate Change | 4.76250000 % | | $0.00 | $1,000,000.00 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

| Date | Description | | Debit | Credit | Balance |
|------|-------------|--|-------|--------|---------|
| 11/18/2019 | Effective Date Credit Interest Adj. | | | $7.03 | $1,000,000.00 |
| 11/20/2019 | Regular Payment | | | $1,000.00 | $1,000,000.00 |

| Payment Break Down | | | | | |
|--------------------|--|--|--|--|--|
| Transaction Description | Affects | | Debit | Credit | Balance |
| Interest Payment Split Out | Interest Payment | | | | $1,000,000.00 |

| Date | Description | | Debit | Credit | Balance |
|------|-------------|--|-------|--------|---------|
| 11/26/2019 | Regular Payment | | | $6,770.55 | $1,000,000.00 |

| Payment Break Down | | | | | |
|--------------------|--|--|--|--|--|
| Transaction Description | Affects | | Debit | Credit | Balance |
| Late Charge Split Out | Late Charge | | | | $1,000,000.00 |
| Interest Payment Split Out | Interest Payment | | | | $1,000,000.00 |
| Late Charge Split Out | Late Charge | | | | $1,000,000.00 |
| Interest Payment Split Out | Interest Payment | | | | $1,000,000.00 |

| Date | Description | | Debit | Credit | Balance |
|------|-------------|--|-------|--------|---------|
| 12/11/2019 | Regular Payment | | | $25,000.00 | $979,153.80 |

| Payment Break Down | | | | | |
|--------------------|--|--|--|--|--|
| Transaction Description | Affects | | Debit | Credit | Balance |
| Principal Payment Split Out | Principal | | | | $979,153.80 |
| Interest Payment Split Out | Interest Payment | | | | $1,000,000.00 |

| Date | Description | | Debit | Credit | Balance |
|------|-------------|--|-------|--------|---------|
| 12/16/2019 | Interest Rate Change | 4.73738000 % | | $0.00 | $979,153.80 |
| 01/16/2020 | Interest Rate Change | 4.66900000 % | | $0.00 | $979,153.80 |
| 01/22/2020 | Regular Payment | | | $4,000.00 | $979,053.71 |

October 1, 2020
    Page: 3

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## Payment Break Down

| Transaction Description | | Affects | Debit | Credit | Balance |
|---|---|---|---|---|---|
| Principal Payment Split Out | | Principal | | | $979,053.71 |
| Interest Payment Split Out | | Interest Payment | | | $979,153.80 |
| 01/28/2020 | Loan Advance | | $20,946.29 | | $1,000,000.00 |
| 02/18/2020 | Interest Rate Change | 4.65850000 % | | $0.00 | $1,000,000.00 |
| 02/18/2020 | Effective Date Credit Interest Adj. | | | $0.58 | $1,000,000.00 |
| 02/26/2020 | Late Charge Assessed | | $211.74 | | $1,000,000.00 |
| 02/28/2020 | Interest Rate Change | 5.64700000 % | | $0.00 | $1,000,000.00 |
| 02/28/2020 | Loan Advance | | $1,250,000.00 | | $2,250,000.00 |
| 02/28/2020 | Additional Interest Payment | | | $7,473.60 | $2,250,000.00 |
| 02/28/2020 | Loan Renewal | | | $0.00 | $2,250,000.00 |
| 03/02/2020 | Loan Advance | | $550,000.00 | | $2,800,000.00 |
| 03/12/2020 | Loan Advance | | $125,000.00 | | $2,925,000.00 |
| 03/16/2020 | Interest Rate Change | 4.80013000 % | | $0.00 | $2,925,000.00 |
| 03/26/2020 | Loan Advance | | $16,100.00 | | $2,941,100.00 |
| 04/07/2020 | Late Charge Assessed | | $295.49 | | $2,941,100.00 |
| 04/08/2020 | Additional Principal Payment | | | $450,000.00 | $2,491,100.00 |
| 04/16/2020 | Interest Rate Change | 4.75075000 % | | $0.00 | $2,491,100.00 |
| 04/20/2020 | Loan Advance | | $400,000.00 | | $2,891,100.00 |

October 1, 2020

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

| 04/28/2020 | Regular Payment | | | $5,909.74 | $2,891,100.00 |

| **Payment Break Down** | | | | | |
|---|---|---|---|---|---|
| Transaction Description | Affects | | Debit | Credit | Balance |
| Interest Payment Split Out | Interest Payment | | | | $2,891,100.00 |

| 04/28/2020 | Regular Payment | | | $12,035.38 | $2,891,100.00 |

| **Payment Break Down** | | | | | |
|---|---|---|---|---|---|
| Transaction Description | Affects | | Debit | Credit | Balance |
| Interest Payment Split Out | Interest Payment | | | | $2,891,100.00 |

| Date | Transaction Description | Rate | Debit | Credit | Balance |
|---|---|---|---|---|---|
| 05/18/2020 | Interest Rate Change | 4.18213000 % | | $0.00 | $2,891,100.00 |
| 05/18/2020 | Effective Date Credit Interest Adj. | | | $91.32 | $2,891,100.00 |
| 05/28/2020 | Additional Principal Payment | | | $700,000.00 | $2,191,100.00 |
| 06/03/2020 | Loan Advance | | $500,000.00 | | $2,691,100.00 |
| 06/08/2020 | Late Charge Assessed | | $554.33 | | $2,691,100.00 |
| 06/09/2020 | Loan Advance | | $250,000.00 | | $2,941,100.00 |
| 06/09/2020 | Loan Advance | | $55,000.00 | | $2,996,100.00 |
| 06/15/2020 | Late Fee Waive Assessed | | | $211.74 | $2,996,100.00 |
| 06/15/2020 | Late Fee Waive Assessed | | | $295.49 | $2,996,100.00 |
| 06/15/2020 | Late Fee Waive Assessed | | | $554.33 | $2,996,100.00 |
| 06/15/2020 | Regular Payment | | | $11,086.50 | $2,996,100.00 |

| **Payment Break Down** | | | | | |
|---|---|---|---|---|---|
| Transaction Description | Affects | | Debit | Credit | Balance |
| Interest Payment Split Out | Interest Payment | | | | $2,996,100.00 |

| | | | | |
|---|---|---|---|---|
| 06/16/2020 | Interest Rate Change | 4.19388000 % | $0.00 | $2,996,100.00 |
| 07/08/2020 | Late Charge Assessed | $533.31 | | $2,996,100.00 |
| 07/10/2020 | Regular Payment | | $11,199.54 | $2,996,100.00 |

| Payment Break Down | | | | |
|---|---|---|---|---|
| Transaction Description | Affects | Debit | Credit | Balance |
| Late Charge Split Out | Late Charge | | | $2,996,100.00 |
| Interest Payment Split Out | Interest Payment | | | $2,996,100.00 |

| | | | | |
|---|---|---|---|---|
| 07/13/2020 | Loan Advance | $3,800.00 | | $2,999,900.00 |
| 07/16/2020 | Interest Rate Change | 4.18088000 % | $0.00 | $2,999,900.00 |
| 08/07/2020 | Late Charge Assessed | $488.60 | | $2,999,900.00 |
| 08/17/2020 | Interest Rate Change | 4.16188000 % | $0.00 | $2,999,900.00 |
| 08/17/2020 | Effective Date Credit Interest Adj. | | $1.58 | $2,999,900.00 |
| 08/18/2020 | Regular Payment | | $10,260.63 | $2,999,900.00 |

| Payment Break Down | | | | |
|---|---|---|---|---|
| Transaction Description | Affects | Debit | Credit | Balance |
| Late Charge Split Out | Late Charge | | | $2,999,900.00 |
| Interest Payment Split Out | Interest Payment | | | $2,999,900.00 |

| | | | | |
|---|---|---|---|---|
| 08/20/2020 | Interest Rate Change | 4.15200000 % | $0.00 | $2,999,900.00 |
| 08/20/2020 | Loan Advance | $1,979,296.50 | | $4,979,196.50 |
| 08/20/2020 | Loan Renewal | | $0.00 | $4,979,196.50 |
| 08/20/2020 | Regular Payment | | $10,803.49 | $4,979,196.50 |

Electronically Filed - St. Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

| Payment Break Down | | | | |
|---|---|---|---|---|
| Transaction Description | Affects | Debit | Credit | Balance |
| Interest Payment Split Out | Interest Payment | | | $4,979,196.50 |
| 08/21/2020 Loan Advance | | $20,803.00 | | $4,999,999.50 |
| 09/21/2020 Interest Rate Change | 4.15625000 % | | $0.00 | $4,999,999.50 |
| 09/21/2020 Effective Date Debit Interest Adj. | | $0.59 | | $4,999,999.50 |
| | **Totals:** | $6,174,223.12 | $1,266,521.56 | |

**20SL-CC05024**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

BUSEY BANK, an Illinois banking )
corporation, )
  )
                **Plaintiff,** )
  )
**v.** )     **Case No.:**
  )
**BENJA INCORPORATED,** )     **Division:**
**a Delaware corporation,** )
<u>Serve</u>:  **Andrew Chapin** )
     **26 Cragmont Avenue** )
     **San Francisco, CA 94116** )
**and** )
  )
**ANDREW J. CHAPIN,** )
<u>Serve at</u>: **26 Cragmont Avenue** )
     **San Francisco, CA 94116** )
  )
             **Defendants.** )

## <u>AFFIDAVIT OF JOE ALOUF</u>

I, Joe Alouf, being first duly sworn on oath, depose and state as follows:

1.     Except as otherwise indicated herein, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

2.     I am a resident of the State of California.  I am over the age of twenty-one and have never been convicted of a felony or crime of moral turpitude.

3.     I make this Affidavit in support of the Verified Petition (the "<u>Petition</u>") and the Verified Expedited Motion for Appointment of General Receiver (the "<u>Motion</u>") filed by Busey Bank (the "<u>Bank</u>") in this action.  Unless otherwise defined herein, capitalized terms have the meanings assigned to such terms in the Petition and Motion.

74985783.5

1

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

4.      I am a Certified Public Accountant, and I have over three decades of corporate finance and restructuring experience in a multitude of industries.

5.      I frequently serve as a part time or interim Chief Financial Officer (CFO) or other C-level positions for companies experiencing rapid growth, or those in financial distress and need of operational transformation or business model reengineering.

6.      I have significant experience in corporate governance and leadership positions.  I served in an executive or board director or observer capacity for public and private corporations, including Mrs. Fields Cookies, Chicken of the Sea, Guckernheimer, Grubb and Ellis, Bills DollarStores, AirMethods, Victoria Jewelry, Delia's Cleaners, Neuvant Aerospace, Foote and Davies, Minami International and QT Optoelectronics.

7.      In late May 2020, I was contacted by an executive recruiter I know about a possible engagement with a San Francisco based company called Benja Incorporated ("Benja"). I was told that Benja is a $25 million per year revenue e-commerce company (information regarding Benja is available for review on its website at www.benja.com) led by a young, charismatic but relatively inexperienced Chief Executive Officer, Andrew J. Chapin ("Chapin"), and that Benja's Board of Directors wanted a seasoned financial consultant to provide financial guidance and discipline to Chapin and the company.  I was told it would be a part-time engagement of 15-20 hours per month where I would be responsible for putting financial reporting and other systems in place to enable Benja to grow its business.  As the business would grow, either I would scale up my time, or a more permanent CFO would be hired.

8.      Thereafter, Chapin agreed to have Benja engage me as a consultant on a trial-basis, initially to review and comment on a proposed $1 million secured loan transaction that

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Chapin wanted Benja to enter into with E-Revshare Core, LLC d/b/a Empowerment Capital ("Empowerment").  During our discussions regarding the potential Empowerment transaction, Chapin mentioned that Benja had a $3 million secured line of credit with Busey Bank (the "Bank") that was untapped.  I advised Chapin that the proposed Empowerment transaction was not attractive because its terms were too expensive, and that Benja should simply draw on the much cheaper and available Bank line of credit.  Chapin said he wanted to "keep his powder dry" with the Bank line of credit and wanted to proceed with the Empowerment transaction.  I also asked how he could do the Empowerment transaction given that the Bank likely had a lien on all of Benja's assets and asked to see the underlying Bank loan documents.  Chapin claimed that the Bank line of credit was secured solely by Benja's "deposits" (as I later learned, the Bank has a lien on all of Benja's assets), so it would not be an issue.  He provided me a copy of the Bank's Promissory Note, but would not provide me the rest of the Bank's loan documents that would reflect the nature and extent of the Bank's security interest.

9.      After these discussions, I did not hear anything more from Chapin or Benja for several weeks.  Then, in mid-June 2020, I was contacted by a Michael Stern with Empowerment.  Mr. Stern advised me that he had closed and funded the $1 million loan transaction on or about June 5, 2020, and that Chapin had advised him to contact me, who Chapin claimed to be Benja's Chief Financial Officer, to provide Mr. Stern various financial information regarding Benja, including bank statements, financial statements, etc.  I told Mr. Stern that I was not aware that the transaction had closed or that Chapin wanted him to talk with me.  I told Mr. Stern that I would look into the issues and revert back to him.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

10.     Early in July 2020, Chapin extended me an offer to become Benja's part-time CFO.  I was first retained as an independent contractor, but shortly thereafter was hired as a W-2 employee of the company, retroactive to July 1, 2020.

11.     In order to perform my duties as CFO, I requested access to all books and records of the company so that I could, among other things, get up to speed and start preparing GAAP-compliant financial statements to comply with the company's reporting requirements and enable Benja to be in a position to raise capital in order to grow.  Chapin advised me that he would arrange a call with the company's outside bookkeeper, a Jennifer Lee, and he would provide me the access I needed.  Despite his statements, Chapin never put me in touch with Ms. Lee, or provide me access to the company's books and records, despite my repeated requests over time. (Much later I finally made contact with Ms. Lee, who said that she had done very little work for Benja, was never provided access to the company's books and records, and had learned that Chapin had falsely represented to lenders and investors that she served as the company's CFO and had created a fictitious Benja email account for her from which he was corresponding with investors, all without her knowledge.)

12.     Throughout July and August I received repeated requests from Mr. Stern at Empowerment for all of the Benja financial records he requested back in June.  I advised Mr. Stern that I was still not being granted access to the company's books and records and that I would continue to try to get the information he wanted.  Mr. Stern grew more and more concerned about the situation.

13.     In August 2020, Mr. Stern sent me a copy of Benja's balance sheet dated as of June 30, 2020, which he had been provided by Chapin.  The financial statement did not reflect

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

the outstanding loans from either the Bank or Empowerment.  (Nor did the financial statement reflect the outstanding $3.5 million loan from MHC (as set forth below) and other loans from individuals to the company.)  It also showed little or no accounts payable.  I knew the balance sheet was incorrect because the Empowerment loan was funded on or about June 5, 2020, and was outstanding.   When I asked Chapin about this discrepancy, he claimed that the Empowerment loan did not need to be listed because it was a "revenue sharing" agreement (even though the loan was fully secured, and as a CPA, I believe and so advised Chapin that the loan is not an off-balance sheet obligation), and that the Bank line of credit did not need to be listed because Benja had not drawn on that loan.  (I later learned that the Bank's line of credit was drawn at the time).  I noted, again, that in my view, after reviewing the UCC filings, the Bank was secured by all assets of the company and hence the company was in default with Empowerment, and also with the Bank.  Chapin claimed again that the Bank's security was limited to "deposits" and that Empowerment was okay with that lien because Empowerment's security was accounts receivable.  He further indicated that he had a legal opinion from Benja's outside counsel, Fenwick & West, to that effect.  I later learned from Fenwick that they never worked on any matter related to the Bank.

14.     Given the situation with Empowerment and my concern that the Empowerment transaction was a violation of the Bank's loan documents, I pressed Chapin to provide me copies of all of the Bank loan documents.  Chapin finally provided me a copy of the Bank's Loan Agreement, which confirmed that the Bank's line of credit is a traditional asset-based loan secured by all assets of Benja.  I told Chapin that we needed to resolve the conflict between the Bank and Empowerment liens and the outstanding defaults with both lenders.  After Chapin

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

finally authorized me to do so, I discussed the situation with Mr. Stern.  Although concerned, Mr. Stern tentatively agreed to renegotiate, including re-price, the Empowerment transaction to reflect the loan as unsecured.

15.     When I told Chapin that I wanted to talk with the Bank directly to discuss the situation, disclose the defaults, and work on a resolution, he claimed that the Bank was aware of the Empowerment transaction and had agreed to amend its security interest to be limited to "deposits" (I later learned this was not true), and that he would facilitate an introduction with the Bank.  Despite his representation, Chapin did not put me in touch with the Bank.  All along Chapin assured me that his net position with the Bank was positive (deposits less debt).  I later realized this was very much the reverse.

16.     Unbeknownst to me at the time, Chapin caused Benja to borrow an additional $2 million from the Bank in August, bringing the total outstanding Bank loan to $5 million.

17.     On September 11, 2020, I received an email from Chapin asking me to talk with a Mike Roznowski from Fractal Capital Advisors, who Chapin said was working to introduce Benja to potential lenders.  Shortly thereafter, I got on a call with Mr. Roznowski, who said that he had been working with Chapin for several months and was seeking to arrange a new loan from MidFirst Bank and wanted me to talk with MidFirst to answer questions regarding Benja's finances.  Mr. Roznowski and I then got on a call with MidFirst representatives, who said they were ready to fund a $5 million loan to Benja but needed to obtain various financial records as part of their due diligence.  I told them that I did not yet have access to the company's books and records, and that I would need time after getting access to prepare the GAAP-compliant financials they were requesting.  MidFirst said they would proceed with their credit review and

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

prepare the loan for funding pending receipt of the financial information.  I never received access to the books and records, and MidFirst never funded the loan.

18.     Immediately after the MidFirst call, I asked Mr. Roznowski to call me.  During that call I asked him how the company could get a secured loan from MidFirst given that Benja already had outstanding loans with the Bank and Empowerment.  Mr. Roznowski said that Chapin had never told him about these outstanding loans.  Mr. Roznowski then told me that Benja had another outstanding loan with MHC Financial Services, Inc. ("MHC") of approximately $3.5 million, the MHC loan was in default, MHC had made a demand for payment, Benja and MHC had entered into a standstill agreement, and the proposed MidFirst loan was intended to refinance and pay off the MHC loan.  This was the first time I had heard about the MHC loan.

19.     I also learned from Mr. Roznowski that Chapin had previously attempted to get a loan from UMB Bank ("UMB"), and that in anticipation of the loan UMB filed a UCC financing statement against Benja.  He indicated that as part of its preparation to fund the new loan, UMB discovered various inconsistencies with information it was receiving from and was becoming suspicious of Chapin.  Subsequently, in early August, UMB decided not to proceed with the proposed loan and terminated is security interest.

20.     On September 14, 2020, I called Chapin to confront him about the MHC loan.  I also told him that MHC's security interest appeared in lien searches I had obtained.  He first denied any knowledge of MHC and said it was a mistake.  He later acknowledged that MHC had previously made a loan, but that the loan had been refinanced in 2019, and was paid off with the

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

loan from the Bank.  I told Chapin that I believed he was lying and wanted to understand the true story.  Chapin responded that "all of this can be explained" in due course.

21.     Based on my growing concerns about Chapin's actions, I contacted one of Benja's Directors, Scott Sklarr, on September 14, 2020.  I participated in a call that night with both Mr. Sklarr and Nick Floppe, both Directors of Benja, and shared with them my findings and my concerns about Chapin and Benja.  On September 15, 2020, I requested to have a call with the company's Board and counsel, Fenwick, to discuss my concerns.  In the day leading to this call, I learned that Benja was in the process of raising $1.5 million in equity of which about $1 million was already funded.

22.     The call took place on September 17th.  During the call, I stated that one of my concerns is that a condition to the equity raise is a certification by Chapin to investors that Benja was not in default of any loans.  This certification was problematic, as the Bank, Empowerment and MHC loans were in default at that time.  I also laid out a plan to reach out to Empowerment and the Bank (note that I was of the impression that MHC was fully paid off at that point, which I later learned was not the case).  I demanded access to the books and records, so that I could begin the process of accurately presenting the company's financial condition to lenders and stockholders.  Chapin committed to provide this access no later than the end of the business day. However, Chapin never provided me the necessary access.

23.     Later that day, Empowerment emailed Chapin advising him that unless I was given full access to the books and records, they would accelerate their loan the following day.

24.     Late that evening, after not being granted the needed access, I sent an email to Chapin and the other parties that were on the conference call advising them that Chapin had

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

failed on his promise.  I stated that if I did not receive access to the company's books and records, I could not continue with the company.  Moments later, Chapin responded that he accepted my "resignation," which I interpreted to mean that I was being fired.  Shortly thereafter, I advised Mr. Stern that I had been fired and that I would not be able to provide the requested information.  Based on that development, Empowerment accelerated their loan pursuant to a notice dated the following day, September 18, 2020.

25.     Fenwick thereafter advised Chapin and the company that if I was not reinstated, they would withdraw as counsel.  The Directors also advised Chapin that they would resign as well.  Other investors weighed in and demanded my involvement.  As a result, Chapin reinstated me on September 19th.  I was to report to the Board, and Chapin was to provide me immediate and full access to all books and records.

26.     On September 20, 2020, I had a call with the lead counsel at Fenwick.  I advised him that Chapin had told me that a Fenwick attorney was in contact with the Bank about the situation, and that the Bank had agreed to limit its security interest to "deposits" in order to resolve the Empowerment situation.  (I later learned this was not true.)  He responded that he was not aware of these communications with the Bank, but agreed to investigate within his firm.  He thereafter confirmed that no one at Fenwick had been in contact with the Bank.  On September 21, 2020, Fenwick withdrew as Benja's counsel.

27.     On September 21, 2020, I introduced Chapin to the law firm of Vedder Price, and Chapin engaged Scott Olson from that firm as replacement counsel.

28.     On or about September 26, 2020, I understand that Directors Scott Sklarr and Nick Floppe, another shareholder, Pano Anthos, and Mr. Olson had a conversation with Chapin

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

about the situation.  They advised Chapin that he needed to resign as CEO and Director of the company and that an interim officer would be appointed in his place.  He was told that he could stay on with the company in a sales or related capacity, but that he had to immediately relinquish all financial oversite of the business.  He was to provide full access to me of all the books and records, tax returns, bank accounts, payroll system etc.  Chapin agreed with the plan and committed to provide this access.

29.     Mr. Olson prepared the corporate documents to effectuate the management changes pursuant to which Chapin resigned as CEO and Ddirector, I was appointed as Interim President (in addition to being CFO), and Mr. Anthos was appointed as Board Chairman.  True and correct copies of the Written Consents executed by Chapin on September 29, 2020, effectuating these changes are attached hereto as Group **Exhibit A**.

30.     However, Chapin again failed to provide me access.  He also failed to satisfy a very specific request—to demonstrate that the accounts receivable appearing on the borrowing base certificates provided to the Bank were legitimate.  To this day, Chapin hasn't provided any indication that the accounts receivable are associated with legitimate invoices to real clients.

31.     The following day, September 29, 2020, Chapin reversed course and announced that he intended, as majority shareholder, to reinstate himself as CEO and sole Director of Benja. It is not clear whether Chapin is in fact the majority shareholder of Benja and has the ability to take this action.  Various documents previously provided by Chapin have all shown that he holds about 25% of the equity.

32.     As a result of Chapin's actions, Vedder Price withdrew as Benja's counsel on the same day.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

33.     On October 1, 2020, Chapin sent an email to the Bank, on which I was carbon copied, announcing the foregoing management changes and that neither Anthos nor I are authorized to speak for Benja.  A true and correct copy of Chapin's email is attached hereto as **Exhibit B**.

34.     Although Chapin consistently refused to give me access to the books and records of Benja, I was able to gain access to certain limited company financial documents.  In addition to the June 30, 2020 financial statement provided by Mr. Stern as noted above, Mr. Stern provided me with copies of monthly statements of Benja's deposit account at the Bank for the months of April through August 2020, which he had received from Chapin, true and correct copies of which are attached hereto as **Exhibit C** (collectively, the "Chapin Bank Statements").  I am aware that Chapin provided the Chapin Bank Statements not only to Empowerment, but to other potential lenders and investors.

35.     During recent discussions with representatives of the Bank, I received from the Bank copies of the actual monthly statements of Benja's deposit account at the Bank for the months of April through August 2020, true and correct copies of which are attached hereto as **Exhibit D** (collectively, the "Busey Bank Statements").  Upon my review with the Bank of both sets of bank statements, we determined that Chapin had altered the Chapin Bank Statements to reflect numerous large deposits to the Bank account from purported customers that do not appear in the actual Busey Bank Statements, the result of which is to substantially inflate the account balances appearing in the Chapin Bank Accounts.  Below are the month-end account balances as reflected in each set of bank statements as prepared by the Bank and provided to me:

| Account Balance in Busey Bank Statements | Account Balance in Chapin Bank Statements |
| --- | --- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

| April 30, 2020 | $195,406.71 | $1,371,516.57 |
| May 30, 2020 | $3,016.22 | $227,186.20 |
| June 30, 2020 | $17,983.54- | $4,804,007.63 |
| July 31, 2020 | $27,538.59- | $2,313,294.48 |
| August 31, 2020 | $1,974.80 | $1,272,044.92 |

36.     Thus, it appears that Chapin overstated the balance of the Bank account in the Chapin Bank Statements he provided to Empowerment and other creditors and investors by hundreds of thousands or millions of dollars, including by over $4.8 million in the June 2020 statement and approximately $1.27 million in the last (August 2020) statement.

37.     Additionally, I am aware that Chapin executed and delivered to the Bank borrowing base certificates from March to July 2020 reflecting accounts receivable totaling between $4.7 million to $6 million, which I have no reason to believe are accurate.  Among other things, the attached Busey Bank Statements do not reflect any deposits made to the Bank account from the purported customers appearing in the borrowing base certificates indicating that the accounts receivable are real.

38.     I also have come to learn that approximately three months ago, Chapin caused Benja to open a separate account at JPMorgan Chase Bank ("Chase"), which was not permitted under the Bank's loan documents.  I was able to gain limited access to the activity in the Chase account, and there is no indication that customer deposits have been made to that account.  This reflects that if Benja has any real customers, they are remitting payment to a company account that only Chapin is aware exists.  While reviewing activity in the Chase account, I did discover that a $600,000 deposit was made to the Chase account on September 25, 2020, made by a

74985783.5                                    12

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

company called the Taco Corporation of America ("TCA").  Because TCA is not a customer or a known party doing business with Benja, I investigated TCA to determine the nature of the deposit.  I determined that TCA is owned or otherwise affiliated with a Brett Brueck.  I then reached out to Mr. Brueck and thereafter had several conversations with him and his counsel. Mr. Brueck advised me that the $600,000 deposit was a secured loan he had just made to Benja at Chapin's request.  He also claimed to have previously been a director and shareholder of Benja.  He confirmed that over the last year he had received approximately $4.6 million from Benja, apparently in repayment of his equity interests in the company.  A review of the Busey Bank Statements reflects some of these transfers.  I believe that Mr. Brueck and his counsel convinced Chapin to rescind his resignation as CEO and director of Benja by suggesting that his resignation was done under duress and that I have some agenda in seeking his removal.

39.     When I discovered the $600,000 deposit in the Chase account from TCA, I noticed that immediately thereafter a $350,000 transfer was made out of the Chase account to a personal Chapin account at Chase.  When I raised this transfer with Chapin, he claimed that he needed the $350,000 in order to return an equity investment from a Tom Peters of $250,000 in connection with the recent equity raise.  Chapin claimed he couldn't make the transfer out of Benja's Chase account because the withdrawal would require two signatures.  Chapin claimed he needed the extra $100,000 to repay an additional amount owed to MHC.  I later learned that Peters was wired $250,000 from Chapin.

40.     As part of Chapin agreeing to step down, I contacted Chase to have signature authority transferred over to me.  However, the next day, after Chapin reinstated himself as CEO,

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

he contacted Chase to reassert control over the account.  Similar action took place in connection with the payroll account.

41.     On October 2, 2020, Chapin contacted me by telephone and advised me that he was terminating my employment with Benja.  To date, I have not been able to determine whether Chapin has the corporate authority to terminate my employment.  I asked Benja's new corporate counsel, Wilson Sonsini Goodrich & Rosati, to give me direction as to my status, which they have not provided.  In fact, I was advised on October 5, 2020, that Wilson Sonsini has declined to go forward with its representation of Benja.

42.     Based on all of the foregoing, I firmly believe that Chapin has operated, and will continue to operate, Benja as a fraudulent enterprise to the detriment of the Bank, other creditors and investors.  I believe it is critical that a receiver be appointed for Benja in order to investigate Chapin's actions and safeguard Benja's remaining assets.

**[Remainder of page left intentionally blank]**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

I certify under the penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

_____
Joe Alouf

WITNESS my hand and official seal.

_____
Notary Public

My Commission Expires:   Aug. 4th 2021

CID CHIU
Notary Public – California
San Francisco County
Commission # 2208802
My Comm. Expires Aug 4, 2021

74985783.5

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT A

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BENJA INCORPORATED**

**UNANIMOUS WRITTEN CONSENT OF THE BOARD OF DIRECTORS**

**September 29, 2020**

The undersigned, being the sole member of the Board of Directors (the "Board") of Benja Incorporated, a Delaware corporation (the "Corporation"), hereby consent and agree, in lieu of a special meeting of the Board, to the approval and adoption of the following resolutions:

1.    With Respect to the Election of a New Chief Executive Officer:

**WHEREAS**, Andrew Chapin has resigned as Chief Executive Officer of the Corporation, effective as of September 29, 2020;

**WHEREAS**, in accordance with Section 5.5 of the Bylaws of the Corporation, any vacancy occurring in any officer position of the Corporation may be filled by the Board; and

**WHEREAS**, the Board has determined that it is in the best interest of the Corporation to appoint Joe Alouf as Interim President of the Corporation.

**NOW, THEREFORE, BE IT RESOLVED**, that effective as of date hereof, Joe Alouf be, and the same hereby is, appointed as Interim President of the Corporation, to serve until the earlier of his death, resignation or removal or until his successor shall have been duly elected and qualified.

2.    Omnibus:

**RESOLVED**, that, in order to fully carry out the intent and effectuate the purposes of the foregoing resolutions, the directors and officers of the Corporation be, and each of them hereby is, individually authorized in the name and on behalf of the Corporation from time to time (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, (ii) to pay or cause to be paid on behalf of the Corporation any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Corporation, as each such director or officer, in such person's discretion, shall deem necessary or advisable to complete and effect the foregoing transactions or to carry out the intent and purposes of the foregoing resolutions and the transactions contemplated thereby, the preparation, execution, delivery and performance of any such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, the

VP/#40220901

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

payment of any such costs or expenses and the performance of any such other acts shall be conclusive evidence of the approval of the Board thereof and all matters relating thereto.

**[SIGNATURE PAGE TO FOLLOW]**

2

VP/#40220901

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

*(Signature Page to Unanimous Written Consent of the Board of Directors of Benja Incorporated.)*

This written consent is made pursuant to Section 141(f) of the General Corporation Law of the State of Delaware, and amended, shall be effective as of the date hereof, shall have the same force and effect as a vote of the Board at a duly called meeting and shall be filed with the minutes of the Corporation in the Corporation's minute book.  A facsimile or electronic mail copy of a signature page hereto shall be deemed an original for all purposes.  This consent may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same document.

Dated as of the date first written above.

**BOARD**:

_____
Andrew J. Chapin

VR/#40220901

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**BENJA INCORPORATED**

**WRITTEN CONSENT OF THE [MAJORITY OF COMMON STOCK]¹**

**September 29, 2020**

The undersigned, being the holders of the majority of the common stock (the "Majority Holders") of Benja Incorporated, a Delaware corporation (the "Corporation"), hereby consent and agree, in lieu of a special meeting of the stockholders, to the approval and adoption of the following resolutions:

1.      With Respect to the Election of a Director:

**WHEREAS**, Andrew Chapin resigned as the sole director of the Corporation, effective as of September 29, 2020; and

**WHEREAS**, the Majority Holders have determined that it is in the best interest of the Corporation to appoint Pano Anthos as the sole director of the Corporation.

**NOW, THEREFORE, BE IT RESOLVED**, that effective as of the date hereof, Pano Anthos be, and the same hereby is, appointed as the sole director of the Corporation, to serve until the earlier of his death, resignation or removal or until his successor shall have been duly elected and qualified.

2.      Omnibus:

**RESOLVED**, that, in order to fully carry out the intent and effectuate the purposes of the foregoing resolutions, the directors and officers of the Corporation be, and each of them hereby is, individually authorized in the name and on behalf of the Corporation from time to time (i) to prepare, execute, deliver and perform, as the case may be, such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances, instruments, notices, orders, requests, resolutions, supplements or undertakings, (ii) to pay or cause to be paid on behalf of the Corporation any related costs and expenses and (iii) to take such other actions, in the name and on behalf of the Corporation, as each such director or officer, in such person's discretion, shall deem necessary or advisable to complete and effect the foregoing transactions or to carry out the intent and purposes of the foregoing resolutions and the transactions contemplated thereby, the preparation, execution, delivery and performance of any such agreements, amendments, applications, approvals, certificates, communications, consents, demands, directions, documents, further assurances,

---

¹ NTD: Please confirm.

1

VP/#40220007.3

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

instruments, notices, orders, requests, resolutions, supplements or undertakings, the payment of any such costs or expenses and the performance of any such other acts shall be conclusive evidence of the approval of the Majority Holders thereof and all matters relating thereto.

**[SIGNATURE PAGE TO FOLLOW]**

VP/#40220907.3

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

*(Signature Page to Written Consent of the Majority Holders of Benja Incorporated.)*

This written consent is made pursuant to Section 228 of the General Corporation Law of the State of Delaware, and amended, shall be effective as of the date hereof, shall have the same force and effect as a vote of the Majority Holders at a duly called meeting and shall be filed with the minutes of the Corporation in the Corporation's minute book.  A facsimile or electronic mail copy of a signature page hereto shall be deemed an original for all purposes.  This consent may be executed in two or more counterparts, each of which shall be deemed an original but all of which shall together constitute one and the same document.

Dated as of the date first written above.

**MAJORITY HOLDERS**:

By _____
Andrew Chapin

[__]

By _____
Name:
Its:

[__]

By _____
Name:
Its:

[__]

By _____
Name:
Its:

VP/#40220907.3

*(Signature Page to Written Consent of the Majority Holders of Benja Incorporated.)*

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

VP/#40220907.3

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

EXHIBIT B

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**From:** Andrew Chapin <andrew@benja.co>
**Date:** October 1, 2020 at 11:54:55 AM CDT
**To:** "Ricke, Patrick" <Patrick.Ricke@busey.com>
**Cc:** Joe Alouf <alouf@benja.co>, Pano Anthos <pano@xrclabs.com>
**Subject: State of Benja**

---

**CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

---

Patrick,

As you are likely aware, there were a few management changes at Benja the last few days.

A long story made short — I am writing to inform you the move made early in the week (appointing Pano Anthos to the Board of Directors and Joe Alouf as Interim President) has been undone by vote of the majority of shareholders. I have returned to each of those roles effective yesterday.

