IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION - ST. LOUIS
BEFORE THE HONORABLE HENRY E. AUTREY
DISTRICT JUDGE

```
BUSEY BANK,                         )
                                    )
                    Plaintiff,      )
vs.                                 )   4:20-CV-01473-HEA
                                    )
BENJA INCORPORATED, ET AL.,         )
                                    )
                    Defendants.     )
```

==================================================================

EMERGENCY MOTION FOR EXPEDITED HEARING

ON MOTION FOR APPOINTMENT OF GENERAL RECEIVER

OCTOBER 15TH, 2020

==================================================================

APPEARANCES


For Plaintiff Busey Bank:          For Plaintiff Busey Bank:
Michael A. Campbell, Esq.          Jerry L. Switzer, Jr, Esq.
POLSINELLI, PC                     POLSINELLI, PC
100 S. Fourth Street, #1000        150 N. Riverside Plaza, #3000
St. Louis, MO  63102               Chicago, IL  60606

For Defendants Benja Incorporated
and Andrew J. Chapin:
Ryan J. Mason, Esq.
MASON LAW FIRM, LLC
13421 Manchester Road, #105
St. Louis  MO  63131


Stenographically Reported & Produced by:
LINDA NICHOLS, RDR, CRR
Official Court Reporter
United States District Court
Eastern District of Missouri
111 South 10th Street, Third Floor
St. Louis, MO  63102

Case: 4:20-cv-01473-HEA   Doc. #:  14   Filed: 10/23/20   Page: 2 of 18 PageID #: 358
October 15th, 2020 -  Emergency Motion Hearing

2

1      EMERGENCY MOTION FOR EXPEDITED HEARING

2      ON MOTION FOR APPOINTMENT OF GENERAL RECEIVER

3             THURSDAY, OCTOBER 15TH, 2020

4   ZOOM VIDEOCONFERENCE PROCEEDINGS

5   COMMENCED AT 10:32 A.M.:

6          THE COURT:  This is the matter of Busey Bank vs. Benja

7   Incorporated and Andrew J. Chapin.  The matter is before the

8   Court at this time for purposes of proceeding on an Emergency

9   Motion for Expedited Hearing on Verified Expedited Motion for

10  Appointment of General Receiver, Case Number 4:20-CV-01473.  The

11  parties are present through Counsel.

12         Noting for the record that the Court also received,

13  moments ago, a suggestion of Bankruptcy and Notice of Automatic

14  Stay in the matter of Busey Bank vs. Benja Incorporated, et al.,

15  document number 11, filed this morning sometime early.

16         Are the parties ready to proceed?  Not that -- at this

17  point I don't know if there is much that we can proceed on, but

18  that being said, are we ready to go?

19         MR. CAMPBELL:  We are, Your Honor.

20         THE COURT:  All right.  Well, I guess the simple

21  question right now is, in light of the suggestions of Bankruptcy

22  and Notice of Automatic Stay, really, what is it that there is

23  for us to do at this time?

24         MR. CAMPBELL:  Well, Judge, I'm Michael Campbell with

25  Polsinelli, on behalf of Busey Bank.  My partner, Jay Switzer,

1    is on with us.  And of course Ryan Mason, who is also on,

2    represents the Defendants.

3             THE COURT:  Yes.

4             MR. CAMPBELL:  There may still be one matter we would

5    like you to address and it has to do with the potential for

6    spoliation of evidence that has to do with Andrew Chapin.

7             Although the Bankruptcy was filed, the Bankruptcy stays

8    any action with regard to Benja Incorporated --

9             THE COURT:  Uh-huh.

10            MR. CAMPBELL:  -- but it doesn't stay any actions by

11   this Court with respect to Andrew Chapin.  And as you will see

12   in the Emergency Motion for an Expedited Hearing on the Motion

13   for Relief from -- I'm sorry -- Motion for Appointment of

14   Receiver, you will see that we have set forth for you the facts

15   concerning the Google accounts, email accounts, that Mr. Chapin

16   used with respect to Benja.

17            And we think that those accounts are fairly important

18   because Mr. Chapin developed or set up fake accounts --

19            THE COURT:  Uh-huh.

20            MR. CAMPBELL:  -- in the name of people who, in this

21   very small company, who were working for him and used that

22   information to provide information to investors that was false.

23   And our goal is to at least preserve those Google accounts to

24   the extent that it's possible.

25            We understand -- and let me give you a very brief

1    background.  As we understand it, Benja Incorporated is a very

2    small e-commerce company that had only several employees.

