SEALED BY ORDER OF THE COURT

AO 91 (Rev. 11/11)   Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| | |
|---|---|
| United States of America<br>v.<br>ANDREW CHAPIN<br><br>*Defendant(s)* | Case No 3:20-mj-71712 MAG |

**FILED**
Nov 23 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __2018 through October 2020__ in the county of __San Francisco__ in the __Northern__ District of __California__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1344<br>18 U.S.C. § 1343<br>15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. § 240.10b-5 | Count One: Bank Fraud<br>Count Two: Wire Fraud<br>Count Three: Securities Fraud<br>Max. Penalties: Count One: Up to 30 yrs. imprisonment, $1,000,000 fine; Count Two: Up to 20 yrs. imprisonment, $250,000 fine or twice the gross gain/loss; Count Three: Up to 20 yrs. imprisonment, $5,000,000 fine. For all three counts: 3 yrs. supervised release; $100 mandatory special assessment |

This criminal complaint is based on these facts:

The attached affidavit of FBI Special Agent Alexandra Bryant.

☑ Continued on the attached sheet.

/s/
*Complainant's signature*

Alexandra Bryant, Special Agent, FBI
*Printed name and title*

Approved as to form _____/s/_____
AUSA Kimberly Hopkins

Sworn to before me by telephone.

Date: November 20, 2020

*Judge's signature*

City and state: San Francisco, CA

Hon. Jacqueline Scott Corley, U.S. Magistrate Judge
*Printed name and title*

**EXHIBIT A**

# AFFIDAVIT OF SPECIAL AGENT ALEXANDRA BRYANT IN SUPPORT OF CRIMINAL COMPLAINT

I, Alexandra Bryant, a Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

## OVERVIEW AND AGENT BACKGROUND

1. I make this affidavit in support of a three-count Criminal Complaint against ANDREW CHAPIN (hereinafter CHAPIN):

    a. Count One: Bank Fraud for providing false information from at least 2019 through September 2020, regarding his company, Benja Incorporated (BENJA), to obtain a $5 million line of credit with an FDIC-insured bank, in violation of 18 U.S.C. § 1344;

    b. Count Two: Wire Fraud for providing false information regarding BENJA from at least March 2020 through June 2020, in order to secure a $1 million investment from an investment group in New York, in violation of 18 U.S.C. § 1343;

    c. Count Three: Securities Fraud for selling securities through false, fraudulent, and misleading statements and promises from at least 2018 through September 2020 in connection with sales of securities in BENJA, in violation of 15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. § 240.10b-5.

For the reasons set forth below, I believe there is probable cause to believe CHAPIN has committed each of the foregoing violations of federal law.

2. The statements contained in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. This affidavit summarizes such information in order to show that there is probable cause to believe that CHAPIN has committed the violations listed above. This affidavit does not purport to set forth all of my knowledge about this matter, or to name all of the persons who participated in these crimes.

3. I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed for approximately three years. I am currently assigned to a Complex Financial Crime Squad of FBI's San Francisco Field Division. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime.

**APPLICABLE LAW**

4. Title 18, U.S.C. §1344 prohibits bank fraud. The essential elements of this offense are: 1) the defendant knowingly executed a scheme to defraud a financial institution as to a material matter; 2) the defendant did so with the intent to defraud the financial institution; and 3) the financial institution was insured by the Federal Deposit Insurance Corporation. See Ninth Circuit Instruction 8.125.

5. Title 18, U.S.C. § 1343 prohibits wire fraud. The essential elements of this offense are: 1) the defendant knowingly participated in, devised or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; 2) the statements made or facts omitted as part of the scheme were material, that is they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; 3) the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and 4) the defendant used, or caused to be used, a wire communication to carry out, or attempt to carry out an essential part of the scheme. See Ninth Circuit Instruction 8.124.

6. Title 15, U.S.C. §§ 78j(b) and 78ff; and Title 17 C.F.R. § 240.10b-5 prohibit securities fraud. The essential elements of this offense are: 1) the defendant knowingly and willfully used or employed a manipulative or deceptive device, 2) the manipulation or deception was in connection with the sale of a security, 3) the manipulation or deception constituted a false statement or misleading omission of material fact. *See United States v. Jenkins*, 633 F.3d 788

2

(9th Cir. 2011). Promissory notes tied to shares in a company and/or dependent on corporate performance are a form of security covered by the law.

