

```
1  ERIN E. SCHNEIDER (Cal. Bar No. 216114)
     schneidere@sec.gov
2  MONIQUE C. WINKLER (Cal. Bar No. 213031)
     winklerm@sec.gov
3  TRACY L. DAVIS (Cal. Bar No. 184129)
     davistl@sec.gov
4  SUSAN F. LAMARCA (Cal. Bar No. 215231)
     lamarcas@sec.gov
5  MARC D. KATZ (Cal. Bar No. 189534)
     katzma@sec.gov
6  MATTHEW G. MEYERHOFER (Cal. Bar No. 268559)
     meyerhoferm@sec.gov
7
   Attorneys for Plaintiff
8  SECURITIES AND EXCHANGE COMMISSION
   44 Montgomery Street, Suite 2800
9  San Francisco, CA 94104
   (415) 705-2500 (Telephone)
10 (415) 705-2501 (Facsimile)
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. |
| Plaintiff, | |
| vs. | **COMPLAINT** |
| BENJA INCORPORATED and ANDREW J. CHAPIN, | |
| Defendants. | |

Plaintiff Securities and Exchange Commission (the "SEC") alleges:

**SUMMARY OF THE ACTION**

1. During 2018 and 2020, Benja Incorporated ("Benja") and its Chief Executive Officer, Defendant Andrew J. Chapin raised millions of dollars from investors, and banks, by making false representations about Benja's business. Benja, a San Francisco-based e-commerce startup, purports to place online advertisements for major clothing brands to sell excess

EXHIBIT B

merchandise at a discount. In particular, Chapin and Benja falsely claimed to prospective investors that Benja was profitable and had generated millions of dollars in revenue from customers that supposedly included Nike, Patagonia and Fanatics.

2. In reality, Benja did not have contracts with, or revenue from, the major brands it claimed were its customers. Chapin maintained the illusion of Benja's commercial success through a scheme that included using falsified documents in the offering of securities, forging contracts with purported customers, doctoring bank statements, and impersonating customers in calls with at least one investor.

3. The SEC seeks an order from the Court enjoining Defendants Benja and Chapin from future violations of the antifraud provisions of the securities laws; requiring Defendants to each pay a civil monetary penalty, and to disgorge their respective ill-gotten gains or unjust enrichment with prejudgment interest thereon; prohibiting Chapin from acting as an officer or director of any public company; and providing for other appropriate relief.

**JURISDICTION AND VENUE**

4. The SEC brings this action pursuant to Sections 20(b) and 20(d) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77t(b) and 77t(d)] and Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78u(d) and 78u(e)].

5. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, [15 U.S.C. § 77v(a)], and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

6. Defendants, directly or indirectly, made use of the means and instrumentalities of interstate commerce or of the mails in connection with the acts, transactions, practices, and courses of business alleged in this complaint.

7. Venue is proper in this District pursuant to Section 22(a) of the Securities Act, [15 U.S.C. § 77v(a)], and Section 27(a) of the Exchange Act [15 U.S.C. § 78aa(a)]. Acts, transactions, practices, and courses of business that form the basis for the violations alleged in this complaint occurred in the Northern District of California.

8. Under Civil Local Rule 3-2(d), this civil action should be assigned to the San Francisco Division, because a substantial part of the events or omissions which give rise to the

claims alleged herein occurred in San Francisco County; in addition, Defendant Benja's principal place of business is in San Francisco and Defendant Chapin resides in San Francisco.

### DEFENDANTS

9. Defendant Andrew J. Chapin, age 31, resides in San Francisco, California. Chapin is Benja's founder and CEO, and has controlled Benja from its formation at least until its bankruptcy filing.

10. Defendant Benja Incorporated is a Delaware Corporation with is principal place of business in San Francisco, California. Benja was founded by Chapin in June 2018, as the successor to another company, EPHE Corp., that Chapin had founded by 2015. Chapin operated EPHE Corp. under the "Benja" name from at least December 2016 until the incorporation of Benja in June 2018. From at least June 2018 through September 2020, Benja purported to be an e-commerce startup that places online advertisements for major clothing brands, enabling those brands to sell excess merchandise at a discount. On or about October 15, 2020, Benja filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the Northern District of California.