Mr. Anthos and Mr. Alouf are no longer authorized to speak on behalf of Benja as it relates to this matter.

I would like to discuss the state of affairs between Benja and Busey. I come bearing a plan for resolution - and the sooner we can connect, the sooner we can put this in motion.

I'm available at (203) 695 4167 or (415) 326 4167. Give me a call, would be good to touch base briefly before a call with the full group.

Best,

**Andrew J. Chapin**
Co-Founder
Benja Incorporated

The information contained in this e-mail is privileged and confidential. Unless otherwise indicated or obvious from the message, this is intended only for the individual(s) listed above. Please see our Privacy Notices at http://www.busey.com.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT E

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

```
   7283947                    Date 4/30/2020        Page     1
   BENJA INC                  Primary Account       500764766
   845 MARKET ST 450A
   SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                       Number of Enclosures               0
Account Number            500764766     Statement Dates    4/01/20 thru 4/30/20
Previous Balance         353,222.03     Days in the statement period      30
    19 Deposits/Credits 1,944,608.17    Average Ledger            862,369.30
     4 Checks/Debits      926,313.63    Average Collected         862,369.30
Service Charge                  .00
Interest Paid                   .00
Ending Balance         1,371,516.57
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 4/1 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 1,990.00 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 3,734.22 |
| 4/1 | STRIPE TRANSFER X | TRANSFER | 15,630.00 |
| 4/1 | UNDER ARMOUR INC ACH/CRED 200401 OFA58223889962 | TRANSFER | 39,442.01 |
| 4/1 | ZAPPOS.COM, INC. ACH/CRED 200401 OFA51566133585 | TRANSFER | 49,100.65 |
| 4/1 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200401 OFA99403294665 | TRANSFER | 102,184.75 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  4/30/2020        Page      2
Primary Account          500764766

BUSINESS ANALYSIS            500764766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 4/1 | COLUMBIA SPORTSWEAR CO ACH/CRED 200401 TRANSFER OFA82401998473 | 166,474.00 |
| 4/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200401 TRANSFER OFA83394855793 | 322,445.49 |
| 4/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200401 TRANSFER OFA87411909044 | 357,309.60 |
| 4/2 | FANATICS INC. ACH/CRED  200402 TRANSFER OFA78016096012 | 479,383.68 |
| 4/30 | STRIPE TRANSFER X  TRANSFER | 1,990.00 |
| 4/30 | STRIPE TRANSFER X  TRANSFER | 1,998.75 |
| 4/30 | STRIPE TRANSFER X  TRANSFER | 3,425.50 |
| 4/30 | HELLY HANSEN LEISURE INC. ACH/CRED 200430 TRANSFER OFA69938477483 | 16,780.00 |
| 4/30 | UNDER ARMOUR INC ACH/CRED 200430 TRANSFER OFA33412878394 | 46,862.86 |
| 4/30 | ZAPPOS.COM, INC. ACH/CRED 20430 TRANSFER OFA34851134728 | 53,091.76 |
| 4/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200430 TRANSFER OFA92715807823 | 101,176.50 |
| 4/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200430 TRANSFER OFA86925798887 | 180,338.40 |



100 W University Ave
Champaign IL 61820

Date  4/30/2020        Page     3
Primary Account        500764766

BUSINESS ANALYSIS              500764766 (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 4/1 | BILL PAY FLIPBOARD BENJA CK ON 200401      PAYMENT | 158,424.00– |
| 4/30 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA04166994160      PAYMENT | 76,715.43– |
| 4/30 | BILL PAY FLIPBOARD BENJA CK ON 200430      PAYMENT | 152,904.00– |
| 4/30 | BILL PAY PINTEREST INC BENJA CK ON 200430      PAYMENT | 538,270.30– |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

```
   7990492                    Date 5/31/2020        Page    1
   BENJA INC                  Primary Account        500764766
   845 MARKET ST 450A
   SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                 Number of Enclosures              0
Account Number        500764766   Statement Dates   5/01/20 thru 5/31/20
Previous Balance   1,371,516.57   Days in the statement period     31
        9 Deposits/Credits  1,659,965.67   Average Ledger          799,351.39
        9 Checks/Debits  2,804,296.04   Average Collected       799,351.39
Service Charge              .00
Interest Paid               .00
Ending Balance       227,186.20
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 5/1 | STRIPE TRANSFER X | TRANSFER | 2,317.50 |
| 5/1 | STRIPE TRANSFER X | TRANSFER | 3,984.12 |
| 5/1 | WOLVERINE WORLD WIDE C ACH/CRED 200501 OFA18474943192 | TRANSFER | 16,248.00 |
| 5/1 | STRIPE TRANSFER X | TRANSFER | 76,455.00 |
| 5/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200501 OFA47918205132 | TRANSFER | 324,408.11 |
| 5/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200501 OFA20349940646 | TRANSFER | 357,309.60 |



100 W University Ave
Champaign IL 61820

Date  5/31/2020      Page     2
Primary Account      500764766

BUSINESS ANALYSIS           500764766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** **TRANSACTION DESCRIPTION** | | **AMOUNT** |
| 5/1 | NIKE INC. ACH/CRED 200501  TRANSFER OFA95740208255 | 374,652.53 |
| 5/1 | FANATICS INC. ACH/CRED  200501  TRANSFER OFA31706715418 | 483,094.95 |
| 5/2 | STRIPE TRANSFER X  TRANSFER | 1,250.00 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  5/31/2020        Page      3
Primary Account          500764766

BUSINESS ANALYSIS              500764766 (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 5/1 | GUSTO Benja Incorporated n60lttz0rr8 PAYMENT | 124,332.29– |
| 5/1 | Online Domestic Wire Transfer Via:MUFG UNION BANK/122000496 A/C: JOMBOY MEDIA INC. PAYMENT | 160,000.00– |
| 5/1 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803.. PAYMENT | 263,271.44– |
| 5/1 | BILL PAY SPORTSILLU xxxBENJA ON PAYMENT | 576,807.00– |
| 5/31 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA42515646530 PAYMENT | 79,198.13– |
| 5/31 | BILL PAY FLIPBOARD BENJA CK ON 200531 PAYMENT | 164,447.70– |
| 5/31 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803.. PAYMENT | 274,654.84– |
| 5/31 | BILL PAY PINTEREST INC BENJA CK ON 200531 OFA68401088588 PAYMENT | 583,664.64– |
| 5/31 | BILL PAY SPORTSILLU xxxBENJA ON PAYMENT | 613,961.25– |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

```
     8020564                      Date 6/30/2020        Page     1
BENJA INC                        Primary Account        500764766
845 MARKET ST 450A
SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | | |
|---|---|---|---|
| Account Number | 500764766 | Number of Enclosures | 0 |
| Previous Balance | 227,186.20 | Statement Dates | 6/01/20 thru 6/30/20 |
| 43 Deposits/Credits | 6,324,533.45 | Days in the statement period | 30 |
| 8 Checks/Debits | 1,747,711.92 | Average Ledger | 1,483,076.64 |
| Service Charge | .00 | Average Collected | 1,483,076.64 |
| Interest Paid | .00 | | |
| Ending Balance | 4,804,007.73 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 6/1 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,011.91 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,019.80 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 2,463.75 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 3,484.49 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 4,019.82 |
| 6/1 | HELLY HANSEN LEISURE INC. ACH/CRED 200601 OFA89924079043 | TRANSFER | 17,083.40 |
| 6/1 | WOLVERINE WORLD WIDE C ACH/CRED 200601 OFA49389309622 | TRANSFER | 17,400.00 |
| 6/1 | STRIPE TRANSFER X | TRANSFER | 20,582.88 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  6/30/2020       Page      2
Primary Account          500764766

BUSINESS ANALYSIS              500764766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 6/1 | UNDER ARMOUR INC ACH/CRED 200601 OFA60545457583 | TRANSFER | 53,676.20 |
| 6/1 | ZAPPOS.COM, INC. ACH/CRED 200601 OFA61339634857 | TRANSFER | 53,837.69 |
| 6/1 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200601 OFA584739079394 | TRANSFER | 96,218.50 |
| 6/1 | COLUMBIA SPORTSWEAR CO ACH/CRED 200601 OFA54480887555 | TRANSFER | 212,473.85 |
| 6/1 | NEW BALANCE ATHLETICS, INC ACH/CRED 200601 OFA20683754258 | TRANSFER | 324,805.50 |
| 6/1 | BACKCOUNTRY.COM, LLC. ACH/CRED 200601 OFA60406856944 | TRANSFER | 358,864.45 |
| 6/1 | NIKE INC. ACH/CRED 200601 OFA54571761717 | TRANSFER | 380,281.86 |
| 6/1 | FANATICS INC. ACH/CRED  200601 OFA77381734722 | TRANSFER | 462,183.93 |
| 6/5 | WIRE TRANSFER ... | TRANSFER | 1,000,000.00 |
| 6/9 | ADVANCE TO ***4766 ADVANCE FROM ***0865 | TRANSFER | 1,100,000.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 1,250.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,140.03 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  6/30/2020        Page     3
Primary Account          500764766

BUSINESS ANALYSIS              500764766 (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,194.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 2,514.94 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 3,660.44 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 4,199.00 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 5,055.12 |
| 6/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200630 OFA29775116753 | TRANSFER | 13,967.72 |
| 6/30 | HELLY HANSEN LEISURE INC. ACH/CRED 200630 OFA23541722980 | TRANSFER | 17,255.90 |
| 6/30 | WOLVERINE WORLD WIDE C ACH/CRED 200630 OFA39202182771 | TRANSFER | 17,927.22 |
| 6/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200630 OFA60924447472 | TRANSFER | 18,768.25 |
| 6/30 | NEW BALANCE ATHLETICS, INC ACH/CRED 200630 OFA9647096787 | TRANSFER | 21,069.78 |
| 6/30 | STRIPE TRANSFER X | TRANSFER | 21,540.84 |
| 6/30 | NIKE INC. ACH/CRED 200630 OFA59642156022 | TRANSFER | 24,636.71 |
| 6/30 | BACKCOUNTRY.COM, LLC. ACH/CRED 200630 OFA49415436471 | TRANSFER | 24,847.80 |
| 6/30 | ZAPPOS.COM, INC. ACH/CRED 200630 OFA62443625650 | TRANSFER | 54,729.73 |
| 6/30 | UNDER ARMOUR INC ACH/CRED 200401 OFA58223889962 | TRANSFER | 55,206.36 |
| 6/30 | CHECK DEP | TRANSFER | 89,118.00 |



100 W University Ave
Champaign IL 61820

Date  6/30/2020          Page     4
Primary Account          500764766

BUSINESS ANALYSIS              500764766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 6/30 | PATAGONIA INTERNATIONAL, INC. ACH/CRED 200630 OFA96259626036 TRANSFER | 102,018.25 |
| 6/30 | COLUMBIA SPORTSWEAR CO ACH/CRED 200630 OFA94483634455 TRANSFER | 208,453.60 |
| 6/30 | NEW BALANCE ATHLETICS, INC ACH/CRED 200630 OFA61261172972 TRANSFER | 316,963.13 |
| 6/30 | NIKE INC. ACH/CRED 200630 OFA20383116002 TRANSFER | 368,265.59 |
| 6/30 | BACKCOUNTRY.COM, LLC. ACH/CRED 200630 OFA42685451429 TRANSFER | 371,854.80 |
| 6/30 | FANATICS INC. ACH/CRED 200630 OFA36495538206 TRANSFER | 464,238.21 |



100 W University Ave
Champaign IL 61820

Date  6/30/2020        Page      5
Primary Account           500764766

BUSINESS ANALYSIS                500764766 (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 6/1 | Amazon Az 3600037 EDI PYMNTS BENJA INCOR OFA81030497279 | PAYMENT | 98,364.57− |
| 6/1 | GUSTO Benja Incorporated n60lttz0rr8 | PAYMENT | 124,332.29− |
| 6/1 | CK #5009 | PAYMENT | 140,000.00− |
| 6/1 | BILL PAY PINTEREST INC BENJA CK ON 200102 OFA68401088588 | PAYMENT | 146,520.33− |
| 6/1 | Online Domestic Wire Transfer Via:MUFG UNION BANK/122000496 A/C: JOMBOY MEDIA INC. | PAYMENT | 170,000.00− |
| 6/1 | BILL PAY SPORTSILLU xxxBENJA ON | PAYMENT | 598,647.00− |
| 6/30 | BILL PAY FLIPBOARD BENJA CK ON 200630 | PAYMENT | 189,710.81− |
| 6/30 | Online Domestic Wire Transfer Via:Silvergate Lajolla/322286803.. | PAYMENT | 280,136.92− |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

```
    8069609                 Date 7/31/2020        Page     1
    BENJA INC               Primary Account          500764766
    845 MARKET ST 450A
    SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                    Number of Enclosures                    0
Account Number          500764766    Statement Dates   7/01/20 thru 7/31/20
Previous Balance     4,804,007.73    Days in the statement period          31
    1 Deposits/Credits   88,794.00   Average Ledger            3,494,585.87
   12 Checks/Debits   2,579,507.25   Average Collected         3,494,585.87
Service Charge                .00
Interest Paid                 .00
Ending Balance       2,313,294.48
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 7/1 | COVERAGEGEAR<br>ACH/CRED 200701 | TRANSFER | 88,794.00 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  7/31/2020        Page      2
Primary Account          500764766

BUSINESS ANALYSIS              500764766 (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 7/1 | GUSTO Benja Incorporated | PAYMENT | 146,520.33- |
| 7/1 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 585,795.60- |
| 7/2 | Amazon Az EDI PYMNTS BENJA INCOR PAYMENT OFA | PAYMENT | 95,509.47- |
| 7/2 | TIK TOK INC. TRANSFER OFA | PAYMENT | 138,000.00- |
| 7/2 | PINTEREST INC BENJA CK ON PAYMENT OFA | PAYMENT | 609,133.20- |
| 7/3 | NEXT DOOR BENJA CK ON PAYMENT | PAYMENT | 86,250.00- |
| 7/3 | Online Domestic Wire Transfer Via:MUFG UNION BANK A/C: JOMBOY MEDIA INC. | PAYMENT | 260,000.00- |
| 7/3 | CK PAYMENT | PAYMENT | 283,772.84- |
| 7/10 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,Benja June 2020 | PAYMENT | 3,597.44- |
| 7/14 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,20200714MMQFMP UN000137 | PAYMENT | 33,917.56- |
| 7/31 | SPOTIFY INT xxxBENJA ON PAYMENT | PAYMENT | 133,500.00- |
| 7/31 | FLIPBOARD CK ON PAYMENT | PAYMENT | 203,510.81- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

```
     8102849                     Date 8/31/2020        Page    1
     BENJA INC                   Primary Account        500764766
     845 MARKET ST 450A
     SAN FRANCISCO CA 94103
```

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS                Number of Enclosures                   0
Account Number      500764766    Statement Dates      8/01/20 thru 8/31/20
Previous Balance  2,313,294.48   Days in the statement period          31
     23 Deposits/Credits  2,275,275.28   Average Ledger      2,400,566.19
     13 Checks/Debits     3,316,524.84   Average Collected   2,400,566.19
Service Charge             .00
Interest Paid              .00
Ending Balance    1,272,044.92
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $.00 |
| Returned Item Fees | $.00 | $.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|---|---|---|---|
| 8/3 | STRIPE TRANSFER X | TRANSFER | 1,500.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 1,950.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 2,080.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 2,250.00 |
| 8/3 | NIKE INC. ACH/CRED TRANSFER OFA | TRANSFER | 2,397.50 |
| 8/3 | NEW BALANCE ATHLETICS, INC. ACH/CRED | TRANSFER | 2,441.11 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 4,080.00 |
| 8/3 | PATAGONIA TRANSFER INTERNATIONAL INC. ACH/CRED OFA | TRANSFER | 4,625.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 5,137.37 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  8/31/2020        Page      2
Primary Account        500764766

BUSINESS ANALYSIS                 500764766 (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 8/3 | SPORTSILLU xxxBENJA ON PAYMENT | TRANSFER | 5,542.08 |
| 8/3 | BACKCOUNTRY.COM LLC. ACH/CRED TRANSFER OFA | TRANSFER | 5,802.21 |
| 8/3 | HELLY HANSEN LEISURE INC. ACH/CRED TRANSFER OFA | TRANSFER | 16,090.00 |
| 8/3 | WOLVERWINE WORLD WIDE C ACH/CRED TRANSFER OFA | TRANSFER | 16,854.00 |
| 8/3 | STRIPE TRANSFER X | TRANSFER | 22,144.68 |
| 8/3 | FANATICS INC. ACH/CRED TRANSFER OFA | TRANSFER | 31,962.47 |
| 8/3 | COVERAGEGEAR ACH/CRED 200803 | TRANSFER | 89,946.00 |
| 8/3 | COLUMBIA SPORTSWEAR CO ACH/CRED | TRANSFER | 259,931.74 |
| 8/3 | NEW BALANCE ATHLETICS, INC. ACH/CRED | TRANSFER | 393,552.67 |
| 8/3 | NIKE INC. ACH/CRED TRANSFER OFA | TRANSFER | 451,048.68 |
| 8/3 | FANATICS INC. ACH/CRED TRANSFER OFA | TRANSFER | 457,464.90 |
| 8/3 | BACKCOUNTRY.COM LLC. ACH/CRED TRANSFER OFA | TRANSFER | 460,688.09 |
| 8/10 | Wire Transfer Credit WF EXC RTN TO SNDR 721 WIP MAC P6101-081 1300 SW 5TH AVE 8TH FL PORTLAND OR 97201-566720200810I1B7031 R011337 | TRANSFER | 37,386.78 |



100 W University Ave
Champaign IL 61820

Date  8/31/2020        Page      3
Primary Account           500764766

BUSINESS ANALYSIS               500764766 (Continued)

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| 8/21 | Memo Credit PAYPAL TRANSFER ACH Entry | TRANSFER | 400.00 |

<div align="center">

## DEPOSITS AND OTHER CREDITS

## CHECKS AND OTHER DEBITS

</div>

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| 8/3 | SPORTSILLU xxxBENJA ON PAYMENT | PAYMENT | 603,750.00− |
| 8/10 | Wire Transfer Debit E-Revshare Core LLC 121000248 026012881 WELLS FARGO BANK,20200810MMQFMP UN000097 | PAYMENT | 37,386.78− |
| 8/12 | Wire Transfer Debit E-Revshare Core LLC 121000248 1200787933 WELLS FARGO BANK,20200812MMQFMP UN000149 | PAYMENT | 37,386.78− |
| 8/31 | Amazon Az EDI PYMNTS BENJA INCOR PAYMENT OFA | PAYMENT | 96,758.43− |
| 8/31 | GUSTO Benja Incorporated | PAYMENT | 146,520.33− |
| 8/31 | NEXT DOOR BENJA CK ON PAYMENT OFA | PAYMENT | 149,533.00− |
| 8/31 | TIK TOK INC. TRANSFER OFA | PAYMENT | 164,000.00− |
| 8/31 | FLIPBOARD CK ON PAYMENT OFA | PAYMENT | 203,510.81− |
| 8/31 | CONDE xxxBENJA | PAYMENT | 208,484.54− |
| 8/31 | Online Domestic Wire Transfer Via:MUFG UNION BANK A/C: JOMBOY MEDIA INC. | PAYMENT | 260,000.00− |
| 8/31 | CK PAYMENT | PAYMENT | 283,772.84− |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  8/31/2020        Page      4
Primary Account          500764766

BUSINESS ANALYSIS                500764766 (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 8/31 | PINTEREST INC BENJA CK ON PAYMENT OFA   PAYMENT | 549,937.48- |
| 8/31 | SPOTIFY INT xxxBENJA ON PAYMENT   PAYMENT | 575,937.48- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT D

# Busey®

100 W University Ave
Champaign IL 61820

15810992                          Date  8/31/20         Page    1
BENJA INC                         Primary Account        500764766
845 MARKET ST 450A
SAN FRANCISCO CA 94117

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 2 |
|---|---|---|---|
| Account Number | 500764766 | Statement Dates  8/03/20 thru  8/31/20 | |
| Previous Balance | 27,538.59- | Days in the statement period | 29 |
| 38 Deposits/Credits | 2,289,795.77 | Average Ledger | 8,477.06 |
| 35 Checks/Debits | 2,260,282.38 | Average Collected | 8,477.06 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 1,974.80 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 8/03 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-M2D0B0E2U5B4 | 77.21 |
| 8/04 | Reverse OD Item Charge | 35.00 |
| 8/04 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-C2I2I7X5Q0F3 | 273.50 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Reverse OD Item Charge | 35.00 |
| 8/05 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200805B1QGC08C003144<br>20200805MMQFMPUN000082<br>08050914FT03 | 25,000.00 |
| 8/05 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Q7Z8U4B8W7E5 | 127.47 |
| 8/06 | Reverse OD Item Charge | 35.00 |
| 8/06 | Reverse OD Item Charge | 35.00 |
| 8/06 | Wire Transfer Credit<br>ANDREW J CHAPIN | 20,000.00 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

(Account Number)

New Address: _____

(Street Address) _____ (Unit #)

(City) _____ (State) _____ (Zip Code)

Member FDIC   (Telephone Number) _____ (Social Security Number)

(Customer Signature) _____

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | | |
|---|---|---|---|---|---|
| Check No. | $ | | | | |

ENDING  BALANCE Shown On This Statement   $ _____   Current Checkbook Balance   $ _____

ADD (+)   $ _____   ADD (+)

Deposits, Loan Advances, Credit Memos, And   $ _____   Interest Earned From This Statement   $ _____
Other Automatic Deposits Not Shown On This
Statement   $ _____   SUBTRACT (-)

Misc. Charges From This Statement   $ _____

SUBTRACT (-)   $ _____

Total of Checks Outstanding, Automatic Loan   $ _____   **NEW CHECKBOOK BALANCE**
Payments, Automatic Savings Transfers, Service   $ _____   Should Agree With BALANCE Line   $ _____
Charges, Debit Memos  And Other Automatic   $ _____
Deductions Not Shown On This Statement   $ _____

TOTAL   $   BALANCE   $_____

### IMPORTANT INFORMATION

#### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1)  Tell us your name and account  number.
(2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)  Tell us the date and the dollar amount of the suspected  error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1)  Your name and account number.
(2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)  The date and the dollar amount of the suspected  error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

CSI REV 4/16   6146-STMT

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  8/31/20          Page     2
Primary Account        500764766

BUSINESS ANALYSIS                500764766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|  | 26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200806B1QGC03C005761<br>20200806MMQFMPUN000133<br>08061035FT03 | |
| 8/06 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Y3N2O6U8G3E5 | 70.22 |
| 8/07 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200807B1QGC05C009613<br>20200807MMQFMPUN000204<br>08071319FT03 | 134,000.00 |
| 8/07 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-W5G3P6P5G5R8 | 111.32 |
| 8/10 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200810B1QGC06C002330<br>20200810MMQFMPUN000037<br>08100801FT03 | 25,000.00 |
| 8/10 | Wire Transfer Credit<br>WF EXC RTN TO SNDR 721 WIP<br>MAC P6101-081<br>1300 SW 5TH AVE 8TH FL<br>PORTLAND OR 97201-5667<br>20200810I1B7031R011337<br>20200810MMQFMPUN000177<br>08101335FT03 | 37,386.78 |
| 8/10 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-O6C6P2B7B2U4 | 20.21 |
| 8/11 | Wire Transfer Credit<br>ANDREW J CHAPIN<br>26 CRAGMONT AVE<br>SAN FRANCISCO CA 94116-1308 US<br>20200811B1QGC05C005373<br>20200811MMQFMPUN000141<br>08111113FT03 | 4,000.00 |
| 8/11 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-J9H7B0X1H0D5 | 155.35 |
| 8/12 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN | 49.67 |



100 W University Ave
Champaign IL 61820

Date  8/31/20          Page     3
Primary Account        500764766

BUSINESS ANALYSIS                    500764766   (Continued)

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|--|--------|
| | ST-E1N1O8T8K9W6 | | |
| 8/14 | CGUSABENJA    TRANSFER | | 215.66 |
| | ANDREW CHAPIN | | |
| | ST-B2I0O3L2W3X5 | | |
| 8/17 | CGUSABENJA    TRANSFER | | 112.19 |
| | ANDREW CHAPIN | | |
| | ST-E5N8U1U0K8O3 | | |
| 8/18 | Wire Transfer Credit | | 11,000.00 |
| | ANDREW J CHAPIN | | |
| | 26 CRAGMONT AVE | | |
| | SAN FRANCISCO CA 94116-1308 US | | |
| | 20200818B1QGC01C007938 | | |
| | 20200818MMQFMPUN000164 | | |
| | 08181252FT03 | | |
| 8/18 | CGUSABENJA    TRANSFER | | 418.48 |
| | ANDREW CHAPIN | | |
| | ST-X6F7Z6A7F6Z3 | | |
| 8/19 | Wire Transfer Credit | | 20,803.49 |
| | ANDREW J CHAPIN | | |
| | 26 CRAGMONT AVE | | |
| | SAN FRANCISCO CA 94116-1308 US | | |
| | 20200819B1QGC02C008957 | | |
| | 20200819MMQFMPUN000279 | | |
| | 08191531FT03 | | |
| 8/19 | CGUSABENJA    TRANSFER | | 181.67 |
| | ANDREW CHAPIN | | |
| | ST-X3I1C7P0A7P8 | | |
| 8/20 | CGUSABENJA    TRANSFER | | 130.35 |
| | ANDREW CHAPIN | | |
| | ST-U9Y3O6Y5T6X3 | | |
| 8/20 | FROM LOAN 0865 | | 1,979,296.50 |
| 8/21 | CGUSABENJA    TRANSFER | | 93.62 |
| | ANDREW CHAPIN | | |
| | ST-H5D2Y3E4J5I0 | | |
| 8/21 | From L 6706744910865 | | 20,803.00 |
| | To DDA 500764766 | | |
| 8/24 | CGUSABENJA    TRANSFER | | 141.80 |
| | ANDREW CHAPIN | | |
| | ST-Q0L0W9V7I0J7 | | |
| 8/25 | CGUSABENJA    TRANSFER | | 398.10 |
| | ANDREW CHAPIN | | |
| | ST-K8G5M0Y6C8R5 | | |
| 8/26 | CGUSABENJA    TRANSFER | | 32.80 |
| | ANDREW CHAPIN | | |
| | ST-H4R5F4Q7W9S8 | | |
| 8/27 | PAYPAL        TRANSFER | | 8,410.46 |
| | ANDREW CHAPIN | | |
| | 1010139078579 | | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  8/31/20      Page    4
Primary Account    500764766

BUSINESS ANALYSIS              500764766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 8/28 | CGUSABENJA    TRANSFER<br>ANDREW CHAPIN<br>ST-L7S9T9J4R1Y0 | 85.56 |
| 8/31 | CGUSABENJA    TRANSFER<br>ANDREW CHAPIN<br>ST-D1V4E7Y2O4G4 | 155.36 |
| 8/31 | PAYPAL        TRANSFER<br>ANDREW CHAPIN<br>1010179433893 | 1,000.00 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 8/03 | STRIPE         TRANSFER<br>ANDREW CHAPIN<br>ST-Y3D8S2F0R4C3 | 1,526.64- |
| 8/03 | Overdraft Item Charge | 35.00- |
| 8/04 | GUSTO          FEE 275077<br>Benja Incorporated<br>6semjooc091 | 111.00- |
| 8/04 | STRIPE         TRANSFER<br>ANDREW CHAPIN<br>ST-X4Q7W9P7X0R4 | 170.57- |
| 8/04 | SSBTRUSTOPS    P/R Contr<br>BENJA INCORPORAT | 5,703.75- |
| 8/04 | Overdraft Item Charge | 140.00- |
| 8/05 | STRIPE         TRANSFER<br>ANDREW CHAPIN<br>ST-R5G1I8I8A7G3 | 320.18- |
| 8/05 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>M4460 | 5,800.00- |
| 8/05 | Overdraft Item Charge | 70.00- |
| 8/06 | Guideline Retire GUIDELINE.<br>BENJA INCORPORATED<br>ST-W1Z6D6R7G1G0 | 39.00- |
| 8/06 | STRIPE         TRANSFER<br>ANDREW CHAPIN<br>ST-K1T5Y5N3I4V2 | 60.06- |
| 8/07 | Wire Transfer Debit<br>Sports Byline USA<br>122016066<br>0450009504<br>CITY NATIONAL BANK<br>20200807MMQFMPUN000270<br>20200807L2LFCK1C003392<br>08071344FT03 | 2,000.00- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  8/31/20          Page     5
Primary Account        500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 8/07 | Wire Transfer Debit<br>Koosh Media<br>321370765<br>8103786531<br>AMERICAN SAVINGS B<br>INV AUGUST<br>20200807MMQFMPUN000313<br>20200807GMQFMP01020788<br>08071428FT03 | 10,000.00- |
| 8/07 | Wire Transfer Debit<br>Sean C Fleming Rev Trust 5/1/0<br>026007993<br>101-WA-258641-000<br>UBS AG<br>Further Credit U2 32785 SCF Tr<br>20200807MMQFMPUN000312<br>20200807B1Q8051R000649<br>08071428FT03 | 12,500.00- |
| 8/07 | Wire Transfer Debit<br>MHC Financial Services, Inc.<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200807MMQFMPUN000348<br>20200807J1B7841C001254<br>08071459FT03 | 100,000.00- |
| 8/10 | Wire Transfer Debit<br>E-Revshare Core LLC<br>121000248<br>026012881<br>WELLS FARGO BANK,<br>20200810MMQFMPUN000097<br>20200810I1B7033R010050<br>08101129FT03 | 37,386.78- |
| 8/10 | STRIPE          TRANSFER<br>ANDREW CHAPIN<br>ST-K1H7F8F2G2G0 | 401.43- |
| 8/12 | Wire Transfer Debit<br>E-Revshare Core LLC<br>121000248<br>1200787933<br>WELLS FARGO BANK,<br>20200812MMQFMPUN000149<br>20200812I1B7031R011373<br>08121206FT03 | 37,386.78- |
| 8/12 | STRIPE          TRANSFER<br>ANDREW CHAPIN<br>ST-I8D8U3A1D6Z5 | 41.89- |



100 W University Ave
Champaign IL 61820

Date  8/31/20        Page    6
Primary Account      500764766

BUSINESS ANALYSIS                500764766   (Continued)

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 8/13 | Wire Transfer Debit | 4,500.00- |
|      | TYZ LAW GROUP PC | |
|      | 321171184 | |
|      | 206670879 | |
|      | CITIBANK, N.A. | |
|      | 20200813MMQFMPUN000021 | |
|      | 20200813B1Q8021R009731 | |
|      | 08130904FT03 | |
| 8/14 | Account Analysis Charge | 230.26- |
| 8/17 | STRIPE          TRANSFER | 135.82- |
|      | ANDREW CHAPIN | |
|      | ST-D3A1U6U2I8C0 | |
| 8/18 | From DDA 500764766 | 10,260.63- |
|      | to L 6706744910865 | |
| 8/20 | Wire Transfer Debit | 1,941,298.12- |
|      | MHC Financial Services, Inc. | |
|      | 101000695 | |
|      | 9872224221 | |
|      | UMB BANK, N.A. | |
|      | 20200820MMQFMPUN000031 | |
|      | 20200820J1B7841C000325 | |
|      | 08200926FT03 | |
| 8/20 | FEE AND INT DUE LOAN 0865 | 20,803.49- |
| 8/21 | Wire Transfer Debit | 30,000.00- |
|      | Andrew Chapin | |
|      | 322271627 | |
|      | 555475257 | |
|      | JPMORGAN CHASE BAN | |
|      | 20200821MMQFMPUN000116 | |
|      | 20200821B1QGC01R031442 | |
|      | 08211128FT03 | |
| 8/24 | WCB Warehouse    WCB Wareho | 571.75- |
|      | BENJA INCORPORATED | |
|      | ST-J1P7E3N5I8K0 | |
| 8/24 | CHASE CREDIT CRD EPAY | 8,000.00- |
|      | ANDREW J CHAPIN | |
|      | 4842308773 | |
| 8/24 | PAYPAL          INST XFER | 8,410.46- |
|      | ANDREW CHAPIN | |
|      | MARTIJNKLEI | |
| 8/25 | Wire Transfer Debit | 9,065.00- |
|      | Martinus Petrus Kleiweg | |
|      | 031176110 | |
|      | 36105355930 | |
|      | CAPITAL ONE, NA | |
|      | 20200825MMQFMPUN000068 | |
|      | 20200825MMQFMPGH001506 | |
|      | 08251031FT03 | |

**CHECKS AND OTHER DEBITS**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

```
                                   Date  8/31/20        Page      7
                                   Primary Account      500764766
```

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 8/27 | Wire Transfer Debit | 702.40- |
| | Benja Incorporated | |
| | 322271627 | |
| | 599330732 | |
| | JPMORGAN CHASE BAN | |
| | 20200827MMQFMPUN000017 | |
| | 20200827B1QGC01R021347 | |
| | 08270920FT03 | |
| 8/27 | Wire Transfer Debit | 10,000.00- |
| | MHC Financial Services Inc. | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200827MMQFMPUN000115 | |
| | 20200827J1B7841C000678 | |
| | 08271150FT03 | |
| 8/28 | Wire Transfer Debit | 2,500.00- |
| | MHC Financial Services, Inc. | |
| | 101000695 | |
| | 9872224221 | |
| | UMB BANK, N.A. | |
| | 20200828MMQFMPUN000308 | |
| | 20200828J1B7841C001659 | |
| | 08281546FT03 | |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 8/04 | 5015 | 110.46 | 8/07 | 5016 | .91 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 8/03 | 29,023.02- | 8/04 | 34,950.30- | 8/05 | 15,873.01- |
| 8/06 | 4,168.15 | 8/07 | 13,778.56 | 8/10 | 38,397.34 |
| 8/11 | 42,552.69 | 8/12 | 5,173.69 | 8/13 | 673.69 |
| 8/14 | 659.09 | 8/17 | 635.46 | 8/18 | 1,793.31 |
| 8/19 | 22,778.47 | 8/20 | 40,103.71 | 8/21 | 31,000.33 |
| 8/24 | 14,159.92 | 8/25 | 5,493.02 | 8/26 | 5,525.82 |
| 8/27 | 3,233.88 | 8/28 | 819.44 | 8/31 | 1,974.80 |



Check 5015 Amount $110.46 Date 8/4/2020

Check 5016 Amount $0.91 Date 8/7/2020

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# Busey®

100 W University Ave
Champaign IL 61820

14776286

BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  7/31/20        Page    1
Primary Account      500764766

## CHECKING ACCOUNT SUMMARY & DETAIL

| | | | |
|---|---|---|---|
| BUSINESS ANALYSIS | | Number of Enclosures | 0 |
| Account Number | 500764766 | Statement Dates  7/01/20 thru  8/02/20 | |
| Previous Balance | 17,983.54- | Days in the statement period | 33 |
| 42 Deposits/Credits | 124,314.55 | Average Ledger | 5,614.76- |
| 67 Checks/Debits | 133,869.60 | Average Collected | 5,614.76- |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 27,538.59- | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $105.00 | $910.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 7/01 | Reverse OD Item Charge | 35.00 |
| | Reverse OD Item Charge | 35.00 |
| 7/01 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-P2P7L9K0W0G3 | 125.09 |
| 7/02 | Reverse OD Item Charge | 35.00 |
| 7/02 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-B1T1Y9G8C7W7 | 45.73 |
| 7/03 | Reverse OD Item Charge | 35.00 |
| 7/03 | Reverse OD Item Charge | 35.00 |
| 7/06 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Z2Z7A7V2X7L0 | 56.96 |
| 7/07 | Reverse OD Item Charge | 35.00 |
| 7/07 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-L7D3I7O1M6K4 | 222.24 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/08 | Reverse OD Item Charge | 35.00 |
| 7/09 | Wire Transfer Credit<br>ANDREW J CHAPIN | 17,850.00 |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

(Account Number)

New Address: _____

(Street Address)                                              (Unit #)

_____

(City)                          (State)                     (Zip Code)

Member FDIC   (Telephone Number)                            (Social Security Number)

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |
|---|---|---|---|---|---|
| Check No. | $ | | | | |
| | | ADD (+) | $ _____ | ADD (+) | |
| | | Deposits, Loan Advances, Credit Memos, And | $ _____ | Interest Earned From This Statement | $ _____ |
| | | Other Automatic Deposits Not Shown On This | $ _____ | | |
| | | Statement | $ _____ | SUBTRACT (-) | |
| | | | | Misc. Charges From This Statement | $ _____ |
| | | SUBTRACT (-) | $ _____ | | |
| | | Total of Checks Outstanding, Automatic Loan | $ _____ | **NEW CHECKBOOK BALANCE** | |
| | | Payments, Automatic Savings Transfers, Service | $ _____ | Should Agree With BALANCE Line | $ _____ |
| | | Charges, Debit Memos  And Other Automatic | $ _____ | | |
| | | Deductions Not Shown On This Statement | $ _____ | | |
| TOTAL | $ | BALANCE | $ _____ | | |

### IMPORTANT INFORMATION

#### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account  number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected  error.