3    Andrew Chapin started the company and he had help from a man by

4    the name of Tom Goode, it's spelled G-o-o-d-e, but Mr. Goode had

5    handled the technical side of the equation, drafting code for

6    the software, and Mr. Chapin was the entrepreneurial salesman.

7    And Mr. Chapin solicited a number of investors with this

8    company, which actually started as a crypto-currency company,

9    and they issued Benja coins in the crypto-currency world.

10          But that changed to this e-commerce platform where

11   Benja would provide a service to various companies like Nike and

12   New Balance and otherwise, allegedly, in which they were to pay

13   the Benja money for this advertising app that would hover over

14   other pages like magazines, on-line magazines and things that

15   readers would look at, and then they would see an advertisement

16   and they could buy a pair of shoes from Nike.

17          All of that sounded great but what we understand later

18   on, from Joe Alouf -- and you have his affidavit -- is that the

19   entire concept more or less failed with filtering software that

20   had to do with advertisements.

21          That's neither here nor there.  Here's what's

22   important.  Mr. Chapin solicited a number of investors for the

23   company who did invest millions of dollars in this company.

24   Some of the investors who were also directors became very

25   concerned about how the company was being operated and what was

1   happening with the money, and they asked Mr. Chapin to hire an

2   outside financial consultant.  And in May of this year he hired

3   Joe Alouf, who has more than 30 years of experience in financial

4   consulting for some major corporations around the country.

5         And Joe Alouf came into the company and he received

6   very little cooperation from Mr. Chapin.  He was originally

7   brought in to look at a $1 million dollar loan that was going to

8   be made from a company called Empowerment, run by Michael Stern,

9   and he was to provide some financial advice with regard to it

10  but he wasn't given information to do so.

11        Several weeks passed and nothing happened.  And then

12  finally Mr. Alouf was contacted again and was asked to do a few

13  more things.  He was actually contacted by Michael Stern at

14  Empowerment, who said, who basically said, Well, we've made the

15  $1 million dollar loan, which was news to Mr. Alouf, and they

16  started comparing notes.

17        And they found out that Mr. Stern had been provided

18  with bank statements for Benja that were bank statements at

19  Busey Bank for the operating account of Benja, and these bank

20  statements had been digitally altered and were fraudulent.  They

21  showed $1.2 million dollars, on August 31 of this year, of a

22  bank balance.  They showed what is essentially millions of

23  dollars in accounts receivable coming from large companies like

24  Nike that were allegedly deposited to that bank account.

25        And when Mr. Alouf, who by that time had become, been

1    appointed the Interim CFO of the company, was still not getting

2    enough cooperation but getting, exploring from outside sources,

3    he contacted Busey Bank and he obtained the actual bank

4    statements, which showed that on August 31 the bank balance was

5    only $1,900, not $1.2 million dollars, and that there were no

6    deposits of accounts receivable because there were no accounts

7    receivable that were coming in.  No such payments.

8          These were fraudulent bank statements that were

9    provided to outside investors, including Empowerment and Michael

10   Stern, to lure more investors, which by the way were more loans

11   that were a violation of Benja and Mr. Chapin's Loan Agreement

12   with Busey Bank, our client.

13         Our client has $5 million dollars outstanding in loans

14   or a loan to Benja, and it is secured by, guaranteed and signed

15   by Mr. Chapin.  That loan is dependent on accounts receivable as

16   its collateral.  And from what Joe Alouf, from the inside of

17   this company, has basically said, as more or less a

18   whistleblower, as you will see in his affidavit that was on file

19   in the state court action, which is before you, he has

20   essentially said, There are no accounts receivable and this is

21   all simply a fraud.

22         There are other frauds that have been committed and

23   we've outlined them in both the -- I should say Joe Alouf

24   outlines them in the affidavit.  We outlined a series of them in

25   the Emergency Motion that we filed with this Court yesterday.

October 15th, 2020 -  Emergency Motion Hearing

7

1          THE COURT:  Uh-huh.

2          MR. CAMPBELL:  There were financial statements, for

3   instance, that were presented to our client, Busey Bank, by

4   Mr. Chapin and those financial statements purported to show

5   million of dollars of accounts receivable, again from companies

6   like Nike, New Balance, Columbia and others, and in fact those

7   financial statements -- I'm sorry -- those accounts receivable

8   did not exist.  The financial statements included what purported

9   to be an Accounts Receivable Verification from an outside

10  third-party firm and from what we now see, that was also forged

11  by Mr. Chapin.