## FACTS SUPPORTING PROBABLE CAUSE

**Summary of the Scheme**

7. The following facts lay out the fraud scheme that has occurred thus far. The subject is ANDREW CHAPIN, a 32-year-old male living in San Francisco, CA. From at least 2014 to present, CHAPIN has been the co-founder and CEO of BENJA (formerly called EPHE). BENJA is purported to be a digital advertising company. BENJA creates "shoppable media", placing digital ads on websites that allows a shopper to purchase products in the ad itself without being redirected to another website. The company originally started out as a mobile app before placing ads on websites. BENJA claims to help companies like Nike, Fanatics, Backcountry, Patagonia, and Zappos sell overstock inventory through these ad placements. CHAPIN portrayed BENJA as a successful company to investors and creditors, claiming BENJA generated $6.2 million in revenue in 2018 and $13.2 million in revenue in 2019.

8. In 2019 and 2020, CHAPIN began looking for additional investors and lines of credit for BENJA. This included seeking a line of credit from Bank B that grew from $1 million to $5 million. Bank B is a FDIC-insured bank headquartered in Champaign, IL. The line of credit with Bank B was secured by BENJA's assets. BENJA's primary asset was its account receivables (amounts due from its customers like Nike, Fanatics, Backcountry, and Patagonia). The account receivables and financial statements provided to the bank were misstated and false. The investigation has uncovered that Nike, Fanatics, Backcountry, and Patagonia never purchased advertising from BENJA and therefore a majority of the purported revenue was fabricated. A review of bank records from 2018 to 2020 indicate that BENJA was generating almost no revenue from its purported ad placement business and almost all the customers CHAPIN claimed BENJA had were lies. CHAPIN used almost the full $5 million line of credit

3

of which a majority did not go to operating a company, but rather to paying off other creditors and investors, paying CHAPIN's credit cards and personal expenses, and sending funds to CHAPIN's personal account at Gemini, a crypto-currency exchange.

9. In addition to seeking lines of credit from financial institutions, CHAPIN raised $1 million in 2020 from a venture capital firm in New York, "VC Firm E", as well as raised at least $1.8 million from multiple individuals from 2018 to 2020. CHAPIN again presented the same false account receivables and financial statements to investors. CHAPIN had individuals pose as employees from Nike and Fanatics in order to provide false references about BENJA to investors. CHAPIN also lied and claimed a venture capital firm in St. Louis, MO had invested in BENJA and established a fake email address for the founder of the firm to email potential investors.

10. The remainder of this affidavit will lay out the facts supporting each Count in detail. This affidavit is based on FBI interviews, information from other law enforcement officers and regulators, and the review of financial and business records.

**Bank Fraud**

11. CHAPIN began a loan application with Bank B for a $1 million line of credit for BENJA on approximately June 24, 2019. Bank B is FDIC-insured and headquartered in Champaign, IL. A credit analyst at Bank B reviewed the application. As part of the application process, CHAPIN provided financial statements, a balance sheet, incorporation documents, and tax information for BENJA.

12. On July 16, 2019, CHAPIN signed a business loan agreement with Bank B for $1 million with a maturity date of July 15, 2020 and loan number 10865. The listed borrower was "Benja Incorporated" located at 845 Market Street 450A, San Francisco, CA 94103. All of BENJA's assets collateralized the $1 million loan. BENJA's account receivables were viewed by

4

the bank as the bulk of BENJA's assets. The terms of the loan allowed CHAPIN to borrow the lesser of $1 million or 80% of the 90-day aged account receivables.

13.  On July 17, 2019, CHAPIN certified to Bank B that the total 90-day aged account receivables for BENJA was $2,027,290. To support this CHAPIN provided the below aged receivables report to Bank B as part of the loan closing:

## Aged Receivables

**Benja Incorporated
July 2019**

| Receivables | Current | June | May | April | Older | Total |
|---|---|---|---|---|---|---|
| Apple | - | 1,913 | 1,896 | - | - | 3,808 |
| Arc'teryx | - | 1,000 | 1,000 | - | - | 2,000 |
| Backcountry | - | 156,780 | 156,780 | - | - | 313,560 |
| Black Diamond | - | 13,962 | 7,398 | 6,564 | - | 27,923 |
| Columbia | - | 44,841 | 40,066 | - | - | 84,907 |
| Fanatics | - | 290,700 | 268,316 | 249,014 | - | 808,030 |
| Helly Hansen | - | 10,000 | 10,000 | - | - | 20,000 |
| Hunter Boots | - | 995 | 975 | - | - | 1,970 |
| Ibex | - | 1,980 | 1,766 | - | - | 3,746 |
| Lululemon | - | 2,000 | 1,000 | - | - | 3,000 |
| Michael Kors | - | 2,713 | 2,635 | - | - | 5,348 |
| New Balance | - | 72,990 | 33,900 | - | - | 106,890 |
| Nike | - | 226,121 | 149,253 | - | - | 375,375 |
| Patagonia | - | 56,841 | 52,300 | - | - | 109,141 |
| Sperry | - | 7,500 | 6,000 | - | - | 13,500 |
| Under Armour | - | 46,140 | 31,452 | - | - | 77,592 |
| Zappos | - | 37,681 | 32,821 | - | - | 70,502 |
| **Total Receivables** | - | 974,156 | 797,557 | 255,577 | - | 2,027,291 |
| | 0.0% | 48.1% | 39.3% | 12.6% | 0.0% | |

14.  There is probable cause to believe that this aged receivables report is falsified and the majority of the listed receivables are fabricated. Subpoenaed records from Nike, Fanatics, Backcountry, and Patagonia and a review of records from these companies show that none of these four firms ever hired or used BENJA from 2014 to present. This means that CHAPIN completely fabricated approximately $1.6 million of the $2 million listed in the July 2019 account receivables report provided to Bank B. Additionally, I reviewed both BENJA and CHAPIN's accounts at Wells Fargo, Chase Bank, and Bank B from 2018 to the present. I did not see any deposits from any of the companies listed in the receivables report provided to Bank B. I, therefore, believe there is probable cause that almost all of the receivables report is false.

5

15. On July 19, 2019, CHAPIN asked for a $668,000 advance on his line of credit with Bank B. The funds were deposited into BENJA's business account ending 4766 at Bank B. That same day, CHAPIN wired $400,000 from the account ending 4766 to an individual, who based on the investigation so far I believe to be some form of investor ("Investor BB"). On July 22, 2019 and July 23, 2019, CHAPIN wired $65,100 and $15,050 to his personal account at Chase Bank ending 5257. CHAPIN's Chase account ending 5257 had a balance of approximately $1 before these transfers. CHAPIN proceeded to then wire out funds from his Chase account to a personal account at Gemini, a crypto-currency exchange. CHAPIN wired $20,000 on July 22, 2019, $30,000 on July 23, 2019, and $15,000 on July 31, 2019 to his Gemini account. CHAPIN also made a payment of $4,500 on July 22, 2019 to his personal Chase credit card.

16. Around February 22, 2020, CHAPIN asked for the line of credit to be increased to $3 million with Bank B. CHAPIN signed an additional promissory note for the increase to $3 million on February 28, 2020. The line of credit was still secured by BENJA's assets including the account receivables. CHAPIN certified on January 2, 2020 that BENJA's account receivables were $4,000,814, which was large enough to support the borrowing base. Fanatics was listed as owing BENJA $1,256,115, which based on documents from Fanatics was fabricated. On February 28, 2020, CHAPIN requested a $1,250,000.00 advance to BENJA's Bank B account ending 4766. On March 2, 2020, CHAPIN wired $95,042 to his personal Chase account ending 5257. CHAPIN's account balance at Chase was less than $1,000 before this wire. Between March 2, 2020 and March 4, 2020, CHAPIN wired approximately $83,000 from his Chase account to his personal Gemini account and $10,000 to his personal E*Trade account. Also on March 2, 2020, CHAPIN wired $1,000,000 from BENJA's Bank B account ending 4766 to "Taco Corp.", which based on the investigation so far is an entity connected to Investor BB.