### FACTUAL ALLEGATIONS

**A.     Chapin Deceives Investors to Obtain Early Benja Investments**

11. In 2017, Chapin operated Benja, then known as EPHE Corp., as a start-up company. In or around early 2017, Benja obtained operating funds through its acceptance into a New York-based "start-up accelerator," which provides funding and business guidance to small, new business ventures.

12. Through Benja's participation in the accelerator, in or around November 2017 Chapin was introduced to a venture capital investor from San Francisco. During the spring of 2018, Chapin and the venture capital investor discussed the potential for an investment in Benja.

13. To entice the San Francisco venture capital investor to make an investment, Chapin made claims to the investor about Benja's business that were not true. In particular, Chapin told the investor that Benja was a profitable company, whose customers included famous brands, including Fanatics, Backcountry.com, and Patagonia.

14. In or around June 2018, Chapin provided to the San Francisco venture capital investor a slide deck, which represented that Nike, Patagonia, and Backcountry.com were all Benja customers of Benja's "merchandise ad network," which purportedly sold advertisement impressions across web, mobile, and social channels. The slide deck, which described Benja as a "group of scrappy hustlers," further claimed that up to that point in 2018, Nike had spent $275,000 with Benja, Patagonia had spent $161,500 with Benja, and Backcountry.com had spent $170,000 with Benja.

15. The representations contained in the slide deck, and made verbally by Chapin to the venture capital investor, were false. Neither Fanatics, Backcountry, Patagonia, or Nike had signed agreements with Benja, nor had any of these companies spent any money with Benja as Defendants had claimed.

16. As the San Francisco venture capital investor and Chapin continued to discuss a potential investment, the investor told Chapin that it would be important to his decision-making to hear from another institutional investor that had also committed to investing in Benja. The investor wanted assurances that another sophisticated investor had vetted Benja as an investment.

17. Soon afterwards, Chapin told the San Francisco venture capital investor that another institutional investor had decided to make a $1 million investment in Benja. In particular, Chapin identified the supposed institutional investor, which was another venture capital firm located in Saint Louis, Missouri, which manages funds that make "early-stage" investments in startup companies.

18. The San Francisco venture capital investor requested to speak with someone from the Saint Louis venture capital firm about their expected investment in Benja. Accordingly, in or around October 23, 2018, Chapin arranged a call between the San Francisco venture capital investor and an individual whom Chapin introduced by name, and who was supposedly the founder and general partner of the Saint Louis venture capital firm. After this call, on or about October 26, 2018, the San Francisco venture capital investor purchased 1,278 shares of Benja common stock for $100,000. The investor wired his $100,000 investment into a bank account owned by Chapin.

COMPLAINT -4- CASE NO. _____

19. In reality, the Saint Louis venture capital firm did not invest in Benja. In addition, in or around September 2020, the San Francisco venture capital investor directly contacted the founder and general partner of the Saint Louis venture capital firm, whom he had supposedly spoken with in 2018 in the call arranged by Chapin. The founder and general partner of the Saint Louis firm denied that he had ever taken part in the call or invested in Benja.

20. In early November 2018, the San Francisco venture capital investor introduced an acquaintance of his to Chapin, for the purpose of considering an investment in Benja. On or around November 9, 2018, Chapin spoke with the acquaintance and described Benja's purported business to him. During the discussion, Chapin falsely represented to the acquaintance that Benja's customers included Nike and Fanatics.

21. The acquaintance of the San Francisco venture capital investor also told Chapin that the participation of an institutional investor was important to his investment decision. The acquaintance also wanted assurances that another sophisticated investor had vetted Benja as an investment. Chapin represented to the acquaintance that the same Saint Louis venture capital firm that he had described to the San Francisco investor, and which Chapin identified by name, had recently invested in Benja. At the request of the acquaintance, Chapin arranged a similar call between the acquaintance and a person purportedly associated with the Saint Louis venture capital firm.