We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected  error.

You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

CSI REV 4/16   6146-STMT



100 W University Ave
Champaign IL 61820

Date  7/31/20        Page    2
Primary Account      500764766

BUSINESS ANALYSIS                500764766   (Continued)

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| | 26 CRAGMONT AVE | |
| | SAN FRANCISCO CA 94116-1308 US | |
| | 20200709B1QGC08C007019 | |
| | 20200709MMQFMPUN000143 | |
| | 07091148FT03 | |
| 7/09 | CGUSABENJA        TRANSFER | 92.93 |
| | ANDREW CHAPIN | |
| | ST-M0L6Y9Q8L4W8 | |
| 7/10 | Wire Transfer Credit | 19,600.00 |
| | ANDREW J CHAPIN | |
| | 26 CRAGMONT AVE | |
| | SAN FRANCISCO CA 94116-1308 US | |
| | 20200710B1QGC07C004764 | |
| | 20200710MMQFMPUN000155 | |
| | 07101113FT03 | |
| 7/13 | CGUSABENJA        TRANSFER | 160.34 |
| | ANDREW CHAPIN | |
| | ST-L3P5K1H5O8G2 | |
| 7/13 | Benja - Affordab Benja - Af | 3,800.00 |
| | ANDREW CHAPIN | |
| | ST-C1Z3A0J4V8F5 | |
| 7/13 | From L  6706744910865 | 3,800.00 |
| | To DDA 500764766 | |
| 7/14 | Wire Transfer Credit | 32,818.09 |
| | ANDREW J CHAPIN | |
| | 26 CRAGMONT AVE | |
| | SAN FRANCISCO CA 94116-1308 US | |
| | 20200714B1QGC02C006404 | |
| | 20200714MMQFMPUN000140 | |
| | 07141147FT03 | |
| 7/14 | CGUSABENJA        TRANSFER | 254.97 |
| | ANDREW CHAPIN | |
| | ST-B8G4G2D3T0C3 | |
| 7/15 | Wire Transfer Credit | 40,000.00 |
| | ANDREW J CHAPIN | |
| | 26 CRAGMONT AVE | |
| | SAN FRANCISCO CA  94116-1308 | |
| | 20200715E6B7361C000380 | |
| | 20200715MMQFMPUN000040 | |
| | 07150818FT03 | |
| 7/15 | CGUSABENJA        TRANSFER | 32.17 |
| | ANDREW CHAPIN | |
| | ST-G6E1B1Z9U6P3 | |
| 7/15 | Benja - Affordab Benja - Af | 550.00 |
| | ANDREW CHAPIN | |
| | ST-O9E2A6J0W0O6 | |
| 7/16 | Benja - Affordab Benja - Af | 1,350.00 |
| | ANDREW CHAPIN | |

**DEPOSITS AND OTHER CREDITS**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  7/31/20        Page      3
Primary Account      500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|---|--------|
|  | ST-N7Z5F8V2F7J2 | | |
| 7/20 | CGUSABENJA | TRANSFER | 115.02 |
|  | ANDREW CHAPIN | | |
|  | ST-T2C0S9X1K9N4 | | |
| 7/20 | Benja - Affordab Benja - Af | | 658.58 |
|  | ANDREW CHAPIN | | |
|  | ST-T1G3B4V6C2S4 | | |
| 7/21 | CGUSABENJA | TRANSFER | 462.71 |
|  | ANDREW CHAPIN | | |
|  | ST-N6Y6R6X8J5C5 | | |
| 7/22 | CGUSABENJA | TRANSFER | 32.80 |
|  | ANDREW CHAPIN | | |
|  | ST-H1D2M6V8M3E8 | | |
| 7/22 | Benja - Affordab Benja - Af | | 390.00 |
|  | ANDREW CHAPIN | | |
|  | ST-P0Z2N5H4O5T4 | | |
| 7/23 | CGUSABENJA | TRANSFER | 65.83 |
|  | ANDREW CHAPIN | | |
|  | ST-J1T0X5E6G1U3 | | |
| 7/24 | CGUSABENJA | TRANSFER | 257.08 |
|  | ANDREW CHAPIN | | |
|  | ST-F1W0O9T7Y7W7 | | |
| 7/27 | CGUSABENJA | TRANSFER | 58.18 |
|  | ANDREW CHAPIN | | |
|  | ST-S6Z9F0O0S1F4 | | |
| 7/27 | Benja - Affordab Benja - Af | | 640.00 |
|  | ANDREW CHAPIN | | |
|  | ST-I3O4R0R4R7W3 | | |
| 7/28 | CGUSABENJA | TRANSFER | 137.60 |
|  | ANDREW CHAPIN | | |
|  | ST-X4H6Y1K8C2G1 | | |
| 7/28 | Benja - Affordab Benja - Af | | 200.00 |
|  | ANDREW CHAPIN | | |
|  | ST-G3V7I5W5I4N8 | | |
| 7/30 | CGUSABENJA | TRANSFER | 57.06 |
|  | ANDREW CHAPIN | | |
|  | ST-C9M4N1V7H6I2 | | |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | Reverse OD Item Charge | | 35.00 |
| 7/31 | CGUSABENJA | TRANSFER | 26.17 |
|  | ANDREW CHAPIN | | |
|  | ST-H2I5E0G6Q2P1 | | |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date   7/31/20        Page     4
Primary Account       500764766

BUSINESS ANALYSIS              500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 7/01 | SHOPIFY CAPITAL   RLCTKHK5S<br>Andrew Chapin<br>R7581875 | 26.74- |
| 7/01 | Overdraft Item Charge | 35.00- |
| 7/02 | SHOPIFY CAPITAL   RAFYIHIGX<br>Andrew Chapin<br>R7592370 | 54.52- |
| 7/02 | GUSTO          FEE 955354<br>Benja Incorporated<br>6semjol7uee | 117.00- |
| 7/02 | Overdraft Item Charge | 70.00- |
| 7/06 | SHOPIFY CAPITAL   RIQGVENQI<br>Andrew Chapin<br>R7603172 | 55.43- |
| 7/06 | Overdraft Item Charge | 35.00- |
| 7/07 | SHOPIFY CAPITAL   RUK26RHJG<br>Andrew Chapin<br>R7644096 | 21.80- |
| 7/07 | SHOPIFY CAPITAL   RX5AASE5C<br>Andrew Chapin<br>R7634750 | 35.98- |
| 7/07 | SHOPIFY CAPITAL   RPUOUZGDQ<br>Andrew Chapin<br>R7624759 | 46.25- |
| 7/07 | SHOPIFY CAPITAL   REFDLBBLF<br>Andrew Chapin<br>R7614041 | 57.00- |
| 7/07 | Overdraft Item Charge | 140.00- |
| 7/08 | SHOPIFY CAPITAL   R3YTE3HVO<br>Andrew Chapin<br>R7653886 | 38.60- |
| 7/08 | Overdraft Item Charge | 35.00- |
| 7/09 | SHOPIFY CAPITAL   RA6JN4TG4<br>Andrew Chapin<br>R7664471 | 9.49- |
| 7/09 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-S0K3N3Q8V9B7 | 729.38- |
| 7/09 | Overdraft Item Charge | 70.00- |
| 7/10 | Wire Transfer Debit<br>Sports Byline USA<br>122016066<br>0450009504<br>CITY NATIONAL BANK<br>20200710MMQFMPUN000256<br>20200710L2LFCK1C003772<br>07101432FT03 | 2,000.00- |
| 7/10 | Wire Transfer Debit<br>E-Revshare Core LLC | 3,597.44- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM


100 W University Ave
Champaign IL 61820

Date  7/31/20          Page    5
Primary Account        500764766

BUSINESS ANALYSIS              500764766   (Continued)

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| | 121000248 | |
| | 1200787933 | |
| | WELLS FARGO BANK, | |
| | Benja June 2020 | |
| | 20200710MMQFMPUN000119 | |
| | 20200710I1B7031R009610 | |
| | 07101131FT03 | |
| 7/10 | SHOPIFY CAPITAL  RGY5P45I5 | 37.72- |
| | Andrew Chapin | |
| | R7675495 | |
| 7/10 | CGUSABENJA      TRANSFER | 48.17- |
| | ANDREW CHAPIN | |
| | ST-D7A4R1M2X3B5 | |
| 7/10 | to loan 6706744910865 | 11,199.54- |
| | from dda 500764766 | |
| 7/13 | SHOPIFY CAPITAL  RHOHWPCKL | 26.18- |
| | Andrew Chapin | |
| | R7686557 | |
| 7/14 | Wire Transfer Debit | 33,917.56- |
| | E-Revshare Core LLC | |
| | 121000248 | |
| | 1200787933 | |
| | WELLS FARGO BANK, | |
| | 20200714MMQFMPUN000137 | |
| | 20200714I1B7031R011008 | |
| | 07141203FT03 | |
| 7/14 | SHOPIFY CAPITAL  RVXEXCCSD | 35.84- |
| | Andrew Chapin | |
| | R7708123 | |
| 7/14 | SHOPIFY CAPITAL  RFD7MTUJM | 38.65- |
| | Andrew Chapin | |
| | R7717989 | |
| 7/14 | PAYPAL          INST XFER | 47.44- |
| | ANDREW CHAPIN | |
| | REESE8453 EBAY | |
| 7/14 | SHOPIFY CAPITAL  RBKII5AXD | 51.93- |
| | Andrew Chapin | |
| | R7697558 | |
| 7/14 | GUSTO          CND 027771 | 75.00- |
| | Benja Incorporated | |
| | 6semjom9jlq | |
| 7/15 | Account Analysis Charge | 286.68- |
| 7/15 | Wire Transfer Debit | 13,125.00- |
| | Sean C Fleming Rev Trust 5/1/0 | |
| | 026007993 | |
| | 101WA258641000 | |
| | UBS AG | |
| | U2 32785 SCF Tr Alt Inv | |

## CHECKS AND OTHER DEBITS

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  7/31/20        Page      6
Primary Account       500764766

BUSINESS ANALYSIS                500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| | 20200715MMQFMPUN000041 | |
| | 20200715B1Q8052R000407 | |
| | 07150921FT03 | |
| 7/15 | Wire Transfer Debit<br>UMB Bank NA<br>101000695<br>9872215826<br>UMB BANK, N.A.<br>20200715MMQFMPUN000042<br>20200715J1B7841C000337<br>07150921FT03 | 30,000.00- |
| 7/15 | SHOPIFY CAPITAL   RR3G3Z7R7<br>Andrew Chapin<br>R7728106 | 115.49- |
| 7/15 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-D6Q8E9Y3S9O9 | 250.00- |
| 7/15 | GUSTO            CND 063362<br>Benja Incorporated<br>6semjomjc6q | 500.00- |
| 7/16 | Wire Transfer Debit<br>CFOs2Go<br>121143260<br>0101150100<br>WESTERN ALLIANCE B<br>20200716MMQFMPUN000249<br>20200716L1LFB71C001608<br>07161536FT03 | 4,250.00- |
| 7/16 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-U0F5Z7N1N4Q8 | 9.73- |
| 7/16 | SHOPIFY CAPITAL   RNS6W7IBL<br>Andrew Chapin<br>R7738730 | 70.61- |
| 7/17 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-S5N2F5B0R8U1 | .37- |
| 7/17 | SHOPIFY CAPITAL   RZ6DPYVYF<br>Andrew Chapin<br>R7749605 | 34.97- |
| 7/20 | SHOPIFY CAPITAL   RBLUIHBSA<br>Andrew Chapin<br>R7760752 | 48.48- |
| 7/21 | SHOPIFY CAPITAL   R7MEQNSVL<br>Andrew Chapin<br>R7771889 | 5.46- |
| 7/21 | SHOPIFY CAPITAL   RQ7Y4LEKA<br>Andrew Chapin | 13.22- |



100 W University Ave
Champaign IL 61820

Date  7/31/20          Page      7
Primary Account        500764766

BUSINESS ANALYSIS                          500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|--|--------|
| | R7792529 | | |
| 7/21 | SHOPIFY CAPITAL   RCJSO5DIK | | 19.30- |
| | Andrew Chapin | | |
| | R7782568 | | |
| 7/21 | SMOOTHOSTING LTD IAT PAYPAL | | 110.00- |
| | ANDREW CHAPIN | | |
| 7/22 | SHOPIFY CAPITAL   RKMAVDNTR | | 20.79- |
| | Andrew Chapin | | |
| | R7802761 | | |
| 7/22 | PAYPAL            INST XFER | | 148.30- |
| | ANDREW CHAPIN | | |
| | AIRBRUSHUNL | | |
| 7/24 | VENMO             PAYMENT | | 11.99- |
| | ANDREW CHAPIN | | |
| | 3806386704 | | |
| 7/24 | SHOPIFY CAPITAL   RZD7VLYFH | | 52.27- |
| | Andrew Chapin | | |
| | R7824477 | | |
| 7/24 | WCB Warehouse     WCB Wareho | | 250.00- |
| | BENJA INCORPORATED | | |
| | ST-U7T5A5U5I9H4 | | |
| 7/27 | PAYPAL            INST XFER | | 16.26- |
| | ANDREW CHAPIN | | |
| | SPORTSKARDC EBA | | |
| 7/27 | SHOPIFY CAPITAL   RRRRH62HX | | 47.87- |
| | Andrew Chapin | | |
| | R7835433 | | |
| 7/28 | SHOPIFY CAPITAL   RKFDGNVL3 | | 6.37- |
| | Andrew Chapin | | |
| | R7867135 | | |
| 7/28 | SHOPIFY CAPITAL   R673UTSRW | | 12.83- |
| | Andrew Chapin | | |
| | R7857229 | | |
| 7/28 | SHOPIFY CAPITAL   RKSIS5ECF | | 13.55- |
| | Andrew Chapin | | |
| | R7846553 | | |
| 7/29 | CGUSABENJA        TRANSFER | | 48.17- |
| | ANDREW CHAPIN | | |
| | ST-A2B3U3O7U3Z5 | | |
| 7/30 | GUSTO             CND 142790 | | 50.00- |
| | Benja Incorporated | | |
| | 6semjono4dl | | |
| 7/30 | GUSTO             CND 142790 | | 150.00- |
| | Benja Incorporated | | |
| | 6semjono4eo | | |
| 7/30 | GUSTO             CND 142790 | | 200.00- |
| | Benja Incorporated | | |
| | 6semjono4ef | | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  7/31/20       Page    8
Primary Account       500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|-------------------------|--|--------|
| 7/30 | GUSTO                CND 142790 | | 300.00- |
|      | Benja Incorporated | | |
|      | 6semjono4el | | |
| 7/30 | GUSTO                CND 142790 | | 400.00- |
|      | Benja Incorporated | | |
|      | 6semjono4e3 | | |
| 7/30 | GUSTO                CND 142790 | | 450.00- |
|      | Benja Incorporated | | |
|      | 6semjono4dn | | |
| 7/30 | GUSTO                CND 142790 | | 1,000.00- |
|      | Benja Incorporated | | |
|      | 6semjono4en | | |
| 7/30 | GUSTO                REM 142476 | | 1,900.00- |
|      | Benja Incorporated | | |
|      | 6semjonpvv5 | | |
| 7/30 | GUSTO                TAX 142477 | | 7,717.25- |
|      | Benja Incorporated | | |
|      | 6semjonpvpo | | |
| 7/30 | GUSTO                NET 142475 | | 19,476.98- |
|      | Benja Incorporated | | |
|      | 6semjonpvmu | | |
| 7/30 | Overdraft Item Charge | | 105.00- |

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 7/01 | 17,850.19- | 7/02 | 18,010.98- | 7/03 | 17,940.98- |
| 7/06 | 17,974.45- | 7/07 | 18,018.24- | 7/08 | 17,951.84- |
| 7/09 | 817.78- | 7/10 | 1,899.35 | 7/13 | 9,633.51 |
| 7/14 | 8,540.15 | 7/15 | 4,845.15 | 7/16 | 1,864.81 |
| 7/17 | 1,829.47 | 7/20 | 2,554.59 | 7/21 | 2,869.32 |
| 7/22 | 3,123.03 | 7/23 | 3,188.86 | 7/24 | 3,131.68 |
| 7/27 | 3,765.73 | 7/28 | 4,070.58 | 7/29 | 4,022.41 |
| 7/30 | 27,669.76- | 7/31 | 27,538.59- | | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**AGREEMENT AND CONSENT TO ELECTRONIC DELIVERY OF BANK STATEMENTS, NOTICES AND OTHER ACCOUNT DOCUMENTS**

1. Welcome to Busey Bank's e-delivery service. Busey Bank's goal is to provide you with an easy and convenient way to receive electronically your periodic bank account statements ("Bank Statements"), notices and other account documents.

2. **Your consent:** For Busey Bank (the "Bank") to begin forwarding your Bank Statements and other account documents to you electronically, the Bank needs your consent. Your consent is given when you accept this Agreement and Consent to Electronic Delivery of Bank Statements and Other Account Documents (this "Agreement"). By agreeing to have these documents sent electronically, you also agree to notify the Bank immediately by telephone at the numbers set forth in this Agreement of any change in your email address or any errors or complications relating to your electronic receipt or access of your Bank Statements and other account documents.  To the extent that you previously agreed to electronic delivery of your Bank Statements and other account documents, this Agreement hereby supersedes any prior agreement and your consent to electronic delivery remains in place unless you instruct the Bank otherwise within thirty (30) calendar days after receiving this Agreement by contacting the Bank at the phone number, email address or mailing address included below.

- **Statement delivery -** If you elect to receive your Bank Statements through electronic delivery, the Bank will no longer send you your Bank Statements through the mail.

- **Whether your consent applies only to a particular transaction or to categories of transactions –** Your consent will authorize the Bank to forward to you electronically your periodic Bank Statements, notices and other documents regarding your account(s), including but not limited to, Truth in Savings disclosures and other required disclosures and documents relating to your accounts.

- **The right to withdraw consent to have records provided electronically, including any consequences or fees associated with doing so -** To discontinue this electronic delivery service, you can log into the Busey online banking platform and navigate to the Documents section. Under the Sign Up/ Changes option you can elect to unenroll any accounts you wish to have paper delivery. It will take up to forty-five (45) days for the Bank to implement your request, and after such time you will no longer receive your Bank Statements, notices, disclosures, and other documents regarding your accounts electronically.

- **How the customer may obtain a paper copy of records upon request –** To obtain paper copies of a particular Bank Statement, notice or other account document contact the Bank at 1-800-672-8739. A fee per statement will be charged to your account. Please see Terms and Fees Disclosure for the fee amount.

- **Hardware and software requirements for access and retention of the electronic information -** The hardware and software requirements to enable you to receive and retain your Bank Statements, notices and other account documents electronically are discussed below in **The Bank's Requirements**.

3. **The Bank's Requirements:** First, the same terms apply with respect to electronically delivered Bank Statements, notices and other accounts documents  as apply to those in paper form, and, except as set forth in **Your Consent** with respect to this Agreement, the account agreements and disclosures that you have previously entered into with or received from the Bank remain in effect.

Second, for you to be able to receive and view your documents effectively, you must use an Internet browser that supports 128-bit encryption. It is recommended that only certified/supported browsers be used to view Bank Statements. A list of supported browsers is available on the Bank's website at www.busey.com/personal/products-and-services/online---mobile/online-banking. To review your Bank Statements, you will need Adobe Acrobat Flash Player. This product is available for free at http:// www.adobe.com.

**You may print or download your eStatements to retain copies of them.**

4.      **Privacy:** The Bank's privacy policy (that has been previously provided to you) will apply to this service and the policy is incorporated into and made a part of this Agreement.

5.      **Service Availability:** The Bank may change, suspend or eliminate all or any aspect of this delivery service upon notice to you.

6.      **Security:** You will access your Bank Statements, notices and other account documents through the Busey

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

online banking platform.  To protect the security of your banking information, you must not disclose or share your Busey online banking  password with any third party. In addition, your Bank Statements and notices will not be forwarded to you through email. Documents such as terms and conditions and similar disclosure agreements may be sent directly to you by email.

7.      **NO WARRANTY FOR CONTINUOUS OR UNINTERRUPTED SERVICE:** BECAUSE OF THE UNPREDICTABILITY OF THE INTERNET, THE BANK DOES NOT GUARANTEE CONTINUOUS OR UNINTERRUPTED ACCESS TO YOUR BANK STATEMENTS THROUGH THE INTERNET.

8.      **LIMIT OF LIABILITY:** YOU AGREE THAT IN NO EVENT WILL THE BANK OR THE BANK'S SUPPLIERS (OR ANY OF THE BANK'S OR ITS SUPPLIER'S SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS OR EMPLOYEES) BE LIABLE FOR LOST PROFITS OR ANY SPECIAL, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF OR IN CONNECTION WITH YOUR USE OF THE BANK'S SERVICE, EVEN IF THE BANK HAS BEEN ADVISED OF THE POSSIBILITY THAT SUCH DAMAGE WILL OCCUR. FURTHER YOU AGREE THAT NEITHER THE BANK NOR THE BANK'S SUPPLIERS (OR ANY OF THE BANK'S OR THE BANK'S SUPPLIER'S SHAREHOLDERS, MEMBERS, OFFICERS, DIRECTORS OR EMPLOYEES) WILL BE LIABLE FOR ANY TECHNICAL, HARDWARE OR SOFTWARE FAILURE OF ANY KIND, ANY INTERRUPTION IN THE AVAILABILITY OF THE BANK'S SERVICE, ANY DELAY IN OPERATION OR TRANSMISSION, ANY INCOMPLETE OR GARBLED TRANSMISSION, COMPUTER VIRUS, LOSS OF DATA, OR OTHER SIMILAR LOSS. TO THE EXTENT THE BANK MAY HAVE BREACHED ANY TERM OF THIS AGREEMENT, YOU AGREE THAT YOUR SOLE REMEDY IS TO DISCONTINUE USE OF THIS SERVICE. YOU FURTHER AGREE THAT THE BANK'S LIABILITY TO YOU IN ANY CASE (WHETHER IN CONTRACT OR TORT) WILL NOT EXCEED AMOUNTS PAID TO THE BANK WITHIN THE LAST NINETY (90) DAYS (IF ANY) FOR THIS SERVICE.

9.      **Notice:** If you want to send the Bank a notice in relation to this Agreement, you must send it by email or regular mail to the addresses listed below. The Bank may notify you by sending notice to your email address or by mailing you notice by U.S. mail to the most current mailing address that the Bank has for you. You agree that any notices sent by email will be deemed delivered and received 48 hours after being sent. You agree that any notices sent by U.S. mail as provided in this paragraph will be deemed delivered and received three days after the date of mailing.

10.     **Arbitration:** To the extent that your account(s) is one not already governed by another arbitration provision with the Bank, you agree that at any claim or controversy relating to this Agreement will be settled by binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association. You agree that any claim or controversy you may have will be arbitrated on an individual basis and will not be consolidated in any arbitration with any claim or controversy of any other party. You agree that the arbitration will be conducted in the city in which the Bank's main office is located and that judgment on the arbitration award may be enforced by any court having proper jurisdiction.

11.     **Governing Law:** You agree that this Agreement is governed by the laws of the State of Illinois, excluding any application of conflicts of laws rules or principals. You agree that the sole jurisdiction and venue for any litigation arising from your use of the Bank's service shall be an appropriate federal or state court located in Champaign County, Illinois.

12.  **Contact us:**

   - Phone:    1-800-672-8739    Option    2
     Email: customersupport@busey.com
   - Treasury Management Customers may contact us by phone at 1-800-749-7844 and by Email at
     treasurymanagement@busey.com
   - Address: Attn: eStatements, Busey Bank, P.O. Box 17430, Urbana, IL 61803-9934.

# TERMS AND CONDITIONS
## OF YOUR ACCOUNT

**IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT -** To help the government fight the funding of terrorism and money laundering activities, federal law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account.

What this means for you: When you open an account, we will ask for your name, address, date of birth, and other information that will allow us to identify you. We may also ask to see your driver's license or other identifying documents.

**AGREEMENT -** This document, along with any other documents we give you pertaining to your account(s), is a contract that establishes rules which control your account(s) with us. Please read this carefully and retain it for future reference. If you sign the signature card or open or continue to use the account, you agree to these rules. You will receive a separate schedule of rates, qualifying balances, and fees which are incorporated herein by reference if they are not included in this document. If you have any questions, please call us. **This agreement requires that disputes be resolved in arbitration on an individual basis, rather than through jury trials or class actions. See section Dispute Resolution by Binding Arbitration below for details. If you do not wish to agree to arbitration, you must follow the rejection procedure set forth in the section Dispute Resolution by Binding Arbitration below.**

This agreement is subject to applicable federal laws, the laws of the state of the branch in which your account is located and other applicable rules such as the operating letters of the Federal Reserve Banks and payment processing system rules (except to the extent that this agreement can and does vary such rules or laws). The body of state and federal law that governs our relationship with you, however, is too large and complex to be reproduced here. The purpose of this document is to:

(1) summarize some laws that apply to common transactions;

(2) establish rules to cover transactions or events which the law does not regulate;

(3) establish rules for certain transactions or events which the law regulates but permits variation by agreement; and

(4) give you disclosures of some of our policies to which you may be entitled or in which you may be interested.

If any provision of this document is found to be unenforceable according to its terms, all remaining provisions will continue in full force and effect. We may permit some variations from our standard agreement, but we must agree to any variation in writing either on the signature card for your account or in some other document. Nothing in this document is intended to vary our duty to act in good faith and with ordinary care when required by law.

As used in this document the words "we," "our," and "us" mean the financial institution and the words "you" and "your" mean the account holder(s) and anyone else with the authority to deposit, withdraw, or exercise control over the funds in the account. However, this agreement does not intend, and the terms "you" and "your" should not be interpreted, to expand an individual's responsibility for an organization's liability. If this account is owned by a corporation, partnership or other organization, individual liability is determined by the laws generally applicable to that type of organization. The headings in this document are for convenience or reference only and will not govern the interpretation of the provisions. Unless it would be inconsistent to do so, words and phrases used in this document should be construed so the singular includes the plural and the plural includes the singular. **In Florida,** "Party" means a person who, by the terms of an account, has a present right, subject to request, to payment from the account other than as a beneficiary or agent.

Throughout this document, when a provision is identified as being applicable to a certain state (for example, "in Illinois"), it means that the provision is only applicable if your account is held at a branch located in that particular state. Any provision which is not described as applying to a particular state, applies to your account.

**LIABILITY -** You agree, for yourself (and the person or entity you represent if you sign as a representative of another) to the terms of this account and the schedule of charges. You authorize us to deduct these charges, without notice to you, directly from the account balance as accrued. You will pay any additional reasonable charges for services you request which are not covered by this agreement.

Each of you also agrees to be jointly and severally (individually) liable for any account shortage resulting from charges or overdrafts, whether caused by you or another with access to this account. This liability is due immediately, and we can deduct any amounts deposited into the account and apply those amounts to the shortage. You have no right to defer payment of this liability, and you are liable regardless of whether you signed the item or benefited from the charge or overdraft.

You will be liable for our costs as well as for our reasonable attorneys' fees, to the extent permitted by law, whether incurred as a result of collection or in any other dispute involving your account. This includes, but is not limited to, disputes between you and another joint owner; you and an authorized signer or similar party; or a third party claiming an interest in your account. This also includes any action that you or a third party takes regarding the account that causes us, in good faith, to seek the advice of an attorney, whether or not we become involved in the dispute. All costs and attorneys' fees can be deducted from your account when they are incurred, without notice to you.

**DEPOSITS -** We will give you provisional credit until collection is final for any items, other than cash, we accept for deposit (including items drawn "on us"). Before settlement of any item becomes final, we act only as your agent, regardless of the form of indorsement or lack of indorsement on the item and even though we provide you provisional credit for the item. We may reverse any provisional credit for items that are lost, stolen, or returned. Unless prohibited by law, we also reserve the right to charge back to your account the amount of any item deposited to your account or cashed for you which was initially paid by the payor bank and which is later returned to us due to an allegedly forged, unauthorized or missing indorsement, claim of alteration, encoding error, counterfeit cashier's check or other problem which in our judgment justifies reversal of credit. You authorize us to attempt to collect previously returned items without giving you notice, and in attempting to collect we may permit the payor bank to hold an item beyond the midnight deadline. Actual credit for deposits of, or payable in, foreign currency will be at the exchange rate in effect on final collection in U.S. dollars. We are not responsible for transactions by mail or outside depository until we actually record them. We will treat and record all transactions received after our "daily cutoff time" on a business day we are open, or received on a day we are not open for business, as if initiated on the next business day that we are open. At our option, we may take an item for collection rather than for deposit. If we accept a third-party check or draft for deposit, we may require any third-party indorsers to verify or guarantee their indorsements, or indorse in our presence.

**WITHDRAWALS –**

**Generally -** Unless clearly indicated otherwise on the account records, any of you, acting alone, who signs to open the account or has authority to make withdrawals may withdraw or transfer all or any part of the account balance at any time. Each of you (until we receive written notice to the contrary) authorizes each other person who signs or has authority to make withdrawals to indorse any item payable to you or your order for deposit to this account or any other transaction with us.

**Postdated checks -** A postdated check is one which bears a date later than the date on which the check is written. We may properly pay and charge your account for a postdated check even though payment was made before the date of the check, unless we have received written notice of the postdating in time to have a reasonable opportunity to act. Because we process checks mechanically, your notice will not be effective and we will not be liable for failing to honor your notice unless it precisely identifies the number, date, amount and payee of the item.

**Checks and withdrawal rules -** If you do not purchase your check blanks from us, you must be certain that we approve the check blanks you purchase. We may refuse any withdrawal or transfer request which you attempt on forms not approved by us or by any method we do not specifically permit. We may refuse any withdrawal or transfer request which is greater in number than the frequency permitted, or which is for an amount greater or less than any withdrawal limitations. We will use the date the transaction is completed by us (as opposed to the date you initiate it) to apply the frequency limitations. In addition, we may place limitations on the account until your identity is verified. Even if we honor a nonconforming request, we are not required to do so later. If you violate the stated transaction limitations (if any), in our discretion we may close your account or reclassify it as a transaction account. If we reclassify your account, your account will be subject to the fees and earnings rules of the new account classification.

If we are presented with an item drawn against your account that would be a "substitute check," as defined by law, but for an error or defect in the item introduced in the substitute check creation process, you agree that we may pay such item.

See the funds availability policy disclosure for information about when you can withdraw funds you deposit. For those accounts to which our funds availability policy disclosure does not apply, you can ask us when you make a deposit when those funds will be available for withdrawal. An item may be returned after the funds from the deposit of that item are made available for withdrawal. In that case, we will reverse the credit of the item. We may determine the amount of available funds in your account for the purpose of deciding whether to return an item for insufficient funds at any time between the time we receive the item and when we return the item or send a notice in lieu of return. We need only make one determination, but if we choose to make a subsequent determination, the account balance at the subsequent time will determine whether there are insufficient available funds.

**Cash withdrawals -** We recommend you take care when making large cash withdrawals because carrying large amounts of cash may pose a danger to your personal safety. As an alternative to making a large cash withdrawal, you may want to consider a cashier's check or similar instrument. You assume full responsibility of any loss in the event the cash you withdraw is lost, stolen, or destroyed. You agree to hold us harmless from any loss you incur as a result of your decision to withdraw funds in the form of cash.

**A temporary debit authorization hold affects your account balance -** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money when the merchant does not know the exact amount of the purchase at the time the card is authorized. The amount of the temporary hold may be more than the actual amount of your purchase.

Some common transactions where this occurs involve purchases of gasoline, hotel rooms, or meals at restaurants. When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it could be three calendar days, or even longer in some cases, before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee

Electronically Filed - St. Louis County - October 06, 2020 - 05:19 PM

even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase. An item that has been returned and subsequently resubmitted for payment is considered a new item that may result in an additional NSF fee each time the item is returned for non-sufficient funds.

**Overdrafts -** You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying, or not paying, discretionary overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts.

For consumer accounts, we will not charge fees for overdrafts caused by ATM withdrawals or one-time debit card transactions if you have not opted-in to that service. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

**Multiple signatures, electronic check conversion, and similar transactions -** An electronic check conversion transaction is a transaction where a check or similar item is converted into an electronic fund transfer as defined in the Electronic Fund Transfers regulation. In these types of transactions the check or similar item is either removed from circulation (truncated) or given back to you. As a result, we have no opportunity to review the check to examine the signatures on the item. You agree that, as to these or any items as to which we have no opportunity to examine the signatures, you waive any requirement of multiple signatures.

**Notice of withdrawal -** We reserve the right to require not less than 7 days' notice in writing before each withdrawal from an interest-bearing account other than a time deposit or demand deposit, or from any other savings account as defined by Regulation D. (The law requires us to reserve this right, but it is not our general policy to use it.) Withdrawals from a time account prior to maturity or prior to any notice period may be restricted and may be subject to penalty. See your notice of penalty for early withdrawal.