12          It goes even further, Judge, because we learned only

13  two days ago that Mr. Chapin actually impersonated Jennifer

14  Byrne at Armstrong Teasdale and issued the Shareholders

15  Agreement to other investors in the company and that he had no

16  authority, of course, to do so.

17          We think that he is the one, or he had somebody draft

18  that Shareholders Agreement and he sent it out under Jennifer's

19  name, purporting to be a DocuSign email, with a fake email

20  address that was copied in that DocuSign to

21  JByrne@ArmstrongTeasdalemail.com, which is a domain that does

22  not exist.  Her correct email address we've put forth in that

23  Emergency Motion for Armstrong Teasdale.

24          Jennifer Byrne was contacted by one of the former

25  directors of the company, who is also an investor, a man by the

1  name of Scott Sklar, who has been very concerned about the

2  company and his investment, trying to get to the bottom of it.

3          And in late September he contacted Jennifer Byrne and

4  he asked her about the forged agreement and the documents and

5  representation of Benja, and she said, We at Armstrong Teasdale

6  do not represent Benja.  We never have.  We've not communicated

7  with Mr. Chapin, and we are very concerned about this,

8  essentially the fraudulent use of her name.

9          There are more things that are frauds that we've

10 outlined, Judge, for you.  I'll keep it short, but Borrowing

11 Base Certificates were provided to our client in connection with

12 the loan attesting to an outside accounts receivable, and in

13 fact they don't exist.  So all of these were fraudulently

14 presented to our client.

15         One more thing that is a significant concern of ours

16 but it will be addressed, we are sure, by the Bankruptcy Court,

17 is that Mr. Chapin transferred hundreds of thousands of dollars

18 from the Busey Bank account to JPMorgan Chase.  And there were

19 multiple accounts, we understand, at JPMorgan Chase, at least

20 one in the name of Benja and another one in his own personal

21 name, in which he would take money from Busey Bank, he would

22 transfer it over to Chase, to the Benja account at Chase, and

23 then he would transfer it from the Benja account at Chase to his

24 own personal account.

25         And he actually told Joe Alouf the reason why he did

1   that was because it would have taken two signatures for him to

2   use the JPMorgan account in the name of Benja to make direct

3   payments to other people, whereas it did not require that in his

4   own account.

5          We also learned, Judge, that one of the early

6   investors, who we understand invested only about $300,000,

7   between $200,000 and $400,000, actually threatened criminal

8   action against, we are sure against Mr. Chapin but definitely

9   against a woman by the name of Jennifer Lee who Mr. Chapin hired

10  as more or less a bookkeeper, but he represented her to be a CFO

11  in the company and we again know that he created fake email

12  accounts in her name.

13         But this director essentially came back to -- and this

14  director's name was Bret Brueck, B-r-u-e-c-k.  You will see that

15  name in Mr. Sklar's affidavit.  But Mr. Brueck, who invested

16  only a few hundred thousand dollars, essentially demanded that

17  he receive what he claims was promised to him out of this

18  company, and he received a total of $4.6 million dollars, is

19  what he told Joe Alouf that he received.  And we have verified a

20  lot of that came out of the Busey Bank account for that

21  $4.6 million dollars.

22         Judge, whenever you see an investor who comes into an

23  investment, they invest only $300,000 and they get $4.6 million

24  dollars after threatening criminal action, that's a Ponzi

25  scheme.  And what Mr. Chapin is doing is he's operating and has

October 15th, 2020 -  Emergency Motion Hearing

10

1   been operating a Ponzi scheme for the purpose of essentially

2   keeping this thing afloat, whether or not this e-commerce

3   platform is viable or not, but for the purpose of paying off

4   prior investors using new money.

5          And the way you get new money is you, in his case,

6   fabricate and fraudulently alter bank statements to make it look

7   as though you have accounts receivable, you give that to new

8   investors such as Michael Stern at Empowerment, who loaned a

9   million dollars to the company last month, and you convince them

10  to loan more money to the company to keep it afloat.  That is

11  what he has done.

12         I could go into other things that we don't need to

13  bother you with, such as the fact that Mr. Chapin resigned as

14  the CEO and resigned as a Director, and then a day later he

15  purported to step back in or try to step back in when he didn't

16  have the authority to do so.  So those questions are swirling

17  and they will be, I'm sure, answered by the Bankruptcy Court in

18  short order.