6

17. On July 30, 2020, CHAPIN requested that the line of credit be increased to $5 million claiming the funds were for a new business opportunity with Spotify. On August 20, 2020, CHAPIN signed a promissory note with Bank B for the line of credit to be increased to $5,000,000. CHAPIN certified as of July 31, 2020 that BENJA's account receivables were $6,066,280 and again included Nike, Fanatics, Backcountry, and Patagonia as large BENJA customers. On August 20, 2020, CHAPIN asked for a $1,979,296.50 advance on his line of credit with Bank B. The funds were deposited into BENJA's Bank B account ending 4766. On the same day CHAPIN wired $1,941,298.12 to "Creditor M," a company headquartered in Leawood, KS, that provides financial services including freight factoring to the trucking industry.

18. On March 25, 2020, CHAPIN signed a factoring agreement and a notice of assignment with Creditor M that assigned all of BENJA's current and future account receivables and the proceeds thereof to Creditor M. These were the same assets securing the loan with Bank B. Factoring is a form of financing wherein a financial firm, in this case Creditor M, purchases invoices from the client and pays out the client. This helps the client get immediate cash flow and keeps them from needing to wait 0 to 90 days for outstanding invoices to be paid. CHAPIN provided invoices to Creditor M from Backcountry, Columbia Sportswear, Fanatics, New Balance, Nike, and Zappos totaling $5,457,003.28.

19. CHAPIN also provided Creditor M bank statements for December 2019 to February 2020 for BENJA's business account at Bank B ending 4766. After comparing the statements provided to Creditor M with the statements produced by Bank B, I believe CHAPIN substantially altered the bank statements provided to Creditor M. In the February 2020 statement provided to Creditor M, there are deposits into the account from Fanatics for $407,561.40, Backcountry for $345,027.60, and multiple deposits from Patagonia and Nike. None of these deposits are present in the real bank statements provided by Bank B for account ending 4766. I

believe the bank statements were altered to convince Creditor M that BENJA's account receivables were real and that Nike, Patagonia, Fanatics etc., were BENJA customers when they were in fact not. The BENJA account ending at 4766 never received deposits from Nike, Fanatics, Backcountry, and Patagonia.

20. By July 21, 2020, CHAPIN owed Creditor M $3,018,389.80. Based on documents reviewed from Creditor M, I learned that CHAPIN wrote and signed a letter acknowledging he owed this amount. Similar to what was done with funds from Bank B, CHAPIN received funds from Creditor M and then used those funds to repay others or moved funds into his personal Chase account ending 5257 that eventually were sent to his Gemini account. For example, on April 2, 2020, April 6, 2020, and April 10, 2020, Creditor M wired $414,950.54, $1,243,604.49, and $322,963.00 respectively to BENJA's account at Bank B ending 4766. On April 2, 2020 and April 6, 2020, CHAPIN wired a total of $950,000 to Taco Corp (associated with Investor BB). On April 6, 2020 and April 10, 2020, CHAPIN wired a total of $200,000 to his Chase account ending 5257, which had a balance of $1,248.52 before receiving these funds. On April 6, 2020, April 8, 2020, and April 10, 2020, CHAPIN wired $75,000, $8,000, and $70,000 from his Chase account to his personal account at Gemini.

21. From January 2019 to September 2020, CHAPIN transferred approximately $1,181,999.38 to his account at Gemini. As of approximately October 9, 2020, CHAPIN's Gemini account had a balance of $0, meaning no US dollars and no BTC remained. CHAPIN bought and sold BTC and ETH with the US dollars he deposited into his Gemini account. CHAPIN withdrew some of the BTC into multiple deposit addresses. In January 2019, CHAPIN sent approximately 46.2 BTC to the deposit address **18on44MdbFiZFtuaV6LhU7cNXaua3w36HL**. This address is a deposit address for NitrogenSports, a cryptocurrency gambling site. BTC USD average rate for January 2019 was approximately $3,699, meaning CHAPIN sent approximately $170,893.80 to NitrogenSports.