22. During the call, which occurred on or around December 1, 2018, an individual that Chapin introduced by name, who was purportedly the founder and general partner of the Saint Louis venture capital firm, described the work the Saint Louis firm had supposedly performed to investigate Benja to determine whether to make an investment. The individual further confirmed to the acquaintance that the Saint Louis firm had invested in Benja. In reality, the Saint Louis venture capital firm did not invest in Benja.

23. On or about December 14, 2018, the acquaintance of the San Francisco venture capital investor purchased 1,278 shares of Benja common stock for $100,000. The acquaintance wired his $100,000 investment into a bank account owned by Chapin.

24. In addition, the San Francisco venture capital investor introduced Chapin to one or

more other persons whom he knew, who also made investments in Benja.

**B.  Chapin Fraudulently Solicits Additional Investments in Benja During 2020**

25.  In or around March 2020, Chapin contacted another venture capital firm, located in New York, which funds startup companies that have recurring revenues. Chapin described Benja's supposed business to the principal of the New York venture capital firm.

26.  The principal of the New York venture capital firm sought from Chapin information regarding Benja to allow him to determine whether his firm would make an investment in Benja. In response, Chapin gave the principal of the New York firm multiple documents that purported to show revenue that Benja received from well-known retail brands, including Fanatics, Nike, Patagonia, Zappos, and other companies. According to the documents, Benja was then generating approximately $2 million per month from these and other purported Benja customers. In reality, the revenue reflected in the documents from Fanatics, Nike, Patagonia, Zappos and others was falsified.

27.  Chapin also provided to the principal of the New York venture capital firm forged agreements between Benja and these companies purporting to show that the companies agreed to purchase advertising space on Benja's commerce network, which purportedly included mobile applications, online publishers, web advertisements, and social media networks. In addition, Chapin provided to the principal Benja's bank statements, which had been doctored to falsely show payments from these companies.

28.  Chapin also invited the principal of the New York venture capital firm to participate in two phone calls, one purportedly with a representative of Nike, and the other purportedly with a representative of Fanatics. Chapin introduced the principal to the two purported representatives by name. However, in reality, neither Nike nor Fanatics (nor any persons employed by them) participated in the calls; instead, Chapin arranged for an associate of his to impersonate the representatives of the companies.

29.  Chapin further told the principal of the New York venture capital firm that Benja would use the proceeds from the New York firm's investment to continue developing Benja's technology and to purchase advertising space.

30. On the basis of these fraudulent statements and deceptions, the New York venture capital firm entered into an investment agreement with Benja, and it advanced $1 million to Benja on or about June 4, 2020. The agreement provided, among other things, that the New York firm would be entitled to share in Benja's revenue, and it included a grant to the New York firm of warrants to purchase Benja's common stock.

31. Contrary to the representations Chapin made to the principal of the New York firm about the uses of the proceeds, rather than using the money to develop Benja's technology or purchase advertising, Benja immediately used the money to pay back, in part, a particular Benja creditor.

32. The creditor who was partially repaid in or around June 2020 with the proceeds from the investment by the New York venture capital firm was a financing company from whom Benja had obtained approximately $4.5 million in or around April 2020 and May 2020. The financing company had advanced Benja the funds under an arrangement in which Benja purported to sell certain of its accounts receivables. To obtain the financing, Chapin sent the financing company fake invoices that falsely represented that Benja had outstanding receivables, incurred between February 2020 and May 2020, from companies with well-known brands, including Patagonia, Nike, Fanatics, and Backcountry.com. In reality, those receivables did not exist. By July 2020, the financing company learned that the purported receivables did not exist and demanded repayment from Benja.

33. After Benja received the $4.5 million from the financing company, Chapin wired the money out of Benja's account, and sent a portion of it to Chapin's own bank account and to pay off credit card expenses.

34. In May 2020, Chapin again began discussing a possible additional investment in Benja with the original San Francisco venture capital investor. In furtherance of those negotiations, in or around August 2020, Chapin sent the investor a memorandum regarding a planned capital raise that again falsely represented that Nike was one of Benja's customers.