**In Illinois, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account -** is an account in the name of one person.

**Joint Account - With Survivorship (And Not As Tenants In Common) -** is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship (As Tenants In Common) -** This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust or Pay-On-Death Account -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries of either of these account types cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of the owner(s) of the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either a Pay-On-Death or Revocable Trust account reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**In Florida, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Single-Party Account -** Such an account is owned by one party.

**Multiple-Party Account -** Such an account is payable on request to one or more of two or more parties, whether or not a right of survivorship is mentioned.

**Multiple-Party Account - Tenancy by the Entireties -** The account is owned by two parties who are married to each other and hold the account as tenants by the entirety.

**Rights At Death- Single-Party Account -** At the death of a party, ownership passes as part of the party's estate.

**Multiple-Party Account With Right of Survivorship -** At death of party, ownership passes to the surviving party or parties.

**Multiple-Party Account Without Right of Survivorship -** At death of party, deceased party's ownership passes as part of deceased party's estate.

**Single-Party Account With Pay-on-Death Designation -** At death of the party, ownership passes to the designated pay-on-death beneficiaries and is not part of the party's estate.

**Multiple-Party Account With Right of Survivorship and Pay-on-Death Designation -** At death of last surviving party, ownership passes to the designated pay-on-death beneficiaries and is not part of the last surviving party's estate.

**In Indiana, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account -** is an account in the name of one person.

**Joint Account - With Survivorship (And Not As Tenants In Common) -** is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - No Survivorship (As Tenants In Common) -** This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Revocable Trust Account/In Trust For (pursuant to the Multiple Party Account statutes in *Indiana Code* ch. 32-17-11 et. seq.) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account with LDPS (pursuant to the Transfer on Death Property Act statutes in *Indiana Code* ch. 32-17-14 et. seq.) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless all persons creating the account die. If a named beneficiary does not survive all persons that created the account, that beneficiary's right to a transfer on death transfer belongs to that beneficiary's lineal descendants per stirpes (LDPS) who survive all persons that created the account. LDPS means that group of people that are the lineal descendants of a beneficiary who will take, in place of the beneficiary they have survived, the beneficiary's share as determined under Indiana law. In order for a lineal descendant to take in place of a beneficiary, the lineal descendant must survive the death of that beneficiary. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Pay-on-Death Account No LDPS (pursuant to the Transfer on Death Property Act statutes in *Indiana Code* ch. 32-17-14 et. seq.) -** If two or more of you create this type of account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, beneficiaries will own this account in equal shares unless otherwise designated in writing, without right of survivorship. The person(s) creating this account type may: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Additional Transfer on Death Property Act Rules -** If there are multiple primary beneficiaries and a primary beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving primary beneficiary is allocated among the surviving primary beneficiaries in the proportion that their shares bear to each other. If there are no surviving primary beneficiaries and there are no substitutes for the nonsurviving primary beneficiaries under the LDPS rules, the property belongs to the surviving contingent beneficiaries in equal shares or according to the percentages or fractional shares stated in the designation. If there are multiple contingent beneficiaries and a contingent beneficiary does not survive all persons creating the account and does not have a substitute under the LDPS rules, the share of the nonsurviving contingent beneficiary is allocated among the surviving contingent beneficiaries in the proportion that their shares bear to each other. If no beneficiary survives all persons creating the account, the property belongs to the estate of the owner unless directed to a substitute beneficiary under the LDPS rules.

**In Missouri, OWNERSHIP OF ACCOUNT AND BENEFICIARY DESIGNATION -** These rules apply to this account depending on the form of ownership and beneficiary designation, if any, specified on the account records. We make no representations as to the appropriateness or effect of the ownership and beneficiary designations, except as they determine to whom we pay the account funds.

**Individual Account -** is an account in the name of one person.

**Joint Account - With Survivorship (And Not As A Tenancy By The Entirety Or As Tenants In Common) -** is an account in the name of two or more persons. Each of you intend that when you die the balance in the account (subject to any previous pledge to which we have agreed) will belong to the survivor(s). If two or more of you survive, you will own the balance in the account as joint tenants with survivorship and not as tenants in common.

**Joint Account - As Tenants In Common Without Survivorship (And Not As A Tenancy By The Entirety) -** This is owned by two or more persons, but none of you intend (merely by opening this account) to create any right of survivorship in any other person. We encourage you to agree and tell us in writing of the percentage of the deposit contributed by each of you. This information will not, however, affect the number of signatures necessary for withdrawal.

**Husband And Wife As A Tenancy By The Entirety -** is an account in the name of two persons who are husband and wife as tenants by the entirety.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**Revocable Trust or Pay-On-Death Account (not subject to the Nonprobate Transfers Law of Missouri) -** If two or more of you create such an account, you own the account jointly with survivorship. Beneficiaries cannot withdraw unless: (1) all persons creating the account die, and (2) the beneficiary is then living. If two or more beneficiaries are named and survive the death of all persons creating the account, such beneficiaries will own this account in equal shares, without right of survivorship. The person(s) creating either of these account types reserves the right to: (1) change beneficiaries, (2) change account types, and (3) withdraw all or part of the account funds at any time.

**Registration in Beneficiary Form -** LDPS means a class of unnamed persons who are the lineal descendants per stirpes of a beneficiary and who are to take upon surviving, in place of and with the same priority as the named individual for whom they are indicated as substitutes.

**BUSINESS, ORGANIZATION AND ASSOCIATION ACCOUNTS -** Earnings in the form of interest, dividends, or credits will be paid only on collected funds, unless otherwise provided by law or our policy. You represent that you have the authority to open and conduct business on this account on behalf of the entity. We may require the governing body of the entity opening the account to give us a separate authorization telling us who is authorized to act on its behalf. We will honor the authorization until we actually receive written notice of a change from the governing body of the entity.

**In Illinois and Missouri, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item, and the payee. You may stop payment on any item drawn on your account whether you sign the item or not. Generally, if your stop-payment order is given to us in writing it is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. If the original stop-payment order was oral your stop-payment order will lapse after 14 calendar days if you do not confirm your order in writing within that time period. We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**In Florida, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules. We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law, it must be made in a signed and dated writing, and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item, and the payee.

You may stop payment on any item drawn on your account whether you sign the item or not. Your stop-payment order is effective for six months. Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**In Indiana, STOP PAYMENTS -** Unless otherwise provided, the rules in this section cover stopping payment of items such as checks and drafts. Rules for stopping payment of other types of transfers of funds, such as consumer electronic fund transfers, may be established by law or our policy. If we have not disclosed these rules to you elsewhere, you may ask us about those rules.

We may accept an order to stop payment on any item from any one of you. You must make any stop-payment order in the manner required by law and we must receive it in time to give us a reasonable opportunity to act on it before our stop-payment cutoff time. Because stop-payment orders are handled by computers, to be effective, your stop-payment order must precisely identify the number, date, and amount of the item,

and the payee. You may stop payment on any item drawn on your account whether you sign the item or not. Your stop-payment order is effective for six months if it is given to us in writing or by another type of record (Generally, a "record" is information that is stored in such a way that it can be retrieved and can be heard or read and understood – you can ask us what type of stop-payment records you can give us). Your order will lapse after that time if you do not renew the order in writing before the end of the six-month period. If the original stop-payment order was oral your stop-payment order will lapse after 14 calendar days if it is not confirmed in writing or by another type of record within that time period. We are not obligated to notify you when a stop-payment order expires.

If you stop payment on an item and we incur any damages or expenses because of the stop payment, you agree to indemnify us for those damages or expenses, including attorneys' fees. You assign to us all rights against the payee or any other holder of the item. You agree to cooperate with us in any legal actions that we may take against such persons. You should be aware that anyone holding the item may be entitled to enforce payment against you despite the stop-payment order.

Our stop-payment cutoff time is one hour after the opening of the next banking day after the banking day on which we receive the item. Additional limitations on our obligation to stop payment are provided by law (e.g., we paid the item in cash or we certified the item).

**TELEPHONE TRANSFERS -** A telephone transfer of funds from this account to another account with us, if otherwise arranged for or permitted, may be made by the same persons and under the same conditions generally applicable to withdrawals made in writing. Limitations on the number of telephonic transfers from a savings account are described elsewhere.

**AMENDMENTS AND TERMINATION -** We may change any term of this agreement. Rules governing changes in interest rates are provided separately in the Truth-in-Savings disclosure or in another document. For other changes, we will give you reasonable notice in writing or by any other method permitted by law. We may also close this account at any time upon reasonable notice to you and tender of the account balance personally or by mail. Items presented for payment after the account is closed may be dishonored. When you close your account, you are responsible for leaving enough money in the account to cover any outstanding items to be paid from the account. Reasonable notice depends on the circumstances, and in some cases such as when we cannot verify your identity or we suspect fraud, it might be reasonable for us to give you notice after the change or account closure becomes effective. For instance, if we suspect fraudulent activity with respect to your account, we might immediately freeze or close your account and then give you notice. If we have notified you of a change in any term of your account and you continue to have your account after the effective date of the change, you have agreed to the new term(s).

**NOTICES -** Any written notice you give us is effective when we actually receive it, and it must be given to us according to the specific delivery instructions provided elsewhere, if any. We must receive it in time to have a reasonable opportunity to act on it. If the notice is regarding a check or other item, you must give us sufficient information to be able to identify the check or item, including the precise check or item number, amount, date and payee. Written notice we give you is effective when it is deposited in the United States Mail with proper postage and addressed to your mailing address we have on file. Notice to any of you is notice to all of you.

**STATEMENTS - Your duty to report unauthorized signatures, alterations and forgeries -** You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any unauthorized signatures or alterations, you must promptly notify us of the relevant facts. As between you and us, if you fail to do either of these duties, you will have to either share the loss with us, or bear the loss entirely yourself (depending on whether we used ordinary care and, if not, whether we substantially contributed to the loss). The loss could be not only with respect to items on the statement but other items with unauthorized signatures or alterations by the same wrongdoer.

You agree that the time you have to examine your statement and report to us will depend on the circumstances, but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

You further agree that if you fail to report any unauthorized signatures, alterations or forgeries in your account within 60 days of when we first send or make the statement available, you cannot assert a claim against us on any items in that statement, and as between you and us the loss will be entirely yours. This 60-day limitation is without regard to whether we used ordinary care. The limitation in this paragraph is in addition to that contained in the first paragraph of this section.

**Your duty to report other errors or problems -** In addition to your duty to review your statements for unauthorized signatures, alterations and forgeries, you agree to examine your statement with reasonable promptness for any other error or problem - such as an encoding error or an unexpected deposit amount. Also, if you receive or we make available either your items or images of your items, you must examine them for any unauthorized or missing indorsements or any other problems. You agree that the time you have to examine your statement and items and report to us will depend on the circumstances. However, this time period shall not exceed 60 days. Failure to examine your statement and items and report any errors to us within 60 days of when we first send or make the statement available precludes you from asserting a claim against us for any errors on items identified in that statement and as between you and us the loss will be entirely yours.

**Errors relating to electronic fund transfers or substitute checks -** For information on errors relating to electronic fund transfers (e.g., on-line, mobile, debit card or ATM transactions) refer to your Electronic Fund Transfers disclosure and the sections on consumer liability and error resolution. For information on errors relating to a

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019  Custom 14x  201597321-010  EILTCB11

substitute check you received, refer to your disclosure entitled Substitute Checks and Your Rights.

**Duty to notify if statement not received -** You agree to immediately notify us if you do not receive your statement by the date you normally expect to receive it. Not receiving your statement in a timely manner is a sign that there may be an issue with your account, such as possible fraud or identity theft.

**ACCOUNT TRANSFER -** This account may not be transferred or assigned without our prior written consent.

**DIRECT DEPOSITS -** If we are required for any reason to reimburse the federal government for all or any portion of a benefit payment that was directly deposited into your account, you authorize us to deduct the amount of our liability to the federal government from the account or from any other account you have with us, without prior notice and at any time, except as prohibited by law. We may also use any other legal remedy to recover the amount of our liability.

**TEMPORARY ACCOUNT AGREEMENT -** If the account documentation indicates that this is a temporary account agreement, each person who signs to open the account or has authority to make withdrawals (except as indicated to the contrary) may transact business on this account. However, we may at some time in the future restrict or prohibit further use of this account if you fail to comply with the requirements we have imposed within a reasonable time.

**SETOFF -** We may (without prior notice and when permitted by law) set off the funds in this account against any due and payable debt any of you owe us now or in the future. If this account is owned by one or more of you as individuals, we may set off any funds in the account against a due and payable debt a partnership owes us now or in the future, to the extent of your liability as a partner for the partnership debt. If your debt arises from a promissory note, then the amount of the due and payable debt will be the full amount we have demanded, as entitled under the terms of the note, and this amount may include any portion of the balance for which we have properly accelerated the due date.

This right of setoff does not apply to this account if prohibited by law. For example, the right of setoff does not apply to this account if: (a) it is an Individual Retirement Account or similar tax-deferred account, or (b) the debt is created by a consumer credit transaction under a credit card plan (but this does not affect our rights under any consensual security interest), or (c) the debtor's right of withdrawal only arises in a representative capacity. We will not be liable for the dishonor of any check when the dishonor occurs because we set off a debt against this account. You agree to hold us harmless from any claim arising as a result of our exercise of our right of setoff.

**In Illinois, Indiana and Missouri, AUTHORIZED SIGNER (Individual Accounts only) -** A single individual is the owner. The authorized signer is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the authorized signer may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the authorized signer. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the authorization at any time, and the authorization is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the authorized signer until: (a) we have received written notice or have actual knowledge of the termination of authority, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of an authorized signer.

**In Florida, CONVENIENCE ACCOUNT AGENT (Single-Party Accounts only) -** A convenience account, as defined by Florida law, means a deposit account other than a certificate of deposit, in the name of one individual, in which one or more individuals have been designated as agent with the right to make deposits to and withdraw funds from or draw checks on such account on the owner's behalf. A single individual is the owner, and the agent is merely designated to conduct transactions on the owner's behalf. The owner does not give up any rights to act on the account, and the agent may not in any manner affect the rights of the owner or beneficiaries, if any, other than by withdrawing funds from the account. The owner is responsible for any transactions of the agent. We undertake no obligation to monitor transactions to determine that they are on the owner's behalf.

The owner may terminate the agency at any time, and the agency is automatically terminated by the death of the owner. However, we may continue to honor the transactions of the agent until: (a) we have received written notice or have actual knowledge of the termination of agency, and (b) we have a reasonable opportunity to act on that notice or knowledge. We may refuse to accept the designation of a convenience account agent.

**RESTRICTIVE LEGENDS OR INDORSEMENTS -** The automated processing of the large volume of checks we receive prevents us from inspecting or looking for restrictive legends, restrictive indorsements or other special instructions on every check. For this reason, we are not required to honor any restrictive legend or indorsement or other special instruction placed on checks you write unless we have agreed in writing to the restriction or instruction. Unless we have agreed in writing, we are not responsible for any losses, claims, damages, or expenses that result from your placement of these restrictions or instructions on your checks. Examples of restrictive legends placed on checks are "must be presented within 90 days" or "not valid for more than $1,000.00." The payee's signature accompanied by the words "for deposit only" is an example of a restrictive indorsement.

**FACSIMILE SIGNATURES -** Unless you make advance arrangements with us, we have no obligation to honor facsimile signatures on your checks or other orders. If we do agree to honor items containing facsimile signatures, you authorize us, at any time, to charge you for all checks, drafts, or other orders, for the payment of money, that

are drawn on us. You give us this authority regardless of by whom or by what means the facsimile signature(s) may have been affixed so long as they resemble the facsimile signature specimen filed with us, and contain the required number of signatures for this purpose. You must notify us at once if you suspect that your facsimile signature is being or has been misused.

**CHECK PROCESSING -** We process items mechanically by relying solely on the information encoded in magnetic ink along the bottom of the items. This means that we do not individually examine all of your items to determine if the item is properly completed, signed and indorsed or to determine if it contains any information other than what is encoded in magnetic ink. You agree that we have exercised ordinary care if our automated processing is consistent with general banking practice, even though we do not inspect each item. Because we do not inspect each item, if you write a check to multiple payees, we can properly pay the check regardless of the number of indorsements unless you notify us in writing that the check requires multiple indorsements. We must receive the notice in time for us to have a reasonable opportunity to act on it, and you must tell us the precise date of the check, amount, check number and payee. We are not responsible for any unauthorized signature or alteration that would not be identified by a reasonable inspection of the item. Using an automated process helps us keep costs down for you and all account holders.

**CHECK CASHING -** We may charge a fee for anyone that does not have an account with us who is cashing a check, draft or other instrument written on your account. We may also require reasonable identification to cash such a check, draft or other instrument. We can decide what identification is reasonable under the circumstances and such identification may be documentary or physical and may include collecting a thumbprint or fingerprint.

**INDORSEMENTS -** We may accept for deposit any item payable to you or your order, even if they are not indorsed by you. We may give cash back to any one of you. We may supply any missing indorsement(s) for any item we accept for deposit or collection, and you warrant that all indorsements are genuine.

To ensure that your check or share draft is processed without delay, you must indorse it (sign it on the back) in a specific area. Your entire indorsement (whether a signature or a stamp) along with any other indorsement information (e.g. additional indorsements, ID information, driver's license number, etc.) must fall within 1½" of the "trailing edge" of a check. Indorsements must be made in blue or black ink, so that they are readable by automated check processing equipment.

As you look at the front of a check, the "trailing edge" is the left edge. When you flip the check over, be sure to keep all indorsement information within 1½" of that edge.



It is important that you confine the indorsement information to this area since the remaining blank space will be used by others in the processing of the check to place additional needed indorsements and information. You agree that you will indemnify, defend, and hold us harmless for any loss, liability, damage or expense that occurs because your indorsement, another indorsement or information you have printed on the back of the check obscures our indorsement.

These indorsement guidelines apply to both personal and business checks.

**DEATH OR INCOMPETENCE -** You agree to notify us promptly if any person with a right to withdraw funds from your account(s) dies or is adjudicated (determined by the appropriate official) incompetent. We may continue to honor your checks, items, and instructions until: (a) we know of your death or adjudication of incompetence, and (b) we have had a reasonable opportunity to act on that knowledge. You agree that we may pay or certify checks drawn on or before the date of death or adjudication of incompetence for up to ten (10) days after your death or adjudication of incompetence unless ordered to stop payment by someone claiming an interest in the account.

**FIDUCIARY ACCOUNTS -** Accounts may be opened by a person acting in a fiduciary capacity. A fiduciary is someone who is appointed to act on behalf of and for the benefit of another. We are not responsible for the actions of a fiduciary, including the misuse of funds. This account may be opened and maintained by a person or persons named as a trustee under a written trust agreement, or as executors, administrators, or conservators under court orders. You understand that by merely opening such an

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019  Custom 14x  201597321-010  EILTCB11

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

account, we are not acting in the capacity of a trustee in connection with the trust nor do we undertake any obligation to monitor or enforce the terms of the trust or letters.

**CREDIT VERIFICATION -** You agree that we may verify credit and employment history by any necessary means, including preparation of a credit report by a credit reporting agency.

**LEGAL ACTIONS AFFECTING YOUR ACCOUNT -** If we are served with a subpoena, restraining order, writ of attachment or execution, levy, garnishment, search warrant, or similar order relating to your account (termed "legal action" in this section), we will comply with that legal action. Or, in our discretion, we may freeze the assets in the account and not allow any payments out of the account until a final court determination regarding the legal action. We may do these things even if the legal action involves less than all of you. In these cases, we will not have any liability to you if there are insufficient funds to pay your items because we have withdrawn funds from your account or in any way restricted access to your funds in accordance with the legal action. Any fees or expenses we incur in responding to any legal action (including, without limitation, attorneys' fees and our internal expenses) may be charged against your account. The list of fees applicable to your account(s) provided elsewhere may specify additional fees that we may charge for certain legal actions.

**ACCOUNT SECURITY -**

**Duty to protect account information and methods of access -** It is your responsibility to protect the account numbers and electronic access devices (e.g., an ATM card) we provide you for your account(s). Do not discuss, compare, or share information about your account number(s) with anyone unless you are willing to give them full use of your money. An account number can be used by thieves to issue an electronic debit or to encode your number on a false demand draft which looks like and functions like an authorized check. If you furnish your access device and grant actual authority to make transfers to another person (a family member or coworker, for example) who then exceeds that authority, you are liable for the transfers unless we have been notified that transfers by that person are no longer authorized.

Your account number can also be used to electronically remove money from your account, and payment can be made from your account even though you did not contact us directly and order the payment.

You must also take precaution in safeguarding your blank checks. Notify us at once if you believe your checks have been lost or stolen. As between you and us, if you are negligent in safeguarding your checks, you must bear the loss entirely yourself or share the loss with us (we may have to share some of the loss if we failed to use ordinary care and if we substantially contributed to the loss).

**Positive pay and other fraud prevention services -** Except for consumer electronic fund transfers subject to Regulation E, you agree that if we offer you services appropriate for your account to help identify and limit fraud or other unauthorized transactions against your account, and you reject those services, you will be responsible for any fraudulent or unauthorized transactions which could have been prevented by the services we offered. You will not be responsible for such transactions if we acted in bad faith or to the extent our negligence contributed to the loss. Such services include positive pay or commercially reasonable security procedures. If we offered you a commercially reasonable security procedure which you reject, you agree that you are responsible for any payment order, whether authorized or not, that we accept in compliance with an alternative security procedure that you have selected. The positive pay service can help detect and prevent check fraud and is appropriate for account holders that issue: a high volume of checks, a lot of checks to the general public, or checks for large dollar amounts.

**TELEPHONIC INSTRUCTIONS -** Unless required by law or we have agreed otherwise in writing, we are not required to act upon instructions you give us via facsimile transmission or leave by voice mail or on a telephone answering machine.

**MONITORING AND RECORDING TELEPHONE CALLS AND CONSENT TO RECEIVE COMMUNICATIONS -** Subject to federal and state law, we may monitor or record phone calls for security reasons, to maintain a record and to ensure that you receive courteous and efficient service. You consent in advance to any such recording.

To provide you with the best possible service in our ongoing business relationship for your account we may need to contact you about your account from time to time by telephone, text messaging or email. However, we first obtain your consent to contact you about your account in compliance with applicable consumer protection provisions in the federal Telephone Consumer Protection Act of 1991 (TCPA), CAN-SPAM Act and their related federal regulations and orders issued by the Federal Communications Commission (FCC).

• Your consent is limited to your account, and as authorized by applicable law and regulations.

• Your consent is voluntary and not conditioned on the purchase of any product or service from us.

With the above understandings, you authorize us to contact you regarding your account throughout its existence using any telephone numbers or email addresses that you have previously provided to us by virtue of an existing business relationship or that you may subsequently provide to us.

This consent is regardless of whether the number we use to contact you is assigned to a landline, a paging service, a cellular wireless service, a specialized mobile radio service, other radio common carrier service or any other service for which you may be charged for the call. You further authorize us to contact you through the use of voice, voice mail and text messaging, including the use of pre-recorded or artificial voice messages and an automated dialing device.

If necessary, you may change or remove any of the telephone numbers or email addresses at any time using any reasonable means to notify us.

**CLAIM OF LOSS -** If you claim a credit or refund because of a forgery, alteration, or any other unauthorized withdrawal, you agree to cooperate with us in the investigation of the loss, including giving us an affidavit containing whatever reasonable information we require concerning your account, the transaction, and the circumstances surrounding the loss. Your claim will notify law enforcement authorities of any criminal act related to the claim of lost, missing, or stolen checks or unauthorized withdrawals. We will have a reasonable period of time to investigate the facts and circumstances surrounding any claim of loss. Unless we have acted in bad faith, we will not be liable for special or consequential damages, including loss of profits or opportunity, or for attorneys' fees incurred by you.

You agree that you will not waive any rights you have to recover your loss against anyone who is obligated to repay, insure, or otherwise reimburse you for your loss. You will pursue your rights or, at our option, assign them to us so that we may pursue them. Our liability will be reduced by the amount you recover or are entitled to recover from these other sources.

**EARLY WITHDRAWAL PENALTIES (and involuntary withdrawals) -** We may impose early withdrawal penalties on a withdrawal from a time account even if you don't initiate the withdrawal. For instance, the early withdrawal penalty may be imposed if the withdrawal is caused by our setoff against funds in the account or as a result of an attachment or other legal process. We may close your account and impose the early withdrawal penalty on the entire account balance in the event of a partial early withdrawal. See your notice of penalty for early withdrawals for additional information.

**ADDRESS OR NAME CHANGES -** You are responsible for notifying us of any change in your address or your name. Unless we agree otherwise, change of address or name must be made in writing by at least one of the account holders. Informing us of your address or name change on a check reorder form is not sufficient. We will attempt to communicate with you only by use of the most recent address you have provided to us. If provided elsewhere, we may impose a service fee if we attempt to locate you.

**RESOLVING ACCOUNT DISPUTES -** We may place an administrative hold on the funds in your account (refuse payment or withdrawal of the funds) if it becomes subject to a claim adverse to (1) your own interest; (2) others claiming an interest as survivors or beneficiaries of your account; or (3) a claim arising by operation of law. The hold may be placed for such period of time as we believe reasonably necessary to allow a legal proceeding to determine the merits of the claim or until we receive evidence satisfactory to us that the dispute has been resolved. We will not be liable for any items that are dishonored as a consequence of placing a hold on funds in your account for these reasons.

**WAIVER OF NOTICES -** To the extent permitted by law, you waive any notice of non-payment, dishonor or protest regarding any items credited to or charged against your account. For example, if you deposit an item and it is returned unpaid or we receive a notice of nonpayment, we do not have to notify you unless required by federal Regulation CC or other law.

**ACH AND WIRE TRANSFERS -** This agreement is subject to Article 4A of the Uniform Commercial Code - Fund Transfers as adopted in the state in which you have your account with us. If you originate a fund transfer and you identify by name and number a beneficiary financial institution, an intermediary financial institution or a beneficiary, we and every receiving or beneficiary financial institution may rely on the identifying number to make payment. We may rely on the number even if it identifies a financial institution, person or account other than the one named. You agree to be bound by automated clearing house association rules. These rules provide, among other things, that payments made to you, or originated by you, are provisional until final settlement is made through a Federal Reserve Bank or payment is otherwise made as provided in Article 4A-403(a) of the Uniform Commercial Code. If we do not receive such payment, we are entitled to a refund from you in the amount credited to your account and the party originating such payment will not be considered to have paid the amount so credited. Credit entries may be made by ACH. If we receive a payment order to credit an account you have with us by wire or ACH, we are not required to give you any notice of the payment order or credit.

**TRUNCATION, SUBSTITUTE CHECKS, AND OTHER CHECK IMAGES -** If you truncate an original check and create a substitute check, or other paper or electronic image of the original check, you warrant that no one will be asked to make payment on the original check, a substitute check or any other electronic or paper image, if the payment obligation relating to the original check has already been paid. You also warrant that any substitute check you create conforms to the legal requirements and generally accepted specifications for substitute checks. You agree to retain the original check in conformance with our internal policy for retaining original checks. You agree to indemnify us for any loss we may incur as a result of any truncated check transaction you initiate. We can refuse to accept substitute checks that have not previously been warranted by a bank or other financial institution in conformance with the Check 21 Act. Unless specifically stated in a separate agreement between you and us, we do not have to accept any other electronic or paper image of an original check.

**REMOTELY CREATED CHECKS -** Like any standard check or draft, a remotely created check (sometimes called a telecheck, preauthorized draft or demand draft) is a check or draft that can be used to withdraw money from an account. Unlike a typical check or draft, however, a remotely created check is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner). In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.

You warrant and agree to the following for every remotely created check we receive from you for deposit or collection: (1) you have received express and verifiable

Electronically Filed - St. Louis County - October 06, 2020 - 05:19 PM

authorization to create the check in the amount and to the payee that appears on the check; (2) you will maintain proof of the authorization for at least 2 years from the date of the authorization, and supply us the proof if we ask; and (3) if a check is returned you owe us the amount of the check, regardless of when the check is returned. We may take funds from your account to pay the amount you owe us, and if there are insufficient funds in your account, you still owe us the remaining balance.

**UNLAWFUL INTERNET GAMBLING NOTICE -** Restricted transactions as defined in Federal Reserve Regulation GG are prohibited from being processed through this account or relationship. Restricted transactions generally include, but are not limited to, those in which credit, electronic fund transfers, checks, or drafts are knowingly accepted by gambling businesses in connection with the participation by others in unlawful Internet gambling.

**DISPUTE RESOLUTION BY BINDING ARBITRATION -**

**Claims Subject to Arbitration:** Unless you opt out of this arbitration provision in accordance with the procedure set forth below, you and we agree that any dispute or claim between us, except for claims arising from bodily injury or death, must be arbitrated if either party elects arbitration of that dispute or claim. This agreement to arbitrate is intended to be broadly interpreted. It includes, but is not limited to:

- claims arising out of or relating to any aspect of the relationship between us, whether based in contract, tort, fraud, misrepresentation or any other statutory or common-law legal theory;
- claims that arose before this or any prior agreement (including, but not limited to, claims relating to advertising or disclosures);
- claims for mental or emotional distress or injury not arising out of bodily injury;
- claims asserted in a court of general jurisdiction against you or us, including counterclaims, cross-claims, or third-party claim, that you or we elect to arbitrate;
- claims that are currently the subject of purported class action litigation in which you are not a member of a certified class; and
- claims that may arise after the termination of this agreement.

References to "you," and "us" in this arbitration provision include our respective parents, subsidiaries, affiliates, predecessors, successors, and assigns; our and those entities' agents and employees; and all authorized or unauthorized users or beneficiaries of your account, as well as your heirs, trustees, or other representatives. However, either party may elect arbitration of an action in small claims court seeking only individualized relief, so long as the action remains in that court and is not removed to a court of general jurisdiction. This arbitration agreement does not preclude you from bringing issues to the attention of federal, state, or local agencies. Such agencies can, if the law allows, seek relief against us on your behalf. Nor does this arbitration agreement preclude either you or us from exercising self-help remedies (including setoff), and exercising such a remedy is not a waiver of the right to invoke arbitration of any dispute. **You and we each waive the right to a trial by jury or to participate in a class action whenever either you or we elect arbitration.** This agreement evidences a transaction in interstate commerce, and thus the Federal Arbitration Act governs the interpretation and enforcement of this provision. This arbitration provision shall survive termination of this agreement.

**Pre-Arbitration Notice of Disputes:** Before either you or we commence arbitration, the claimant must first send to the other a written Notice of Dispute ("Notice"). The Notice to us must be sent by certified mail to: General Counsel, Busey Bank, 100 West University Avenue, Champaign, Illinois 61820 ("Notice Address"). The Notice to you will be sent to your address on file with your account. The Notice must (i) include your name and account number; (ii) describe the nature and basis of the claim or dispute; and (iii) set forth the specific relief sought.

If you and we do not reach an agreement to resolve the claim within 30 calendar days after the Notice is received, you or we may commence an arbitration proceeding. During the arbitration, the amount of any settlement offer shall not be disclosed to the arbitrator until after the arbitrator determines the amount, if any, to which you are entitled. If you have complied with the requirements of this paragraph and the arbitrator awards you an amount of money that exceeds the value of our last written settlement to you before the appointment of the arbitrator, then we will pay you $500 in lieu of any smaller award.

In determining whether you are entitled to the minimum $500 recovery, the arbitrator shall not consider amounts offered or awarded for attorneys' fees or costs. Any disputes as to recovery of the $500 minimum recovery shall be resolved by the arbitrator, and must be raised within 14 calendar days of the arbitrator's ruling on the merits.

**Arbitration Procedure:** The arbitration will be governed by the Consumer Arbitration Rules ("AAA Rules") of the American Arbitration Association ("AAA"), as modified by this arbitration provision, and will be administered by the AAA. (If the AAA is unavailable, another arbitration provider shall be selected by the parties or by the court.) The AAA Rules are available online at www.adr.org or by writing to the Notice Address. All issues are for the arbitrator to decide, except that issues relating to the scope and enforceability of the arbitration provision or whether a dispute can or must be brought in arbitration are for the court to decide. The arbitrator may consider but shall not be bound by rulings in other arbitrations involving different customers. Unless you and we agree otherwise, any arbitration hearings will take place in the county of

your address on file with your account. If your claim is for $10,000 or less, we agree that you may choose whether the arbitration will be conducted solely on the basis of documents submitted to the arbitrator, through a telephonic hearing, or by an in-person hearing as established by the AAA Rules. If your claim exceeds $10,000, the right to a hearing will be determined by the AAA Rules. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the award is based. Except as provided below, the arbitrator can award the same damages and relief that a court can award under applicable law.

**Arbitration Fees:** If you complied with the notice requirements above, after we receive notice at the Notice Address that you have commenced arbitration, we will promptly reimburse you for your payment of the filing fee, unless your claim is for greater than $10,000 in value. (The filing fee currently is $200 but is subject to change by the arbitration provider. If you are unable to pay this fee, we will pay it directly upon receiving a written request at the Notice Address.) We also will pay all other AAA filing, administration, and arbitrator fees for that arbitration. If, however, the arbitrator finds that either the substance of your claim or the relief you seek is frivolous or brought for an improper purpose (as measured by the standards set forth in Federal Rule of Civil Procedure 11(b)), then the payment of all such fees will be governed by the AAA Rules. In such case, you agree to reimburse us for all monies previously disbursed that are otherwise your obligation to pay under the AAA Rules. In addition, if you initiate an arbitration in which you seek relief valued at greater than $10,000 (either to you or to us), the payment of these fees will be governed by the AAA rules. We will pay all AAA filing, administration, and arbitrator fees for any arbitration we commence against you.

**Requirement of Individual Arbitration:** The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim. **YOU AND WE AGREE THAT EACH MAY BRING CLAIMS AGAINST THE OTHER ONLY IN YOUR OR OUR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS, REPRESENTATIVE, OR PRIVATE ATTORNEY GENERAL PROCEEDING.** Further, unless both you and we agree otherwise, the arbitrator may not consolidate the claims of more than one person (except for the claims of co- or joint account owners pertaining to that account), and may not otherwise preside over any form of a representative, class, or private attorney general proceeding. If, after exhaustion of all appeals, any of these prohibitions on non-individualized declaratory or injunctive relief; class, representative, and private attorney general claims; and consolidation is found to be unenforceable with respect to a particular claim or with respect to a particular request for relief (such as a request for injunctive relief), then that claim or request for relief shall be severed and decided by a court, and all other claims and requests for relief shall be arbitrated.

**Future Changes to Arbitration Provision:** Notwithstanding any provision in this agreement to the contrary, we agree that if we make any future change to this arbitration provision (other than a change to the Notice Address), you may reject that change by sending us written notice within 30 calendar days of the change to the Notice Address provided above. By rejecting that future change, you are agreeing that you will arbitrate any dispute between us in accordance with the language of this arbitration provision, as amended by any prior changes that you did not timely reject.