19         THE COURT:  Uh-huh.

20         MR. CAMPBELL:  Here is what we're concerned about, and

21  that is that Brian Buster, the attorney for Tom Goode, who was

22  one of the original founders or originally in Benja -- Tom

23  Goode, by the way, signed a Guaranty for our client's loan, or

24  I'm sorry, our clients were given a Guaranty.  Tom Goode says he

25  did not sign it.  That his name was forged by Mr. Chapin.  We

1  don't know if that's true or not, and at this point we don't

2  need to decide that.

3         What we do know is that his attorney, Brian Buster,

4  told us Google -- Mr. Chapin has deleted the email accounts for

5  Benja and the individual email accounts used by individuals such

6  as himself, and the fake ones he had created, and that Google's

7  policy and Google's practice will allow those deleted email

8  accounts to be unrecoverable after October 18, which is

9  essentially this Sunday.

10         If it's possible, Judge, what we would like the Court

11  to do, whether sui sponte or in connection with our motion just

12  as to Andrew Chapin, is to at least issue an order directing

13  Mr. Chapin not to spoliate evidence and not to allow Google to

14  delete the email accounts.  We don't think that there will be

15  enough time in the next one day for the Bankruptcy Court to do

16  that in this context, and we think it's rather important that

17  those, that that small amount of evidence be retained.

18         Now, Judge, we are not going to try to tear up your

19  docket in the next few weeks and make this a long, drawn-out

20  process.  What we're more concerned about is this one hanging

21  issue of the Google email account today that we think needs, at

22  least needs some attention.

23         My partner, Jay Switzer, is on the phone, of course.

24  He may be able to address a little more of this.  And Jay, if

25  there is anything else you think you need to add for the Judge.

1          MR. SWITZER:  I think that Michael has covered --

2    again, Jay Switzer from the Chicago office of Polsinelli.

3          The issue regarding G-Suite software and the Google

4    accounts has been front and center for everybody from Tom Goode,

5    through his counsel Brian Buster, and Joe Alouf has raised it,

6    as well.  You know, we were making preliminary steps to be able

7    to contact Google once a Receiver was appointed to make sure

8    that these emails and other documents are not irretrievably

9    lost.

10          And so I think it would be a prudent order, and I would

11   hope that counsel for Mr. Chapin would agree, that any efforts

12   to further destroy emails or actions that should be taken now to

13   preserve evidence, that that should be ordered by this Court.

14          And so we would certainly make that limited request as

15   part of an order to be entered today.

16          THE COURT:  Okay.

17          MR. CAMPBELL:  You do have control over Andrew Chapin

18   still, Judge, and that's the reason why --

19          THE COURT:  Right.

20          MR. CAMPBELL:  -- we would make that request.  So

21   that's our sole request today.

22          And I apologize for giving you all the background

23   behind the company, but you need to understand I've given you

24   only the tip of the iceberg of all of the fraudulent activity,

25   and how this is really just a shell of a Ponzi scheme, as we are

October 15th, 2020 - Emergency Motion Hearing

13

1   seeing, as Joe Alouf has concluded, and as other former

2   directors are now concluding as they investigate all of this.

3          So that's the limited piece of an order that we're

4   asking the Court to at least enter.

5          THE COURT:  All right.  Anything else?

6          MR. CAMPBELL:  That is it for the moment, Judge.

7          THE COURT:  All right.

8          MR. MASON:  Your Honor, Ryan Mason for the Defendant.

9          THE COURT:  Yes.  Go ahead, Mr. Mason.

10         MR. MASON:  Can you hear me all right, Your Honor?

11         THE COURT:  I hear you just fine, yes, sir.

12         MR. MASON:  Great.  Thank you.

13         You'd be forgiven if you didn't catch all of that.

14  There was a lot in there, to be sure.  If you had a chance to

15  read the original Petition, this is a suit on a note in Count

16  One, a suit on a Guaranty in Count Two, and a suit for a

17  Receiver in Count Three.

18         We are here today on the suit on Count Three for the

19  appointment of a Receiver.  The company that they want to put a

20  Receiver in for is in Bankruptcy as of this morning.  The Stay

21  that's in place, that's what's before the Court right now.  And

22  I think anything beyond that is a violation of the Stay and,

23  frankly, I can't believe this conversation went as broad as it

24  did.  And as to the narrow ask, that was not before the Court

25  with respect to the Google email account.

October 15th, 2020 -  Emergency Motion Hearing

14

1      Put aside for a minute that both of my clients, they

2  will have their opportunity to refute all of these allegations,

3  which they intend to do strenuously in the correct forum.  So

4  I don't think that there is anything for the Court to do.

5      Count Two is Mr. Chapin's Guaranty.  Mr. Campbell and

6  Mr. Switzer can proceed against that Guaranty in Count Two in

7  the coming weeks and months, you know.  He is not going to be

8  subject to the Stay.  But there is not anything before the Court

9  today in the nature of a TRO or anything like that.