8

22. Creditor M attempted to collect on BENJA's fraudulent invoices from Nike, Fanatics, Backcountry, and Patagonia. Below are some of the summaries that occurred with these companies and Creditor M:

   a. In July 2020, an employee from Creditor M reached out to a senior manager at Fanatics to see if the approximately $1.5 million in invoices CHAPIN claimed BENJA had with Fanatics were real. The employee from Creditor M forwarded an email to the Fanatics senior manager. The email was supposedly between CHAPIN and the Fanatics senior manager on April 3, 2020. In the email, the Fanatics senior manager confirmed a BENJA invoice and wrote "Andrew, Spot on. INV-0515 is confirmed as is the update to the accounting file as requested. Sincerely,". The real Fanatics senior manager told the employee from Creditor M that he did not write the April 3, 2020 email and never signed off on emails with "Sincerely". The Fanatics senior manager also reviewed documentation that Creditor M was provided by CHAPIN of the marketing contract between BENJA and Fanatics. This contract was supposedly signed and approved by the Fanatics senior manager. The real Fanatics senior manager wrote to Creditor M on July 28, 2020, that this contact was, "Totally fraudulent. We don't do 4 year commitments on deals, most of the other people listed on his 'work order' are no longer with the company and I wouldn't have signed off on a CPM deal as that isn't my area. Looks like an attempt at bank fraud/wire fraud to me."

   b. An employee from Creditor M reached out to Backcountry in July 2020 in an attempt to collect the fabricated invoices CHAPIN had assigned to Creditor M. A review of Backcountry's documents show multiple Backcountry employees tried to find BENJA or its former operating name EPHE as a vendor. At one point a director at Backcountry tried to find the invoice numbers provided to Creditor M

9

and could not find them anywhere in the Backcountry system and could not find an "open contract or PR" with BENJA.

c. A Creditor M employee also reached out to Patagonia in an attempt to collect the fabricated invoices CHAPIN had assigned to Creditor M. Ultimately, Patagonia had counsel get involved in the matter to address CHAPIN registering "patagonia-inc.com" and its apparent use to redirect to Patagonia's website, and to address the use of the Patagonia Trademark on BENJA's website at https://www.benja.co/ to falsely claim that Patagonia is one of BENJA's clients. On September 9, 2020, CHAPIN signed and entered into a settlement agreement with Patagonia where he admitted to registering the spoof domain address and to falsely claiming Patagonia as a client. In the signed settlement agreement CHAPIN acknowledged the following statement "Shortly thereafter, as a result of communications to Patagonia from [Creditor M], Patagonia discovered that Chapin fraudulently created and doctored documents, statements of work, invoices, and correspondence, including by using the domain to cloak the false communications in legitimacy, in furtherance of a fraud scheme in order to claim that Patagonia owed approximately $300,000 in fees to Benja."

23. The FBI interviewed the Vice President of Special Assets at Bank B, who said if BENJA's account receivables had been falsified, then it would have been material in Bank B's decision to issue the loan. It also would have been material to Bank B if the credit increase from $3 to $5 million was used to pay off a different creditor (Creditor M) as opposed to the operation of BENJA. Bank B was supposed to be made aware of and consent to any new business debt. The Vice President of Special Assets made it clear that CHAPIN was the main point of contact at BENJA. While other employees at BENJA were sometimes copied on the emails, CHAPIN was

the one asking for the line of credit to be increased, providing information to the bank, and working with the bank's relationship manager.

24. Over the course of seeking a line of credit with Bank B and then seeking for that line to be increased, CHAPIN provided materially false information to Bank B. This included fabricating millions in revenue/account receivables from companies BENJA never did business with. These misrepresentations to Bank B are in violation of 18 U.S.C. § 1344 and represent Count One of this complaint.

25. On approximately October 15, 2020, CHAPIN filed for Chapter 11 Bankruptcy for BENJA with the United States Bankruptcy Court for the Northern District of California. As part of the proceedings, CHAPIN submitted a declaration in support of the opposition to the motion for a Chapter 11 trustee to be appointed filed by Bank B. I believe CHAPIN made material false statements in his declaration. CHAPIN declared in part "The business of Benja is to facilitate, directly and indirectly, e-commerce sales for direct-to-consumer brands and retailers. I personally reviewed the accounting records reflecting to Benja's accounts receivable, and believe these records to be complete and accurate. Benja's accounts receivable are $6,361,260.61 as of October 14, 2020, all due within 90 days. I have poured my heart and soul into Benja, taking only a below-market salary of $52,000 in 2019 and 2020, to ensure every dollar Benja makes goes back into helping Benja grow. The company has been operating for five years now, and has achieved millions of dollars in sales for its brand partners. Benja generated more than $13 million in revenue in 2019". CHAPIN continues to claim, even to the Court, that the fabricated revenue from Nike, Fanatics, Backcountry, and Patagonia is real. Also, CHAPIN moved hundreds of thousands of dollars to his personal accounts for credit card payments and to send to his Gemini account. This is in direct opposition to his claim he only took a $52,000 salary.