35. The same memorandum that Chapin provided to the San Francisco venture capital investor also stated, falsely, that Benja had entered into an agreement with Spotify to place

1  advertisements in Spotify podcasts and that "Benja [would] be the exclusive e-commerce partner
2  of Spotify North America for a period of three years." In reality, Spotify never had any such
3  agreement with Benja. Chapin told the investor that the proceeds from the investment would be
4  used to purchase advertising space. Contrary to those representations, as soon as the investment
5  was made, Benja used these funds to re-pay, in part, the financing company.

6    36.  Based on these false representations and other representations about the purported
7  success of Benja's business, on or about September 2, 2020, the San Francisco venture capital
8  investor wired $50,000 to Benja. In return, the investor obtained from Benja a security called a
9  "Simple Agreement for Future Equity." That security provided that the investor would, subject to
10  certain conditions, receive shares of Benja common stock in the future.

11    37.  In August 2020, Chapin also began to discuss with the New York-based accelerator
12  a potential additional investment in Benja. Chapin sent the New York firm the same written
13  representations he had sent to the San Francisco venture capital investor, which included the false
14  representations about Benja's purported relationships with Nike and with the well-known music
15  streaming service, Spotify. Chapin informed a person associated with the New York-based
16  accelerator that the money invested would be used to hire new software developers and to
17  purchase advertising space with Spotify and the well-known video platform, TikTok. Contrary to
18  those representations, as soon as the investment was made, Benja used these funds to re-pay, in
19  part, the financing company.

20    38.  On or about September 2, 2020, the New York-based accelerator made a $500,000
21  investment in Benja, and in exchange obtained a Simple Agreement for Future Equity.

22    39.  In making the above-described false and misleading statements to persons to solicit
23  investments, and in engaging in the above-described deceptive conduct and deceptive course of
24  business, Chapin and Benja acted knowingly or recklessly. For instance, when Chapin made the
25  above-described series of statements about the existence of Benja's purported other investors,
26  customers, revenue and receivables, supposedly related to well-known brands and businesses, he
27  did so on behalf of Benja and he knew, or was reckless in not knowing, that his statements were
28  false and misleading.

40. Chapin engaged in knowing or reckless falsehoods and deceptions on behalf of Benja, and he acted on behalf of Benja in his intent to deceive investors.

## FIRST CLAIM FOR RELIEF

*Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder*

41. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 40.

42. By engaging in the conduct described above, Defendants Benja and Chapin each, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or the mails, with scienter:

 (a) Employed devices, schemes, or artifices to defraud;

 (b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and

 (c) Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons, including purchasers and sellers of securities.

43. By reason of the foregoing, Defendants Benja and Chapin violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

*Violations of Sections 17(a)(1), (2), and (3) of the Securities Act*

44. The SEC re-alleges and incorporates by reference Paragraph Nos. 1 through 40.

45. By engaging in the conduct described above, Defendants Benja and Chapin, directly or indirectly, in the offer or sale of securities, by use of the means or instruments of transportation or communication in interstate commerce or by use of the mails:

 (a) With scienter, employed devices, schemes, or artifices to defraud;

 (b) Obtained money or property by means of untrue statements of material fact or by omitting to state a material fact necessary in order to make the

statements made, in light of the circumstances under which they were made, not misleading; and

(c) Engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon purchasers.

46. By reason of the foregoing, Defendants Benja and Chapin violated, and unless restrained and enjoined will continue to violate, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**PRAYER FOR RELIEF**

WHEREFORE, the SEC respectfully requests that this Court:

**I.**

Permanently enjoin Defendants Benja and Chapin from directly or indirectly violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

**II.**

Issue an order requiring Defendants Benja and Chapin to disgorge the ill-gotten gains or unjust enrichment each of them obtained or derived from such violations, and to pay a civil monetary penalty pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], and Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**III.**

Prohibit Defendant Chapin from serving as an officer or director of any entity having a class of securities registered with the SEC pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78*l*] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)], pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)].

**IV.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees

that may be entered, or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## V.

Grant such other and further relief as this Court may determine to be just and necessary.

Dated: November 23, 2020    Respectfully submitted,

              /s/ Matthew G. Meyerhofer
              MATTHEW G. MEYERHOFER
              Attorney for Plaintiff
              SECURITIES AND EXCHANGE COMMISSION