**Right to Reject Arbitration Provision:** If you do not wish to arbitrate, you have 30 calendar days to reject this arbitration provision by sending a rejection notice to the Notice Address above by certified mail ("Rejection Notice"). To be valid, a Rejection Notice must: (i) include your name, account number, and a statement that you are rejecting the arbitration provision in this agreement; and (ii) be received by us within 30 calendar days after the opening of your account or, if an arbitration provision has been added for the first time to this agreement for an existing account, within 30 calendar days after you received notice of the change in terms. If your Rejection Notice complies with these requirements, this arbitration provision will not apply to you with respect to any claims that you or we commence in litigation or arbitration after we receive your Rejection Notice. Rejecting this arbitration provision will not affect your other rights or responsibilities under this agreement. Nor will it affect any other arbitration agreements between us.

**Military Lending Act:** If you are a covered member of the armed forces or the dependent of a covered member within the meaning of the Military Lending Act and your contract with us involves an extension of consumer credit under that Act, then you are not required to arbitrate disputes.

© 2019 Wolters Kluwer Financial Services, Inc. All rights reserved.
TC-BRO 8/1/2019  Custom 14x  201597321-010  EILTCB11

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# Busey®

100 W University Ave
Champaign IL 61820

13548701

BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  6/30/20        Page    1
Primary Account     500764766

## CHECKING ACCOUNT SUMMARY & DETAIL

| BUSINESS ANALYSIS | | Number of Enclosures | 3 |
|---|---|---|---|
| Account Number | 500764766 | Statement Dates   6/01/20 thru  6/30/20 | |
| Previous Balance | 3,016.22 | Days in the statement period | 30 |
| 29 Deposits/Credits | 1,845,252.06 | Average Ledger | 13,684.01 |
| 87 Checks/Debits | 1,866,251.82 | Average Collected | 13,684.01 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 17,983.54- | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $70.00 | $875.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 6/01 | Wire Transfer Credit | 25,000.00 |
| | BODIL ARLANDER REVOCABLE TRUST | |
| | 1/2008 CHECKING | |
| | 32 LAGOON ROAD | |
| | BELVEDERE CA  94920-2319 | |
| | RBC CAPITAL MARKETS CORPORATIO | |
| | 60 SOUTH SIXTH STREET | |
| | MINNEAPOLIS,MN,55402 | |
| | REF: BODIL ARLANDER | |
| | 20200601MMQFMP31005470 | |
| | 20200601MMQFMPUN000383 | |
| | 06011648FT03 | |
| 6/01 | guideline 401(k) AMTS:55,2 | .02 |
| | BENJA INCORPORATED | |
| | ST-M4K1G9Z7F8O6 | |
| 6/01 | guideline 401(k) AMTS:55,2 | .55 |
| | BENJA INCORPORATED | |
| | ST-S8L8M8O8Z2U2 | |
| 6/01 | CGUSABENJA      TRANSFER | 108.78 |
| | ANDREW CHAPIN | |
| | ST-K2H1D2D3Z4C3 | |
| 6/02 | CGUSABENJA      TRANSFER | 664.26 |
| | ANDREW CHAPIN | |
| | ST-G8P6F5B0D3H5 | |
| 6/03 | CGUSABENJA      TRANSFER | 76.97 |
| | ANDREW CHAPIN | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

(Account Number)

New Address: _____

(Street Address)                                                    (Unit #)

_____

(City)                          (State)                   (Zip Code)

**Member FDIC**   (Telephone Number)                                              (Social Security Number)

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

| THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK | | | | |
|---|---|---|---|---|
| **CHECKS or WITHDRAWALS OUTSTANDING** Not Charged To Your Account | | ENDING  BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |

| Check No. | $ |
|---|---|
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| **TOTAL** | $ |

ADD (+)                                                                    ADD (+)

Deposits, Loan Advances, Credit Memos, And   $ _____   Interest Earned From This Statement   $ _____
Other Automatic Deposits Not Shown On This   $ _____
Statement   $ _____   SUBTRACT  (-)

Misc. Charges From This Statement   $ _____

SUBTRACT  (-)   $ _____

Total of Checks Outstanding, Automatic Loan   $ _____   **NEW CHECKBOOK BALANCE**
Payments, Automatic Savings Transfers, Service   $ _____   Should Agree With BALANCE Line   $ _____
Charges, Debit Memos  And Other Automatic   $ _____
Deductions Not Shown On This Statement   $ _____

BALANCE   $_____

**IMPORTANT INFORMATION**

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

**IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS**

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1)  Tell us your name and account  number.
(2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)  Tell us the date and the dollar amount of the suspected  error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1)  Your name and account number.
(2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3)  The date and the dollar amount of the suspected  error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

CSI REV 4/16   6146-STMT

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**Busey**®

100 W University Ave
Champaign IL 61820

Date  6/30/20          Page     2
Primary Account       500764766

BUSINESS ANALYSIS                500764766   (Continued)

| DEPOSITS AND OTHER CREDITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTON** | **AMOUNT** |
| | ST-Q8S5P6Q4C6F6 | |
| 6/03 | Advance to ***4766<br>Advance from ***0865 | 500,000.00 |
| 6/04 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-G2Y2T0C4B9E4 | 282.74 |
| 6/05 | Wire Transfer Credit<br>E-REVSHARE CORE, LLC<br>C O THE SCION GROUP<br>223 WALL ST<br>HUNTINGTON, NY 11743-2060<br>INVESTMENT<br>20200605I1B7032R016138<br>20200605MMQFMPUN000325<br>06051637FT03 | 1,000,000.00 |
| 6/05 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-T1K4A7I0R6G6 | 97.10 |
| 6/08 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-L2V7O9W2I8V6 | 332.83 |
| 6/09 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-C3R6E7K9C3Y3 | 829.82 |
| 6/09 | to dda 500764766<br>from loan 6706744910865 | 55,000.00 |
| 6/09 | to dda 500764766<br>from loan 6706744910865 | 250,000.00 |
| 6/10 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-H9Z3G9S9M4S9 | 426.32 |
| 6/10 | Benja - Affordab Benja - Af<br>ANDREW CHAPIN<br>ST-N6W5P7N1Y3E9 | 5,000.00 |
| 6/11 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Z5X2Z6W2U1Y6 | 411.46 |
| 6/12 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Z7K6E3A3P7S4 | 228.30 |
| 6/15 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Y1X2H3Z3Y9H2 | 197.32 |
| 6/16 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-W9T6M3R7O2A4 | 757.74 |
| 6/17 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN | 145.40 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  6/30/20        Page    3
Primary Account      500764766

BUSINESS ANALYSIS                    500764766  (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | | AMOUNT |
|------|------------------------|---|--------|
| | ST-H4H5J5Y4K9J5 | | |
| 6/18 | CGUSABENJA | TRANSFER | 129.36 |
| | ANDREW CHAPIN | | |
| | ST-G1V5N7S2J2F6 | | |
| 6/19 | CGUSABENJA | TRANSFER | 194.56 |
| | ANDREW CHAPIN | | |
| | ST-W9N7W8M5B4P5 | | |
| 6/19 | Benja - Affordab Benja | | 1,750.00 |
| | ANDREW CHAPIN | | |
| | ST-V5I2L8J2G1H5 | | |
| 6/22 | CGUSABENJA | TRANSFER | 43.12 |
| | ANDREW CHAPIN | | |
| | ST-H6I1G9M0O4Q4 | | |
| 6/23 | CGUSABENJA | TRANSFER | 306.70 |
| | ANDREW CHAPIN | | |
| | ST-L2C8I8C0I5V0 | | |
| 6/25 | CGUSABENJA | TRANSFER | 71.10 |
| | ANDREW CHAPIN | | |
| | ST-C0L7X0P2U1R4 | | |
| 6/30 | CGUSABENJA | TRANSFER | 97.61 |
| | ANDREW CHAPIN | | |
| | ST-E6W6L6R4Q0W3 | | |
| 6/30 | Benja - Affordab Benja - Af | | 3,100.00 |
| | ANDREW CHAPIN | | |
| | ST-O4X7O4I3O2E3 | | |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|-------------------------|---|--------|
| 6/01 | PAYPAL | INST XFER | 12.17- |
| | ANDREW CHAPIN | | |
| | KENLESKO EBAY K | | |
| 6/01 | SHOPIFY CAPITAL  R6ZIQCV35 | | 19.31- |
| | Andrew Chapin | | |
| | R7255254 | | |
| 6/01 | SHOPIFY CAPITAL  R4NB32JCY | | 28.08- |
| | Andrew Chapin | | |
| | R7253817 | | |
| 6/02 | Wire Transfer Debit | | 10,500.00- |
| | Andrew Chapin Benja | | |
| | 322271627 | | |
| | 555475257 | | |
| | JPMORGAN CHASE BAN | | |
| | 20200602MMQFMPUN000317 | | |
| | 20200602B1QGC01R056571 | | |
| | 06021535FT03 | | |
| 6/02 | SHOPIFY CAPITAL  RB6OVINIV | | 1.57- |
| | Andrew Chapin | | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  6/30/20          Page     4
Primary Account        500764766

BUSINESS ANALYSIS                 500764766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
|      | R7285160 | |
| 6/02 | SHOPIFY CAPITAL  RPE6WKHNB<br>Andrew Chapin<br>R7274537 | 9.10- |
| 6/02 | SHOPIFY CAPITAL  RSS2FHH44<br>Andrew Chapin<br>R7283929 | 9.49- |
| 6/02 | SHOPIFY CAPITAL  RL4ULHEHY<br>Andrew Chapin<br>R7264462 | 18.90- |
| 6/02 | SHOPIFY CAPITAL  R4KWI3ACS<br>Andrew Chapin<br>R7265957 | 49.09- |
| 6/02 | SHOPIFY CAPITAL  R2ICUNGUO<br>Andrew Chapin<br>R7275952 | 66.57- |
| 6/02 | GUSTO           FEE 787806<br>Benja Incorporated<br>6semjoigajn | 117.00- |
| 6/03 | Wire Transfer Debit<br>Koosh Media<br>321370765<br>8103786531<br>AMERICAN SAVINGS B<br>20200603MMQFMPUN000255<br>20200603GMQFMP01016423<br>06031424FT03 | 10,000.00- |
| 6/03 | Wire Transfer Debit<br>Sean C Fleming Rev Trust 5/1/0<br>026007993<br>101-WA-258641-000<br>UBS AG<br>20200603MMQFMPUN000259<br>20200603B1Q8052R000571<br>06031425FT03 | 12,500.00- |
| 6/03 | Wire Transfer Debit<br>Murphy Hoffman Company<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200603MMQFMPUN000256<br>20200603J1B7841C001027<br>06031425FT03 | 102,018.25- |
| 6/03 | Wire Transfer Debit<br>Murphy Hoffman Company<br>101000695<br>9872224221 | 380,281.86- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  6/30/20        Page    5
Primary Account      500764766

BUSINESS ANALYSIS                500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|  | UMB BANK, N.A.<br>20200603MMQFMPUN000257<br>20200603J1B7841C001028<br>06031425FT03 | |
| 6/03 | SHOPIFY CAPITAL  RXME4RTD4<br>Andrew Chapin<br>R7294951 | 13.66- |
| 6/03 | SHOPIFY CAPITAL  RKZA6PX3L<br>Andrew Chapin<br>R7293612 | 27.87- |
| 6/04 | Wire Transfer Debit<br>Internet Escrow Services Inc<br>021000089<br>31044399<br>CITIBANK, N.A.<br>Reference Escrow Transaction #<br>20200604MMQFMPUN000089<br>20200604B1Q8021R020404<br>06041255FT03 | 11,930.05- |
| 6/04 | SHOPIFY CAPITAL  RDSPHCV7P<br>Andrew Chapin<br>R7303701 | 46.97- |
| 6/04 | SHOPIFY CAPITAL  RJV5CT52P<br>Andrew Chapin<br>R7305135 | 49.93- |
| 6/04 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-E5M7M7L3F9M3 | 250.00- |
| 6/05 | Wire Transfer Debit<br>Murphy Hoffman Company<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>Benja - INV-0517<br>20200605MMQFMPUN000516<br>20200605J1B7841C001639<br>06051701FT03 | 212,473.85- |
| 6/05 | Wire Transfer Debit<br>Murphy Hoffman Company<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200605MMQFMPUN000514<br>20200605J1B7841C001637<br>06051701FT03 | 324,805.50- |
| 6/05 | Wire Transfer Debit<br>Murphy Hoffman Company | 462,183.93- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date   6/30/20        Page        6
Primary Account        500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|  | 101000695<br>9872224221<br>UMB BANK, N.A.<br>Benja - INV-0482<br>20200605MMQFMPUN000515<br>20200605J1B7841C001638<br>06051701FT03 |  |
| 6/05 | guideline 401(k) AMTS:55,2<br>BENJA INCORPORATED<br>ST-O4T6P6U4R8T9 | .57- |
| 6/05 | SHOPIFY CAPITAL  R4V2USQ7I<br>Andrew Chapin<br>R7315494 | 17.16- |
| 6/05 | SHOPIFY CAPITAL  R3D6VY2FQ<br>Andrew Chapin<br>R7313981 | 84.45- |
| 6/08 | SHOPIFY CAPITAL  RHP7JZL55<br>Andrew Chapin<br>R7324605 | 8.19- |
| 6/08 | SHOPIFY CAPITAL  RDBJQBSYN<br>Andrew Chapin<br>R7326147 | 58.47- |
| 6/08 | PAYPAL         INST XFER<br>ANDREW CHAPIN<br>BILLCORMALI | 800.00- |
| 6/09 | Wire Transfer Debit<br>Murphy Hoffman Company<br>101000695<br>9872224221<br>UMB BANK, N.A.<br>20200609MMQFMPUN000235<br>20200609J1B7841C001024<br>06091422FT03 | 255,000.00- |
| 6/09 | SHOPIFY CAPITAL  RG5EHLNQD<br>Andrew Chapin<br>R7345473 | 16.97- |
| 6/09 | SHOPIFY CAPITAL  RJSRMF5PG<br>Andrew Chapin<br>R7354960 | 18.30- |
| 6/09 | SHOPIFY CAPITAL  RSNI7UTCG<br>Andrew Chapin<br>R7336816 | 19.87- |
| 6/09 | SHOPIFY CAPITAL  RFJGP4WVH<br>Andrew Chapin<br>R7335272 | 34.45- |
| 6/09 | SHOPIFY CAPITAL  RBVTDSQSZ<br>Andrew Chapin<br>R7346921 | 49.67- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date   6/30/20          Page      7
Primary Account          500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|------------------------|---|--------|
| 6/09 | SHOPIFY CAPITAL   RVVZIO26E<br>Andrew Chapin<br>R7356268 | | 76.87- |
| 6/10 | SHOPIFY CAPITAL   R6WGLTEEX<br>Andrew Chapin<br>R7366323 | | 75.21- |
| 6/10 | PAYPAL             INST XFER<br>ANDREW CHAPIN<br>MARTIJNKLEI EBA | | 89.38- |
| 6/10 | SHOPIFY CAPITAL   R7RUIEYUD<br>Andrew Chapin<br>R7368361 | | 423.13- |
| 6/10 | APPLECARD GSBANK PAYMENT<br>Andrew Chapin<br>1749626 | | 3,158.95- |
| 6/10 | AMEX EPAYMENT     ACH PMT<br>Andrew Chapin<br>W4750 | | 6,500.00- |
| 6/10 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4726092077 | | 8,900.00- |
| 6/11 | SHOPIFY CAPITAL   RHQMK6SKP<br>Andrew Chapin<br>R7375301 | | 20.33- |
| 6/12 | SHOPIFY CAPITAL   RVXTYS45D<br>Andrew Chapin<br>R7385992 | | 35.11- |
| 6/15 | SHOPIFY CAPITAL   RRPIKU2MQ<br>Andrew Chapin<br>R7396746 | | 26.78- |
| 6/15 | VZ WIRELESS VE    VZW WEBPAY<br>ANDREW *CHAPIN<br>9840064 | | 534.64- |
| 6/15 | LIN XIAO LI       IAT PAYPAL<br>ANDREW CHAPIN | | 2,068.99- |
| 6/15 | TO LN 6706744910865<br>FROM DDA 500764766 | | 11,086.50- |
| 6/16 | Account Analysis Charge | | 194.05- |
| 6/16 | SHOPIFY CAPITAL   RUMPYX7IM<br>Andrew Chapin<br>R7427659 | | 18.04- |
| 6/16 | SHOPIFY CAPITAL   RVVJOZWJY<br>Andrew Chapin<br>R7417958 | | 29.82- |
| 6/16 | SHOPIFY CAPITAL   RTZ3YKSKS<br>Andrew Chapin<br>R7407639 | | 47.88- |
| 6/17 | Wire Transfer Debit<br>UMB Capital Finance | | 20,000.00- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**Busey**®

100 W University Ave
Champaign IL 61820

Date  6/30/20        Page    8
Primary Account        500764766

BUSINESS ANALYSIS                500764766   (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| | 101000695 | |
| | 9872215826 | |
| | UMB BANK, N.A. | |
| | 20200617MMQFMPUN000112 | |
| 6/17 | SHOPIFY CAPITAL  RTWRPSWHM<br>Andrew Chapin<br>R7437780 | 16.15- |
| 6/17 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-V8Z6L0G5P3B7 | 250.00- |
| 6/18 | SHOPIFY CAPITAL  RWZ4OTAAP<br>Andrew Chapin<br>R7448357 | 26.18- |
| 6/18 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>BILLCORMALI | 125.00- |
| 6/19 | SHOPIFY CAPITAL  RA7RUYS64<br>Andrew Chapin<br>R7459079 | 83.99- |
| 6/19 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-G4M5Y6R6V0W3 | 582.90- |
| 6/19 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-O9V6E4G8M5K6 | 619.54- |
| 6/22 | GUSTO            CND 884331<br>Benja Incorporated<br>6semjok9c2t | 50.00- |
| 6/22 | SHOPIFY CAPITAL  RQGWLUSYN<br>Andrew Chapin<br>R7469780 | 78.74- |
| 6/23 | SHOPIFY CAPITAL  R6O3DPXFV<br>Andrew Chapin<br>R7500512 | 18.20- |
| 6/23 | SHOPIFY CAPITAL  R6RSELDZV<br>Andrew Chapin<br>R7480652 | 35.48- |
| 6/23 | SHOPIFY CAPITAL  REYVUKJYU<br>Andrew Chapin<br>R7491037 | 65.86- |
| 6/23 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-F5M6Z2V6B2T2 | 250.00- |
| 6/24 | SHOPIFY CAPITAL  RK3VP5ASX<br>Andrew Chapin<br>R7510126 | 40.95- |
| 6/25 | SHOPIFY CAPITAL  RL36ANLSC<br>Andrew Chapin | 9.10- |



**Busey**®

100 W University Ave
Champaign IL 61820

Date   6/30/20          Page        9
Primary Account         500764766

BUSINESS ANALYSIS                    500764766   (Continued)

| \begin{center}**CHECKS AND OTHER DEBITS**\end{center} | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
|  | R7520344 |  |
| 6/25 | VENMO              PAYMENT<br>ANDREW CHAPIN<br>3666252200 | 1,490.00- |
| 6/26 | CGUSABENJA         TRANSFER<br>ANDREW CHAPIN<br>ST-S4T4K5G1T7E7 | 15.42- |
| 6/26 | SHOPIFY CAPITAL  RFZJYVCBI<br>Andrew Chapin<br>R7530750 | 26.09- |
| 6/29 | SHOPIFY CAPITAL  RS34R7QXL<br>Andrew Chapin<br>R7541406 | 59.83- |
| 6/30 | SHOPIFY CAPITAL  RH3AOPWHV<br>Andrew Chapin<br>R7562436 | 31.64- |
| 6/30 | GUSTO            CND 944380<br>Benja Incorporated<br>6semjo11dok | 50.00- |
| 6/30 | SHOPIFY CAPITAL  RPUVPV445<br>Andrew Chapin<br>R7552116 | 53.31- |
| 6/30 | SHOPIFY CAPITAL  RTP7D627W<br>Andrew Chapin<br>R7571971 | 55.76- |
| 6/30 | GUSTO            CND 944380<br>Benja Incorporated<br>6semjo11do6 | 100.00- |
| 6/30 | GUSTO            CND 944380<br>Benja Incorporated<br>6semjo11dpi | 750.00- |
| 6/30 | GUSTO            CND 944380<br>Benja Incorporated<br>6semjo11dp3 | 800.00- |
| 6/30 | GUSTO            REM 944386<br>Benja Incorporated<br>6semjo11dms | 1,490.00- |
| 6/30 | GUSTO            TAX 944394<br>Benja Incorporated<br>6semjo11dlg | 5,814.16- |
| 6/30 | GUSTO            NET 944385<br>Benja Incorporated<br>6semjo11dk7 | 16,201.78- |
| 6/30 | Overdraft Item Charge | 70.00- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  6/30/20      Page    10
Primary Account        500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 6/16 | 5006 | 67.57 | 6/10 | 5007 | 107.24 |
| 6/12 | 5013* | 10.00 | | | |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 6/01 | 28,066.01 | 6/02 | 17,958.55 | 6/03 | 13,193.88 |
| 6/04 | 1,199.67 | 6/05 | 1,731.31 | 6/08 | 1,197.48 |
| 6/09 | 51,811.17 | 6/10 | 37,983.58 | 6/11 | 38,374.71 |
| 6/12 | 38,557.90 | 6/15 | 25,038.31 | 6/16 | 25,438.69 |
| 6/17 | 5,317.94 | 6/18 | 5,296.12 | 6/19 | 5,954.25 |
| 6/22 | 5,868.63 | 6/23 | 5,805.79 | 6/24 | 5,764.84 |
| 6/25 | 4,336.84 | 6/26 | 4,295.33 | 6/29 | 4,235.50 |
| 6/30 | 17,983.54- | | | | |

Date: 6/30/2020  Page: 11 of 11
Primary Account: 500764766



Check 5006 Amount $67.57 Date 6/16/2020



Check 5007 Amount $107.24 Date 6/10/2020



Check 5013 Amount $10.00 Date 6/12/2020

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# Busey®

100 W University Ave
Champaign IL 61820

12344742

BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  5/29/20        Page    1
Primary Account      500764766

## CHECKING ACCOUNT SUMMARY & DETAIL

| | | | |
|---|---|---|---|
| BUSINESS ANALYSIS | | Number of Enclosures | 6 |
| Account Number | 500764766 | Statement Dates  5/01/20 thru  5/31/20 | |
| Previous Balance | 195,406.71 | Days in the statement period | 31 |
| 24 Deposits/Credits | 965,024.70 | Average Ledger | 68,384.33 |
| 91 Checks/Debits | 1,157,415.19 | Average Collected | 68,384.33 |
| Service Charge | .00 | | |
| Interest Paid | .00 | | |
| Ending Balance | 3,016.22 | | |

| | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 5/01 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-U9D7A0P0R4R1 | 31.91 |
| 5/05 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-V7H3O5J9P0Q5 | 77.42 |
| 5/06 | RAINY DAY PRINTI ACH<br>Benja Incorporated | .06 |
| 5/06 | RAINY DAY PRINTI ACH<br>Benja Incorporated | .08 |
| 5/06 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Y9X1D0C8J7Y3 | 6.73 |
| 5/08 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-E5W6V4A3F1J1 | 32.74 |
| 5/11 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Y0X3C6L2W7T7 | 82.34 |
| 5/12 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-R1L7U8Z0N5I6 | 209.70 |
| 5/13 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-W0F3M5J4E4O2 | 63.82 |

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

_____ (Account Number)

New Address: _____

(Street Address)                                                            (Unit #)

(City)                                    (State)                          (Zip Code)

Member FDIC  (Telephone Number)                                    (Social Security Number)

(Customer Signature)

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | | |
|---|---|---|---|---|---|
| Check No. | $ | ENDING  BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |
| | | ADD (+) | $ _____ | ADD (+) | |
| | | Deposits, Loan Advances, Credit Memos, And | $ _____ | Interest Earned From This Statement | $ _____ |
| | | Other Automatic Deposits Not Shown On This | $ _____ | | |
| | | Statement | $ _____ | SUBTRACT (-) | |
| | | | | Misc. Charges From This Statement | $ _____ |
| | | SUBTRACT (-) | $ _____ | | |
| | | Total of Checks Outstanding, Automatic Loan | $ _____ | **NEW CHECKBOOK BALANCE** | |
| | | Payments, Automatic Savings Transfers, Service | $ _____ | Should Agree With BALANCE Line | $ _____ |
| | | Charges, Debit Memos  And Other Automatic | $ _____ | | |
| | | Deductions Not Shown On This Statement | $ _____ | | |
| TOTAL | $ | BALANCE | $ _____ | | |

### IMPORTANT INFORMATION

#### In Case of General Statement Errors

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

#### In Case of Errors or Questions About Your Electronic Transactions

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
(1) Tell us your name and account  number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) Tell us the date and the dollar amount of the suspected  error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

#### In Case of Errors or Questions About Your Line of Credit or Home Equity Loan

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
(1) Your name and account number.
(2) Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
(3) The date and the dollar amount of the suspected  error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

#### Balance Subject to Interest Rate for Line of Credit

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

#### Telephone Number and Address to Be Notified in the Event of Errors

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

CSI REV 4/16   6146-STMT



100 W University Ave
Champaign IL 61820

Date  5/29/20          Page     2
Primary Account        500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 5/14 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-V1Z6M5L6X1Z0 | 144.29 |
| 5/15 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Y1Q2P7N4D9H1 | 31.78 |
| 5/18 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-Q1T2X1F3J2Y8 | 99.72 |
| 5/19 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-E2D7C1S8I4K8 | 426.26 |
| 5/20 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-B4N2Q2A7E8A6 | 84.03 |
| 5/21 | Benja - Affordab Benja - Af<br>ANDREW CHAPIN<br>ST-W9C2J8N3K8T5 | 3,000.00 |
| 5/22 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-V4V8F2Q9U4U4 | 208.25 |
| 5/26 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-O9B9J8R0G3I1 | 97.88 |
| 5/26 | SBAD TREAS 310    MISC PAY<br>Benja Incorporated<br>166317780073000<br>RMT*CT*1663177800 200 12668 F8<br>041********\ | 149,900.00 |
| 5/27 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200527J1B7841C001627<br>20200527MMQFMPUN000319<br>05271651FT03 | 268,872.52 |
| 5/27 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-M1C3I9M8R6O5 | 303.27 |
| 5/27 | MHC FIN SERVICES CHKNAM<br>Benja Incorporated<br>56762 | 540,572.25 |
| 5/28 | CGUSABENJA        TRANSFER<br>ANDREW CHAPIN<br>ST-C3D0Q4V5J9X7 | 175.75 |
| 5/28 | AMZN4F5DE52Z      Marketplac<br>Benja Incorporated | 340.64 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  5/29/20          Page      3
Primary Account        500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
|      | 55Y0Z0MOS2NZMJY | |
| 5/29 | CGUSABENJA      TRANSFER<br>ANDREW CHAPIN<br>ST-Z9W7T5R8O4D6 | 263.26 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| 5/01 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200501MMQFMPUN000254<br>20200501B1QGC01R056608<br>05011340FT03 | 144,000.00- |
| 5/01 | SHOPIFY CAPITAL  RRM6N5WYM<br>Andrew Chapin<br>R6962604 | 5.64- |
| 5/01 | SHOPIFY CAPITAL  RIVLYGTYZ<br>Andrew Chapin<br>R6961211 | 21.55- |
| 5/04 | Wire Transfer Debit<br>Rainy Day Printing<br>102000021<br>103683925111<br>US BANK, NA<br>20200504MMQFMPUN000429<br>20200504J1Q5040C001340<br>05041706FT03 | 200.00- |
| 5/04 | SHOPIFY CAPITAL  RR6UA2ZSL<br>Andrew Chapin<br>R6971590 | 16.82- |
| 5/04 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>BESTAUTHENT EBA | 113.42- |
| 5/04 | GUSTO            FEE 629057<br>Benja Incorporated<br>6semjog3emg | 141.00- |
| 5/04 | GUSTO            REM 630913<br>Benja Incorporated<br>6semjog5pbv | 237.50- |
| 5/05 | Wire Transfer Debit<br>CFOS 2GO STAFFING<br>121143260<br>0101150100 | 2,500.00- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  5/29/20        Page     4
Primary Account        500764766

BUSINESS ANALYSIS                500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
| | WESTERN ALLIANCE B 20200505MMQFMPUN000395 20200505L1LFB71C001847 05051725FT03 | |
| 5/05 | SHOPIFY CAPITAL   RWRDKDZYD Andrew Chapin R6993344 | 2.50- |
| 5/05 | SHOPIFY CAPITAL   RVWB5SBNW Andrew Chapin R6983473 | 11.21- |
| 5/05 | SHOPIFY CAPITAL   RKRDUT63D Andrew Chapin R6991951 | 18.20- |
| 5/05 | SHOPIFY CAPITAL   ROSGNXSN4 Andrew Chapin R7001455 | 33.97- |
| 5/05 | SHOPIFY CAPITAL   R6FPVKKMY Andrew Chapin R6981979 | 44.52- |
| 5/05 | PAYMENTECH       FEE AffordableJerseys 6470807 | 56.27- |
| 5/06 | SHOPIFY CAPITAL   RYSAUIT5O Andrew Chapin R7012844 | 1.23- |
| 5/06 | GUSTO          CND 636917 Benja Incorporated 6semjogc0kp | 250.00- |
| 5/07 | PAYPAL        INST XFER ANDREW CHAPIN SAYIT86 EBAY SA | 2.16- |
| 5/07 | SHOPIFY CAPITAL   RC5Q5D742 Andrew Chapin R7021722 | 7.28- |
| 5/08 | SHOPIFY CAPITAL   ROUB53ATT Andrew Chapin R7033526 | 5.84- |
| 5/08 | SHOPIFY CAPITAL   REMTFR5ZK Andrew Chapin R7032077 | 42.22- |
| 5/11 | SHOPIFY CAPITAL   RC6AKSNGA Andrew Chapin R7042453 | 8.54- |
| 5/11 | SHOPIFY CAPITAL   RWCX25WNO Andrew Chapin R7043877 | 14.57- |
| 5/11 | APPLECARD GSBANK PAYMENT Andrew Chapin | 1,134.01- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  5/29/20        Page     5
Primary Account        500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|---|---|---|
| | 1749626 | |
| 5/12 | SHOPIFY CAPITAL   RTZT5QBJG<br>Andrew Chapin<br>R7073189 | 8.80- |
| 5/12 | SHOPIFY CAPITAL   RT6JGRWDR<br>Andrew Chapin<br>R7071994 | 10.18- |
| 5/12 | SHOPIFY CAPITAL   RV2BIHFYR<br>Andrew Chapin<br>R7064179 | 28.23- |
| 5/12 | SHOPIFY CAPITAL   RMJN567IH<br>Andrew Chapin<br>R7062811 | 36.85- |
| 5/13 | SHOPIFY CAPITAL   RSDJZGG6S<br>Andrew Chapin<br>R7082765 | 11.28- |
| 5/13 | SHOPIFY CAPITAL   R2UPXEWI5<br>Andrew Chapin<br>R7081465 | 18.95- |
| 5/14 | SHOPIFY CAPITAL   R5YLV7CLO<br>Andrew Chapin<br>R7091509 | 9.16- |
| 5/14 | SHOPIFY CAPITAL   RAOIR3ENS<br>Andrew Chapin<br>R7092892 | 25.59- |
| 5/15 | Account Analysis Charge | 346.34- |
| 5/15 | SHOPIFY CAPITAL   REOHWOJUZ<br>Andrew Chapin<br>R7103053 | 5.62- |
| 5/15 | SHOPIFY CAPITAL   REPTKSAFM<br>Andrew Chapin<br>R7101663 | 26.18- |
| 5/18 | SHOPIFY CAPITAL   RS2US7XZ7<br>Andrew Chapin<br>R7111979 | 8.19- |
| 5/18 | SHOPIFY CAPITAL   R7ITCP4RJ<br>Andrew Chapin<br>R7113386 | 17.68- |
| 5/18 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>THETRAVYTRA | 56.00- |
| 5/18 | PAYMENTECH      CHARGEBACK<br>AffordableJerseys<br>6470807 | 72.99- |
| 5/18 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>TYLERPEDEN1 | 89.99- |
| 5/19 | SHOPIFY CAPITAL   R2CLCVRXH<br>Andrew Chapin | 10.27- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  5/29/20        Page      6
Primary Account        500764766

BUSINESS ANALYSIS                500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
|      | R7141938 | |
| 5/19 | SHOPIFY CAPITAL  RTNX2T6NC | 11.24- |
|      | Andrew Chapin | |
|      | R7143224 | |
| 5/19 | SHOPIFY CAPITAL  ROFKYFNXD | 22.52- |
|      | Andrew Chapin | |
|      | R7123927 | |
| 5/19 | SHOPIFY CAPITAL  R3A22DAJ6 | 33.01- |
|      | Andrew Chapin | |
|      | R7133895 | |
| 5/19 | SHOPIFY CAPITAL  RJ46LB7HR | 58.57- |
|      | Andrew Chapin | |
|      | R7132499 | |
| 5/20 | SHOPIFY CAPITAL  RS4UXLJEP | 14.92- |
|      | Andrew Chapin | |
|      | R7153201 | |
| 5/20 | SHOPIFY CAPITAL  R7C3JR2MV | 20.12- |
|      | Andrew Chapin | |
|      | R7151847 | |
| 5/20 | AMEX EPAYMENT    ACH PMT | 8,999.27- |
|      | Andrew Chapin | |
|      | W1786 | |
| 5/21 | SHOPIFY CAPITAL  RDEGYZKZU | 8.19- |
|      | Andrew Chapin | |
|      | R7162064 | |
| 5/21 | PAYMENTECH       CHARGEBACK | 63.00- |
|      | AffordableJerseys | |
|      | 6470807 | |
| 5/21 | WCB Warehouse    WCB Wareho | 250.00- |
|      | BENJA INCORPORATED | |
|      | ST-P8N0P3W1R4I3 | |
| 5/22 | SHOPIFY CAPITAL  RIIBBV3AR | 16.73- |
|      | Andrew Chapin | |
|      | R7172513 | |
| 5/22 | SHOPIFY CAPITAL  RIZFI24QF | 36.75- |
|      | Andrew Chapin | |
|      | R7173938 | |
| 5/26 | Wire Transfer Debit | 600.00- |
|      | Morning Blitz LLC | |
|      | 026009593 | |
|      | 898115416717 | |
|      | 921 Heron Court | |
|      | Marco Island, FL | |
|      | BANK OF AMERICA, N | |
|      | 20200526MMQFMPUN000385 | |
|      | 20200526B6B7HU4R011332 | |
|      | 05261424FT03 | |
| 5/26 | Wire Transfer Debit | 1,100.00- |
|      | Koosh Media LLC | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM


100 W University Ave
Champaign IL 61820

Date  5/29/20          Page    7
Primary Account        500764766

BUSINESS ANALYSIS                500764766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|
|  | 321370765 | |
|  | 8103786531 | |
|  | AMERICAN SAVINGS B | |
|  | 20200526MMQFMPUN000386 | |
|  | 20200526GMQFMP01021050 | |
|  | 05261424FT03 | |
| 5/26 | SHOPIFY CAPITAL  R4YNZFLFY<br>Andrew Chapin<br>R7184415 | 17.30- |
| 5/26 | SHOPIFY CAPITAL  R4TE4DPAB<br>Andrew Chapin<br>R7182983 | 61.12- |
| 5/27 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200527MMQFMPUN000123<br>20200527B1QGC01R031842<br>05271126FT03 | 250,500.00- |
| 5/27 | SHOPIFY CAPITAL  RUJCBVNOE<br>Andrew Chapin<br>R7214810 | 5.64- |
| 5/27 | SHOPIFY CAPITAL  RRAX7ZZ3H<br>Andrew Chapin<br>R7213542 | 9.10- |
| 5/27 | SHOPIFY CAPITAL  RTW6AKAZU<br>Andrew Chapin<br>R7204053 | 9.76- |
| 5/27 | SHOPIFY CAPITAL  RPEBS4R3F<br>Andrew Chapin<br>R7205454 | 12.17- |
| 5/27 | SHOPIFY CAPITAL  RWH64DJXE<br>Andrew Chapin<br>R7224204 | 12.57- |
| 5/27 | SHOPIFY CAPITAL  RAQ67TISH<br>Andrew Chapin<br>R7222908 | 21.35- |
| 5/27 | SHOPIFY CAPITAL  RO7Q73UE7<br>Andrew Chapin<br>R7195257 | 23.27- |
| 5/27 | SHOPIFY CAPITAL  RY6VJLH6N<br>Andrew Chapin<br>R7193707 | 67.79- |
| 5/27 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W9564 | 1,338.79- |
| 5/27 | LIN XIAO LI      IAT PAYPAL<br>ANDREW CHAPIN | 3,593.68- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  5/29/20        Page     8
Primary Account      500764766

BUSINESS ANALYSIS              500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 5/27 | JOMBOY CORP      SALE<br>BENJA INCORPORATED | 4,000.00- |
| 5/27 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4703131471 | 4,412.84- |
| 5/28 | SHOPIFY CAPITAL  REAU276XE<br>Andrew Chapin<br>R7234445 | 31.09- |
| 5/28 | from dda 500764766<br>to loan 6706744910865 | 700,000.00- |
| 5/29 | Wire Transfer Debit<br>Sports Byline USA<br>122016066<br>0450009504<br>CITY NATIONAL BANK<br>20200529MMQFMPUN000295<br>20200529L2LFCK1C003994<br>05291331FT03 | 2,500.00- |
| 5/29 | GUSTO          CND 783183<br>Benja Incorporated<br>6semjoibrth | 50.00- |
| 5/29 | SHOPIFY CAPITAL  RXHOAV62S<br>Andrew Chapin<br>R7244802 | 50.19- |
| 5/29 | SHOPIFY CAPITAL  RYL5OQIML<br>Andrew Chapin<br>R7243381 | 63.52- |
| 5/29 | GUSTO          CND 783183<br>Benja Incorporated<br>6semjoibrt8 | 150.00- |
| 5/29 | GUSTO          CND 783183<br>Benja Incorporated<br>6semjoibrt9 | 150.00- |
| 5/29 | GUSTO          CND 783183<br>Benja Incorporated<br>6semjoibrta | 350.00- |
| 5/29 | GUSTO          CND 783183<br>Benja Incorporated<br>6semjoibrt7 | 400.00- |
| 5/29 | GUSTO          CND 783183<br>Benja Incorporated<br>6semjoibrtk | 800.00- |
| 5/29 | GUSTO          CND 783183<br>Benja Incorporated<br>6semjoibrtd | 850.00- |
| 5/29 | GUSTO          REM 783186<br>Benja Incorporated<br>6semjoibrt4 | 2,187.50- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  5/29/20          Page      9
Primary Account          500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
| 5/29 | GUSTO          TAX 783187<br>Benja Incorporated<br>6semjoibrss | 6,491.07- |
| 5/29 | GUSTO          NET 783185<br>Benja Incorporated<br>6semjoibrse | 17,892.04- |

## CHECKS IN SERIAL NUMBER ORDER

| DATE | CHECK NO | AMOUNT | DATE | CHECK NO | AMOUNT |
|------|----------|--------|------|----------|--------|
| 5/28 | 5005 | 44.99 | 5/22 | 5008* | 107.24 |
| 5/29 | 5009 | 128.37 | 5/20 | 5011* | 134.99 |
| 5/18 | 5012 | 51.50 | 5/22 | 5014* | 12.24 |

*Indicates break in check number sequence

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 5/01 | 51,411.43 | 5/04 | 50,702.69 | 5/05 | 48,113.44 |
| 5/06 | 47,869.08 | 5/07 | 47,859.64 | 5/08 | 47,844.32 |
| 5/11 | 46,769.54 | 5/12 | 46,895.18 | 5/13 | 46,928.77 |
| 5/14 | 47,038.31 | 5/15 | 46,691.95 | 5/18 | 46,495.32 |
| 5/19 | 46,785.97 | 5/20 | 37,700.70 | 5/21 | 40,379.51 |
| 5/22 | 40,414.80 | 5/26 | 188,634.26 | 5/27 | 734,375.34 |
| 5/28 | 34,815.65 | 5/29 | 3,016.22 | | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Date: 5/29/2020   Page: 10 of 10
Primary Account: 500764766



Check 5005 Amount $44.99 Date 5/28/2020

Check 5008 Amount $107.24 Date 5/22/2020





Check 5009 Amount $128.37 Date 5/29/2020

Check 5011 Amount $134.99 Date 5/20/2020





Check 5012 Amount $51.50 Date 5/18/2020

Check 5014 Amount $12.24 Date 5/22/2020

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# Busey®

100 W University Ave
Champaign IL 61820

11386266
BENJA INC
845 MARKET ST 450A
SAN FRANCISCO CA 94117

Date  4/30/20       Page    1
Primary Account       500764766

## CHECKING ACCOUNT SUMMARY & DETAIL

```
BUSINESS ANALYSIS              Number of Enclosures                 0
Account Number      500764766  Statement Dates   4/01/20 thru  4/30/20
Previous Balance    11,599.47  Days in the statement period        30
  28 Deposits/Credits 4,290,724.02  Average Ledger          143,808.36
  101 Checks/Debits  4,106,916.78   Average Collected       143,808.36
Service Charge            .00
Interest Paid             .00
Ending Balance     195,406.71
```

|  | Total For This Period | Total Year-to-Date |
|---|---|---|
| Overdraft Item Fees | $.00 | $805.00 |
| Returned Item Fees | $.00 | $35.00 |

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|---|---|---|
| 4/02 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200401J1B7841C002985<br>20200401MMQFMPUN000330<br>04011745FT01 | 414,950.54 |
| 4/03 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-E5B4L1W0V5J3 | 47.94 |
| 4/06 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>FACTORING PURCHASE<br>MHC FINANCIAL SERVICES<br>20200403J1B7841C001682<br>20200403MMQFMPUN000275<br>04031800FT01 | 1,243,604.49 |
| 4/06 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-Y7O8Y1D4W4H2 | 27.05 |
| 4/08 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN | 21.47 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## CHANGE OF ADDRESS FORM

Please notify us immediately of any address changes on your accounts..

Customer Name: _____

_____ (Account Number)

New Address: _____

(Street Address) _____ (Unit #)

(City) _____ (State) _____ (Zip Code)

Member FDIC    (Telephone Number) _____ (Social Security Number)

(Customer Signature) _____

**Please return this form to the address listed below or bring it to our office**

### THIS FORM WILL HELP YOU BALANCE YOUR CHECKBOOK

| CHECKS or WITHDRAWALS OUTSTANDING Not Charged To Your Account | | | | | |
|---|---|---|---|---|---|
| Check No. | $ | ENDING BALANCE Shown On This Statement | $ _____ | Current Checkbook Balance | $ _____ |
| | | ADD (+) | $ _____ | ADD (+) | |
| | | Deposits, Loan Advances, Credit Memos, And | $ _____ | Interest Earned From This Statement | $ _____ |
| | | Other Automatic Deposits Not Shown On This | $ _____ | | |
| | | Statement | $ _____ | SUBTRACT (-) | |
| | | | | Misc. Charges From This Statement | $ _____ |
| | | SUBTRACT (-) | $ _____ | | |
| | | Total of Checks Outstanding, Automatic Loan | $ _____ | **NEW CHECKBOOK BALANCE** | |
| | | Payments, Automatic Savings Transfers, Service | $ _____ | Should Agree With BALANCE Line | $ _____ |
| | | Charges, Debit Memos And Other Automatic | $ _____ | | |
| | | Deductions Not Shown On This Statement | $ _____ | | |
| TOTAL | $ | BALANCE | $ _____ | | |

### IMPORTANT INFORMATION

**In Case of General Statement Errors**

You must examine your statement of account with "reasonable promptness." If you discover (or reasonably should have discovered) any errors, unauthorized signatures, or alterations, you must promptly notify us of the relevant facts. You agree that the time you have to examine your statement and report to us will depend on the circumstances,but will not, in any circumstance, exceed a total of 30 days from when the statement is first sent or made available to you.

### IMPORTANT INFORMATION FOR CONSUMER ACCOUNTS

**In Case of Errors or Questions About Your Electronic Transactions**

Telephone or write us at the number or address listed below if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.
 (1)  Tell us your name and account number.
 (2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
 (3)  Tell us the date and the dollar amount of the suspected error.
We will investigate your complaint and will correct any error promptly.If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation. To qualify for this recredit, we require a written notice of the problem or complaint within 10 business days of your telephone call to us.

**In Case of Errors or Questions About Your Line of Credit or Home Equity Loan**

If you think your bill is wrong, or if you need information about this loan or a transaction on this statement, please write to us at the address listed below. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights. In your letter, please give us the following information:
 (1)  Your name and account number.
 (2)  Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
 (3)  The date and the dollar amount of the suspected error.
You do not have to pay any amount in question while we are investigating, but you are still obligated to pay the parts of your bill that are not in question. While we investigate your questions, we cannot report you as delinquent or take any action to collect the amount you question.

**Balance Subject to Interest Rate for Line of Credit**

Balance Subject to Interest Rate / Average Daily Balance - We figure the interest charge on your account by applying the periodic rate to the 'AVERAGE DAILY BALANCE' of your account (including current transactions). To get the 'AVERAGE DAILY BALANCE', we take the beginning balance of your account each day, add any new advances and subtract any payments or credits, also subtracting any unpaid finance charges. The automatic minimum payment amount is excluded when calculating the 'AVERAGE DAILY BALANCE' and 'INTEREST CHARGE'. If the account does not have sufficient funds to cover payment and another advance is made to cover minimum payment, this is also excluded from figuring the 'AVERAGE DAILY BALANCE' but is reflected in the beginning balance of the next statement cycle. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the 'AVERAGE DAILY BALANCE'. Written notification of any errors must be given to preserve your rights under the Truth in Lending Act. At any time the debtor may pay the aggregate balance or any portion of his/her indebtedness.

*We may report information about your account to credit bureaus.  Late payments, missed payments, or other defaults on your account may be reflected in your credit report.*

**Telephone Number and Address to Be Notified in the Event of Errors**

Call us at 800.672.8739 or write to us at Busey Bank, Attention: Customer Care Center, P.O. Box 4028, Champaign, IL 61824. You should also call us at this phone number or write to us at this address if you believe a transfer has been made using the information from your check without your permission.

CSI REV 4/16   6146-STMT

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  4/30/20          Page      2
Primary Account          500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| | ST-M7W9W8G2D4P9 | |
| 4/09 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-O8X9K3N4W2R8 | 55.09 |
| 4/10 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200410J1B7841C000516<br>20200410MMQFMPUN000166<br>04101427FT03 | 322,963.00 |
| 4/10 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-X2P9A0K6K2J7 | 103.12 |
| 4/13 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-W0I1B0P6N1A8 | 68.97 |
| 4/14 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-C2E2S0K5G0W4 | 111.86 |
| 4/16 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-J9Z0N0B0N0H3 | 31.91 |
| 4/17 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-Y0E8Y8F5Q7T1 | 6.66 |
| 4/17 | PAYPAL           TRANSFER<br>ANDREW CHAPIN<br>1008631391114 | 100.00 |
| 4/17 | ANDREW GLUCK      SENDER<br>463303580 | 10,000.00 |
| 4/20 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-P0J3W1N5D1P0 | 61.50 |
| 4/20 | to dda 500764766<br>from ln 6706744910865 | 400,000.00 |
| 4/21 | Wire Transfer Credit<br>DISTRIBUTION MANAGEMENT, INC.<br>5 RESEARCH PARK DR<br>SAINT CHARLES,MO,63304<br>20200421L3LF151C003794<br>20200421MMQFMPUN000254<br>04211701FT03 | 200,000.00 |
| 4/21 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-O7S1K5F7J9F8 | 262.32 |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page     3
Primary Account      500764766

BUSINESS ANALYSIS                    500764766   (Continued)

## DEPOSITS AND OTHER CREDITS

| DATE | TRANSACTION DESCRIPTON | AMOUNT |
|------|------------------------|--------|
| 4/21 | SBAD TREAS 310    MISC PAY<br>Benja Incorporated<br>EIDG:3600140295<br>NTE*PMT*EIDG:3600140295\ | 6,000.00 |
| 4/23 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-B1F0S3Z0C9P1 | 138.84 |
| 4/24 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-S7B5Z4A0M0H6 | 187.05 |
| 4/27 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-U8L8T5D4T2R2 | 67.76 |
| 4/28 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-O0A7I7F4P0P2 | 55.62 |
| 4/29 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200429J1B7841C001317<br>20200429MMQFMPUN000356<br>04291639FT03 | 994,774.76 |
| 4/29 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-V6G0S5H2S4Q3 | 33.59 |
| 4/30 | Wire Transfer Credit<br>MHC FINANCIAL SERVICES, INC.<br>MHC FINANCIAL SERVICES INC DBA<br>11120 TOMAHAWK CREEK PKWY SUIT<br>LEAWOOD, KS 662112695<br>ACCOUNT NAME: BENJA INCORPORAT<br>20200430J1B7841C000733<br>20200430MMQFMPUN000198<br>04301138FT03 | 696,970.23 |
| 4/30 | CGUSABENJA       TRANSFER<br>ANDREW CHAPIN<br>ST-O2E7B5D4U6O4 | 5.19 |
| 4/30 | PAYMENTECH       CHARGEBACK<br>AffordableJerseys<br>6470807 | 75.06 |

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|-------------------------|--------|



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page    4
Primary Account        500764766

BUSINESS ANALYSIS                500764766   (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---:|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 4/01 | SHOPIFY CAPITAL  R64TJL6EE<br>Andrew Chapin<br>R6669278 | 59.11- |
| 4/01 | PAYPAL          INST XFER<br>ANDREW CHAPIN<br>JERSEYSTORE | 420.00- |
| 4/02 | Wire Transfer Debit<br>Taco Corp<br>265270413<br>20001214039<br>IBERIABANK<br>20200402MMQFMPUN000061<br>20200402MMQFMP9H000273<br>04021018FT01 | 350,000.00- |
| 4/02 | SHOPIFY CAPITAL  ROP72W4VP<br>Andrew Chapin<br>R6678837 | 17.21- |
| 4/02 | GUSTO          REM 521595<br>Benja Incorporated<br>6semjodiq7s | 50.00- |
| 4/02 | GUSTO          CND 521587<br>Benja Incorporated<br>6semjodiq8i | 100.00- |
| 4/02 | GUSTO          TAX 521606<br>Benja Incorporated<br>6semjodiq75 | 101.89- |
| 4/02 | GUSTO          FEE 520375<br>Benja Incorporated<br>6semjodfebr | 105.00- |
| 4/02 | GUSTO          CND 521587<br>Benja Incorporated<br>6semjodiq8s | 300.00- |
| 4/02 | GUSTO          NET 521594<br>Benja Incorporated<br>6semjodiq6d | 570.93- |
| 4/03 | Wire Transfer Debit<br>KEMA Partners LLC<br>021000021<br>606768692<br>JPMORGAN CHASE BAN<br>20200403MMQFMPUN000052<br>20200403B1QGC01R017533<br>04030914FT01 | 50,000.00- |
| 4/03 | SHOPIFY CAPITAL  RX4EW4OTJ<br>Andrew Chapin<br>R6689748 | 8.54- |
| 4/03 | SHOPIFY CAPITAL  RMYANBU3L<br>Andrew Chapin | 40.56- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**Busey®**

100 W University Ave
Champaign IL 61820

Date  4/30/20        Page    5
Primary Account       500764766

BUSINESS ANALYSIS              500764766   (Continued)

| | CHECKS AND OTHER DEBITS | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| | R6688428 | |
| 4/03 | PAYMENTECH      FEE<br>AffordableJerseys<br>6470807 | 138.95- |
| 4/03 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W4154 | 3,201.25- |
| 4/06 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200406MMQFMPUN000032<br>20200406B1QGC01R018097<br>04060928FT03 | 100,000.00- |
| 4/06 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>20200406MMQFMPUN000033<br>20200406MMQFMP9H000284<br>04060929FT03 | 600,000.00- |
| 4/06 | SHOPIFY CAPITAL  R7ZTBQ6R5<br>Andrew Chapin<br>R6699452 | 4.79- |
| 4/06 | VZ WIRELESS VE   VZW WEBPAY<br>ANDREW *CHAPIN<br>5165198 | 672.59- |
| 4/06 | CHASE CREDIT CRD EPAY<br>ANDREW J CHAPIN<br>4621558942 | 1,234.80- |
| 4/07 | SHOPIFY CAPITAL  RNJWCDUZG<br>Andrew Chapin<br>R6717418 | 18.03- |
| 4/07 | SHOPIFY CAPITAL  RANYWFALH<br>Andrew Chapin<br>R6707965 | 18.59- |
| 4/07 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-C6Y7K9M6H8V6 | 480.64- |
| 4/07 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>ALEXFREEDMA EBA | 1,111.27- |
| 4/08 | SHOPIFY CAPITAL  RR4MQL5JH<br>Andrew Chapin<br>R6737042 | 3.86- |
| 4/08 | SHOPIFY CAPITAL  RTJLEJUJ6<br>Andrew Chapin | 43.68- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**Busey®**

100 W University Ave
Champaign IL 61820

Date  4/30/20        Page    6
Primary Account        500764766

BUSINESS ANALYSIS              500764766   (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| | R6735755 | |
| 4/08 | to loan 6706744910865 | 450,000.00- |
| | from dda 500764766 | |
| 4/09 | SHOPIFY CAPITAL   R7NVYAWIU | 9.75- |
| | Andrew Chapin | |
| | R6746547 | |
| 4/09 | SHOPIFY CAPITAL   RMFPDTCYT | 23.72- |
| | Andrew Chapin | |
| | R6745236 | |
| 4/10 | Wire Transfer Debit | 100,000.00- |
| | Andrew Chapin | |
| | 322271627 | |
| | 555475257 | |
| | JPMORGAN CHASE BAN | |
| | 20200410MMQFMPUN000180 | |
| | 20200410B1QGC01R032183 | |
| | 04101405FT03 | |
| 4/10 | SHOPIFY CAPITAL   RBNF33WE4 | 8.19- |
| | Andrew Chapin | |
| | R6754933 | |
| 4/10 | SHOPIFY CAPITAL   R5CK4YRHB | 18.22- |
| | Andrew Chapin | |
| | R6756274 | |
| 4/13 | Wire Transfer Debit | 7,100.00- |
| | Fenwick & West | |
| | 026009593 | |
| | 1484401104 | |
| | BANK OF AMERICA, N | |
| | 20200413MMQFMPUN000036 | |
| | 20200413B6B7HU3R002651 | |
| | 04130912FT03 | |
| 4/13 | Wire Transfer Debit | 250,000.00- |
| | Taco Corp of America | |
| | 265270413 | |
| | 20001214039 | |
| | IBERIABANK | |
| | 20200413MMQFMPUN000037 | |
| | 20200413MMQFMP9H000197 | |
| | 04130912FT03 | |
| 4/13 | SHOPIFY CAPITAL   RYZGDWHL2 | 7.81- |
| | Andrew Chapin | |
| | R6764705 | |
| 4/13 | SHOPIFY CAPITAL   R2QPXBOOI | 12.23- |
| | Andrew Chapin | |
| | R6766051 | |
| 4/14 | SHOPIFY CAPITAL   R5L2AQJ4X | 1.36- |
| | Andrew Chapin | |
| | R6775914 | |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page    7
Primary Account      500764766

BUSINESS ANALYSIS              500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|--------------------------|--------|
| 4/14 | SHOPIFY CAPITAL  RPRGLTPBH<br>Andrew Chapin<br>R6785151 | 6.15- |
| 4/14 | SHOPIFY CAPITAL  RGSRI3P3A<br>Andrew Chapin<br>R6793699 | 12.30- |
| 4/14 | SHOPIFY CAPITAL  RTXYUMJZX<br>Andrew Chapin<br>R6792494 | 23.49- |
| 4/14 | GUSTO            CND 555619<br>Benja Incorporated<br>6semjoeds55 | 50.00- |
| 4/14 | PAYMENTECH       CHARGEBACK<br>AffordableJerseys<br>6470807 | 75.06- |
| 4/14 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>STEINERSPOR EBA | 147.00- |
| 4/14 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-I4Z5V4O3Y3O4 | 250.00- |
| 4/14 | GUSTO            CND 555619<br>Benja Incorporated<br>6semjoeds3i | 400.00- |
| 4/14 | GUSTO            CND 555619<br>Benja Incorporated<br>6semjoeds49 | 650.00- |
| 4/14 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W6968 | 9,000.00- |
| 4/15 | Account Analysis Charge | 332.52- |
| 4/15 | PAYPAL           INST XFER<br>ANDREW CHAPIN<br>PJ721 | 41.99- |
| 4/16 | SHOPIFY CAPITAL  RGFQWO3IV<br>Andrew Chapin<br>R6812720 | 5.64- |
| 4/16 | SHOPIFY CAPITAL  R4XAOLOSG<br>Andrew Chapin<br>R6811377 | 24.92- |
| 4/16 | APPLECARD GSBANK PAYMENT<br>Andrew Chapin<br>1749626 | 1,336.71- |
| 4/17 | SHOPIFY CAPITAL  RZAYTZTYP<br>Andrew Chapin<br>R6823115 | 1.22- |
| 4/17 | SHOPIFY CAPITAL  RHDTNVIW3<br>Andrew Chapin | 35.38- |



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page      8
Primary Account      500764766

BUSINESS ANALYSIS                500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|------------------------|--------|
|      | R6821632 | |
| 4/17 | PAYPAL            INST XFER<br>ANDREW CHAPIN<br>THOMASBARBI | 55.00- |
| 4/20 | Wire Transfer Debit<br>Andrew Chapin<br>322271627<br>555475257<br>JPMORGAN CHASE BAN<br>20200420MMQFMPUN000285<br>20200420B1QGC01R063780<br>04201554FT03 | 100,000.00- |
| 4/20 | SHOPIFY CAPITAL  RQNSADQG7<br>Andrew Chapin<br>R6833834 | 10.82- |
| 4/20 | SHOPIFY CAPITAL  R6ENGTIPG<br>Andrew Chapin<br>R6832349 | 58.81- |
| 4/21 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>20200421MMQFMPUN000261<br>20200421MMQFMP9H000845<br>04211516FT03 | 350,000.00- |
| 4/21 | SHOPIFY CAPITAL  RH4OCW5ER<br>Andrew Chapin<br>R6854362 | 11.28- |
| 4/21 | SHOPIFY CAPITAL  RGS465RSV<br>Andrew Chapin<br>R6863817 | 17.19- |
| 4/21 | SHOPIFY CAPITAL  RUIV6OLLW<br>Andrew Chapin<br>R6844403 | 17.88- |
| 4/21 | SHOPIFY CAPITAL  R3APRBEFB<br>Andrew Chapin<br>R6852901 | 25.10- |
| 4/22 | Wire Transfer Debit<br>Koosh Media LLC<br>321370765<br>8103786531<br>AMERICAN SAVINGS B<br>20200422MMQFMPUN000017<br>20200422GMQFMP01004587<br>04220915FT03 | 4,000.00- |
| 4/22 | Wire Transfer Debit<br>Taco Corp of America | 150,000.00- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page      9
Primary Account        500764766

BUSINESS ANALYSIS                500764766   (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | | AMOUNT |
|------|-------------------------|---|--------|
| | 265270413 | | |
| | 20001214039 | | |
| | IBERIABANK | | |
| | 20200422MMQFMPUN000016 | | |
| | 20200422MMQFMP9H000209 | | |
| | 04220915FT03 | | |
| 4/22 | VENMO | PAYMENT | 706.00- |
| | ANDREW CHAPIN | | |
| | 3379376019 | | |
| 4/23 | SHOPIFY CAPITAL | RNHWSW655 | 9.10- |
| | Andrew Chapin | | |
| | R6882378 | | |
| 4/23 | SHOPIFY CAPITAL | RJHC6HFHG | 24.60- |
| | Andrew Chapin | | |
| | R6883777 | | |
| 4/23 | GUSTO | CND 589409 | 50.00- |
| | Benja Incorporated | | |
| | 6semjof7efh | | |
| 4/23 | PAYPAL | INST XFER | 170.25- |
| | ANDREW CHAPIN | | |
| | FURRYPAL EBAY F | | |
| 4/23 | APPLECARD GSBANK PAYMENT | | 384.43- |
| | Andrew Chapin | | |
| | 1749626 | | |
| 4/23 | AMEX EPAYMENT | ACH PMT | 6,250.00- |
| | Andrew Chapin | | |
| | W8840 | | |
| 4/24 | SHOPIFY CAPITAL | RHROD3XNG | 26.84- |
| | Andrew Chapin | | |
| | R6892419 | | |
| 4/24 | SHOPIFY CAPITAL | RQSBYQQOI | 33.02- |
| | Andrew Chapin | | |
| | R6893816 | | |
| 4/27 | SHOPIFY CAPITAL | RNLUNOKHW | 8.78- |
| | Andrew Chapin | | |
| | R6902528 | | |
| 4/27 | SHOPIFY CAPITAL | RO4ZPIVYH | 11.97- |
| | Andrew Chapin | | |
| | R6903941 | | |
| 4/27 | VENMO | PAYMENT | 2,000.00- |
| | ANDREW CHAPIN | | |
| | 3390259925 | | |
| 4/27 | CHASE CREDIT CRD EPAY | | 3,048.26- |
| | ANDREW J CHAPIN | | |
| | 4651188106 | | |
| 4/28 | SHOPIFY CAPITAL | RAKS3DJJG | 9.49- |
| | Andrew Chapin | | |
| | R6931462 | | |



100 W University Ave
Champaign IL 61820

```
                                    Date  4/30/20        Page    10
                                    Primary Account       500764766
```

BUSINESS ANALYSIS                    500764766   (Continued)

| CHECKS AND OTHER DEBITS | | |
|---|---|---|
| **DATE** | **TRANSACTION DESCRIPTION** | **AMOUNT** |
| 4/28 | SHOPIFY CAPITAL  RN4RUUU7B<br>Andrew Chapin<br>R6914127 | 9.84- |
| 4/28 | SHOPIFY CAPITAL  R34HUTHPL<br>Andrew Chapin<br>R6922251 | 18.38- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffner | 50.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffndr | 100.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffnee | 150.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffncl | 200.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffnct | 200.00- |
| 4/28 | WCB Warehouse    WCB Wareho<br>BENJA INCORPORATED<br>ST-J7K6J3A8V8G0 | 250.00- |
| 4/28 | GUSTO          CND 599561<br>Benja Incorporated<br>6semjoffndc | 300.00- |
| 4/28 | GUSTO          CND 599563<br>Benja Incorporated<br>6semjoffnf9 | 500.00- |
| 4/28 | to ln 6706744910865<br>from dda 500764766 | 5,909.74- |
| 4/28 | to ln 6706744910865<br>from dda 500764766 | 12,035.38- |
| 4/29 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>20200429MMQFMPUN000415<br>20200429MMQFMP9H001432<br>04291642FT03 | 1,000,000.00- |
| 4/29 | SHOPIFY CAPITAL  R7JJDFZ7C<br>Andrew Chapin<br>R6942475 | 5.93- |
| 4/29 | SHOPIFY CAPITAL  RBVZ3BZHK<br>Andrew Chapin<br>R6941126 | 27.36- |

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



100 W University Ave
Champaign IL 61820

Date  4/30/20        Page    11
Primary Account      500764766

BUSINESS ANALYSIS                500764766  (Continued)

## CHECKS AND OTHER DEBITS

| DATE | TRANSACTION DESCRIPTION | AMOUNT |
|------|--------------------------|--------|
| 4/29 | AMEX EPAYMENT    ACH PMT<br>Andrew Chapin<br>W6272 | 1,547.65- |
| 4/30 | Wire Transfer Debit<br>Taco Corp of America<br>265270413<br>20001214039<br>IBERIABANK<br>Close out<br>20200430MMQFMPUN000131<br>20200430MMQFMP9H000768<br>04301156FT03 | 515,027.24- |
| 4/30 | SHOPIFY CAPITAL  R3J4C37ZY<br>Andrew Chapin<br>R6952301 | .96- |
| 4/30 | SHOPIFY CAPITAL  RFTVIYDOD<br>Andrew Chapin<br>R6950966 | 34.57- |
| 4/30 | GUSTO         REM 619626<br>Benja Incorporated<br>6semjofqu60 | 950.00- |
| 4/30 | GUSTO         TAX 619632<br>Benja Incorporated<br>6semjofqu5h | 6,503.53- |
| 4/30 | GUSTO         NET 619622<br>Benja Incorporated<br>6semjofqu4k | 17,892.03- |

## DAILY BALANCE SECTION

| DATE | BALANCE | DATE | BALANCE | DATE | BALANCE |
|------|---------|------|---------|------|---------|
| 4/01 | 11,120.36 | 4/02 | 74,825.87 | 4/03 | 21,484.51 |
| 4/06 | 563,203.87 | 4/07 | 561,575.34 | 4/08 | 111,549.27 |
| 4/09 | 111,570.89 | 4/10 | 334,610.60 | 4/13 | 77,559.53 |
| 4/14 | 67,056.03 | 4/15 | 66,681.52 | 4/16 | 65,346.16 |
| 4/17 | 75,361.22 | 4/20 | 375,353.09 | 4/21 | 231,543.96 |
| 4/22 | 76,837.96 | 4/23 | 70,088.42 | 4/24 | 70,215.61 |
| 4/27 | 65,214.36 | 4/28 | 45,537.15 | 4/29 | 38,764.56 |
| 4/30 | 195,406.71 | | | | |

**20SL-CC05024**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
## STATE OF MISSOURI

| | | |
|---|---|---|
| BUSEY BANK, an Illinois banking corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| BENJA INCORPORATED, a Delaware corporation, | ) ) ) | Division: |
| Serve:  Andrew Chapin<br>        26 Cragmont Avenue<br>        San Francisco, CA 94116<br>and | ) ) ) ) ) | |
| ANDREW J. CHAPIN,<br>Serve at: 26 Cragmont Avenue<br>        San Francisco, CA 94116 | ) ) ) ) | |
| Defendants. | ) ) | |

## AFFIDAVIT OF HOWARD B. SAMUELS

I, Howard B. Samuels, being first duly sworn on oath, depose and state as follows:

1.      I am the founder of Rally Capital Services, LLC ("Rally").  Except as otherwise indicated herein, I have personal knowledge of the matters set forth herein and, if called as a witness, would testify competently thereto.

2.      I am a resident of the State of Illinois.  I am over the age of twenty-one and have never been convicted of a felony or crime of moral turpitude.

3.      I make this Affidavit in support of the Verified Petition (the "Petition") and the Verified Expedited Motion for Appointment of General Receiver (the "Motion") filed by Busey Bank (the "Bank") in this action seeking the appointment of a general receiver (the "Receiver")

1

74992807.2

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

for the Defendant, Benja Incorporated ("Benja").  I, along with Rally, have been asked to serve, and are willing to serve, as the Receiver in this action.  Unless otherwise defined herein, capitalized terms have the meanings assigned to such terms in the Petition and Motion.

4.      To the extent Rally discovers additional facts bearing upon the matters described herein during the retention, Rally will supplement the information contained in this Affidavit.

## QUALIFICATIONS

5.      I founded Rally in 1998, and I continue to serve as its founding member today.  I bring a wealth of knowledge and a broad range of experience, having worked as an Internal Revenue Agent and IRS Midwest Regional Division Appellate Conferee, attorney, tax law specialist, and trusted strategic business advisor to a variety of operating businesses, commercial lenders, and other business professionals.

6.      Prior to founding Rally, I served as the founding member and principal of P&S Capital Services, a Chicago based financial consulting firm specializing in structuring complex commercial debt and equity financing, creditor workouts, Debtor-in-Possession management, and Assignments for the Benefit of Creditors.  Prior to that time, I served in private legal practice, where I specialized in business planning and matters relating to State and Federal Income Taxation, including the administrative disposition of tax controversies.

7.      I have structured hundreds of millions of dollars in transactional funding for my clients, including the successful implementation of creditor workouts involving millions of dollars in debt with more than 3,500 creditors and claims ranging from small deals to multi-million dollar deals.  As a paid professional, I have served as Managing Agent to Debtors-in-Possession, Assignee/Trustee in Assignments for the Benefit of Creditors, Court Appointed Receiver to

2

74992807.2

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

operating businesses, Liquidating Agent and advisor to business owners, commercial lenders, and other professional advisors.  Since early 2018, I have been serving as the elected Chapter 7 Trustee of Central Grocers, which was formerly the second largest food cooperative in the United States.  Information regarding the experience and qualifications of myself and Rally are attached hereto as **Exhibit 1**.

## COMPENSATION

8.      Pursuant to the proposed engagement, I and Rally will bill the receivership estate for our services on an hourly basis.  A list of hourly rates for me and the other professionals of Rally are attached hereto as **Exhibit 2** and incorporated herein by reference.  Additionally, we will be reimbursed for all direct expenses incurred in connection with the performance of our duties.

## DISINTERESTEDNESS

9.      Rally maintains a database containing the names of current, former, and potential clients and other principal parties related to such clients.  I caused Rally to review and analyze the conflict database to determine whether Rally has any connection with certain potential parties in interest in this case.  As a result of such review, Rally makes the following disclosures with respect to Rally's disinterestedness (references to Rally include all members expected to render services in these cases):

   a.  Rally is not a party to this action, or a relative, partner, director, officer, agent, attorney, employee, creditor or lienholder of, or holder of an equity interest in, or controls or is controlled by, Benja;

   b.  Rally is not an agent, affiliate, or attorney of any disqualified person;

   c.  Rally does not have any interests adverse to the interests of persons to be affected by this receivership; and

3

74992807.2

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

       d.  Rally is not a sheriff of any county.

10.      By reason of the foregoing, I respectfully submit that Rally is eligible for retention as a Court-appointed Receiver in this case.   To the best of my knowledge, Rally and the professionals employed by it are disinterested persons who do not hold or represent any interests adverse to the receivership estate and do not have any connection either with the estate, its creditors, or any other party in interest in this case or with their respective professionals, agents, or employees.