10      THE COURT:  Any response?

11      MR. CAMPBELL:  Yes, Your Honor.

12      I would submit that the Court does have plenary

13  jurisdiction over discovery matters, and that when it comes to

14  the attention that there is a rather clear instance of

15  spoliation of evidence -- in this case we're convinced that

16  Mr. Chapin has deleted the Google email accounts because he's

17  probably concerned about his non-civil issues as well as this

18  civil case.  In that instance, Judge, the Court does have

19  plenary jurisdiction to, if nothing else, at least issue a

20  cautionary order that directs Mr. Chapin not to allow evidence

21  to be destroyed.

22      And the evidence in this case, Google email accounts

23  are a very critical piece of evidence with respect to not just

24  Benja, which we are not arguing today, but with respect to

25  Andrew Chapin himself.  And that is our concern here, Judge.

1    So, Judge, all we can do is ask.  And if you decide

2  that you do not want to exercise your plenary jurisdiction, we

3  understand.  But we are asking you to at least do that much, and

4  if you will do so, that we would appreciate it.

5         That's it, Judge.

6         THE COURT:  All right.  Well, clearly, as everybody

7  agrees, the essence and the heart of the purpose for us being

8  here today was related to the Motion for Emergency Relief which

9  has been, well, obviated by the filing of Bankruptcy by Benja

10 Incorporated.

11        There is nothing in any of the pleadings relative to

12 this motion hearing today that relate to the relief that you ask

13 for, which I think is a really broad swipe beyond and outside of

14 the pleadings.  So with respect to that request for that, even

15 as you indicated, limited relief, Counsel, I'm going to deny

16 that at this time.  Okay?  All right.

17        MR. CAMPBELL:  Understood, Judge.  Thank you.

18        THE COURT:  All right.  Anything else, Counsel?

19        MR. CAMPBELL:  Nothing for us, Judge.  If we don't ask,

20 we don't get.  You know that.

21        THE COURT:  That's true.  That's what I've been

22 preaching my whole life.

23        MR. MASON:  Your Honor --

24        THE COURT:  Yes.

25        MR. MASON:  Your Honor, I have one procedural question.

October 15th, 2020 -  Emergency Motion Hearing

16

1   Was this matter on the record?

2          THE COURT:  Yes, it was.

3          MR. MASON:  Okay.  And is there a way to get a

4   transcript?

5          THE COURT:  For a small fee.  That's a judge joke.

6   Yeah.

7          MR. MASON:  That's fair.  That's fair.  Do we have time

8   to contact your clerk to make that happen?

9          THE COURT:  Yeah.  Do that.

10         MR. MASON:  Thank you, Your Honor.

11         MR. CAMPBELL:  Again, Judge, I'm sure the record

12   reflects it but I'm going to repeat it, that we are not today,

13   we did not proceed on the motion, our motion against Benja in

14   any way, shape or form.

15         We do not intend to go after or proceed against any

16   collateral of Benja.  That is not our intent in asking for the

17   exercise of plenary jurisdiction over discovery having to do

18   with Andrew Chapin, only, which was solely our request.

19         THE COURT:  Correct.  All right.

20         MR. CAMPBELL:  So I just want to be sure the record is

21   clear on that.

22         THE COURT:  I believe it is.  All right.  Thank you all

23   very much.

24         MR. CAMPBELL:  Thank you.

25         THE COURT:  Stay well.

1          MR. SWITZER:   Thank you.

2                    - RECESS AT 11:00 A.M. -

REPORTER'S CERTIFICATE


I, Linda C. Nichols, Registered Diplomate Reporter and Certified Realtime Reporter, do hereby certify that I am a duly appointed Official Court Reporter for the United States District Court of the Eastern District of Missouri, and that the foregoing is a true and accurate reproduction of proceedings had in the matter of:

BUSEY BANK vs. BENJA INCORPORATED, ET AL.

No. 4:20-CV-01473-HEA


In the event copies are made of the transcript herein, (pp. 1-17), the court reporter takes no responsibility for missing or damaged pages.



Dated this 22nd day of October, 2020.



 \s\  Linda Nichols
Linda Nichols, RDR, CRR
Official Court Reporter
United States District Court
Eastern District of Missouri
linda_nichols@moed.uscourts.gov