11

**Wire Fraud in connection with fundraising for Benja**

26. In addition to soliciting funds from financial institutions, CHAPIN solicited funds from venture capital firms and individuals. In 2020, CHAPIN raised $1 million from VC Firm E, a venture capital firm in New York. VC Firm E was started approximately two years ago and focuses on investing $300,000 to $3 million in startup companies. VC Firm E is different from other venture firms in that they request a share of a startup company's revenue as opposed to shares in the company. On March 23, 2020, CHAPIN reached out to VC Firm E via their website contact form. CHAPIN sent the below message:

> Benja delivers shoppable media to enable commerce where people live and spend time online. We offer commerce experiences that enable checkout on the page and in the feeds that people love - on GQ.com, in Nextdoor and Flipboard, in inbox, and elsewhere.
>
> Our focus on low-friction commerce delivers the rare triple win: publishers retain traffic (because ads aren't pulling people away), brands sell merchandise (average 19x return on spend), and the end-user has a more pleasant commerce experience.
>
> We're four years old, profitable, and did more than $250m in gross merchandise volume last year. We're looking for the right partner to help us step on the gas. From what I've read, our styles match much better than a traditional VC. Would love to chat.

27. Shortly after CHAPIN reached out, VC Firm E began due diligence on BENJA and considering them for investment. On March 23, 2020, CHAPIN emailed Manager MS at VC Firm E a link to a virtual data room with information on BENJA including financials. On March 28, 2020, CHAPIN emailed Manager MS four Microsoft Excel sheets. Each Excel sheet was BENJA's income broken up by customers/contracts for 2017, 2018, 2019, and 2020. The 2019 excel sheet listed 21 customers including Nike, Fanatics, Backcountry, and Patagonia and the income totaled $13,471,715.59. CHAPIN listed that BENJA had earned $3,869,223.01 in 2019 from Fanatics, $2,495,755.58 from Backcountry, and $764,141.16 from Patagonia. As discussed above there is probable cause to believe this revenue is fabricated because BENJA did not have a business relationship with the above-mentioned companies.

28. The March 28, 2020 email containing the Excel sheets was sent from CHAPIN's BENJA email address andrew@benja.com. CHAPIN resided and operated BENJA out of San

12

Francisco, CA. This email was sent in connection with CHAPIN executing a scheme to defraud VC Firm E and obtain a $1 million dollar investment from VC Firm E, which is discussed below. Since this email traveled from the Northern District of California to New York where Manager MS is located and works from, this wire constitutes the interstate wire for Count 2 of this Complaint.

29. VC Firm E asked CHAPIN to answer a due diligence questionnaire and began to work on their investment memorandum in March and April 2020. VC Firm E sent CHAPIN a term sheet for a $1 million investment with a 1.5% revenue share agreement. As part of VC Firm E's due diligence, they required reference calls with some of BENJA's customers. On approximately April 23, 2020, Manager MS sat in on CHAPIN's "check-in" calls with Nike and Fanatics. Manager MS asked CHAPIN for the contact numbers for the Nike and Fanatic employees, so VC Firm E could directly speak to them without CHAPIN.

   a. The Nike contact CHAPIN provided VC Firm E was Adam Spangler with phone number 808-250-4825. Manager MS spoke to who he thought was Adam Spangler. On the call, Spangler told Manager MS that he would increase the amount of business Nike did with BENJA if he could and overall gave a positive reference. The FBI reached out to Nike and interviewed the real Adam Spangler, Senior Director of Sustainability Marketing. Spangler had never heard of BENJA or CHAPIN, never used the phone number 808-250-4825, and never spoke on the phone to Manager MS. Based on database records, 808-250-4825 is a wireless number registered to an individual determined to have been an employee of Benja. I believe that CHAPIN had someone pose as Adam Spangler so that VC Firm E would not find out that BENJA did not have a business relationship with Nike.