11.      Although Rally is unaware of any other connections at the present time, it is possible that Rally may have provided services for certain other creditors or other parties of interest in this case in matters wholly unrelated to Benja or the instant case.   I understand that if any information as stated herein changes or if I learn of any additional connections at a later date, I have a duty to supplement this affidavit to disclose those facts.   Rally will conduct an ongoing review of its files to ensure that no conflicts or other disqualifying circumstances arise.   If any new material facts or relationships are discovered or arise, Rally will supplement its disclosure to this Court.

12.      I am generally familiar with the Missouri Commercial Receivership Act, and Rally will comply with such laws, subject to the Orders of this Court.

*[**Remainder of Page Intentionally Left Blank**]*

4

74992807.2

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

I certify under the penalty of perjury that the foregoing is true and correct to the best of my

knowledge, information and belief.

OFFICIAL SEAL
SAMANTHA SCIRENCO
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:11/15/22

Howard B. Samuels

WITNESS my hand and official seal.

Notary Public

My Commission Expires:  11|15|22

5

74992807.2

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 1

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**Commercial Real Estate Profile and Statement of Qualifications**

Since 2004, Rally Capital Advisors has consistently provided superior, and cost-effective management and administration of distressed commercial, industrial, retail, hospitality, multi-family and residential real estate asset classes through-out the United States.  Rally's professionals have executed assignments and projects in a myriad of stages and situations, including, asset and project acquisition, financing, construction, development, management, leasing, disposition, eviction, auction, foreclosure and liquidation. Rally's engagement has varied from court appointed receiver, audit and project manager, assignee, portfolio and asset disposition manager, trustee and liquidating agent.

**Experience:**

Rally's extensive and trusted experience has been relied upon by private equity firms, institutional owners and investors, financial institutions and non-bank lenders. Over the last 20 years, Rally's expertise extends over a vast and diverse range of properties and projects including:

- *Retail shopping centers, mixed use commercial retail & office, regional shopping malls, new construction condominiums, townhome and single- family developments, urban and suburban office buildings, multi-family buildings, globally recognized hospitality brands*

- *aviation hangars, globally recognized hospitality brands, restaurants, low income housing, gas stations, convenience stores, car washes, self- storage facilities*

- *car and truck dealerships, health clubs, industrial buildings, distribution centers, golf courses, special use facilities including school buildings, horse farms, and special use facilities for religious organizations*

Select examples include:

- **RC Quarter Horses –** Project Manager and Liquidating Agent for United States Marshal and FBI- for largest seizure of livestock (championship quarter horses) ever undertaken by a Federal agency
- (also included two breeding farms in Sterling, IL and Beloit, WI, salable embryos/semen, and related personal property)

- **Pasquinelli Homes** – Receiver – 31 separate, new construction, planned developments for 7 individual banks in 7 states including: South Carolina, North Carolina, Georgia, Indiana, Illinois, Pennsylvania, and Texas

- **Peregrine Financial (Russell Wasendorf)** – Liquidating agent for the Court Appointed Federal Receiver's Agent

- **Special Use Facility** – provided consulting, accounting, construction management and advisory services to the lender for a mega church

- **Silver Tower Condominiums** – Receiver – 369 -unit high rise new construction condominium in River North. Completed construction and sold remaining 70% of units

- **LCF** – complete audit and review of construction lending practices and portfolio to evaluate and determine/recommend additional funding. This project involved over 300 separate loans

- **Kennedy Homes** –Receiver –11 separate partially-completed planned developments in WI and IL

**Professional Disciplines**:

Rally currently has 10 professionals, with extensive commercial real estate backgrounds and expertise in real estate property and portfolio management, project and construction development and management, leasing, real estate and foreclosure land eviction and property accounting. Rally Capital Advisors does NOT act as a commercial real estate broker.

350 North LaSalle Street
Suite 1100
Chicago IL  60654
Phone 312/645-1975
Fax 312/645-1976
www.rallyllc.com



Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

350 North LaSalle Street
Suite 1100
Chicago IL  60654
Phone 312/645-1975
Fax 312/645-1976
www.rallyllc.com

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM





**Howard B. Samuels**
Founding Member
Howard@rallyllc.com
312.661.0637

## Profile

Howard founded Rally Capital Services, LLC in 1998, and continues to serve as its founding member today. He brings a wealth of knowledge and a broad range of experience, having worked as an Internal Revenue Agent and IRS Midwest Regional Division Appellate Conferee (pre- U.S. Tax Court adjudicator), attorney, tax law specialist and trusted strategic business advisor to a variety of operating businesses, commercial lenders and other business professionals.

Howard has structured hundreds of millions of dollars in transactional funding for his clients, including the successful implementation of creditor workouts involving millions of dollars in debt with more than 3,500 creditors and claims ranging from small deals to multi-million-dollar deals. As a paid professional, he has served as Managing Agent to Debtors-in-Possession, Assignee/Trustee in Assignments for the Benefit of Creditors, Court-Appointed Receiver to operating businesses, Liquidating Agent and advisor to business owners, commercial lenders and other professional advisors. Since early 2018, Howard has been serving as the elected Chapter 7 Trustee of Central Grocers, formerly the second largest food cooperative in the United States.

From 1986 to 1998, Howard served as founding member and principal of P&S Capital Services, a Chicago-area financial consulting firm specializing in structuring complex commercial debt and equity financing, creditor workouts, Debtor-in-Possession management, and Assignments for the Benefit of Creditors. Before that, he was in private legal practice, where he specialized in business planning and matters relating to state and Federal Income Taxation, including the administrative disposition of tax controversies.

Howard is a member of the Commercial Law League of America and the Turnaround Management Association. He has been licensed to practice law in Illinois and before the United States Tax Court since 1972. Howard earned a J. D. from DePaul University Law School in 1972, and received a B.S.B.A. in Accounting from Roosevelt University in 1968.



Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**Representative Matters**

- Elected Chapter 7 Trustee for Central Grocers (17B13886) and SVT (17B18817)
- Court Appointed Receiver Case 18CH02032 – Joint Equity Partners V. 600 Waukegan and Scott Krone, et. al.
- Court Appointed Receiver (St. Louis, MO) Vatterott Educational (17-SC-CC03126)
- Court Appointed Receiver Case 17CH1028 - Market Square Hospitality
- Contractor for the Department of Justice U.S. Marshals Service for RC Quarter Horses, representing the largest seizure of livestock in U.S. history from former Dixon, Illinois, Comptroller Rita Crundwell.
- Facilitated the sale of Edward Hines Lumber Company, including its custom shops, commercial division and four lumberyards.
- Appointed Receiver for St. Louis-based Process Controls International, Inc., and facilitated a "going concern" sale in full payment of secured debt and dividend to unsecured creditors.
- Appointed Receiver of Rockford, IL based - Roper Whitney; continued to operate the business until a successful asset sale to a Tennessee-based press brake manufacturer.
- Served as the Receiver for the 62-unit Onyx luxury condominium building in Las Vegas.
- Served as Trustee under an Assignment for Benefit of Creditors for Chicago- based Krahl Construction Company.
- Served as the Liquidating Agent for Olmarc Packaging Company, Inc. in Chicago.
- Facilitated the sale of Chicago-based Gutmann & Day Leathers.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM





**Daniel T. Lee**
Managing Member
Dan@rallyllc.com
312.661.0557

**Profile**

Dan joined Rally Capital in 2004. He works with local and national lenders and their borrowers to transition distressed businesses through acquisition, turnaround, refinance and asset disposition. In this capacity, he frequently serves as Senior Restructuring Officer, Receiver, Liquidating Agent and Senior Consultant to a variety of businesses and their advisors.

Before joining Rally Capital, Dan spent more than 20 years in commercial lending and bank operations. During this time, he held positions in audit and portfolio management and underwriting with national commercial non-bank institutions, including Uni-Fin Corporation, Sanwa Business Credit Corporation and FINOVA Capital Corporation, where he served middle-market businesses across the nation. In addition, he has experience in risk management from his position as Senior Vice President at Cole Taylor Bank.

Prior to his banking tenure, Dan held financial and operational positions in the private sector, including Chief Financial Officer of a multi-plant manufacturer/distributor, President of a business consulting firm he founded, and most recently as majority shareholder of a local startup manufacturing company.

In 2013, Dan – along with Rally Capital colleagues David Missner and Ryan Hayes – was awarded the Regional and National 2013 Small Company Turnaround of the Year Award for the reorganization of R&M Aviation, Inc., d/b/a AeroCare Medical Transport Systems, Inc. In this case, the Rally Capital team acted as financial advisors to the debtor in Chapter 11 proceedings, working to stabilize the company's operations and aid in formulating a restructuring plan that maximized value and creditor recovery.
Dan is a Certified Public Accountant and a member of the Association of Certified Fraud Examiners and the Turnaround Management Association. He received a B.A. in Accounting from Carthage College in 1984, and earned an M.B.A. in Finance from Loyola University Chicago in 1993.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**Representative Matters**

- Court Appointed business asset Receiver of several middle-market and large companies that include the packaging, construction, restaurant and food distribution industries.
- Court Appointed real estate Receiver of several properties, including single family homes, multi-purpose properties and commercial and industrial warehouses.
- Senior restructuring professional for R&M Aviation, Inc.
- Senior consultant and onsite project manager protecting and preserving U.S. Government seized assets in the Rita Crundwell of Dixon, IL fraud matter.
- Lead consultant on several matters involving the successful sale of business assets that include trucking, construction, distribution and manufacturing concerns.
- Senior consultant and onsite project manager for numerous matters involving the successful sale, refinance or transition of multi-million dollar companies in the gaming, automotive, distribution, manufacturing and medical industries.



Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

350 North LaSalle Street, Suite 1100, Chicago, IL 60654
(P) 312.645.1975 (F) 312.645.1976

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

# EXHIBIT 2

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM



**2020 Billing Rates**

**Rally Capital Advisors, LLC and Rally Management Services, LLC**

|  | Chicago Area | St. Louis |
|---|---|---|
| Howard B. Samuels | $495.00 | $425.00 |
| Daniel T. Lee | $495.00 | $425.00 |
| Robert Goldstein | $495.00 | $425.00 |
| David A. Sheetz | $395.00 | $325.00 |
| Ryan M. Hayes | $350.00 | $295.00 |
| Jeffrey D. Samuels | $295.00 | $225.00 |
| Timothy Bellcourt | $295.00 | $225.00 |
| Andrew J. Seaks | $250.00 | $195.00 |
| Kristine M. Sheetz | $250.00 | $195.00 |
| Ryan Smith | $250.00 | $195.00 |
| Rodney Richards | $100.00 | $75.00 |
| Donna M. Eiermann | $100.00 | $75.00 |
| Samantha Scirenco | $75.00 | $50.00 |

350 North LaSalle Street
Suite 1100
Chicago IL  60654
Phone 312/645-1975
Fax 312/645-1976
www.rallyllc.com

**20SL-CC05024**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

### IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
### STATE OF MISSOURI

| | | |
|---|---|---|
| **BUSEY BANK, an Illinois banking** | ) | |
| **corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.:** |
| | ) | |
| **BENJA INCORPORATED,** | ) | **Division:** |
| **a Delaware corporation,** | ) | |
| <u>Serve</u>:  **Andrew Chapin** | ) | |
|        **26 Cragmont Avenue** | ) | |
|        **San Francisco, CA 94116** | ) | |
| **and** | ) | |
| | ) | |
| **ANDREW J. CHAPIN,** | ) | |
| <u>Serve at</u>: **26 Cragmont Avenue** | ) | |
|        **San Francisco, CA 94116** | ) | |
| | ) | |
| **Defendants.** | ) | |

### <u>VERIFIED EXPEDITED MOTION FOR</u>
### <u>APPOINTMENT OF GENERAL RECEIVER</u>

COMES NOW Plaintiff, Busey Bank, by and through its undersigned counsel, and pursuant to §515.500 et seq. of the Revised Statutes of Missouri and Missouri and Supreme Court Rule 68.02, herewith moves this honorable Court for entry of an Order appointing Howard B. Samuels of Rally Capital Services, LLC, as General Receiver for Defendant Benja Incorporated ("<u>Benja</u>") and for the Collateral (as defined and more fully described herein), and in support thereof states as follows:

1.      Filed contemporaneously herewith and in support of Plaintiff's Petition (the "<u>Petition</u>") is the Verification of Michael McElhone, who is a Vice President and Special Assets Officer at the Bank. Such Verification from Mr. McElhone verifies the facts and matters set forth herein, and further authenticates each of the Exhibits identified herein and attached to the

74952838.4

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Petition.

2.      Also filed contemporaneously herewith and in support of Plaintiff's Petition is the Affidavit of Joe Alouf, who was the Interim President and Chief Financial Officer of Benja until his purported termination on October 2, 2020.  The Alouf Affidavit verifies certain additional facts and matters as set forth herein in support of the Petition relating to extensive fraudulent actions committed by Benja by and through Defendant Andrew J. Chapin ("Chapin").

**Background**

3.      On July 16, 2019, Benja executed a Promissory Note in favor of the Bank dated as of July 16, 2019, in the principal amount of $1,000,000.00, as replaced and superseded by a Promissory Note dated as of February 28, 2020, executed by Benja in favor of the Bank in the original principal amount of $3,000,000.00, as further replaced and superseded by a Promissory Note dated as of August 20, 2020, executed by Benja in favor of the Bank in the original principal amount of $5,000,000.00 (collectively, the "Note") evidencing a loan (the "Loan") in the same amounts. A true and accurate copy of Note is attached to the Petition and incorporated therein (and herein) by reference as **Exhibit 1**.

4.      The Loan is also evidenced by a Business Loan Agreement (Asset Based) dated July 16, 2019, executed by Benja and the Bank, as amended by a Modification to Business Loan Agreement (Asset Based) dated as of February 28, 2020, executed by Benja in favor of Bank in the original principal amount of $3,000,000.00, as further replaced and superseded by a Business Loan Agreement (Asset Based) dated as of August 20, 2020, executed by Benja in favor of Bank in the original principal amount of $5,000,000.00 (collectively, the "BLA").  A true and accurate copy of the BLA is attached to the Petition and incorporated therein (and herein) by reference as **Exhibit 2**.

74952838.4

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

5.      The Note is secured by a Commercial Security Agreement dated July 16, 2019 (the "Security Agreement") executed by Benja in favor of the Bank. Under the Security Agreement, and as security for the Loan, Benja granted to the Bank a security interest in the Collateral (as defined and as more particularly described therein), including, but not limited to, all of Benja's inventory, equipment, accounts, chattel paper, instruments, letters of credit, documents, deposit accounts, investment property, money, other rights to payment and performance, and general intangibles, and all proceeds, additions, substitutions, and replacements thereof. A true and accurate copy of the Security Agreement is attached to the Petition and incorporated therein (and herein) by reference as **Exhibit 3**.

6.      To perfect the security interest arising under the Security Agreement, the Bank caused a UCC Financing Statement to be filed on July 19, 2019, with the Delaware Department of State as File Number 20195005348 (the "UCC Filing" and, together with the Security Agreement, the "Security Documents"), with respect to all assets and property of Benja as described therein. A true and accurate copy of the UCC Filing is attached to the Petition and incorporated therein (and herein) by reference as **Exhibit 4**.

7.      Benja maintains a deposit account number XXXXX4766 at the Bank that is and has been used by Benja in connection its business.  (The foregoing account, and any other accounts of Benja at the Bank, are collectively referred to herein as the "Deposit Account").  The Bank funded the Loan by depositing monies directly into the Deposit Account.  The Deposit Account and the funds on deposit therein are part of the Collateral securing the Loan.

8.      The Note is also secured by a Commercial Guaranty executed by Chapin on or about July 16, 2019 (the "Chapin Guaranty").  A true and accurate copy of this Commercial

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Guaranty is attached to the Petition and incorporated therein (and herein) by reference as **Exhibit 5**.

9.      The Note is also secured by a Commercial Guaranty executed by Thomas L. Goode III ("Goode") on or about July 16, 2019 (the "Goode Guaranty" and, together with the Chapin Guaranty, the "Guarantees").   A true and accurate copy of the Goode Guaranty is attached to the Petition and incorporated therein (and herein) by reference as **Exhibit 6**.

10.     The Note, BLA, Guarantees, Security Agreement, the UCC Filing, and all other agreements, instruments, and documents evidencing, securing, or otherwise relating to the Loan are collectively referred to herein as the "Loan Documents."   Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Loan Documents.

11.     Pursuant to a letter dated September 29, 2020 (the "Default Letter"), the Bank notified Benja and the Guarantors of various Events of Default under the Loan Documents and reserved all rights and remedies on account thereof under the Loan Documents, at law or in equity.   As reflected in the Default Letter, the outstanding Events of Default include, without limitation, that Benja violated the BLA and Security Agreement in the following respects:

a.      Benja borrowed money from First Corporate Solutions and E-Revshare Core, LLC, and in connection therewith granted security interests to those lenders in assets of Benja.

b.      Benja allowed certain state tax liens in favor of the California Employment Development Department to be recorded against Benja and its assets on or about January 14, 2020, and March 9, 2020.

c.      Benja allowed a judgment in favor of Peter A. Manderino to be recorded against Benja and its assets on or about October 30, 2018.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

   d.  Additionally, as reflected in the Default Letter, Goode contends that he did not execute and/or is not bound by the Goode Guaranty.  Although the Bank disputes this contention, if it is ultimately determined that Goode did not execute and/or is not bound by the Goode Guaranty, Benja violated the BLA, which required the execution of the Goode Guaranty as a condition to the Bank making the Loan.[1]

   e.  Finally, as reflected in the Default Letter, Benja violated the BLA by maintaining an operating account at JPMorgan Chase Bank, and not with the Bank, as the BLA requires that Benja maintain the Bank as its primary depository and cash management services institution.

A true and accurate copy of the Default Letter is attached to the Petition and incorporated therein (and herein) by reference as **<u>Exhibit 7</u>**.

   12.  As of October 1, 2020, the total balance due under the Note, exclusive of applicable late charges, default interest, and costs, expenses and attorneys' fees incurred by the Bank, is as follows:

| | |
|---|---|
| Principal: | $4,999,999.50 |
| Regular Interest: | <u>$    26,656.53</u> |
| **Total:** | **$5,026,656.03** |

   13.  Additionally, interest continues to accrue under the Note from and after October 1, 2020.

   14.  True and accurate copies of a Loan Payoff Statement showing the balance due under the Note and a transactional history of the Loan are attached to the Petition and

---

[1] The Bank is currently investigating the issues raised by Goode with respect to the execution and enforceability of the Goode Guaranty, and therefore has elected not to name Goode as a defendant herein or seek to enforce the Goode Guaranty against him at this time.  By not naming Goode as a defendant herein, the Bank has not waived, and hereby preserves, all of its rights, claims and causes of action against Goode pursuant to the Goode Guaranty and otherwise.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

incorporated therein (and herein) by reference as **Exhibit 8**.

### Expedited Motion for Appointment of Receiver

15.     As set forth above, the Note and Loan are secured by the Security Documents under which Benja granted the Bank security interests in the Collateral, and pursuant to which Benja contractually granted the Bank the right to the appointment of a receiver in the event of default.

16.     It has recently become apparent to the Bank that Chapin, as Chief Executive Officer and Director, has been engaged in extensive fraudulent and deceitful actions purportedly in furtherance of Benja's business, to the detriment of the Bank and Benja's other creditors and investors.  These actions are set forth in detail in the Affidavit of Joe Alouf filed in support hereof, which is incorporated herein by reference.  These revelations justify the exigent nature of the Bank's request for an expedited hearing.  In order to immediately prevent any further dissipation or diminution of the Collateral or the value of the operations and assets of Benja, it is imminently necessary to appoint a receiver as soon as possible.

17.     The Bank hereby exercises its option to make an application to the Court for an appointment of a Receiver over Benja for the benefit of the Bank (and other creditors and investors), and to take possession of the Collateral and all proceeds of the Collateral for the benefit of the Bank, with the power to, among other things, manage, receive, collect, and apply all income and revenues with respect to Benja and the Collateral.

18.     This Court is empowered to appoint a receiver pursuant to RSMo. §515.500 et seq., known as the Missouri Commercial Receivership Act (the "Receivership Act") and Missouri Supreme Court Rule 68.02.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

19.     Section 515.510.1 of the Receivership Act provides in relevant part that:

[T]he court, or any judge thereof on vacation, shall have the power to appoint a receiver, whenever such appointment shall be deemed necessary, whose duty it shall be to keep and preserve any moneys or other thing deposited in court, or that may be subject of a tender, and to keep and preserve all property and protect any business or business interest entrusted to the receiver pending any legal or equitable action concerning the same, subject to the order of the court, including in the following instances:

. . .

(2)  In an action in which the person seeking appointment of a receiver has a lien on or interest in property or its revenue-producing potential, and either:

(a)  The appointment of a receiver with respect to the property or its revenue-producing potential is necessary to keep and preserve the property or its revenue-producing potential or to protect any business or business interest concerning the property or its revenue-producing potential; or

(b)  The appointment of a receiver with respect to the property or its revenue-producing potential is provided for by a valid and enforceable contract or contract provision;

. . .

(9)  In an action against any entity if that person is insolvent or is not generally paying the entity's debts as those debts become due unless they are the subject of bona fide dispute;

. . .

(12)  Pursuant to the terms of a valid and enforceable contract or contract provision providing for the appointment of a receiver, other than pursuant to a contract or contract provision providing for the appointment of a receiver with respect to the primary residence of a debtor who is a natural person;

. . .

(14)  To prevent irreparable injury to the person or persons requesting the appointment of a receiver with respect to the debtor's property.

20.     Additionally, Missouri Supreme Court Rule 68.02 states that:

Whenever in a pending legal or equitable proceeding it appears to the court that a receiver is necessary to keep, preserve and protect any business, business interest or property, including money or other thing deposited in court or the subject of a tender, the court, or any judge thereof in vacation, may appoint a receiver whose

74952838.4

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

duty it shall be to keep, preserve and protect, to the extent and in the manner that the court may direct, that which the receiver is ordered to take into the receiver's charge.

21.     The Security Agreement provides the Bank with the right to appoint a receiver in the event of a default.  In relevant part, the Security Agreement provides:

> **Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

22.     The Security Agreement provides that the receiver may serve without bond if permitted by law.

23.     A receiver is just and necessary to keep and preserve the Bank's business interest in Benja and security interests in the Collateral, and to prevent irreparably injury to the Bank, for the following reasons:

    a.      Benja and the Guarantors are in extensive default under the Loan Documents, and such defaults remain outstanding despite notice;

    b.      Benja contractually agreed to the appointment of a receiver in the event of default pursuant to the Security Agreement;

    c.      Chapin has engaged, and has caused Benja to engage, in an extensive pattern of malfeasance and fraud as set forth in the Affidavit of Joe Alouf, the extent of which requires an investigation by the receiver;

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

d.      After such investigation, it may be necessary for the Receiver to assert and maintain claims and causes of action on behalf of Benja that arose as a result of Chapin's actions;

e.      It is necessary that a receiver take control of the revenues and income generated by Benja, preserve such income and revenues, pay ongoing expenses associated with the business, and pay the Bank the sums owed under the Note;

f.      Federal and state income, payroll, sales, personal property, and similar tax returns may need to be executed and filed with respect to Benja, and the appointment of a receiver will help to assure that such tax returns are filed and every effort is made to pay such taxes;

g.      The only source of repayment of the Note is from the recovery of the Collateral, including the recovery upon potential claims and causes of action, and a receiver is necessary to pursue and recover the Collateral in order to satisfy the balance due under the Note;

h.      The Bank lacks other good and sufficient security from Benja or the Guarantors to further secure the Note; and

i.      The Bank has a vested interest in making sure that Benja and the Collateral is not subject to waste, diversion, or diminution, whereby it may incur irreparable injury.

24.      The Bank has no adequate remedy at law (other than under RSMo. §§ 515.500 et seq. and Missouri Supreme Court Rule 68.02) and is in need of this Court's Order Appointing a General Receiver to protect its interests in Benja and the Collateral and to keep, preserve, and maintain Benja and the Collateral.

74952838.4

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

25.     Without the appointment of a receiver to take control of, collect, manage, and liquidate Benja and the Collateral, and to enforce all rights of the Bank in Benja and the Collateral, the Bank and others will suffer irreparable injury and loss.

26.     The appointment of a receiver pursuant to the Receivership Act and Missouri Supreme Court Rule 68.02 is appropriate for the foregoing purposes, with the power to take all actions of a receiver as defined in the Receivership Act and as permitted by the Security Agreement, and with the enumerated powers set forth below.

27.     The Bank reserves the right, pursuant to the Security Documents to pursue any and all other remedies with respect to the Note described above, which may be available to the Bank pursuant to the Loan Documents or applicable law.

28.     The Bank seeks the appointment of Howard B. Samuels of Rally Capital Services, LLC as a general receiver (the "Receiver") pursuant to §§ 515.515 et seq. of the Receivership Act.  Section 515.515 provides in relevant part as follows:

> A receiver shall be a general receiver if the receiver is appointed to take possession and control of all or substantially all of a debtor's property and provided the power to liquidate such property.

29.     The proposed Receiver is suitable and capable, with extensive knowledge and expertise in the management of a business and collateral of this nature, as well as the pursuit of litigation claims that will likely be at issue.  The Affidavit of Howard B. Samuels in support of the appointment of the Receiver has been filed contemporaneously herewith and is incorporated herein by reference.  Attached to such Affidavit are the qualifications of the Receiver and the proposed hourly rates to be charged by the Receiver in this case.

30.     Howard B. Samuels of Rally Capital Services, LLC meets the requirements for appointment as a receiver under § 515.525 of the Receivership Act.

74952838.4

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

WHEREFORE, the Bank respectfully requests that the Court enter an Order:

A.      Appointing Howard B. Samuels of Rally Capital Services, LLC as general Receiver for the following interests, including all income, revenues and proceeds of the same:

　　1.      Benja and all of its business, operations and assets;

　　2.      The Deposit Account;

　　3.      All other accounts of Benja; and

　　4.      All other Collateral identified in the Security Documents for the purpose of assembling and administering the Collateral and the proceeds thereof identified therein;

B.      Granting to such Receiver all rights, powers and authority as more fully set forth in the proposed Order Appointing General Receiver filed contemporaneously herewith; and

C.      Granting such other and further relief as the Court deems just and proper.

POLSINELLI PC


By:  /s/ Michael A. Campbell
　　MICHAEL A. CAMPBELL (#35392)
　　mcampbell@polsinelli.com
　　NICHOLAS A. GRIEBEL (#69104)
　　ngriebel@polsinelli.com
　　100 South Fourth Street, Suite 1000
　　St. Louis, Missouri 63102
　　(314) 889-8000

　　JERRY L. SWITZER, JR. (*pro hac pending*)
　　jswitzer@polsinelli.com
　　150 North Riverside Plaza, Suite 3000
　　Chicago, Illinois 60606
　　(312) 873-3626

　　*ATTORNEYS FOR PLAINTIFF*
　　*BUSEY BANK*

74952838.4

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

## <u>CERTIFICATE OF ORIGINAL SIGNATURE</u>

Pursuant to Missouri Supreme Court Rule 55.03, the undersigned hereby certifies that she signed the original document herein and shall maintain that document for a period of not less than the maximum allowable time to complete the appellate process regarding this matter.

/s/ Michael A. Campbell
Michael Campbell

12

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that a copy of the foregoing was transmitted by serving a copy of the same with the Summonses and copy of the Petition in the above-captioned case, on the date indicated in the Return of Service of such Summonses:

<u>/s/ Michael A. Campbell</u>

13

74952838.4

Electronically Filed - St. Louis County - October 06, 2020 - 05:19 PM

**VERIFICATION**

STATE OF MISSOURI          )
                           )
COUNTY OF ST. LOUIS        )

      Before me, the undersigned authority, on this day personally appeared Michael McElhone, who, being by me duly sworn, upon his oath, deposed and stated that he is the Vice President and Special Assets Officer of Busey Bank, and certifies that the statements set forth in this Motion are true and correct, except as to matters therein stated to be on information and belief, and to such matters, the undersigned certifies as aforesaid that he verily believes the same to be true.

                                   _____

                                   Michael McElhone
                                   Vice President and Special Assets Officer
                                   Busey Bank

      I certify under PENALTY OF PERJURY under the laws of the State of Missouri that the foregoing paragraph is true and correct.

                        WITNESS my hand and official seal.

                        _____
                        Notary Public

My Commission Expires: 04/29/2023

> KAJAL TAYLOR
> Notary Public - Notary Seal
> State of Missouri
> Commissioned for St. Louis County
> My Commission Expires: April 29, 2023
> Commission Number: 19402167

74952838.4

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

| | | |
|---|---|---|
| **BUSEY BANK, an Illinois banking corporation,** | ) ) ) | |
| **Plaintiff,** | ) ) | |
| **v.** | ) ) | **Case No.: 20SL-CC05024** |
| **BENJA INCORPORATED,** | ) | |
| **a Delaware corporation,** | ) | **Division: 21** |
| <u>Serve</u>:  **Andrew Chapin** | ) | |
| **26 Cragmont Avenue** | ) | **Hon. Nancy Watkins McLaughlin** |
| **San Francisco, CA 94116** | ) | |
| **and** | ) | |
| | ) | |
| **ANDREW J. CHAPIN,** | ) | |
| <u>Serve at</u>: **26 Cragmont Avenue** | ) | |
| **San Francisco, CA 94116** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**NOTICE OF HEARING**</u>

PLEASE TAKE NOTICE THAT the **Verified Expedited Motion for Appointment of General Receiver** filed by Plaintiff Busey Bank in the above-captioned case shall be taken up and heard before the **Honorable Nancy Watkins McLaughlin in Division 21 of the Circuit Court of St. Louis County, Missouri on Tuesday, October 13, 2020 at 9:00 a.m.**, as soon thereafter as the same may be heard.  This hearing will be held via videoconference on the Zoom application or https://zoom.us/join, using Meeting ID: 973 145-9775, Pass code: 6Zw9hr.

Respectfully submitted,

POLSINELLI PC

By:  /s/ Michael A. Campbell
      MICHAEL A. CAMPBELL (#35392)
      mcampbell@polsinelli.com
      NICHOLAS A. GRIEBEL (#69104)
      ngriebel@polsinelli.com
      100 South Fourth Street, Suite 1000
      St. Louis, Missouri 63102
      (314) 889-8000

JERRY L. SWITZER, JR.
jswitzer@polsinelli.com
150 North Riverside Plaza, Suite 3000
Chicago, Illinois 60606
(312) 873-3626
(*pro hac vice admission pending*)

*ATTORNEYS FOR PLAINTIFF*
*BUSEY BANK*

## CERTIFICATE OF ORIGINAL SIGNATURE

Pursuant to Missouri Supreme Court Rule 55.03, the undersigned hereby certifies that he signed the original document herein and shall maintain that document for a period of not less than the maximum allowable time to complete the appellate process regarding this matter.

/s/ Michael A. Campbell

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the above and foregoing Motion was served upon the above-named Defendants on the date as appears in the Return of Service filed by the special process server effecting service thereof, and to any counsel of record through the Court's electronic filing system on October 9, 2020.

/s/ Michael A. Campbell

75043552.1

**20SL-CC05024**

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY**
**STATE OF MISSOURI**

| | | |
|---|---|---|
| BUSEY BANK, an Illinois banking corporation, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No.: |
| BENJA INCORPORATED, a Delaware corporation, | ) ) | Division: |
| <u>Serve</u>:  Andrew Chapin | ) | |
| 26 Cragmont Avenue | ) | |
| San Francisco, CA 94116 | ) | |
| and | ) ) | |
| ANDREW J. CHAPIN, | ) | |
| <u>Serve at</u>: 26 Cragmont Avenue | ) | |
| San Francisco, CA 94116 | ) ) | |
| Defendants. | ) | |

<u>**ORDER APPOINTING GENERAL RECEIVER**</u>

This matter coming before the Court on the Verified Expedited Motion for Appointment of General Receiver (the "<u>Motion</u>") filed by Plaintiff Busey Bank (the "<u>Bank</u>") seeking the appointment of a general receiver for Defendant Benja Incorporated ("<u>Benja</u>" or "<u>the debtor</u>") and for the Collateral (as defined herein and in the Motion); the Court having reviewed the Motion and other pleadings filed by the Bank in support thereof; the Court finding that (i) the Bank has no adequate remedy at law, except as provided in RSMo. § 515.500 et seq., known as the Missouri Commercial Receivership Act (the "<u>Receivership Act</u>"), and therefore is entitled to the appointment of a receiver as set forth herein, (ii) a receiver is just and necessary to keep and preserve the Bank's business interest in Benja and security interest in the Collateral, and to prevent irreparably injury to the Bank, for the reasons set forth in the Motion, (iii) without the

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

appointment of a receiver to take control of, collect, manage, and liquidate Benja, the Collateral, and the property and assets of Benja, and to enforce all rights of the Bank in Benja and the Collateral, the Bank and others will suffer irreparable injury and loss, and (iv) the appointment of a general receiver over Benja, its property and assets, and the Collateral pursuant to the Receivership Act and Missouri Supreme Court Rule 68.02 is appropriate for the foregoing purposes, with the power to take all actions of a receiver as defined in the Receivership Act and as permitted by the Security Agreement (as defined in the Motion), and with the enumerated powers set forth below; the Court having found that good cause exists for the entry of this Order on an expedited basis for the reasons set forth in the Motion; and the Court having been fully advised in the premises and, having jurisdiction to consider and rule upon the Motion;[1]

Pursuant to the Receivership Act and Rule 68.02 of the Missouri Rules of Civil Procedure, IT IS HEREBY ORDERED THAT:

1.      Howard B. Samuels of Rally Capital Services, LLC (the "Receiver") is appointed to act and serve as a general Receiver for the following interests, including all income, revenues and proceeds of the same:

A.      Benja and all of its business, operations, property, and assets;

B.      The Deposit Account identified in the Motion, including, without limitation, deposit account number XXXXX4766 and any other accounts of Benja at the Bank;

C.      All other accounts of Benja held by any other institution or third party; and

---

[1] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to such terms in the Motion.

D.      All other Collateral identified in the Security Documents (as defined in the Motion) and all proceeds of Collateral for the purpose of assembling and administering the Collateral identified therein.