13

  b. The Fanatics contact CHAPIN provided VC Firm E was Wade Tonkin with phone number 904-385-0634. Manager MS spoke to who he thought was Wade Tonkin and Tonkin gave BENJA a positive reference. Wade Tonkin is the Fanatics senior manager discussed above that Creditor M emailed with at Fanatics. The real Wade Tonkin at Fanatics is the one who wrote to Creditor M "Totally fraudulent. We don't do 4 year commitments on deals, most of the other people listed on his "work order" are no longer with the company and I wouldn't have signed off on a CPM deal as that isn't my area. Looks like an attempt at bank fraud/wire fraud to me." Based on records from Google, 904-385-0634 is a Google Voice number. The number was used by subscriber "Fade UrBummAss" starting on April 23, 2020. Again, I believe that CHAPIN had someone pose as Wade Tonkin to ensure VC Firm E did not find out that BENJA did not have a business relationship with Fanatics.

30. As part of the due diligence process, CHAPIN also provided VC Firm E bank statements for BENJA's Bank B account ending 4766. CHAPIN provided monthly statements for June 2019 to March 2020. Based on the statements I reviewed from Bank B, I believe CHAPIN altered all of the monthly bank statements provided to VC Firm E. In fact, the February 2020 bank statement is the same false bank statement provided to Creditor M. The bank statements provided to VC Firm E were altered to show incoming payments from the 21 customers listed on the Excel income statements CHAPIN sent VC Firm E, when in fact BENJA's Bank B account ending 4766 never received income from any of the 21 customers.

31. On June 5, 2020, CHAPIN signed a revenue participation purchase agreement with VC Firm E. As part of this agreement, VC Firm E invested $1 million in BENJA for 1.5% of BENJA's revenue. All of BENJA's assets including BENJA's account receivables collateralized the agreement. Again, these were the same assets used to secure loans from Bank

14

B and Creditor M. On June 5, 2020, VC Firm E wired $1,000,000 from its Wells Fargo account to BENJA's Bank B account ending 4766. The VC Firm E's account was addressed in Huntington, New York. On June 5, 2020, the same day the $1,000,000 was wired to BENJA's Bank B account ending 4766, CHAPIN wired out $212,473.85, $324,805.50, and $462,183.93 to Creditor M.

    32.    On October 2, 2020 and October 9, 2020, the FBI recorded, with Manager MS's consent, two calls between Manager MS and CHAPIN. Below is a summary parts of these calls:

        a.  On the October 2, 2020 call, Manager MS confronted CHAPIN that Manager MS believed the bank statements and financial statements CHAPIN provided were false. Manager MS asked CHAPIN if he had received a draft civil complaint that VC Firm E was thinking of filing and asked CHAPIN if he could pay back VC Firm E. CHAPIN thanked Manager MS for sharing his points and did not want to comment on the allegations Manager MS laid out. Manager MS asked CHAPIN, what happened with VC Firm E's $1 million and CHAPIN replied "We used the capital to operate the company full stop um there is uh nothing else to it". Manager MS and CHAPIN then discussed when CHAPIN could pay back VC Firm E.

        b.  On the October 9, 2020, CHAPIN asked Manager MS if VC Firm E had filed a civil suit against CHAPIN yet. CHAPIN claimed he engaged corporate counsel to figure out BENJA's correct capitalization table and to confirm CHAPIN is the majority shareholder. CHAPIN then discussed making a "good faith payment" to VC Firm E soon and how he got involved with CREDITOR M, the trucking financial services firm. CHAPIN claimed he was using a consulting firm to prepare GAAP financials for BENJA. CHAPIN also claimed he had two term

15

sheets (one for $5 million and one for $10 million) from two different organizations that he was considering to use to help pay back investors.

33. For the reasons set forth above, I believe CHAPIN made materially false and fraudulent pretenses, representations, and promises to VC Firm E and concealed material facts from VC Firm E in order to secure an investment in VC Firm E, in violation of 18 U.S.C. § 1343.

**Securities Fraud in connection with fundraising for Benja**

34. In addition to seeking funds from VC Firm E, CHAPIN secured investments from individual investors and sold shares in BENJA. One individual investor, Investor RH, invested $100,000 in BENJA in December 2018 and was issued 1,278 shares of common stock in BENJA. In approximately November 2018, Investor RH was introduced to CHAPIN via his friend, who was also an investor in BENJA. Investor RH was interested in BENJA because the return of investment presented by CHAPIN was high. On November 19, 2018, CHAPIN emailed Investor RH BENJA's income statement for the period ending Q3 2018. The listed revenue for the year so far for 2018 was $4,353,172.