2.      The Receiver shall have the full power and authority over Benja and its business, operations, property and assets, and to take the following actions by and through Benja:

a.      Assemble, take exclusive control and possession of, collect, manage, liquidate, and distribute all Collateral, all property and assets of Benja, and all other Collateral described in or covered by the Security Documents, and all revenues, income, and proceeds of the same;

b.      Gain access to the books and records of Benja and all information necessary to collect, manage, and preserve the Collateral;

c.      Assert and maintain rights, claims, and causes of action of Benja, and to maintain in the Receiver's name or in the name of Benja any action to enforce any right, claim, or cause of action on behalf of Benja, including, without limitation, claims and causes of action against any past or present officers and employees of Benja, or against any third parties, for or on account of any misrepresentation, fraud, fraudulent transfers, breach of fiduciary or other duties, conversion, preferential transfers, negligence, negligent misrepresentation, conspiracy, violations of any Uniform Fraudulent Transfers Acts or similar statutes, violations of any other statutes, and any other claims and causes of action based on any statute or common law;

d.      Institute, prosecute, defend, compromise, or intervene in or become a party to such actions or proceedings in state or federal court relating to Benja, its assets,

74971789.5                                3

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

or the Collateral, and those necessary to recover or dispose of the assets of Benja or the Collateral, for the carrying out of the terms and provisions of this Order, and/or to defend against any action brought against the Receiver acting in such capacity;

e.      Recover any Collateral or property and assets of Benja transferred to any persons or third parties in contravention of the Bank's security interest or in fraud or hindrance of the Bank or Benja's creditors, including, but not limited to, any funds, proceeds, revenues, and income of the Collateral, the Deposit Account, and any property of Benja;

f.      Require Benja, including, without limitation, Defendant Andrew Chapin, and any third party transferees, and their respective officers, employees, agents and representatives, to turn over and deliver possession to the Receiver of the Deposit Account, all other accounts held by or on behalf of Benja, all of the Collateral, all assets and property of Benja, all records concerning the Collateral and any property of Benja, and all other property subject to this Order, without any right of offset or recoupment, including: (1) all contracts and other documents relating to the Collateral and any property of Benja, and all communications and correspondence pertinent thereto, (2) all deposits, deposit and checking accounts, funds, cash, cash equivalents, securities, and all other sums relating to the Collateral and any property of Benja, and any records and accountings of any of the foregoing, (3) any and all payroll records, employee files, applications, and other materials relevant to the Collateral, (4) all federal, state, and local tax returns and tax filings with respect to Benja and its operations, including income, sales, payroll, and any other taxes, (5) all financial statements and financial records of

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

any kind concerning Benja and its operations, (6) all financial, bookkeeping, and accounting software, programs, and databases concerning Benja and its operations, and full access to the same, (7) all computers and devices owned or used by Benja with respect to any of its operations, (8) all user names, passwords, and other means of access pertaining to any and all computers, devices, programs, accounts, software, files, databases, and other records of any kind related to Benja and its operations, (9) all keys, entry codes, and other means of access with respect to any property or assets of Benja, (10) any and all documents pertaining to ongoing or potential litigation, (11) any and all documents pertinent to any licenses maintained in connection with the Collateral, and all communications and correspondence pertinent thereto, and (12) all other books, records, contracts, accounts, papers and other such items of information as will enable the effective recovery, collection, conservation, operation, and management of Benja, the Collateral, all property and assets of Benja, and all proceeds thereof.

       g.      Operate the business and the affairs of Benja, including, but not limited to, (1) collecting, depositing, and disbursing all income and revenues, (2) collecting and enforcing all accounts receivable and other receivables and sums due Benja of any kind, (3) paying ordinary and customary expenses of operation or that may be associated with the business of Benja, as the Receiver determines appropriate, (4) negotiating and executing any and all agreements and contracts with respect to Benja, (5) negotiating, amending, modifying, terminating, and executing any other contracts or agreements, and taking any and all actions the Receiver may determine appropriate, (6) hiring and firing any employees of Benja, (7) engaging, retaining, or terminating any and all service

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

providers, contractors, independent contractors, or other persons or companies in connection with Benja, including, without limitation, Joe Alouf, and negotiating and executing any contracts in connection therewith, (8) making any and all repairs, improvements, modifications, or changes that the Receiver may determine necessary or appropriate to the operation of the business, any property or assets of Benja, or the marketing of the same for sale, (9) establishing any rates or other such prices, or any matters associated therewith, (10) establishing any and all business policies and practices, and (11) conducting any and all other business that is or could be conducted on behalf of Benja;

h.      Negotiate, extend, terminate, modify, and execute and enter, any contracts, agreements, or leases with respect to the receivership estate as the Receiver may deem appropriate;

i.      Take any and all actions the Receiver deems reasonable and appropriate to prevent waste to and to operate Benja to preserve, secure, manage, maintain and safeguard the business and the Collateral;

j.      With the Bank's consent, make such payments and disbursements, in the ordinary course of business, as may be necessary or proper for the preservation of the Collateral;

k.      Retain, hire, or discharge such managers, agents, employees, servants, accountants, and attorneys as may in the Receiver's judgment be advisable or necessary in the management, conduct, control, or custody of the Collateral;

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

l.      Retain legal counsel to enforce Receiver's duties, which counsel may be the same as counsel representing the Bank as provided in § 515.605.2 of the Receivership Act, and for these purposes the Court specifically approves the Receiver's employment of the Bank's counsel to assist the Receiver and represent the Receiver in connection with all matters referenced herein, and determines that there is no actual conflict of interest or inappropriate appearance of a conflict in such employment under the circumstances of this receivership;

m.      Retain any other person, firm or corporation the Receiver deems necessary to carry out his duties to collect or manage the Collateral, assist in the operation of Benja and its assets, or to dispose of or liquidate such assets or the Collateral;

n.      Negotiate, execute and issue, any loans, letters of intent, commitments, and other such documents needed in connection with the operation of Benja;

o.      Negotiate, modify, amend, and execute any service contracts, maintenance agreements, and similar agreements needed in connection with the Collateral or operation of Benja;

p.      Prepare and file any federal and state income, payroll, sales, personal property, and similar tax returns that may be needed in connection with the Collateral and the operation of Benja, or retain any accountants or tax preparers for this purpose, except that this authorization shall not impose any duty on the Receiver to prepare or file any such tax returns, and the obligation to do so shall remain with the entity, entities, and individuals ordinarily responsible for doing so;

74971789.5

7

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

q.      Pay any and all of the foregoing described taxes with respect to the business or Collateral;

r.      Negotiate and enter into any other new contracts with respect to Benja or the Collateral; modify existing contracts in the ordinary course of business or as necessary to preserve, protect, manage, liquidate or dispose of Benja or the Collateral; pay all expenses and other obligations secured by or which may give rise to liens, and all other outstanding obligations to suppliers and servicers in the ordinary course of business, including obligations incurred prior to the commencement of the receivership so long as the Receiver has determined that it is prudent to do so in order to maintain business relationships that are beneficial to the conduct of the receivership; make repairs necessary to the maintenance of the Collateral in order to preserve the Collateral; and comply with all requirements and regulations applicable to the Collateral;

s.      Market and, with the Court's approval and the Bank's consent, sell, transfer, dispose of or otherwise liquidate Benja's assets and/or the Collateral free and clear of all liens, claims, and encumbrances, incur such expenses as may be necessary or advisable in connection therewith, enter into any contracts, amendments, and other documents required in connection therewith, and remit the net sums of any such sale of Collateral to the Bank for application to the indebtedness owed to the Bank under the Note and to the repayment of any advances, expenditures, or other payments associated with the Collateral or the Receiver's administration of the same;

t.      Employ any agents, brokers, or other marketing professionals for the purpose of marketing and selling the Collateral as the Receiver determines appropriate;

u.      Open and review mail (including email) and faxes received by or in connection with Benja, its property and assets, or the Collateral, and the Receiver is hereby authorized to issues his demand that (1) the U.S. Postal Service grant exclusive possession and control of all mail including postal boxes as may have been used by Benja, and may direct that such mail to Benja be re-directed to the Receiver, (2) any and all hosts, service providers, and other entities with control over any email accounts, websites, and other electronic accounts and services that may have been used by Benja grant exclusive possession and control of all such accounts and services to the Receiver.

v.      Undertake all actions and exercise the usual and customary powers afforded to a receiver under Missouri law, including all rights and powers under the Receivership Act (except as otherwise limited by any order of this Court), until further order of this Court.

3.      Benja and all persons or entities controlling Benja and any part of the Collateral, including, without limitation, Defendant Andrew Chapin, shall immediately turn over to the Receiver all of Benja's property, assets, business and operations, the Collateral, the Deposit Account, and any other property that is the subject of this Order, together with all files, documents, records, and instruments related to Benja and the Collateral.

4.      All financial institutions, including without limitation, all banks, credit unions, brokerage firms and other institutions, holding any and all accounts, deposit accounts, money market accounts, or other funds of any kind, in the name of or for the benefit of Benja, shall immediately turn over the same to the Receiver without offset.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

5.      Benja, and any persons or entities controlling Benja and any part of the Collateral or property of Benja, including, without limitation, Defendant Andrew Chapin, are hereby:

a.      Stayed and enjoined from in any manner disturbing the Receiver's possession and disposition of the Collateral, the property and assets of Benja, and any other property that is the subject of this Order;

b.      Prohibited and restrained from transferring, selling, disposing of, conveying, encumbering, dissipating, mishandling, misappropriating, managing, or interfering with, the Collateral, the property and assets of Benja, and any other property that is the subject of this Order, without the consent of the Receiver or Order of this Court;

c.      Stayed and enjoined from taking any actions that would, directly or indirectly, have an adverse impact on the value of the receivership estate, all until further order of the Court; and

d.      Ordered to preserve and immediately make available to the Receiver all information and records of any kind that are stored or accessible electronically.

6.      Additionally, as provided in § 515.575 of the Receivership Act, the entry of this Order shall operate as a stay, applicable to all persons, of:

(1)      The commencement or continuation, including the issuance, employment, or service of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the entry of the order of appointment, or to recover a claim against the debtor that arose before the entry of this Order;

74971789.5

10

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

(2)　　The enforcement against the debtor or any estate property of a judgment obtained before this Order;

(3)　　Any act to obtain possession of estate property from the Receiver, or to interfere with, or exercise control over, estate property;

(4)　　Any act to create, perfect, or enforce any lien or claim against estate property except by exercise of a right of setoff, to the extent that the lien secures a claim against the debtor that arose before the entry of the order of appointment; or

(5)　　Any act to collect, assess, or recover a claim against the debtor that arose before the entry of the order of appointment.

7.　　In accordance with § 515.560 of the Receivership Act, within thirty days after the date of this Order, the debtor, including Defendant Andrew Chapin, shall file with the Court and submit to the Receiver the following schedules: (1) a true list of all known creditors and applicable regulatory and taxing authorities of Borrowers, including the mailing addresses for each, the amount and nature of their claims, and whether their claims are disputed and (2) a true list of all estate property, including the estimated liquidation value and location of the such property and, if real property, a legal description thereof, as of the date of appointment of the Receiver.

8.　　All persons who have come into possession of money paid in satisfaction of the Collateral or any property or assets of Benja, or any part thereof shall yield and deliver possession of the same to the Receiver immediately upon request.

9.　　For all purposes the Receiver appointed by this Order shall be considered a general receiver appointed by this Court with the same rights, duties, and obligations thereof and

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

with the same relationships to the Court and to the parties to this litigation. The appointment of the Receiver pursuant to the request of the Bank shall in no way cause the Bank to be considered the owner, manager, or otherwise responsible for the business of Benja.

10.     Benja and Defendant Andrew Chapin shall indemnify, defend, and hold the Receiver harmless from all claims and lawsuits in connection with Benja's business and the Collateral and property of Benja, and from any and all liability, related to the Receiver's collection of the Collateral and property of Benja, except for liability arising out of the Receiver's misconduct or gross negligence.

11.     In accordance with § 515.560 of the Receivership Act, the Receiver may obtain unsecured credit and incur unsecured debt in the ordinary course of business of Benja as an administrative expense of the receiver without order of the Court. Additionally, after notice, hearing and the Court's approval, the Receiver may obtain credit or incur debt other than in the ordinary course of business of Benja, and the Receiver may mortgage, pledge, hypothecate, or otherwise encumber estate property as security for repayment of any such debt that the Receiver may incur, including that the Court may provide that additional credit extended to the Receiver by the Bank or another secured creditor of Benja be afforded the same priority as the Bank's or secured creditor's existing liens. For these purposes, to the extent that the Bank makes advances of money or credit to fund the Receiver's expenses incurred in the receivership, the Receiver or the Bank may apply to this Court at any time before or after such advances are made to authorize the   Receiver to mortgage, pledge, hypothecate, or otherwise encumber estate property as security for repayment of any such advances, and that the Bank be afforded the same priority with respect to such advances as the Bank's existing liens.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

12.     The Receiver shall not be obligated to file with the Court monthly reports of the Receiver's operations and financial affairs unless hereafter ordered by the Court, except that the Receiver is directed to file within sixty (60) days of entry of this Order a report showing the assets and Collateral collected by the Receiver.  At the option of the Bank, any such reports filed by the Receiver may be submitted to the Clerk of the Court under seal and shall not be available for public inspection without further Order of the Court.  The Receiver is also authorized to redact any information from any such reports that the Receiver may determine appropriate.

13.     The Receiver may apply at any time to the Court, with notice to all other parties in this case, for further instructions and for further powers necessary to enable the Receiver to properly fulfill his duties.

14.     As provided in § 515.615.2 of the Receivership Act, all claims, other than claims of duly perfected secured creditors including the Bank, arising prior to the Receiver's appointment shall be in the form required by that Section and served and noticed as required by that Section.  Any claim not in the form required by that Section and so served and noticed is barred from participating in any distribution to creditors.

15.     As provided in § 515.600.2 of the Receivership Act, the Receiver, and the agents, attorneys, and employees of the receivership employed by the Receiver pursuant to § 515.605, shall enjoy judicial immunity for acts and omissions arising out of and performed in connection with their official duties on behalf of the Court and within the scope of the Receiver's appointment. All debts, liabilities and obligations incurred by the Receiver in the course of this receivership, whether in the name of the Receiver or Benja, shall be the obligations of Benja only, and not of the Receiver or his agents, attorneys, or employees personally.

74971789.5

13

16.     No person or entity may file suit against the Receiver, or the agents, attorneys, and employees of the Receiver, unless otherwise authorized in advance by this Court after notice and hearing as provided in § 515.600.2 of the Receivership Act.

17.     The enumeration of the Receiver's powers and authority in this Order shall not exclude or prohibit the Bank from asserting any of its own claims or causes of action with respect to the Note, the Loan, the Collateral, or the recovery of any Collateral or proceeds thereof from any parties liable for payment of the Note or any third parties, and such claims may be asserted separately or jointly with the Receiver.

18.     Upon the earlier to occur of (a) when all of the Collateral has been collected, liquidated, and applied to the indebtedness owed to the Bank, (b) when this case has been dismissed by the Plaintiff, or (c) when Plaintiff consents to the Receiver's discharge, the Receiver may request that he be discharged from his duties in this case and the Receiver shall be so discharged by further order of the Court.

19.     The Court finds that good cause has been shown to shorten the period for notice of an application for the appointment of a receiver as provided in § 515.515.3 of the Receivership Act by reason of the facts and matters set forth in the Motion and the Affidavit of Joe Alouf filed in support of the Motion.

20.     This Order appointing the Receiver shall be in effect until terminated by order of this Court and the authority granted to the Receiver shall be self-executing unless the action specifically requires approval.

21.     The Receiver shall serve with a bond of $15,000.00 in light of the fact that the Security Agreement securing the Bank's loans provides that the Receiver may serve without

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

bond if permitted by law.  Such bond may be posted by the Bank, and may be in the form of a cash bond or a bond issued by a surety.  Any such bond posted by the Bank shall be refunded to the Bank upon the termination of the receivership estate and the discharge of the Receiver, provided that no action is then pending that seeks a payment on the bond.

22.     Entry of this Order appointing the Receiver shall not in any manner affect, impair or prejudice any of the other rights and remedies of the Bank, or the liability and obligations of Benja, Defendant Andrew Chapin, or other parties to the Bank under the Loan Documents, at law or in equity.

23.     As used herein, the words "property" and "assets" shall be construed in their broadest sense, and shall include, without limitation, all real and personal property, general intangibles, contract rights, claims, causes of action, accounts, accounts receivable, deposit accounts, cash, goods, furniture, fixtures, equipment, certificates of title, instruments, securities, debts and obligations owed to Benja, and any other such tangible and intangible property and assets, and any and all proceeds and income in connection with any of the foregoing property and assets, and any and all records and information pertaining to the same.

24.     The Receiver and any agents, attorneys and employees of the Receiver, are hereby authorized to communicate with any and all third parties, government agencies, or other persons, firms or entities, in connection with any matters concerning Benja, its property or assets, or the Collateral.

25.     The Receiver is hereby authorized to obtain the assistance of any Sheriff or law enforcement agency in the enforcement of this Order, or to carry out any of the Receiver's powers and duties described herein, or to keep the peace in connection with any such actions.

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**SO ORDERED:**

_____

Judge

_____   _____

Date                               Time

20SL-CC05024

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

**In the**

# CIRCUIT COURT
## Of St. Louis County, Missouri

_October 6, 2020_
Date

For File Stamp Only

BUSEY BANK
Plaintiff/Petitioner

_____
Case Number

vs.

_____
Division

BENJA INCORPORATED,
Defendant/Respondent

## <u>REQUEST FOR APPOINTMENT OF PROCESS SERVER</u>

Comes now  Plaintiff                                                          , pursuant
Requesting Party

to Local Rule 28, and at his/her/its own risk requests the appointment of the Circuit Clerk of

 Kathleen King c/o HPS Process Service & Investigations, 1669 Jefferson Street, Kansas City, MO 64108  (816) 842-9800
Name of Process Server                                Address                                                      Telephone

 Uriel Carmona, co/ HPS Process Service & Investigations, 1669 Jefferson Street, Kansas City, MO 64108 (816) 842-9800
Name of Process Server                                Address or in the Alternative                              Telephone

_____
Name of Process Server                                Address or in the Alternative                              Telephone

Natural person(s) of lawful age to serve the summons and petition in this cause on the below
named parties.  This appointment as special process server does not include the authorization
to carry a concealed weapon in the performance thereof.

SERVE:                                                    SERVE:
 Benja Incorporated                                       _____
Name                                                      Name
 c/o Andrew Chapin, 26 Cragmont Avenue                    _____
Address                                                   Address
 San Francisco, CA 94116                                  _____
City/State/Zip                                            City/State/Zip

SERVE:                                                    SERVE:
 Andrew J. Chapin                                         _____
Name                                                      Name
 26 Cragmont Avenue                                       _____
Address                                                   Address
 San Francisco, CA 94116                                  _____
City/State/Zip                                            City/State/Zip

Appointed as requested:

**JOAN M. GILMER,** Circuit Clerk                          /s/ Michael A. Campbell
                                                          Signature of Attorney/Plaintiff/Petitioner
                                                           35392
                                                          Bar No.
By _____                         100 S. Fourth Street, Suite 1000, St. Louis, MO 63102
   Deputy Clerk                                           Address
                                                           (314) 889-8000
_____                          Phone No.                              Fax No.
Date

Electronically Filed - St Louis County - October 06, 2020 - 05:19 PM

Local Rule 28.  SPECIAL PROCESS SERVERS

(1)    Any Judge may appoint a Special Process Server in writing in accordance with the law and at the risk and expense of the requesting party except no special process server shall be appointed to serve a garnishment [except as allowed by Missouri Supreme Court Rule 90.03(a)].

This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

(2)    The Circuit Clerk may appoint a natural person other than the Sheriff to serve process in any cause in accordance with this subsection;

(A)    Appointments may list more than one server as alternates.

(B)    The appointment of a person other than the Sheriff to serve process shall be made at the risk and expense of the requesting party.

(C)    Any person of lawful age, other than the Sheriff, appointed to serve process shall be a natural person and not a corporation or other business association.

(D)    No person, other than the Sheriff, shall be appointed to serve any order, writ or other process which requires any levy, seizure, sequestration, garnishment, [except as allowed by Missouri Supreme Court Rule 90.03(a)], or other taking.

(E)    Requests for appointment of a person other than the Sheriff to serve process shall be made on a "Request for Appointment of Process Server" electronic form, which may be found on the Court's Web Site, https://wp.stlcountycourts.com > forms.

(F)    This appointment as Special Process Server does not include the authorization to carry a concealed weapon in the performance thereof.

SERVICE RETURN

Any service by the St. Louis County Sheriff's Office shall be scanned into the courts case management system.  Any service by another Sheriff or a Special Process Server or any other person authorized to serve process shall return to the attorney or party who sought service and the attorney shall file the return electronically to the Circuit Clerk.



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>NANCY WATKINS MCLAUGHLIN | **Case Number:  20SL-CC05024** |
| Plaintiff/Petitioner:<br>BUSEY BANK | Plaintiff's/Petitioner's Attorney/Address:<br>MICHAEL ALLEN CAMPBELL<br>100 SOUTH 4TH STREET<br>SUITE 1100<br>SAINT LOUIS, MO  63102 |
| **vs.** | |
| Defendant/Respondent:<br>BENJA INCORPORATED | Court Address:<br>ST LOUIS COUNTY COURT BUILDING |
| Nature of Suit:<br>CC Promissory Note | 105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:  ANDREW J CHAPIN
                          Alias:

**26 CRAGMONT AVENUE**
**SAN FRANCISCO, CA  94116**

*COURT SEAL OF*

*ST. LOUIS COUNTY*

      **You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.**
      **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

<u>09-OCT-2020</u>                       _____
**Date**                                               **Clerk**
**Further Information:**
**AMH**

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by:  (check one)
     ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
  ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with
_____, a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.
  .
     ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to
_____ (name) _____ (title).
     ☐ other (describe) _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).
_____      _____
       Printed Name of Sheriff or Server                     Signature of Sheriff or Server
          **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
          I am: (check one) ☐ the clerk of the court of which affiant is an officer.
                     ☐ the judge of the court of which affiant is an officer.
                     ☐ authorized to administer oaths in the state in which the affiant served the above summons.
                        (use for out-of-state officer)
*(Seal)*              ☐ authorized to administer oaths.  (use for court-appointed server)
                           _____
                                        Signature and Title

| **Service Fees, if applicable** | | |
|---|---|---|
| Summons | $_____ | |
| Non Est | $_____ | |
| Mileage | $_____ | (_____miles @ $ _____ per mile) |
| **Total** | $_____ | |

*See the following page for directions to clerk and to officer making return on service of summons.*

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion and/or petition must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion and/or petition when offered to him, the return shall be prepared to show the offer of the officer to deliver the summons and motion and/or petition and the Defendant's/Respondent's refusal to receive the same.

Service shall be made:  (1) On Individual.  On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion and/or petition to the individual personally or by leaving a copy of the summons and motion and/or petition at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and motion and/or petition to an agent authorized by appointment or required by law to receive service of process;  (2) On Guardian.  On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion and/or petition to the guardian personally;  (3)  On Corporation, Partnership or Other Unincorporated Association.  On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion and/or petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  On a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory in the United States.  If served in a territory, substitute the word "territory" for the word "state."

The officer making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than sixty days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly, and in any event so that it will reach the Missouri Court within 30 days after service.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

## Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

## Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

## Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits.   Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.   An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) <u>Early Neutral Evaluation ("ENE")</u>:** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) <u>Mini-Trial</u>:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) <u>Summary Jury Trial</u>:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73



# IN THE 21ST JUDICIAL CIRCUIT COURT, ST. LOUIS COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>NANCY WATKINS MCLAUGHLIN | **Case Number:  20SL-CC05024** |
| Plaintiff/Petitioner:<br>BUSEY BANK | Plaintiff's/Petitioner's Attorney/Address:<br>MICHAEL ALLEN CAMPBELL<br>100 SOUTH 4TH STREET<br>SUITE 1100<br>**vs.** SAINT LOUIS, MO  63102 |
| Defendant/Respondent:<br>BENJA INCORPORATED | Court Address:<br>ST LOUIS COUNTY COURT BUILDING |
| Nature of Suit:<br>CC Promissory Note | 105 SOUTH CENTRAL AVENUE<br>CLAYTON, MO  63105 |
| | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to:   **BENJA INCORPORATED**
                            Alias:

**C/O ANDREW CHAPIN**
**26 CRAGMONT AVENUE**
**SAN FRANCISCO, CA  94116**

*COURT SEAL OF*

        **You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading to the attorney for the Plaintiff/Petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service.  If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.**

        **SPECIAL NEEDS:  If you have special needs addressed by the Americans With Disabilities Act, please notify the Office of the Circuit Clerk at 314-615-8029, FAX 314-615-8739, email at SLCADA@courts.mo.gov, or through Relay Missouri by dialing 711 or 800-735-2966, at least three business days in advance of the court proceeding.**

*ST. LOUIS COUNTY*

    <u>09-OCT-2020</u>
      **Date**                                    _____
    **Further Information:**                             **Clerk**
    **AMH**

### Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by:  (check one)
   ☐ delivering a copy of the summons and a copy of the petition to the Defendant/Respondent.
   ☐ leaving a copy of the summons and a copy of the petition at the dwelling place or usual abode of the Defendant/Respondent with _____, a person of the Defendant's/Respondent's family over the age of 15 years who permanently resides with the Defendant/Respondent.
   .
   ☐ (for service on a corporation) delivering a copy of the summons and a copy of the petition to _____ (name) _____ (title).
   ☐ other (describe) _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).
_____
     Printed Name of Sheriff or Server                     Signature of Sheriff or Server

        **Subscribed and Sworn To** me before this _____ (day) _____ (month) _____ (year)
        I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
                          ☐ the judge of the court of which affiant is an officer.
                          ☐ authorized to administer oaths in the state in which the affiant served the above summons.
                             (use for out-of-state officer)
   *(Seal)*              ☐ authorized to administer oaths.  (use for court-appointed server)

                                 _____
                                        Signature and Title

| Service Fees, if applicable | | | |
|---|---|---|---|
| Summons | $_____ | | |
| Non Est | $_____ | | |
| Mileage | $_____ | (_____miles @ $ _____ per mile) | |
| **Total** | $_____ | | |

*See the following page for directions to clerk and to officer making return on service of summons.*

## Directions to Officer Making Return on Service of Summons

A copy of the summons and a copy of the motion and/or petition must be served on each Defendant/Respondent.  If any Defendant/Respondent refuses to receive the copy of the summons and motion and/or petition when offered to him, the return shall be prepared to show the offer of the officer to deliver the summons and motion and/or petition and the Defendant's/Respondent's refusal to receive the same.

Service shall be made:  (1) On Individual.  On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and motion and/or petition to the individual personally or by leaving a copy of the summons and motion and/or petition at the individual's dwelling house or usual place of abode with some person of the family over 15 years of age, or by delivering a copy of the summons and motion and/or petition to an agent authorized by appointment or required by law to receive service of process;  (2) On Guardian.  On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and motion and/or petition to the guardian personally;  (3)  On Corporation, Partnership or Other Unincorporated Association.  On a corporation, partnership or unincorporated association, by delivering a copy of the summons and motion and/or petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the Defendant/Respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body.  On a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory in the United States.  If served in a territory, substitute the word "territory" for the word "state."

The officer making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths.  This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than ten days nor more than sixty days from the date the Defendant/Respondent is to appear in court.  The return should be made promptly, and in any event so that it will reach the Missouri Court within 30 days after service.

**THE CIRCUIT COURT OF ST.  LOUIS COUNTY, MISSOURI**

Twenty First Judicial Circuit

**NOTICE OF ALTERNATIVE DISPUTE RESOLUTION SERVICES**

## Purpose of Notice

As a party to a lawsuit in this court, you have the right to have a judge or jury decide your case. However, most lawsuits are settled by the parties before a trial takes place.  This is often true even when the parties initially believe that settlement is not possible.   A settlement reduces the expense and inconvenience of litigation.  It also eliminates any uncertainty about the results of a trial.

Alternative dispute resolution services and procedures are available that may help the parties settle their lawsuit faster and at less cost.  Often such services are most effective in reducing costs if used early in the course of a lawsuit.  Your attorney can aid you in deciding whether and when such services would be helpful in your case.

## Your Rights and Obligations in Court Are Not Affected By This Notice

You may decide to use an alternative dispute resolution procedure if the other parties to your case agree to do so.  In some circumstances, a judge of this court may refer your case to an alternative dispute resolution procedure described below.   These procedures are not a substitute for the services of a lawyer and consultation with a lawyer is recommended.   Because you are a party to a lawsuit, you have obligations and deadlines which must be followed whether you use an alternative dispute resolution procedure or not.  **IF YOU HAVE BEEN SERVED WITH A PETITION, YOU MUST FILE A RESPONSE ON TIME TO AVOID THE RISK OF DEFAULT JUDGMENT, WHETHER OR NOT YOU CHOOSE TO PURSUE AN ALTERNATIVE DISPUTE RESOLUTION PROCEDURE.**

## Alternative Dispute Resolution Procedures

There are several procedures designed to help parties settle lawsuits.  Most of these procedures involve the services of a neutral third party, often referred to as the "neutral," who is trained in dispute resolution and is not partial to any party.  The services are provided by individuals and organizations who may charge a fee for this help.  Some of the recognized alternative dispute resolutions procedures are:

**(1) Advisory Arbitration:** A procedure in which a neutral person or persons (typically one person or a panel of three persons) hears both sides and decides the case.  The arbitrator's decision is not binding and simply serves to guide the parties in trying to settle their lawsuit.  An arbitration is typically less formal than a trial, is usually shorter, and may be conducted in a private setting at a time mutually agreeable to the parties.  The parties, by agreement, may select the arbitrator(s) and determine the rules under which the arbitration will be conducted.

**(2) Mediation:** A process in which a neutral third party facilitates communication between the parties to promote settlement.  An effective mediator may offer solutions that have not been considered by the parties or their lawyers.  A mediator may not impose his or her own judgment on the issues for that of the parties.

CCADM73

**(3) Early Neutral Evaluation ("ENE"):** A process designed to bring the parties to the litigation and their counsel together in the early pretrial period to present case summaries before and receive a non-binding assessment from an experienced neutral evaluator.  The objective is to promote early and meaningful communication concerning disputes, enabling parties to plan their cases effectively and assess realistically the relative strengths and weaknesses of their positions.  While this confidential environment provides an opportunity to negotiate a resolution, immediate settlement is not the primary purpose of this process.

**(4) Mini-Trial:** A process in which each party and their counsel present their case before a selected representative for each party and a neutral third party, to define the issues and develop a basis for realistic settlement negotiations.  The neutral third party may issue an advisory opinion regarding the merits of the case.  The advisory opinion is not binding.

**(5) Summary Jury Trial:** A summary jury trial is a non binding, informal settlement process in which jurors hear abbreviated case presentations.  A judge or neutral presides over the hearing, but there are no witnesses and the rules of evidence are relaxed.  After the "trial", the jurors retire to deliberate and then deliver an advisory verdict.  The verdict then becomes the starting point for settlement negotiations among the parties.

## Selecting an Alternative Dispute Resolution Procedure and a Neutral

If the parties agree to use an alternative dispute resolution procedure, they must decide what type of procedure to use and the identity of the neutral.  As a public service, the St. Louis County Circuit Clerk maintains a list of persons who are available to serve as neutrals.  The list contains the names of individuals who have met qualifications established by the Missouri Supreme Court and have asked to be on the list.  The Circuit Clerk also has Neutral Qualifications Forms on file.  These forms have been submitted by the neutrals on the list and provide information on their background and expertise.  They also indicate the types of alternative dispute resolution services each neutral provides.

A copy of the list may be obtained by request in person and in writing to: Circuit Clerk, Office of Dispute Resolution Services, 7900 Carondelet Avenue, 5th Floor, Clayton, Missouri 63105.  The Neutral Qualifications Forms will also be made available for inspection upon request to the Circuit Clerk.

The List and Neutral Qualification Forms are provided only as a convenience to the parties in selecting a neutral.  The court cannot advise you on legal matters and can only provide you with the List and Forms. You should ask your lawyer for further information.

CCADM73

**IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI**
**TWENTY-FIRST JUDICIAL CIRCUIT**

| | | |
|---|---|---|
| **BUSEY BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 20SL-CC05024** |
| | ) | |
| **v.** | ) | **Division 21** |
| | ) | |
| **BENJA INCORPORATED, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## ENTRY OF APPEARANCE

COMES NOW Ryan J. Mason of Mason Law Firm LLC, and enters his appearance on behalf of Defendants BENJA INCORPORATED and ANDREW J. CHAPIN.

Respectfully submitted,

MASON LAW FIRM LLC

By: */s/ Ryan J. Mason*
    RYAN J. MASON (#56167)
    13421 Manchester Road, Suite 105
    St. Louis, Missouri 63131
    (314) 686-4044
    Fax (314) 754-9568
    rmason@masonlawstl.com

ATTORNEY FOR DEFENDANTS
BENJA INCORPORATED and ANDREW J. CHAPIN

## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing was filed with the clerk of the court through the electronic-filing system pursuant to Rule 103.05 on this **12**th day of **October, 2020**. Service shall be made to registered users through the **electronic-filing system** pursuant to Rule 103.08.

*/s/ Ryan J. Mason*

## IN THE CIRCUIT COURT OF ST. LOUIS COUNTY, MISSOURI
## TWENTY-FIRST JUDICIAL CIRCUIT

| | | |
|---|---|---|
| **BUSEY BANK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 20SL-CC05024** |
| | ) | |
| **v.** | ) | **Division 21** |
| | ) | |
| **BENJA INCORPORATED, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### APPLICATION FOR CHANGE OF JUDGE

COME NOW Defendants BENJA INCORPORATED and ANDREW J. CHAPIN (collectively, "**Defendants**"), by and through undersigned counsel, and hereby file their application for change of judge pursuant to Missouri Supreme Court Rule 51.05. In support of their application, Defendants state as follows:

1.      Rule 51.05(a) requires that "[a] change of judge **shall be ordered** in any civil action upon the timely filing of a written application therefor by any party." (Emphasis added.)

2.      Upon the filing of a proper, timely application under the Rule 51.05, the court has no jurisdiction to do anything other than to grant the application and transfer the cause. *State ex rel. Raack v. Kohn,* 720 S.W.2d 941, 943 (Mo. 1986); *State ex rel. Cohen v. Riley*, 994 S.W.2d 546, 547 (Mo. 1999); *State ex rel. Walters v. Schaeperkoetter*, 22 S.W.3d 740, 743 (Mo. App. E.D. 2000); *see also* Rule 51.05(e).

3.      In order to be timely, "the application must be filed within sixty days from service of process or thirty days from the designation of the trial judge, whichever time is longer." Rule 51.05(b).

4.      Plaintiff had Defendants served with process three days ago on October 9, 2020, and the trial judge was designated six days ago on October 6, 2020.

5.      This application is timely, and no party to this action has previously sought a change of judge, so the court has no jurisdiction to do anything other than grant the application and transfer the cause.

WHEREFORE, Defendants respectfully request this Honorable Court issue its Order granting this Application for Change of Judge as required under Rule 51.05.

Respectfully submitted,

MASON LAW FIRM LLC


By: */s/ Ryan J. Mason*
       RYAN J. MASON (#56167)
       13421 Manchester Road, Suite 105
       St. Louis, Missouri 63131
       (314) 686-4044
       Fax (314) 754-9568
       rmason@masonlawstl.com

ATTORNEY FOR DEFENDANTS
BENJA INCORPORATED and ANDREW J. CHAPIN


## CERTIFICATE OF SERVICE

The undersigned certifies that a true and correct copy of the above and foregoing was filed with the clerk of the court through the electronic-filing system pursuant to Rule 103.05 on this **12th** day of **October, 2020**. Service shall be made to registered users through the **electronic-filing system** pursuant to Rule 103.08.

*/s/ Ryan J. Mason*