35. In approximately November 2018, CHAPIN informed Investor RH that an institutional venture capital firm based in St. Louis, MO, VC Firm CC, was going to make a $1.5 million investment in BENJA. As part of his investment due diligence, Investor RH asked to speak to Manager CH at VC Firm CC. On approximately December 1, 2018, Investor RH had a conference call with Manager CH and CHAPIN. Investor RH asked if VC Firm CC had received audited financials and conducted reference calls. Manager CH told Investor RH that VC Firm CC had used a third party firm to verify BENJA's financials and had done customer reference calls, which were positive.

36. Investor RH received a shareholder's agreement from CHAPIN. Investor RH had questions about the agreement and wanted to speak with Manager CH again. On December 1,

16

2018, Investor RH asked CHAPIN for Manager CH's contact info. CHAPIN gave Investor RH the email address cliffordholekamp@gmail.com for Manager CH. Investor RH emailed that address on December 5, 2018, asking for a follow-up call. On December 7, 2018, the email CHAPIN claimed belonged to Manager CH responded claiming he was overseas and would be back in a few days. Investor RH then asked who he believed was Manager CH a series of questions over email about the shareholder's agreement and the email account responded to the questions. Investor RH's questions were answered to his satisfaction and so he decided to continue and invest in BENJA.

37. On approximately December 12, 2018, CHAPIN and Investor RH signed a shareholder's agreement in which Investor RH purchased 1,278 shares of common stock in BENJA for $100,000. Investor RH wired $100,000 to CHAPIN's checking account at Wells Fargo ending 8325 on December 14, 2018. CHAPIN's balance in this account before the wire was $10.58. After receiving the wire, CHAPIN transferred $90,757 to his other Wells Fargo account ending 7177. From the account ending 7177, CHAPIN made a $9,493.33 American Express payment on December 14, 2018 and transferred $70,000 to his Gemini account on December 17, 2018.

38. There is probable cause to believe that Investor RH did not speak to the real Manager CH and that the email address cliffordholekamp@gmail.com was registered by CHAPIN. The FBI interviewed the real Manager CH, who is co-founder of VC Firm CC. In 2018, CHAPIN had pitched BENJA to Manager CH, but VC Firm CC ultimately passed on investing in BENJA. Manager CH never signed a shareholder's agreement with BENJA and never was on BENJA's board of directors. Manager CH had never used the email address cliffordholekamp@gmail.com. Manager CH also did not recall ever talking to Investor RH about investing in BENJA in 2018.

17

39. Based on information from Google, cliffordholekamp@gmail.com was created on December 3, 2018, two days after Investor RH requested Manager CH's contact information. The recovery SMS for the email address was 415-326-4167. Based on database records 415-326-4167 is a VOIP number registered to Bandwidth. I believe this number is the main contact number for BENJA. In a review of Manager MS's emails with CHAPIN, CHAPIN asks Manager MS to call him at 415-326-4167. CHAPIN also lists 415-326-4167 as a phone number on his Gemini account. I believe CHAPIN created the Gmail account for Manager CH and lied to Investor RH about VC Firm CC investing in order to secure Investor RH's investment. I believe CHAPIN provided material false information in connection to the sale of securities to Investor RH and this conduct represents Count 3 of the complaint.

## CONCLUSION

40. Based on the foregoing, it is my opinion that there is probable cause to believe that Andrew CHAPIN committed Bank Fraud, in violation of 18 U.S.C. § 1344, Wire Fraud, in violation of 18 U.S.C. § 1343, and Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5. Accordingly, I respectfully request that a warrant for the arrest of CHAPIN be issued.

## REQUEST FOR SEALING

41. I respectfully request that the Court issue an order sealing, until further order of the Court, the Criminal Complaint and all papers submitted in support of this Criminal Complaint, including this affidavit. I believe that sealing is necessary in order to effectuate the orderly arrest of CHAPIN and in order to guard against flight and destruction of evidence.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

_____/s/_____
ALEXANDRA E. BRYANT
Special Agent
Federal Bureau of Investigation


Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this __20th__ day of November 2020

_____
HON. JACQUELINE SCOTT CORLEY
United States Magistrate Judge

19